**1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF FLORIDA
 3                    MIAMI DIVISION
 4    _____
                                    )
 5    FARHAD AZIMA,                 )
                                    )
 6                    Petitioner,   )
                                    )
 7    vs.                           ) Case No.:
                                    ) 1:22-MC-20707
 8    INSIGHT ANALYSIS AND RESEARCH LLC )
      AND SDC-GADOT LLC,            )
 9                                  )
                      Respondents.  )
10    _____)
11
12
13
14          Videotaped 30(b)(6) Deposition of
15                    SDC-GADOT LLC
16    by and through its Corporate Representative
17                     AMIT FORLIT
18            Wednesday, July 20, 2022
19           11:09 a.m. Israel Daylight Time
20
21
22
23
24
25    Reported by:  BRENDA MATZOV, CSR NO. 9243
```

**2**

```
 1          Videoconference 30(b)(6) deposition
 2    of SDC-GADOT LLC, by and through its Corporate
 3    Representative, AMIT FORLIT, taken in the
 4    above-entitled cause pending in the United
 5    States District Court, for the Southern
 6    District of Florida, Miami Division, before
 7    BRENDA MATZOV, CSR NO. 9243, at the David
 8    Intercontinental Hotel, Tel Aviv, Israel,
 9    and simultaneously in the Zoom participants'
10    remote locations, on Wednesday, the 20th
11    day of July, 2022, at 11:09 a.m. Israel
12    Daylight Time.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1    APPEARANCES:
 2    FOR PETITIONER:
 3          BARET LAW GROUP
            By:  ELAN I. BARET, ESQ.
 4          3999 Sheridan Street
            Suite 200
 5          Hollywood, Florida 33021
            (954) 486-9966
 6          elan@baretlawgroup.com
 7
 8    FOR RESPONDENTS:
 9          MILLER & CHEVALIER CHARTERED
            By:  KIRBY D. BEHRE, ESQ.
10               IAN A. HERBERT, ESQ.
            900 16th Street N.W.
11          Black Lives Matter Plaza
            Washington, D.C. 20006
12          (202) 626-5800
            kbehre@milchev.com
13          iherbert@milchev.com
14          BURLINGTONS LEGAL, LLP
15          By:  DOMINIC HOLDEN
            5 Stratford Place
16          London W1C 1AX
            +44 20 7529 5420
17          dominic.holden@burlingtons.legal
18
19
20
21
22
23
24
25
```

**4**

```
 1    APPEARANCES (Continued):
 2    ALSO PRESENT (in Israel):
 3          MITCHELL COOPERSMITH, Videographer
 4          HAYA SHAVIT-KEDAR, Hebrew Interpreter
 5          RUCHIE AVITAL, Hebrew Interpreter
 6
 7    ALSO PRESENT (remotely via Zoom):
 8          LESLEY SEMONES, Miller & Chevalier
 9          FREDERICK WILMOT-SMITH, Burlingtons Legal
10          LUKE HACKETT, Burlingtons Legal
11          FARHAD AZIMA
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
 1                    I N D E X
 2   WITNESS
 3   Amit Forlit
 4   (Witness Location:  Tel Aviv, Israel)
 5
 6   EXAMINATION                              PAGE
 7   By Mr. Behre                               11
 8
 9                  E X H I B I T S
10   NUMBER       DESCRIPTION              MARKED
11   Exhibit 1    Document Entitled
12                "Subpoena to Produce
                  Documents, Information,
13                or Objects or to Permit
                  Inspection of Premises in
14                a Civil Action," Service
                  Date March 23, 2022
15                (No Bates Number)             45
16   Exhibit 2    Document Entitled
                  "Electronic Articles of
17                Organization for Florida
                  Limited Liability Company,"
18                for SDC-Gadot LLC, Date
                  Filed October 18, 2017,
19                and Related Documents
                  (No Bates Number)             61
20   Exhibit 3    Two Affidavits of Amit
21                Forlit, Dated May 12, 2022,
                  and June 1, 2022
22                (No Bates Number)             73
23   Exhibit 4    Multiple Citibank Bank
                  Statements for SDC-Gadot
24                LLC, Multiple Dates
                  (SDC-GADOT-CITI 00044 to 00147) 114
25
```

---

7

```
 1        Q U E S T I O N S   I N S T R U C T E D
 2              N O T   T O   A N S W E R
 3              PAGE     LINE
 4              179      10
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

6

```
 1                  E X H I B I T S
 2   NUMBER       DESCRIPTION              MARKED
 3   Exhibit 5    Document Entitled "Letter
 4                of Engagement," Dated
                  March 1, 2016
 5                (No Bates Number)            162
 6   Exhibit 6    Multiple Invoices from
                  SDC-Gadot LLC to Page
 7                Group ME Ltd. and Page
                  Risk Management DMCC,
 8                Multiple Dates
                  (No Bates Number)            165
 9   Exhibit 7    Multiple Invoices from
10                Gadot Information Services
                  to PPS Ltd., Multiple Dates
11                (No Bates Number)            172
12   Exhibit 8    WhatsApp Messages between
                  Stuart Page and Amit Forlit
13                                             175
14   Exhibit 9    E-mail from Mario Ros
                  to "amit@gadot.co" Dated
15                September 7, 2019, Subject:
                  "Citibank"
16                (SDC-GADOT-CITI 00155)       181
17   Exhibit 10   Document Entitled "Project
                  Beech Report - Farhad Azima,"
18                Dated August 4, 2015
                  (No Bates Number)            183
19   Exhibit 11   Document Entitled "Project
                  Beech - Comprehensive Action
20                Plan," Dated January 26,
                  2016
21                (No Bates Number)            193
22
23
24
25
```

---

8

```
 1              WEDNESDAY, JULY 20, 2022
 2             11:09 A.M. ISRAEL DAYLIGHT TIME
 3
 4        THE VIDEOGRAPHER:  Today's date
 5   is July 20th, 2022.  The time on the video
 6   monitor is 11:09 a.m.
 7        This is the videotaped deposition
 8   of Amit Forlit, in the matter of Farhad
 9   Azima versus Insight Analysis and Research
10   LLC and SDC-Gadot, being heard in the United
11   States District Court, Southern District
12   of Florida, Case No. 1:22-MC-20707.
13        This videotaped deposition is
14   taking place in Tel Aviv, Israel, as well
15   as parties are attending remotely.
16        Would the counsel present in
17   Tel Aviv please voice-identify themselves
18   and whom they represent.
19        MR. BEHRE:  Good morning, Kirby
20   Behre, on behalf of Farhad Azima.
21        MR. BARET:  Morning.  Elan Baret,
22   on behalf of SDC-Gadot and Insight.
23        MR. HERBERT:  Ian Herbert, on
24   behalf of Farhad Azima.
25        THE COURT REPORTER:  Dominic?
```

```
 1          MR. HOLDEN:  Dominic Holden, on
 2  behalf of Farhad Azima.
 3          THE VIDEOGRAPHER:  Something is
 4  making noise.  I don't --
 5          THE COURT REPORTER:  Let's go off
 6  the record for a second.
 7          THE VIDEOGRAPHER:  Can we go --
 8  off the record at 11:11.
 9          (Recess from 11:11 a.m. to 11:15 a.m.
10  Israel Daylight Time.)
11          THE VIDEOGRAPHER:  Back on record
12  at 11:15.
13
14                HAYA SHAVIT-KEDAR
15                     and
16                RUCHIE AVITAL,
17          the interpreters, were duly affirmed
18          to translate from English to Hebrew
19          and from Hebrew to English.
20
21          (The following proceedings were
22          conducted through the interpreters,
23          unless otherwise indicated, and
24          excluding colloquy.)
25  //
```

```
 1          AMIT FORLIT,
 2          called as a witness, was examined
 3          and testified under penalty of
 4          perjury as hereinafter set forth.
 5
 6                EXAMINATION
 7  BY MR. BEHRE:
 8      Q.  Good morning, Mr. Forlit.
 9      A.  Good morning.
10      Q.  Would you please state your full
11  name for the record?
12      A.  Amit Forlit.
13      Q.  And how old are you?
14      A.  Soon 55.
15      Q.  And where are you a resident in?
16      A.  In Israel.
17      Q.  What countries are you a citizen
18  of?
19      A.  Only Israeli citizenship.
20      Q.  So you're here today to testify
21  on behalf of SDC-Gadot LLC; is that correct?
22      A.  Yes.
23      Q.  And is that a Florida corporation?
24      A.  Yes.
25      Q.  And is that your company?
```

```
10    12
```

```
 1          THE COURT REPORTER:  I will ask
 2  counsel to please stipulate that, in lieu
 3  of formally swearing in the witness, the
 4  reporter will ask the witness to acknowledge
 5  that their testimony will be true under the
 6  penalties of perjury, that counsel will not
 7  object to the admissibility of the transcript
 8  based on proceeding in this way, and that
 9  the witness has verified that he is Amit
10  Forlit.
11          Counsel, do you agree?
12          MR. BEHRE:  Agreed.
13          MR. BARET:  Agreed.
14          THE COURT REPORTER:  Mr. Forlit,
15  do you hereby acknowledge that your testimony
16  will be true under the penalties of perjury
17  and do you affirm that the testimony you
18  are about to give in this deposition will
19  be the truth, the whole truth, and nothing
20  but the truth?
21          THE WITNESS:  Yes.
22  //
23  //
24  //
25  //
```

```
 1      A.  Yes.
 2      Q.  And is Insight Analysis and Research
 3  LLC also your company?
 4      A.  No.
 5      Q.  How about Insight GSIA, is or was
 6  that your company?
 7      A.  No.
 8      Q.  How about Gadot Information Services,
 9  is that your company?
10      A.  Yes.
11      Q.  Who owns Insight Analysis and Research,
12  if not you?
13      A.  A gentleman who manages my finances.
14  His name is Omri Gur Lavie.
15      Q.  And what about Insight GSIA, who
16  owns that?
17      A.  If I recall, his name is Effi
18  Lavie.
19      Q.  And do you have any ownership
20  interest in Insight Analysis and Research
21  LLC?
22      A.  I don't have an interest in the
23  ownership.  But I am partner to its management.
24      Q.  And what management position do
25  you hold?
```

**Page 13**

```
 1       A.    This is -- I'm not quite sure
 2  I understand.  This is a wallet company.
 3  Almost every decision that is made is
 4  made by me.
 5       Q.    A wallet company?
 6       A.    The company was established
 7  mainly because there was a problem
 8  transferring monies from Dubai to Israel
 9  at that time.  And at the request of
10  Mr. Page, two companies were established
11  in the United States to facilitate the
12  transfer of money.
13       Q.    Okay.  Okay.  Well, we'll get
14  a little more into that later.
15             You know who I am -- right? --
16  Kirby Behre?
17       A.    "Kin."
18       Q.    And you've known my name for
19  many years, haven't you?
20       A.    That's correct.
21       Q.    And you know my client Farhad
22  Azima's name; right?
23       A.    I've heard of him.  Yes.
24       Q.    And you've known that name for
25  many years too; right?
```

**Page 14**

```
 1       A.    Yes.
 2       Q.    And when do you think you first
 3  heard the name Farhad Azima?
 4       A.    So at the start of the investigation
 5  of Gadot Israel, which is also known as
 6  Gadot Information Services, we learned that
 7  the subject of the investigation was a man
 8  named Dr. Khater Massaad.  Khater Massaad
 9  was referred to your firm by your client
10  Farhad Azima.
11       Q.    And do you recall what year you
12  learned that name -- the name of Farhad
13  Azima?
14       A.    Because I reviewed some of the
15  material in preparation for today, I --
16  I would say it was in March 2015, early
17  2015.
18       Q.    And in conjunction with your
19  investigation of Farhad Azima, was the
20  name Project Beech used?
21            MR. BARET: Objection.  Form.
22            THE WITNESS:  I have never
23  investigated Farhad Azima.  The
24  investigation was of Dr. Khater Massaad.
25  //
```

**Page 15**

```
 1  BY MR. BEHRE:
 2       Q.    Okay.  So in preparation for your
 3  testimony today, you said that you reviewed
 4  some documents; is that correct?
 5       A.    Yes.
 6       Q.    And what have you reviewed to
 7  prepare for your testimony here today?
 8       A.    Affidavits given by Stuart Page.
 9       Q.    Okay.  Anything else?
10       A.    Bank accounts.  Invoices for --
11  for Stuart Page.
12       Q.    And when you say "bank accounts,"
13  what are you referring to specifically?
14       A.    I wanted to see when we first
15  charged for the work concerning Khater
16  Massaad.
17       Q.    And when you say "the work
18  regarding Khater Massaad," did that include
19  anything having to do with Farhad Azima?
20       A.    The name of Farhad Azima came up
21  throughout all the years the investigation
22  was being carried out, in a number of
23  transactions which were suspected of
24  being illegal that we investigated.
25  But the client or the representatives
```

**Page 16**

```
 1  of the client, especially at the beginning
 2  of the investigation, said that Farhad
 3  Azima served as a mediator or a go-between
 4  between them and Khater Massaad.  And
 5  that's why neither we nor the client were
 6  asked to investigate Farhad Azima -- were
 7  asked to investigate Farhad Azima.
 8       Q.    What's the business of SDC-Gadot
 9  LLC?
10       A.    In Gadot SDC, as well as in Insight,
11  there's no business activity other than to
12  serve as a conduit to transfer money to Gadot
13  Israel.
14            And the issue or the matter was
15  because Stuart Page, according to him, received
16  the money directly in a bank account in Dubai
17  from the ruler Ras Al Khaimah -- RAK.
18            THE INTERPRETER:  I'm sorry?
19            THE WITNESS:  (Comment in Hebrew.)
20            THE COURT REPORTER:  It's here.
21  It's here.
22            THE INTERPRETER: RAK.  Okay.
23  Yeah.  Okay.
24            THE WITNESS:  "The head of the
25  tent."  This is what -- the meaning.
```

```
 1          THE INTERPRETER:  "The head of
 2    the tent"?
 3          THE WITNESS:  Ras Al Khaimah
 4    is the "head of the tent."
 5          THE INTERPRETER:  Okay.
 6          THE WITNESS:  And in order to
 7    transfer the money to us, he had to transfer
 8    it first to Hong Kong and then to transfer
 9    it to Israel.  In the early years, we
10    experienced very serious problems in the
11    transfer of the money.  And, consequently,
12    Stuart asked or -- either Stuart or his
13    person in charge of finance to simplify
14    and streamline it by opening companies
15    in the United States.
16    BY MR. BEHRE:
17          Q.   And what was or is the business
18    of Gadot here in Israel?
19          A.   Are you referring to the Israeli
20    company Gadot Israel or the Florida company?
21          Q.   The Israeli company, which I
22    understand you're now saying was using
23    the U.S. entity to transmit funds.
24          A.   Gadot Israel is a firm for crisis
25    management that uses the collection of
```

```
 1    data, data analysis, and recommendations
 2    for actions to be taken by their customers.
 3          Q.   And in your role with Gadot, has
 4    Gadot ever had in its possession stolen
 5    data, including stolen e-mails?
 6          A.   The answer to that question is
 7    a little bit problematic.  Because the
 8    analysts of Gadot sometimes use information
 9    that has been leaked to various websites
10    such as WikiLeaks.  Sometimes e-mails
11    that were stolen have been published.
12          So to say that we don't use
13    stolen e-mails in our data collection
14    or as part of our data collection, that
15    would not be accurate.  But I can say --
16    but I can say that Gadot Israel does
17    not steal data and does not do anything
18    criminal in its activities involving --
19    in its work here in Israel.
20          Q.   When you mentioned analysts
21    at Gadot, what specifically is the role
22    that analysts play in the company?
23          A.   In many cases, we get from
24    customers too and from open sources --
25    also from collecting from open sources
```

```
 1    and from investigations.  For example,
 2    by participating in chat rooms and
 3    investigations of pretext and --
 4    pretext and monitoring, all this data
 5    that is collected is analyzed by analysts.
 6          Q.   And by "pretext," do you mean
 7    misrepresentations by individuals about
 8    who they are to get information?
 9          Correct?
10          A.   So every -- so as far as I'm
11    concerned, pretext -- every -- every case
12    should be judged separately.  But it could
13    involve hanging out in a bar and overhearing
14    a conversation or talking to someone.
15          Anything -- I consider anything
16    where you don't introduce yourself and say
17    I am so-and-so and I am investigating is
18    what I would consider pretext.
19          Q.   And you also used the term
20    "monitoring."
21          What is it you're monitoring?
22          A.   (Comment in Hebrew.)
23          THE INTERPRETER:  "Surveillance"?
24          THE WITNESS:  "Surveillance."
25          THE INTERPRETER:  Okay.
```

```
 1          THE WITNESS:  (Comment in Hebrew.)
 2          THE INTERPRETER:  The word should
 3    have been "surveillance."
 4    BY MR. BEHRE:
 5          Q.   And "surveillance," you mean
 6    human --
 7          THE INTERPRETER:  Physical
 8    surveillance -- I'm sorry -- he -- he --
 9    he explained.
10          He said:  "Physical surveillance."
11          MR. BEHRE:  Okay.  Thank you.
12          THE INTERPRETER:  Actually
13    surveilling someone.
14    BY MR. BEHRE:
15          Q.   Following someone without them
16    knowing it, is that an example of surveillance?
17          A.   Yes.  That's an example.
18          Q.   So just to jump back, you said
19    you looked at some bank statements; is that
20    correct?
21          A.   My own.
22          Q.   Okay.  And by your own, which
23    company are you talking about?
24          A.   Gadot SDC and Insight.
25          Q.   And which banks are those?
```

21

```
1      A.   Insight in Bank of America and
2   Gadot at Citibank.
3      Q.   Okay.  And in addition, you
4   mentioned reviewing invoices in preparation
5   for your testimony.
6           Who are those invoices to and from?
7      A.   The invoices from Insight and from
8   Gadot in the U.S. to Stuart Page in the Beech
9   case.
10     Q.   And could you spell "Beech," please,
11  for the record?
12     A.   Sometimes we got it wrong.  But I
13  think it's B-e-e-c-h.
14          (Not translated.)  So the intent
15  is "beach" like the ocean and not "beech"
16  like the tree?
17     A.   (In English.)  No.
18          (Translated.)  It was Stuart Page
19  who chose the name.
20          (Last question translated.)
21          THE WITNESS:  I think his initial
22  intention was to the tree.  But we might
23  have got the spelling wrong.
24  BY MR. BEHRE:
25     Q.   In addition to the bank statements
```

22

```
1   and the invoices, what else did you review
2   to prepare for your testimony?
3      A.   I spoke to my attorneys about
4   the legal proceedings we've been involved
5   in until now.
6      Q.   Yeah.  I'm just asking you about
7   documents now, not -- not discussions.
8      A.   In this case, there was a security
9   protocol that was dictated by the customer
10  not to preserve any documentation in the
11  case.
12     Q.   And who was the customer?
13     A.   RAK.
14     Q.   And was Stuart Page a customer?
15     A.   Stuart Page asked to meet me --
16  I think it was March 2015.
17          And he told me that the ruler
18  wanted him to -- wanted to investigate
19  the illegal activities of Khater Massaad.
20  And according to what Stuart told me, his
21  work was directly vis-a-vis the ruler.  And
22  the payment he received, according to what
23  Stuart said, was also -- also came directly
24  from the account of the ruler rather than
25  some company.
```

23

```
1           Throughout the entire investigation,
2   we would call the ruler "the boss."  That
3   was his nickname.  But my actual customer
4   was Stuart Page.
5      Q.   Okay.  And you said that the
6   customer dictated the policy of not
7   preserving documents; correct?
8      A.   That's what Stuart Page told
9   me.  I never met the boss.
10     Q.   And, again, by "boss," you mean
11  the ruler; right?
12     A.   Yes.
13     Q.   And what were the documents that
14  were created but were not retained?
15     A.   Approximately every month, but
16  not always, and based on the findings of
17  the investigation, we would produce a report.
18          The report had an executive summary
19  at the beginning.  And this was followed by a
20  breakdown of the findings of the investigation.
21  And we would send these reports using the
22  method that Stuart described quite accurately
23  in his affidavit to Stuart.
24          Stuart always asked, from the
25  beginning, that we leave the report in
```

24

```
1   an open format for two reasons.  The first
2   one was that he said that our English was
3   beneath contempt.  And he would also add
4   sections to the report involving investigations
5   that he did that had nothing to do with us.
6      Q.   Did you draft or write any portion
7   of those reports?
8      A.   The report was prepared by the
9   staff of analysts.  I would review the
10  report before it was sent out, sometimes
11  make corrections or changes.
12     Q.   And when you say the "staff of
13  analysts," who were those people specifically?
14     A.   This was a staff of people who
15  worked for Gadot.  And for reasons of
16  privacy, I will not state their names.
17     Q.   And what are the reasons of
18  privacy that you can't disclose the
19  employees of your company?
20     A.   First and foremost, this
21  investigation relates to Gadot U.S.A.
22  and to Insight.  And these employees
23  are not employees of Gadot or Insight.
24          And, secondly, some of them
25  have security clearances here in Israel.
```

25

```
1   Some of them came from the various security
2   systems, Israeli security systems.
3       Q.   Well, as I understand your
4   testimony, the payments that were made
5   to SDC-Gadot were payments for the work
6   of Gadot here in Israel; correct?
7       A.   Correct.
8       Q.   And, therefore, the work of
9   SDC-Gadot directly relates to Gadot?
10      A.   Yes.
11      Q.   So I'm asking you for the names
12  of the employees who prepared the report --
13  or reports I should say.
14      A.   I understood your question.  But
15  I will not answer that question.
16      Q.   Okay.  Well, that's not a -- it --
17  it's not a valid reason not to answer.
18           MR. BEHRE:  And if you want to
19  interject anything -- I mean, we can --
20           MR. BARET:  Well --
21           MR. BEHRE:  -- go to the Court.
22  But --
23           MR. BARET:  Well, I -- I disagree
24  with your analysis, with all due respect.
25  I don't think Gadot --
```

27

```
1   BY MR. BEHRE:
2       Q.   So in addition to the bank
3   statements, the invoices, did you look
4   at anything else to prepare for today?
5       A.   No.
6       Q.   Well, you indicated before we
7   started that you had documents in front
8   of you -- correct? -- that included Stuart
9   Page's declaration or declarations?
10      A.   Yes.  These are Stuart Page's
11  declarations.  And these are lists which
12  I made for myself to assist myself in
13  reconstructing the proceedings that we've
14  been through so far.
15      Q.   (Not translated.)  Could you
16  tell us what statements you have in front
17  of you by date --
18           THE INTERPRETER:  Statements?
19  BY MR. BEHRE:
20      Q.   (Not translated.)  -- and title?
21           THE INTERPRETER:  Statements?
22           MR. BEHRE:  Witness statements.
23  Affidavits.
24           (Pending question translated.)
25           THE WITNESS:  I have Stuart's
```

26

```
1            THE INTERPRETER:  (Comment in
2   Hebrew.)
3            MR. BARET:  Gadot SDC did not
4   have any employees.  And Gadot -- and the
5   subject of this deposition is for Gadot SDC,
6   not for Gadot Israel.  So he -- he decided
7   not to answer.  And you can -- you can make
8   a note of that.
9            MR. BEHRE:  Are you instructing
10  him not to answer?
11           MR. BARET:  I'm not instructing
12  him anything.  He made a decision.  And
13  I'm not instructing him to answer.  [sic]
14           MR. BEHRE:  Okay.
15           MR. BARET:  You didn't hear me --
16           MR. BEHRE:  In addition --
17           MR. BARET:  I'm sorry.  You didn't
18  hear me instructing him not to answer; right?
19  Just so we're clear.  I'm not instructing
20  him not to answer.
21           MR. BEHRE:  But you're not
22  instructing him to answer?
23           MR. BARET:  He's -- he's a
24  grown man.  If he doesn't want to answer,
25  that's his choice.
```

28

```
1   affidavit from the 7th of January, 2022.
2   And an additional one by Stuart from the
3   7th of February.
4       A.   I also -- I also had the affidavit
5   of Majdi Halabi.  But I don't seem to find
6   it here.  I probably left it in my office.
7   BY MR. BEHRE:
8       Q.   So in front of you you have two
9   affidavits of Stuart Page; right?
10      A.   Yes.
11      Q.   And you also have some handwritten
12  notes you made; correct?
13      A.   Correct.
14      Q.   And those are one page or more?
15      A.   More.  Eleven.
16      Q.   And in addition to the things
17  we've just discussed, is there anything
18  else document-wise you looked at to
19  prepare for your testimony?
20      A.   No.
21      Q.   Have you ever reviewed any of
22  the pleadings in Farhad Azima's U -- U.K.
23  case?
24      A.   (Translated.)  Not -- not in
25  the last few days.  But I am familiar
```

**Page 29**

1    with these proceedings, with this claim
2    or this action that Farhad Azima is
3    conducting versus Nick Del Rosso --
4         (In English.)  NDR.
5         (Translated.)  -- NDR.
6    Q.   And so you've looked at -- at
7    pleadings involving the Azima versus Del
8    Rosso case in the United States?
9    A.   Yes.  I've been through the
10   pleadings.  And many times journalists
11   from Reuters approached me.  And I think
12   that I'm pretty well familiar with these
13   proceedings.
14   Q.   And when Reuters approached you,
15   did you speak with them?
16   A.   Yes.
17   Q.   And what was the name of the
18   reporter?
19   A.   Raphael Satter.
20        MR. BEHRE:  I think that's
21   Satter, S-a-t-t-e-r.
22        THE INTERPRETER:  Satter?
23        MR. BEHRE:  Satter.  Yeah.
24        THE INTERPRETER:  Satter.
25        THE WITNESS:  It's like Beech

**Page 30**

1    is both a tree and a seashore.
2    BY MR. BEHRE:
3    Q.   In preparation for your testimony
4    here today, have you spoken to anyone to
5    gain information about which you can
6    testify?
7    A.   No.
8    Q.   Have you spoken to Stuart Page
9    about your testimony here today?
10   A.   No.
11   Q.   When's the last time you spoke
12   with Stuart Page?
13   A.   I estimate that it's been about
14   seven, eight months since we last spoke.
15   Q.   When did you last communicate
16   with him?
17        And by that, I mean text or
18   e-mail or messaging app.
19   A.   I can check that and provide
20   an accurate reply.
21   Q.   Just a rough estimate?
22   A.   Seven, eight months.
23   Q.   Okay.  What about his assistant
24   Caroline Timberlake, when's the last time
25   you spoke with her?

**Page 31**

1    A.   In my opinion, I haven't spoken
2    to her in about two years.
3    Q.   And when's the last time you
4    communicated with her, again, text, e-mail,
5    or messaging app?
6    A.   The same answer.
7    Q.   What about Neil Gerard, did you
8    talk to him in preparation for your testimony
9    here today?
10   A.   In my view, the last time I spoke
11   to Neil Gerard was in that meeting that
12   I described in -- which took place in
13   Switzerland.
14   Q.   And when's the last time you
15   communicated with Neil Gerard?  And I
16   can keep repeating it.  But text?  E-mail?
17   A.   First of all, throughout the --
18   all the -- all these years, I did not have
19   a direct connection or direct communication
20   with Neil Gerard.
21        My opinion -- my evaluation is
22   that, ever since the first trial that took
23   place between Farhad Azima and the client
24   in London, I did not speak to him, I did
25   not meet him, I did not correspond with him.

**Page 32**

1    Q.   But there was a time you met with
2    Neil Gerard at Dechert's offices in London;
3    right?
4    A.   All along the time that this
5    procedure is being run, I believe I've
6    been in Dechert's office once or twice
7    in London.  It can be checked in the
8    log-in of Dechert, because it's been
9    verified.
10        Beyond my meetings with Neil
11   at Dechert, I believe that, in the last
12   four or five years of conducting this
13   case, I met Neil perhaps another ten
14   times.  I have never met Neil without
15   Stuart's presence.  And that's it as
16   far as Neil is concerned.
17   Q.   Now, you indicated the Dechert
18   log-in system for visitors, it's been
19   verified.
20        What did you mean by that?
21   A.   When you come to visit their
22   offices -- when you come to visit their
23   offices, you have to present some document
24   of identification.  And then they issue for
25   you a magnetic card, which you use throughout

33

1   your visit to open the doors, to open the
2   elevator -- I don't remember.
3       Q.   And you've also visited with Neil
4   Gerard at your apartment at the Metropolitan
5   Hotel in London too; correct?
6       A.   (Translated.)  Once or twice,
7   a few times -- I don't remember exactly --
8   Neil came to meetings which were held in
9   the apartment.  But these meetings as well
10  were attended by Stuart Page.
11          And this -- and this apartment
12  is a room in a hotel.  It's not as if I
13  have an apartment there.
14          (In English.)  I wish I had.
15      Q.   It would be a very expensive
16  apartment.
17      A.   (In English.)  Also to rent.
18      Q.   Yeah.  And, finally, have you
19  ever visited Gerard at his home?
20      A.   Never.
21      Q.   Now, what about Jamie Buchanan,
22  did you speak with him about your testimony
23  here today?
24      A.   No.
25      Q.   When's the last time you spoke

34

1   with him?
2       A.   I estimate something like
3   ten months.  That's my estimate.  Even
4   before I became aware that there's some
5   proceedings here against me.
6       Q.   And when's the last time you
7   communicated with him?
8       A.   After I learned about the
9   testimony that Stuart gave, I -- I
10  communicated with him not directly,
11  but via his attorney.
12      Q.   And who is his attorney?
13      A.   A woman -- a woman by the
14  name of Sue or something like that,
15  in England, in --
16      Q.   In --
17      A.   -- the U.K.
18          THE INTERPRETER:  "A women
19  by the name of Sue or something like
20  that in the U.K."
21  BY MR. BEHRE:
22      Q.   What about the ruler, when's
23  the last time you spoke with him?
24          And did you talk to him to
25  prepare for your testimony today?

35

1       A.   In all my 55 years of existence,
2   I have never spoken to the ruler nor met
3   him.
4       Q.   Have you ever communicated with
5   him in text, e-mail, or messaging?
6       A.   Never.  Never.
7       Q.   How about Amir Handjani, did you
8   talk to him to prepare for your testimony?
9       A.   Same answer as for the ruler.
10      Q.   In all my 55 years of existence,
11  I never met him.  I never spoke to him.
12  I never communicated.  I don't know him.
13      Q.   And did you attend the trial
14  of Farhad Azima in London in 2019?
15      A.   No.
16      Q.   Were you in London at the time?
17      A.   I don't recall.  I can check
18  that.  I don't think so.
19      Q.   Did you meet with any of the
20  parties on behalf of RAK who were at that
21  trial at the time they were in that trial?
22      A.   I don't think so.  I don't think
23  so.
24          I believe I did meet with Stuart,
25  because I had a very close contact with --

36

1   very close connection with Stuart.  I don't
2   think it was at the time of the proceedings.
3       Q.   I -- I have something to add.
4       A.   I went over a few more documents
5   in preparation to this testimony, which I
6   forgot to mention before.  I took out from
7   the Ministry of Interior all the dates of
8   my exits and entries into the country in
9   order to refresh my memory as to these
10  visits or trips.
11      Q.   Exits and entries from which
12  country?
13      A.   Only from Israel.  Because I
14  possess an Israeli passport.  That's
15  the only -- the only thing that could
16  be checked.
17      Q.   And why did you look at that
18  information to prepare?
19      A.   Because, when I read the affidavit
20  by Majdi Halabi, I did not remember some of
21  the meetings that he described as me being
22  in attendance.  So I wanted to check whether
23  at all I had been present in the places as
24  he was describing it.
25      Q.   And did you receive a printout

**Page 37**

1 from the Israeli Ministry about your travel?
2     A.  Yes.  Every citizen can do that.
3     Q.  And do you have a copy of that
4 with you today?
5     A.  I have it in the mail.  I can
6 have it printed if you want.
7     Q.  Okay.  We'd appreciate that.
8     A.  My attorney will provide you
9 that in reference to the specific dates.
10    Q.  (Not translated.)  Now, going
11 back to the people you might have spoken
12 with to prepare for your testimony, did
13 you -- did you speak with anyone from
14 Karv Communications, such as Andrew
15 Frank, before you --
16        THE INTERPRETER:  From Karv?
17 BY MR. BEHRE:
18    Q.  (Not translated.) -- testified
19 here today?
20        THE INTERPRETER:  Karv -- Karv
21 Communications?
22        MR. BEHRE:  Karv, K-a-r-v.
23        THE INTERPRETER:  Okay.
24        (Pending question translated.)
25        THE WITNESS:  Just like my

JULY 20, 2022 - AMIT FORLIT
30 (B) (6) SDC-GADOT LLC

**Page 38**

1 previous answer, I have never met him.
2 I don't know him.  I have never communicated
3 with him.
4 BY MR. BEHRE:
5     Q.  And how about David Hughes?
6     A.  I have met David Hughes when he
7 was working at Dechert.  And I believe that
8 the last time I met him was in that meeting
9 in Cyprus, which is described in Stuart's
10 affidavit.  I have never communicated with
11 him directly, neither before nor after, and
12 not indirectly either.
13    Q.  Okay.  And how about Majdi Halabi?
14    A.  The last time I spoke to Majdi
15 Halabi was after he submitted his affidavit.
16        After I have learned about his
17 affidavit from the Reuters reporter, I
18 called him.  And he refuted, he denied
19 that he had provided such an affidavit.
20 And when I saw -- when I saw it, I -- I
21 cut my connections with him.  And since
22 then, I have not spoken to him.
23    Q.  When's the last time you
24 communicated with him by text, e-mail,
25 or messaging service?

JULY 20, 2022 - AMIT FORLIT
30 (B) (6) SDC-GADOT LLC

**Page 39**

1     A.  It was a telephone conversation.
2 And I believe it was close to the date
3 that he had submitted his affidavit.  And
4 since then, I had no communication with
5 him whatsoever.
6     Q.  (Partially translated.)  Okay.
7 How about the U.K. lawyer, Lucy Ward, did
8 you speak with her before you testified
9 here today?
10        THE COURT REPORTER:  "Lucy."
11        THE INTERPRETER:  What's her
12 name?  Lucy Ward.  Lucy Ward.
13        (Remainder of pending question
14        translated.)
15        THE WITNESS:  I don't know this
16 lady.  And I've never spoken to her.
17 BY MR. BEHRE:
18    Q.  Have you ever communicated with
19 her in any other way?
20    A.  No.
21    Q.  How about Nicholas Del Rosso,
22 did you speak with him before you
23 testified here today?
24    A.  Same answer.
25        In all my 55 years of existence,

JULY 20, 2022 - AMIT FORLIT
30 (B) (6) SDC-GADOT LLC

**Page 40**

1 never met, never heard, never spoken, don't
2 know.
3     Q.  But you've certainly heard of him;
4 right?
5     A.  Yes.
6        Now, seriously, in the beginning
7 of the investigation, I learned that Nick
8 Del Rosso was recruited and he's working
9 on the case in parallel to us but on
10 different -- other issues.
11        I remember that Stuart Page
12 was deeply offended that Nick Del Rosso
13 is being employed.  And he was told that
14 Nick's employment had been suspended.
15        And the next time we encountered
16 the name of Nick Del Rosso, we were told
17 that he was making the connection between
18 a company that was studying the materials
19 leaked from Farhad Azima and the customer,
20 the client.
21        THE COURT REPORTER:  "And" or
22 "in"?
23        THE INTERPRETER:  "And the client."
24 BY MR. BEHRE:
25    Q.  The connection between a company

JULY 20, 2022 - AMIT FORLIT
30 (B) (6) SDC-GADOT LLC

**41**

1   that was?

2      A.  He made a connection to a company

3   that was analyzing materials, the materials

4   that had been leaked from Farhad Azima.

5      Q.  And what was the name of that

6   company?

7      A.  I -- I don't remember.  Once

8   again, all my information comes from

9   Stuart.

10      Q.  What about an investigator by

11   the name of Craig Thomas, did you speak

12   with him to prepare for your testimony

13   here today?

14      A.  I don't even have the faintest

15   clue who this person is.  Until now, I

16   recognize the names.  But this one ...

17      Q.  What about Patrick Grayson?

18      A.  I heard about him.  Never spoken

19   to him, never met him, never communicated

20   with him.

21      Q.  Was he involved in Project Beech,

22   if you know?

23      A.  No.  Not to my knowledge.

24      Q.  Did you speak with Paul Robinson

25   to prepare for your testimony here today?

**42**

1      A.  I heard about Paul Robinson from

2   Stuart Page, even in the course of the

3   meetings held by Stuart Page with Robinson.

4   But I don't know him.  I haven't spoken

5   to him.  And that's it.

6      Q.  In preparation for your testimony

7   here today, have you spoken to anyone else

8   affiliated with Dechert, the law firm?

9      A.  No.

10      Q.  (Not translated.)  And how about

11   anyone from Stewarts Law, the law firm in

12   the U.K. that represents RAK?

13      A.  "Lo."

14      (Pending question translated.)

15      THE WITNESS:  No.

16      MR. BEHRE:  RAK is all -- all

17   caps, R-A-K.

18      THE WITNESS:  (Comment in Hebrew.)

19      THE INTERPRETER:  No.  No.

20      THE COURT REPORTER:  He wants to

21   smoke an electronic cigarette.

22   BY MR. BEHRE:

23      Q.  It's not good for your health.

24   We're not going to do that here.

25      A.  No, this is good for my health.

**43**

1      Q.  You -- you received -- or I should

2   say S -- SDC-Gadot received a subpoena for

3   documents; correct?

4      A.  After a long time after servicing

5   the documents to somebody in Florida, I

6   learned that they had been requested to

7   provide documents.

8      MR. BEHRE:  After servicing the

9   documents to somebody in Florida?

10      THE INTERPRETER:  After -- after

11   the servicing -- serving the -- the -- the

12   subpoena, I imagine.  Serving, not servicing.

13   Serving.  Serving.  Sorry.  Sorry.  Serving.

14      MR. BEHRE:  Okay.  Let me just

15   ask the question again.

16      THE INTERPRETER:  Okay.

17   BY MR. BEHRE:

18      Q.  Do you recall receiving a subpoena

19   for documents from SDC-Gadot in conjunction

20   with the Florida case?

21      A.  Yes.

22      Q.  And are you aware that, in response

23   to that, no documents were produced?

24      A.  I am aware that my bank said --

25   did send them the documents -- my documents

**44**

1   that he was requested -- that the bank was

2   requested to submit.  And immediately after

3   learning about the subpoena, I recruited

4   the services of my attorney here in order

5   to defend myself in respect to the substance

6   of the subpoena.  And only recently did I

7   determine what I am supposed to produce and

8   what I'm -- I'm not.

9      Q.  But you would agree that, in

10   preparation for your testimony here today,

11   you reviewed documents that would be required

12   to be produced under that subpoena; correct?

13      A.  Okay.  In the first subpoena,

14   they required documents connected to the

15   American companies and to the connection

16   to -- the connection to Stuart Page in

17   the connection of the investigation of

18   Farhad Azima.  And since there was no

19   investigation against Farhad Azima, or

20   of Farhad Azima, my initial interpreting

21   was that I have no documents to submit,

22   since I did not investigate Farhad Azima.

23      But pretty soon, they started to

24   submit more and more requests to the Court,

25   which go well beyond the initial request.

45

```
1          So to the best of my understanding,
2    we submitted an opposition, an objection
3    to these requests.  And, finally, the --
4    the agreement was that in -- following
5    the initial -- the first subpoena, I
6    would be deposed here in Israel.
7          And, once again, I will say
8    that I have no connection.  I have
9    never investigated Farhad Azima.
10         (Exhibit 1 marked.)
11   BY MR. BEHRE:
12   Q.   I'd like to show you --
13        MR. BEHRE:  Do you have a copy
14   for counsel?
15   BY MR. BEHRE:
16   Q.   I'd like to show you what we've
17   marked as exhibit --
18        MR. BEHRE:  Do you have a binder
19   clip or something?  Do you have one?  Thank
20   you.  Yeah.
21   BY MR. BEHRE:
22   Q.   Showing you what's been marked --
23   pre-marked as Exhibit No. 1.  That's a copy
24   of the subpoena that I believe was served
25   on SDC-Gadot LLC for documents.
```

46

```
1          Could you take a look at that
2    and see if you've seen that before?
3    A.   (Examining.)  I -- I don't
4    remember.
5          But I do recall that, at some
6    stage, the gentleman whose names -- whose
7    name appears here -- I think it's Shimon
8    Goldenberg [sic] -- is a person I don't
9    know personally, by the way -- he called
10   and he said that he had received a lot
11   of documents and that we should come and
12   see them.  He said he had been trying
13   to e-mail us the documents but that the
14   e-mail had bounced.
15         And when I corrected him --
16   because he had written ".com" instead
17   of ".co.il" -- the -- the documents
18   arrived.
19         In actual fact, the first
20   time I -- I received the documents
21   was a long time after they had been
22   initially sent.  I think my attorney
23   related to this in one of his responses
24   to the Court.
25   Q.   And by "the documents," you're
```

47

```
1    talking about the subpoena, not the
2    documents in response to the subpoena;
3    right?
4    A.   Yes.  That's correct.
5    Q.   (Translated.)  And if you
6    would look, please, at page -- page 8
7    of 39.  So if you look at the number
8    in the upper right-hand corner, page 8.
9          (Not translated.)  And just
10   directing your attention to paragraph
11   21, it describes the scope of the
12   subpoena as covering not just Farhad
13   Azima but also others, including
14   Khater Massaad.
15         Do you see that?
16   A.   Yes.
17   Q.   (Partially translated.)  And
18   the documents that you've indicated you've
19   reviewed in preparation for your testimony
20   included SDC-Gadot's bank records, as well
21   as invoices; right?
22   A.   Yes.
23   Q.   And those --
24        THE COURT REPORTER:  Let her
25   translate.
```

48

```
1    BY MR. BEHRE:
2    Q.   And those would be responsive
3    to the subpoena, wouldn't they?
4    A.   That's correct.
5    Q.   And in addition, you indicated
6    you reviewed other documents as well;
7    correct?
8    A.   Bank statements.
9    Q.   And what about -- what about
10   the corporate records of SDC-Gadot, did
11   you look at those before you testified?
12   A.   No.
13   Q.   And by that, I'm referring to
14   the -- the documentation you file with
15   the Florida Secretary of State every
16   year or so.
17   A.   I did not review them.
18   Q.   And you would agree, wouldn't
19   you, that they would be responsive to
20   this subpoena as well; right?
21        (Comment in Hebrew.)
22        MR. BARET:  Just -- just for the
23   record, you have those documents.  You --
24   you provided it to us.  Would you like us
25   to send it back to you?  Because the only --
```

49

1  other than some of these documents that you
2  provided to us, there is no records, for
3  the record.
4        MR. BEHRE:  I don't -- I don't --
5  I don't know if that's true or not.
6        MR. BARET:  Oh.  So I'm telling
7  you he doesn't have any records.  So nothing
8  was produced because -- nothing was produced
9  because there are no records other than what
10  you already have.
11        MR. BEHRE:  Well --
12        MR. BARET:  But if you want
13  us to produce those records to you, even
14  though you have them, which is Sunday's
15  (phonetic) record, we can do that.
16        MR. BEHRE:  I don't know if
17  they're the same as what I've got or
18  not.  He indicated he has bank records.
19  He indicated he has invoices.
20        MR. BARET:  Only what --
21        MR. BEHRE:  I don't see --
22        MR. BARET:  -- was produced --
23        MR. BEHRE:  -- those.
24        MR. BARET:  -- to us by you.
25        So the bank -- actually, you have

50

1  more bank records than what he does.  Because
2  you got the subpoena from the bank.  And,
3  actually, some of the records we've got is
4  from whatever you produced and received by
5  issuing a subpoena to Bank of America and
6  Citibank.
7        THE WITNESS:  (Comment in Hebrew.)
8        THE COURT REPORTER:  Wait.  Wait.
9  She has to translate the --
10        THE INTERPRETER:  I have to --
11        THE COURT REPORTER:  -- last answer.
12        THE INTERPRETER:  I have to --
13        His answer was:  "I'm not especially
14  proficient in the procedural matters."
15        THE WITNESS:  Our bank accounts
16  were closed in August or September of 2021.
17  And we don't have access to the bank.
18        So the subpoena -- the -- the
19  subpoena that you're referring to is much
20  more comprehensive than what we have because
21  we only kept documents in a sporadic fashion.
22        And regarding the invoices for
23  Stuart Page, I would assume -- I assume
24  that you have copies of them from Stuart
25  Page, because he's cooperating with you

51

1  very well.
2  BY MR. BEHRE:
3        Q.  Well, just because you assume
4  we have something doesn't mean you're
5  not obligated to produce them if they're
6  in your possession.
7        A.  So I apologize.  And I will
8  review, once again, what I have.
9        MR. BARET:  I -- I don't think
10  bank records were requested in the subpoena.
11        Can you please direct me where
12  you are requesting bank records?
13        MR. BEHRE:  Well, I'm not
14  testifying, so no.
15        MR. BARET:  No, so I'm just --
16  for the record, the subpoena you -- you --
17        MR. BEHRE:  It's --
18        MR. BARET:  -- are showing --
19        MR. BEHRE:  -- all records regarding
20  the company, which would include bank records,
21  tax records, for example.
22  BY MR. BEHRE:
23        Q.  Do -- does SDC-Gadot file any
24  taxes in the U.S.?
25        A.  It filed returns.

52

1        Q.  And where do they file those --
2  where does the company file those tax
3  returns?
4        A.  I have to check.  But I would
5  guess it's in Florida.
6        Q.  And those would be responsive
7  to this subpoena, wouldn't they?
8        A.  I'm not sure.  I just have --
9  I have to go back and check.
10        Q.  (Not translated.)  And Ari Propis
11  is the accountant for SDC-Gadot; is that
12  right?
13        THE INTERPRETER:  R.E.?
14        MR. BEHRE:  Ari, A-r-i.  Propis.
15        THE INTERPRETER:  Propis.
16        MR. BEHRE:  P-r-o-p-i-s.
17        THE WITNESS:  No.
18  BY MR. BEHRE:
19        Q.  What is his role, if any, with
20  regard to SDC-Gadot?
21        A.  Ari Propis has no position
22  whatsoever in SDC-Gadot.  He just liaised
23  for us and connected us so we could open
24  the bank account.
25        Q.  Who prepared the company's tax

**Page 53**

1 returns?

2     A.    There is an accountant.  I'd

3 have to ask the financial person.  I

4 don't remember his name.

5     Q.    And who's the financial person

6 you'd have to ask that of?

7     A.    Omri.

8     Q.    Who's Omri?

9     A.    Omri Gur Lavie.  He's our finance

10 person.

11     Q.    And does SDC-Gadot pay taxes to

12 the U.S. Government as best you know?

13     A.    I -- I know that we filed returns

14 and that all income and expenses were reported

15 in the jurisdictions in which we had to do

16 so.  Whether taxes were or were not paid,

17 I would have to check.

18     Q.    (Not translated.)  And who keeps

19 the business expenses for the company?

20         THE INTERPRETER:  What do you

21 mean by "keeps"?  Records?

22         MR. BEHRE:  Keeps the business

23 expense records.

24         THE INTERPRETER:  Who records.

25 Okay.

**Page 54**

1         (Pending question translated.)

2         THE WITNESS:  The accountant.

3 BY MR. BEHRE:

4     Q.    And the accountant is who?

5         Gur Lavie?

6     A.    If you give me a few minutes --

7 it's a U.S. CPA.  He's a U.S. CPA that

8 works from Israel.  If you give me a few

9 minutes, I can check on my phone and --

10 and I'll get back to you with that.

11     Q.    But it's not Mr. Gur Lavie?  It's

12 somebody else?

13     A.    He's the financial director.  But

14 he doesn't work vis-a-vis the authorities.

15 There's an accountant, and that's his job.

16 I'm the one that authorizes all expenses.

17     Q.    Are there any other documents

18 that are filed on behalf of SDC-Gadot

19 with any Government agency that you

20 know of?

21     A.    No.

22     Q.    Are there any filings that

23 SDC-Gadot makes with any banking authority

24 that you know of in the U.S.?

25     A.    What do you mean by "documents"?

**Page 55**

1     Q.    You mean like opening a bank account?

2     A.    Any sorts of filings or forms

3 or applications or anything submitted to

4 a bank.

5     A.    So the only bank that we actually

6 banked with in America was Citibank.  We

7 tried to work with Chase Manhattan.  But

8 it didn't work out.  So we may have filed

9 some forms there at one point, but -- with

10 Chase Manhattan.

11     Q.    Chase Manhattan refused to open

12 an account for you?

13     A.    No.  They did open an account.

14 I don't recall exactly why -- there was

15 some kind of limitations or something.

16 But we just -- it wasn't convenient for

17 us to work with them.

18     Q.    (Not translated.)  Have you

19 ever had any bank account frozen in

20 the U.S.?

21     A.    No.

22     Q.    (Not translated.)  Has any

23 U.S. Government body ever tried to

24 obtain information about your bank

25 accounts, as best you know?

**Page 56**

1     A.    (In English.)  No.

2         (Translated.)  No.

3     Q.    (Not translated.)  So in the --

4 in the document subpoena that you have

5 in front of you, Exhibit No. 1, it asks

6 in -- on page 9 of 39 -- so the numbering

7 is in the upper right-hand corner.

8         Under 1.a, the -- it asks for

9 all reports.

10         Do you see that?

11     A.    Yes.

12     Q.    And are those the reports you

13 referenced as having not been retained?

14     A.    No, we have no reports on Azima,

15 because we didn't do any reports on Azima.

16     Q.    So it is your testimony that there

17 was no report that mentioned Farhad Azima?

18     A.    No.  In my opinion, there were

19 reports that mentioned Azima -- Farhad

20 Azima, not as the subject of an investigation,

21 but as someone whose name came up in the

22 investigation.  And as I said earlier, no

23 reports were preserved.  So everything that

24 I'm saying now about this is from memory.

25     Q.    So is it your testimony that the

57

```
1    reports that mentioned Azima didn't reflect
2    any investigation by your company of Azima?
3         A.   My company did not investigate
4    Farhad Azima.  So my company investigated
5    Dr. Khater Massaad.
6              In some of the transactions that
7    Khater Massaad was involved in, other people
8    were involved, like members of the republican
9    guard in -- Revolutionary Guard in Iran,
10   like other people that were involved in
11   these transactions.  And their names were
12   mentioned.  And Farhad Azima's name came
13   up in some of the transactions.
14        Q.   (Not translated.)  Did you ever
15   use any human intelligence resources to
16   obtain information about Farhad Azima?
17        A.   We -- some of the sources
18   included human intelligence sources.
19   Some of the sources that involved human
20   intelligence mentioned the name Farhad
21   Azima in -- in the context of the
22   investigation into Khater Massaad.
23             The first source in this case
24   told us that Farhad Azima brought Khater
25   Massaad to your firm to represent him.
```

JULY 20, 2022 - AMIT FORLIT
30 (B) (6) SDC-GADOT LLC

58

```
1         Q.   And so your source was a source
2    close to Farhad Azima; correct?
3         A.   It -- it would be more correct
4    to say he was close to your firm.
5         Q.   And who was that source?
6         A.   I'm sorry.  I can't divulge that.
7         Q.   And on what basis will you not
8    divulge that?
9         A.   Based on privilege.
10        THE INTERPRETER:  I don't know
11   if "privilege" is the right word to use.
12   I think "privilege" is only attorney-client.
13        "But based on privilege of the
14   source or maintaining the privacy of the
15   source."
16   BY MR. BEHRE:
17        Q.   (Not translated.)  Well, I don't --
18   I don't think that's a valid basis.  And
19   I'd ask and instruct the witness to answer.
20        MR. BEHRE:  Counsel?
21        MR. BARET:  You can do whatever
22   you want.
23        THE WITNESS:  "Ma"?
24        MR. BARET:  Do you want to
25   disclose the source?
```

JULY 20, 2022 - AMIT FORLIT
30 (B) (6) SDC-GADOT LLC

59

```
1              You can -- you can answer.
2         THE WITNESS:  I don't want to
3    disclose the source.
4    BY MR. BEHRE:
5         Q.   (Not translated.)  I appreciate
6    you don't want to.  But this is a legal
7    proceeding.  And you're required to disclose
8    it.  And if it's -- if you refuse to do it,
9    we'll have to go to the Court and seek the
10   Court's approval to require that disclosure.
11   And that will require you to come back.
12        A.   There was a gentleman who presented
13   himself as a member of the PR staff of your
14   firm who told the story in a -- kind of a
15   friendly social context.
16        Q.   And who was the person with the
17   PR firm?
18        A.   I don't recall his name.
19        Q.   And was the PR person at my firm
20   or someone that was hired by my firm?
21        A.   I don't recall.
22        Q.   The -- the subpoena for documents
23   also asks you for an engagement letter
24   relating to Mr. or -- Mr. Azima or the
25   project.
```

JULY 20, 2022 - AMIT FORLIT
30 (B) (6) SDC-GADOT LLC

60

```
1              Do you see that?
2         A.   We never had an engagement
3    letter with Stuart.
4         Q.   (Not translated.)  It's your
5    testimony you've never had an engagement
6    letter with Stuart Page?
7         A.   To the best of my recollection,
8    we did not have an engagement letter with
9    Stuart.
10        (Comment in Hebrew.)
11        THE COURT REPORTER:  Ruchie.
12        MR. BARET:  Can we have a short
13   break?
14        THE INTERPRETER:  "When are we" --
15        MR. BARET:  He needs a cigarette --
16        THE INTERPRETER:  "Are we going
17   to have a smoking break?"
18        MR. BARET:  -- and a bathroom
19   break.
20        MR. BEHRE:  We can have an
21   e-cigarette break right now.  That would
22   be fine.
23        MR. BARET:  All right.  So 15?
24        THE INTERPRETER:  Do we have to
25   keep working --
```

JULY 20, 2022 - AMIT FORLIT
30 (B) (6) SDC-GADOT LLC

**Page 61**

```
 1          MR. BARET:  10?
 2          THE INTERPRETER:  -- if we're not --
 3          MR. BARET:  10, 15 minutes, it's
 4   good?
 5          MR. BEHRE:  Yeah.  Does he have
 6   to go all the way downstairs?  So probably.
 7          THE WITNESS:  No.
 8          MR. BARET:  I don't know.  Is
 9   there a balcony?
10          MR. BEHRE:  We better go off the
11   record for that discussion.
12          MR. BARET:  Is there a --
13          THE COURT REPORTER:  One moment.
14          MR. BEHRE:  10 minutes.
15          THE COURT REPORTER:  One moment.
16          THE VIDEOGRAPHER:  Going off the
17   record at 12:38.
18          (Recess from 12:38 p.m. to 1:00 p.m.
19   Israel Daylight Time.)
20          THE VIDEOGRAPHER:  Back on record
21   at 1:00 o'clock.
22          (Exhibit 2 marked.)
23   BY MR. BEHRE:
24      Q.   I'd like to next show you what
25   we've marked as Exhibit No. 2 and see if
```

**Page 62**

```
 1   you can identify what these are.
 2          For the record, it's a collection
 3   of corporate records from the State of
 4   Florida regarding your company SDC-Gadot.
 5      A.   (Examining.)
 6      Q.   Have you had a chance to look at
 7   those documents?
 8      A.   Yes, now.
 9      Q.   And are they the corporate records
10   for STD -- SDC-Gadot LLC from the State of
11   Florida?
12      A.   It seems so.  Yes.
13      Q.   (Not translated.)  And for the
14   record, the first document is the Articles
15   of Organization for SDC-Gadot, filed on
16   October 18th, 2017.
17      A.   (In English.)  Okay.
18      Q.   The next document contained in
19   this exhibit is the annual report filed
20   on April 29, 2018.
21          The next exhibit --
22      A.   (In English.)  Okay.
23          (Translated.)  Okay.
24      Q.   The next exhibit is the annual
25   report filed on January 21st, 2019.
```

**Page 63**

```
 1          Do you see that?
 2      A.   Yes.
 3      Q.   And next is the annual report
 4   for SDC-Gadot filed on April 11th, 2020.
 5          Do you see that?
 6      A.   (In English.)  Okay.
 7          (Translated.)  Okay.
 8      Q.   And the next one is the annual
 9   report for SDC-Gadot filed on February
10   3rd, 2021.
11          Do you see that?
12      A.   Yes.  They're pretty well --
13      Q.   And then finally --
14      A.   -- organized.
15      Q.   (Not translated.)  And then,
16   finally, do you see the annual report that
17   was filed for SD -- SDC-Gadot on January
18   27th, 2022?
19          THE INTERPRETER:  27?  January --
20          MR. BEHRE:  Yes.
21          THE INTERPRETER:  -- 27?
22          MR. BEHRE:  January 27, 2022.
23          (Pending question translated.)
24          THE WITNESS:  Okay.  Yes.
25   //
```

**Page 64**

```
 1   BY MR. BEHRE:
 2      Q.   So this is the articles of
 3   incorporation [sic] filed in 2017 and
 4   the annual reports up to this year 2022;
 5   right?
 6      A.   Okay.
 7      Q.   Looking at the Articles of
 8   incorporation -- or of -- of Organization --
 9   apologies -- which is the first page
10   of the exhibit, it indicates a mailing
11   address in Miami, Florida.
12          Do you see that?
13      A.   Yes.
14      Q.   And whose address is that?
15      A.   I imagine that this is the agent
16   through which we set up the company, because
17   we had to provide a -- an address, a local
18   address.
19      Q.   And do you know who lives at the --
20   this address?
21      A.   No.
22      Q.   And if you look at the second
23   page of this exhibit -- or I'm sorry --
24   the second page of this document, the
25   Articles of Organization for October 18,
```

1  2017, there's an electronic signature
2  affixed to it.
3        Do you see that?
4     A.  Aah, yes.
5     Q.  And that electronic signature
6  purports to be yours; correct?
7        MR. BARET:  Here.  (Indicating.)
8  The back of the page.  It just says:
9        "Amit Forlit."
10       THE WITNESS:  I'm looking for it.
11       MR. BARET:  The second page.
12       THE WITNESS:  (Comment in Hebrew.)
13       It's not a manual signature, not
14 a handwritten signature.
15 BY MR. BEHRE:
16    Q.  Right.
17       It's an electronic signature.
18    A.  I don't recall.  But it would
19 seem so.
20    Q.  So do you -- do you see the page
21 that I'm asking about?  It's -- turn to the
22 page that has the exhibit sticker on it.
23       MR. BARET:  This one.  (Indicating.)
24 The -- the back of this page.
25 //

1  you electronically signed here, indicating
2  that you are the, quote, "Owner," end
3  quote --
4     A.  (In English.)  Okay.  "Kin."
5     Q.  -- of the company; correct?
6     A.  Okay.  Yes.
7     Q.  And did all -- were all those
8  documents filed electronically with the
9  State of Florida, as best you know?
10    A.  Yes.
11    Q.  And did you authorize the
12 submission of all these documents on
13 behalf of SDC-Gadot LLC in Florida?
14    A.  I assume I did.
15    Q.  And it -- the -- the first
16 page indicates -- that is, the Article
17 [sic] of Organization indicates that
18 your registered agent in the State of
19 Florida is Shimon Goldberger; is that
20 correct?
21    A.  I assume it is.
22    Q.  Did you hire Mr. Goldberger
23 and his company SRSL Management, Inc.,
24 to represent SDC-Gadot in Florida?
25    A.  I don't recall such a thing.

66

1  BY MR. BEHRE:
2     Q.  And flip it over.
3     A.  Aah.  "Po."
4     Q.  And it indicates that your
5  electronic signature was affixed to
6  this document; correct?
7     A.  Yes.
8     Q.  And did you electronically
9  sign this document?
10    A.  I assume I did.  I do not recall.
11    Q.  Okay.  And this document was filed
12 electronically with the State of Florida;
13 correct?
14    A.  Correct.
15    Q.  Now, going to the first annual
16 report dated April 29, 2018.
17       Do you see that?
18    A.  Yes.
19    Q.  And it indicates on the signature
20 line -- again, electronically signed -- that
21 you signed as the CEO of the company.
22       Is that correct?
23    A.  Yes.
24    Q.  And if you go to the next one
25 from January 21st, 2019, again -- again,

68

1     Q.  Do you know who Mr. Goldberger
2  is?
3     A.  Only recently, when he made
4  contact with us in order to send us the
5  subpoena, I have learned of his existence.
6  To the best of my knowledge, we did not
7  hire him and we did not pay him.  We used
8  his address when setting up the company.
9     Q.  And when you signed electronically
10 the Articles of Organization, it indicates
11 on the document you electronically signed
12 that your registered agent was Shimon
13 Goldberger.  And he too affixed an
14 electronic signature.
15       Do you see that?
16    A.  I see it.  But I simply do not
17 remember.
18    Q.  And looking at the annual report
19 from April 29, 2018, the current principal
20 place of business has changed.  And now
21 it indicates an address in New York.
22       Do you see that?
23    A.  Yes.
24    Q.  And the address is West 210
25 89th Street in New York City; correct?

**69**

```
 1    A.   Yes.
 2    Q.   And in -- in one place says
 3  Apartment 1K.  And in another place,
 4  it says apartment K1.
 5         Do you know which is correct?
 6    A.   I believe it to be the same.
 7    Q.   Who lives at that address?
 8    A.   A friend of mine.
 9    Q.   What's your friend's name?
10    A.   Elad Lev Ran.
11    Q.   Could you spell the last name?
12    A.   L-e-v, dash, R-a-n.
13         THE INTERPRETER:  No.  "Revach."
14  "Space."
15         THE WITNESS:  For -- simply for
16  the purpose of receiving mail.  Because,
17  once again, I do not know what was the
18  first address.  So we changed the address
19  so, when the bank would send documents,
20  they would arrive.
21  BY MR. BEHRE:
22    Q.   And, for example, where did the
23  Citibank records get mailed to?
24    A.   As far as Citibank is concerned,
25  mostly they would send a debit card.  But
```

**70**

```
 1  the rest of the documents was usually sent
 2  via the application, the app.
 3    Q.   And did they send those -- did
 4  they send the debit cards to New York or
 5  to Miami?
 6    A.   No.  They sent it to Israel.
 7         I had a fraud event with my card.
 8  So I canceled the card.  And they sent me
 9  a new card, which they sent to Israel.
10    Q.   And the fraud on the card was
11  for a debit card?
12    A.   Yes.
13    Q.   Who actually used those debit
14  cards during the life of this account at
15  Citibank?
16    A.   I did.
17    Q.   Did anyone else use those cards?
18    A.   With the exception of the fraud
19  case --
20    Q.   Yes.
21    A.   -- nobody else.
22    Q.   So all the purchases, then, that
23  would be indicated in the bank statements
24  for Citi that were made on the debit card
25  would have been your personal charges;
```

**71**

```
 1  correct?
 2    A.   These are not personal expenses.
 3  These are company expenses.
 4    Q.   (Not translated.)  And so when
 5  you purchased a Porsche in Pennsylvania,
 6  was that a business expense or a personal
 7  expense?
 8         THE INTERPRETER:  When you acquired
 9  what?  Sorry.
10         MR. BEHRE:  Porsche.
11         THE INTERPRETER:  Porsche, the car?
12         (Pending question translated.)
13         THE WITNESS:  I never bought a
14  Porsche in Pennsylvania.
15  BY MR. BEHRE:
16    Q.   Okay.  We'll get to that.
17         What e-mail addresses were
18  associated with SDC-Gadot, if any?
19    A.   I believe "amit001@me.com."
20    Q.   And in addition, did you ever
21  use "amit@gadot.com"?
22    A.   No.  No.  I used "amit@gadot.co"
23  [sic] not ".com."
24    Q.   Did anyone else associated with
25  SDC-Gadot use a e-mail address that ended
```

**72**

```
 1  with "@gadot.co"?
 2    A.   I believe no.
 3    Q.   Did you receive an e-mail from
 4  Mr. Goldberger, attempting to resign as
 5  your registered agent?
 6    A.   Could be.  I don't recall.
 7    Q.   Do you recall he threatened to
 8  resign?
 9    A.   I -- I remember he sent something
10  that he was being pestered by all these
11  subpoenas that are being sent to him.  And
12  he -- he asked us to put a stop to it.
13         But since we did not receive them,
14  we did not know what to answer.
15         I understood belatedly that what
16  he had written was "com" instead of "co"
17  and that's why he did not get these mails.
18    Q.   Now, during the course of this
19  litigation in Florida, you've submitted
20  two affidavits; is that correct?
21    A.   I assume yes.
22    Q.   And one of those affidavits was
23  signed by you on May 12th, 2022.  And the
24  second was signed by you on June 1st, 2022.
25         Do you recall that?
```

1    A.   Yes.
2         (Exhibit 3 marked.)
3  BY MR. BEHRE:
4    Q.   I'd like to next show you what's
5  been marked as Exhibit No. 3.
6         MR. BEHRE:  Do we have a stapler
7  by any chance?
8         THE COURT REPORTER:  Moshe, go off.
9         THE VIDEOGRAPHER:  Off the record
10 at 1:19.
11        (Recess from 1:19 p.m. to 1:21 p.m.
12 Israel Daylight Time.)
13        THE VIDEOGRAPHER:  Back on the
14 record at 1:21.
15 BY MR. BEHRE:
16   Q.   So looking at Exhibit 3 -- and
17 when I say Exhibit 3, I'm talking about
18 the sticker that says Exhibit 3.  And,
19 unfortunately, the document happens to
20 have typed on it "Exhibit 2," which is
21 from the court case.  So apologies for
22 that confusion.
23        But this is Exhibit 3.
24   A.   (Examining.)  Okay.
25   Q.   Are those the two affidavits

1    Q.   Have you ever resided in the
2  United States?
3    A.   No.
4    Q.   Have you ever purchased a
5  vacation home in the United States?
6    A.   No.
7    Q.   Have you ever attempted to
8  purchase a vacation home in the United
9  States?
10   A.   No.
11   Q.   Did you ever form an LLC to
12 purchase a vacation home in the United
13 States?
14   A.   No.  I bought once a caravan,
15 an RV.
16   Q.   Did you ever form an LLC with
17 your wife in an effort to buy a vacation
18 home somewhere in the United States?
19   A.   (Translated.)  I set up an LLC
20 with my wife in order to buy a caravan,
21 not --
22        (In English.)  "RV."
23        (Translated.)  -- not a vacation
24 home.  An RV.
25        (In English.)  Recreational vehicle.

1  that you submitted to the Court in Florida?
2    A.   Yes.
3    Q.   And were each of those affidavits
4  filed electronically, as indicated in the
5  top of the doc -- of each affidavit?
6    A.   I assume they did.
7    Q.   Directing your attention to the
8  first affidavit that you signed on May
9  12th, 2022 -- so it's the second page of
10 the exhibit.
11   A.   Okay.
12   Q.   And it indicates in the second
13 paragraph -- numbered paragraph:
14        "I do not reside in the State
15 of Florida."
16   A.   Correct.
17   Q.   And it says:
18        "I do not reside in the United
19 States."
20        Do you see that?
21   A.   Yes.
22   Q.   Have you ever resided in the
23 State of Florida?
24   A.   Only as a tourist.  I never
25 resided there.

1    Q.   What was the last part?  Sorry.
2         THE INTERPRETER:  "An RV."
3         THE WITNESS:  RV.  Rec --
4         THE INTERPRETER:  Recreational --
5         THE WITNESS:  Recreational --
6         THE INTERPRETER:  -- vehicle.
7         THE WITNESS:  -- vehicle.
8         THE INTERPRETER:  An RV.
9  BY MR. BEHRE:
10   Q.   And when -- when was that?
11   A.   I believe it was in 2012.  And
12 then when we -- maybe 20 -- or maybe 2014.
13        THE INTERPRETER:  He adds.
14        THE WITNESS:  And when we divorced
15 in 20 -- the end of 2017, beginning of
16 2018, as part of the divorce arrangement,
17 I transferred to her the ownership of the
18 RV.
19 BY MR. BEHRE:
20   Q.   And while you owned the RV, where
21 was it stored when it was not being used?
22   A.   It was in use about one month
23 or one month and a half per year.  And
24 we would store it in the place that we
25 would be -- we would be arriving at.

## Page 77

```
 1        Q.   And what state was that?
 2        A.   I believe we visit -- visited
 3   something like 30 states, like all over
 4   the place.
 5        Q.   Was it ever stored in the State
 6   of Florida?
 7        A.   I don't believe so.
 8        Q.   Where would --
 9        A.   Because we were more in -- on the
10   west.
11        Q.   And where -- from what state were
12   the license plates obtained from?
13        A.   I don't -- I honestly don't remember.
14        Q.   In what state did you purchase the
15   RV?
16        A.   New Jersey.
17        Q.   Now, you indicate in the third
18   paragraph of this affidavit dated May 12,
19   2022, that SDC-Gadot LLC:
20             "Has not conducted business in
21   the State of Florida."
22             Do you see that?
23        A.   Yes.
24        Q.   Is that an accurate statement?
25        A.   I believe it is.
```

## Page 78

```
 1        Q.   And when you say you -- it --
 2   the company "has not conducted business
 3   in the State of Florida," what do you mean?
 4        A.   That we did not do any business
 5   in the State of Florida.  We -- we did not
 6   carry out any investigation.  And we did
 7   not conduct any business activity.
 8        Q.   Did you engage in any financial
 9   transactions that involve the State of
10   Florida?
11        A.   Please define if -- what you mean
12   by the "State of Florida."
13             Like, if somebody in Florida made
14   a payment to me, does this mean that it
15   involves the State of Florida?
16        Q.   Did you give or receive any funds
17   from an entity or person in the State of
18   Florida?
19        A.   Possibly.  I do not remember.
20        Q.   And you indicate, at the end
21   of paragraph 3, that SDC-Gadot:
22             "Has not conducted any business
23   in years."
24             Correct?
25        A.   Well, what I mean by that is,
```

## Page 79

```
 1   since the closure of the account about
 2   a year and a half ago, maybe even a
 3   little before that -- sadly, since the
 4   beginning of COVID -- I do not recall
 5   any activity after that.
 6        Q.   When is the last time that
 7   SDC-Gadot conducted business?
 8        A.   I believe -- I believe before
 9   the summer of 2021.  2020 maybe.
10        Q.   And what business was conducted
11   in 2020?
12        A.   I think collecting funds from
13   somebody who was owing me money.  But it
14   was not an activity per se.
15        Q.   So you would agree receiving
16   funds is conducting business; correct?
17        A.   It's a -- it's a business
18   transaction of the account, not of the
19   company.  The company did not carry out
20   any -- any activity.
21        Q.   Well, the statement says that
22   the company "has not conducted any business
23   in years," which clearly suggests that it
24   had conducted business at some point.
25             So what does it mean when you
```

## Page 80

```
 1   add to your statement "in years"?
 2        A.   When I say "in years," we're
 3   already talking about two years and more.
 4   When COVID started, we practically stopped
 5   any operations, also in Gadot in Israel.
 6   And my meaning is that there was no work
 7   carried -- carried out.  If there were
 8   some collecting of funds or debts, in
 9   my opinion, this is not operations.
10        Q.   Looking next at the second
11   affidavit, which you executed on June
12   the 1st, 2022.
13             Do you have that in front of
14   you?
15        A.   Yes.
16        Q.   You indicate, in paragraph 3,
17   you had not been in the State of Florida
18   since 2017; correct?
19        A.   Correct.
20        Q.   And what were you doing in
21   Florida in 2017?
22        A.   I opened a bank account.
23        Q.   And which bank account was that?
24        A.   The account in Citibank, which
25   is the bank account of SDC-Gadot.
```

1    Q.    And you came to Florida in 2017
2    solely for the purpose of opening that
3    account or for some other reason?
4    A.    I came as a tourist.  I visited
5    some friends.  And then I took a flight
6    to D.C.
7    Q.    And what did you do when you
8    arrived in D.C.?
9    A.    I don't recall.  I assume that
10   I had business meetings.
11   Q.    During that trip in 2017, did
12   you meet with anyone from the Dechert law
13   firm?
14   A.    No.  I didn't meet anyone in there.
15   The only person I knew from Dechert was Neil.
16   And I didn't meet him in the United States.
17   Q.    (Not translated.)  Well, earlier
18   you indicated you knew David Hughes as well,
19   who was at Dechert; right?
20   A.    David Hughes worked at Stewarts
21   Law before that, before I knew him.
22   Q.    Well, where did he work first,
23   Dechert or Stewarts Law?
24   A.    When I met him, he was working
25   at Stewarts Law.  And I was told that,

1    Q.    Are you -- do you have a license
2    to be a private investigator?
3    A.    There are two levels.  I'm --
4    I have a private investigator's license.
5    And I have a license to run an -- an
6    investigating firm.  I don't actually
7    use them here in Israel.
8    But I have those documents
9    from the Justice Department or Ministry.
10   I don't think I've even renewed those
11   licenses.
12   Q.    (Not translated.)  Has your
13   license ever been suspended or revoked
14   by the Government of Israel?
15   A.    Yes.  Yes.  I don't even recall
16   why they suspended it.  But then they
17   reinstated.
18   Q.    And do you recall what year
19   it was suspended?
20   A.    2005 or '6.
21   Q.    And did it relate to your
22   involvement in smuggling someone out
23   of the State of Israel who was wanted
24   by the Israeli Government?
25   A.    I was accused of that.  There

1    previously, he had worked at Dechert.
2    Q.    (Not translated.)  Okay.  Now,
3    in paragraph 3 as well, you say the last
4    time you were in the United States was 2019.
5    What were you doing in the U.S.
6    in 2019?
7    A.    I was on a trip in the Yosemite
8    National Park and went up to Canada.  I
9    was with my partner.
10   Q.    You indicate, in paragraph 6,
11   that you are an investigator and you
12   were hired by Stuart Page to, quote:
13   "Run intelligence gathering
14   services."
15   End quote.
16   Do you see that?
17   A.    I'm looking -- looking for it.
18   Yes, I see it.
19   Q.    Are you considered a private
20   investigator?
21   A.    Among other things, yes.
22   Q.    Are you registered as a private
23   investigator here in Israel?
24   A.    I'm registered.  And I have a --
25   the -- a firm certificate.

1    was a trial.  I was not found -- I was
2    not convicted.  And so my license was
3    restored.
4    Q.    So that was the reason your
5    license was suspended?
6    A.    I think so.  But I don't
7    recall exactly.
8    Q.    Who was the person you were
9    accused of smuggling?
10   MR. BARET:  Excuse me.  How
11   does that relate to SDC-Gadot Florida,
12   which is the purpose of this deposition?
13   MR. BEHRE:  It's right in
14   his affidavit.  He's claiming he's an
15   investigator.  And I'm probing about
16   his license to be --
17   MR. BARET:  This is --
18   MR. BEHRE:  -- an investigator.
19   MR. BARET:  -- not -- this wasn't
20   for SDC Gadot.  This affidavit was -- was --
21   was provided to the Court as an objection
22   to deposing personally.  It wasn't --
23   MR. BEHRE:  It doesn't matter.
24   It's the same case.
25   MR. BARET:  No, it's not.

85

```
1        I mean, there is objection to
2   his deposition, which the Court has not
3   ruled yet.  We objected for his deposition.
4   And since you came from Washington, I'm --
5   I'm -- I'm sitting quietly and I'm trying
6   not to interfere.  But it turns out that
7   you are deposing Amit Forlit as Amit Forlit,
8   which we objected to this deposition.  And
9   the Court hasn't ruled yet.
10       And we're here for the purposes
11  of investigating or taking deposition of
12  a representative of SDC-Gadot Florida.
13       MR. BEHRE:  Correct.
14       MR. BARET:  Now, it happens to
15  be Amit Forlit.  But the Court has not
16  ruled as to our objection to depose him
17  personally.  And it turns out that this
18  deposition turns to be taking a deposition
19  in his personal capacity, which we are
20  objecting and -- object to.  So --
21       MR. BEHRE:  In the affidavit,
22  paragraph 5, he specifically references:
23       "SDC-Gadot LLC."
24       In paragraph 6, he says:
25       "I am an investigator."
```

86

```
1        MR. BARET:  This is -- this
2   affidavit was provided in our objection
3   to depose him personally.  It wasn't --
4        MR. BEHRE:  I'm -- I'm --
5        MR. BARET:  We never objected to
6   deposition of SDC-Gadot.  We're not objecting
7   to SDC-Gadot.  It's a Florida corporation.
8   He happens to be a representative of that
9   corporation.  And I request that your
10  questioning will be related to SDC-Gadot
11  and not to Amit personally, as the Court
12  hasn't ruled yet as to your right to depose
13  him personally.  If the Court will --
14       MR. BEHRE:  Okay.  I hear your
15  objection.
16       MR. BARET:  -- rules that he can
17  be deposed, then we'll -- we'll come here
18  again.  And you can depose Amit Forlit in
19  his personal capacity.
20  BY MR. BEHRE:
21       Q.  (Not translated.)  Sir, you're
22  aware that the Court ordered you to be
23  deposed in Florida; correct?
24       A.  (In English.)  Yes.
25       Q.  And you know, as a courtesy to
```

87

```
1   you, we came here; right?
2        A.  First of all, I truly appreciate
3   the fact that you came here.  As far as
4   the deposition is concerned, we submitted
5   an objection, which has not been answered
6   yet.  And like the other people present,
7   we could have done it by Zoom.
8        Q.  But it wouldn't have been as
9   intimate as this is.
10       A.  That's the reason why I'm happy
11  that you came here.
12       Q.  Well, thank you.  I'm glad to
13  be here.
14       Whose idea was it to call the
15  project that's the subject of SDG-Gadot
16  [sic] Project Beech?
17       A.  Stuart Page idea.  [sic]
18       Q.  And Stuart Page uses the term
19  "SIGINT."
20       Did SDC-Gadot use SIGINT?
21       A.  I can -- I can state the various
22  methods that -- that SDC-Gadot used.  But,
23  you know, SIGINT is a -- quite an umbrella
24  term that comes from -- from the field of
25  defense.  And on top of that, Gadot SDC did
```

88

```
1   not use anything.  It operated Gadot Israel.
2        Q.  (Not translated.)  Well, it did
3   operate Gadot Israel, didn't it?
4        Because it facilitated the money
5   that was owed to Gadot Israel and that money
6   ran through Florida; right?
7        A.  (Comment in Hebrew.)
8        THE INTERPRETER:  (Comment in
9   Hebrew.)
10       May I?  I'm not sure you got
11  correctly the --
12       THE COURT REPORTER:  No, just --
13       THE INTERPRETER:  -- translation.
14       You -- he said that SDC-Gadot was
15  operating Gadot Israel.
16       MR. BEHRE:  Uh-huh.
17       THE INTERPRETER:  Okay?  Okay.
18       (Pending question translated.)
19       THE WITNESS:  Yes.
20  BY MR. BEHRE:
21       Q.  Did any of the payments that
22  SDC-Gadot received relate to Gadot's
23  use of subcontractors who were located
24  in the United States?
25       A.  Not that I can recall.
```

89

1    Q.   Did you have any subcontractors
2  in the United States?
3    A.   Not subcontractors.  I had vendors
4  that I paid, not --
5    Q.   And did you have --
6    A.   -- subcontractors.
7    Q.   Did you have vendors located
8  in the United States?
9    A.   I had vendors in the United
10  States.  But they are not connected to
11  the case related to Stuart Page.
12    Q.   When you were drafting the
13  reports that you spoke about earlier
14  today, did you have an e-mail account
15  you shared with Stuart Page's assistant
16  Caroline in which you created the reports?
17    A.   As part of transferring the
18  reports, we had something that was called
19  a DLB, a dead letter box.  The reports
20  were sent through that account.  But I
21  don't recall who drafted them.
22    Q.   But they were drafted by someone
23  under your direction; correct?
24    A.   I would assume that yes.
25      Because part of our expertise

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

90

1  was to set the security protocols, because
2  we were experts in cyber-security.  So
3  that way why we did it in this way, why
4  it was decided to do it in this way.
5    Q.   So if I understand the way the
6  dead letter box works is that you share
7  an e-mail account.  And you or someone
8  at your direction writes something in
9  the e-mail.  And then Caroline, on the
10  other side, accesses that same e-mail
11  account, because she knows the password
12  too.  And then Stuart Page gets the report.
13    A.   Basically, yes.  But it's much
14  more complicated than that.  And there's
15  much more security surrounding it.
16    Q.   And why was there so much secrecy
17  and security about these reports?
18    A.   So starting from the beginning
19  of the investigation, one of the greatest
20  concerns of the boss was that Khater
21  Massaad had joined forces with someone
22  else or other people in his family and
23  they wanted to topple him.
24      Throughout the investigation,
25  there were bizarre things that occurred

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

91

1  where there was a lack of cooperation
2  with the Emirates, for example, and
3  other authorities.  And after all,
4  the boss is the State.
5      So later we discovered that
6  there were other parties who were harming
7  or trying to harm the investigation and
8  the boss.  And that's why we set up these
9  security protocols.
10    Q.   And part of the objective of
11  your work was to prevent those who you
12  thought was harming RAK from doing harm;
13  right?
14    A.   So from -- the investigation
15  concentrated or focused on the criminal
16  activities carried out by Khater Massaad,
17  both business -- in business and in politics,
18  such as, for example, assisting Hezbollah
19  or violating the sanctions on Iran and
20  he -- and the use -- his use of various
21  infrastructures belonging to RAK, the
22  State, in order to commit these illegal
23  activities, criminal activities.
24      In -- among other things, we
25  provided protection.  And our work included

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

92

1  protecting -- creating protocols in order
2  to project -- protect the entire environment.
3  The boss was very, very concerned.  And he --
4  he refused even to talk on the telephone
5  because he was so concerned.
6    Q.   And SDC-Gadot received payments
7  that were, at least in part, for the
8  preparation of those reports; correct?
9    A.   (Translated.)  So SDC-Gadot
10  received payment for the whole Beech
11  case.  And that included the security
12  protocols and --
13      (In English.)  The reports.
14      (Translated.)  -- the reports.
15    Q.   And it also included payments
16  for the work that was reflected in those
17  reports; right?
18    A.   Yes.
19    Q.   Now, as part of your work for
20  which you were paid through SDC-Gadot,
21  you attended two meetings in Cyprus;
22  correct?
23    A.   I held more than two meetings
24  in Cyprus.
25    Q.   Okay.  How many were there?

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

93

```
1     A.   So in this -- I don't recall
2  how many exactly.
3          But in this case, I held meetings
4  about once a month with Stuart and also
5  sometimes with James and Neil, but must --
6  much less frequently than with Stuart.
7  The meetings were held on an as-needed
8  basis, not on a specific day or month
9  or something like that.
10     Cyprus was simply a convenient
11  location because they could stop there
12  on their way from Dubai to England.  And
13  for me, it's just a very short flight.
14     Q.   So approximately how many meetings
15  were held in Cyprus involving your work
16  for Stuart Page?
17     A.   I can estimate about five to
18  ten meetings were held with Stuart in
19  Cyprus.
20     Q.   And how many of those were
21  attended by Neil Gerard?
22     A.   I think just one.
23     Q.   How many were held with David
24  Hughes?
25     A.   The same one.
```

94

```
1     Q.   How about with Jamie Buchanan?
2     A.   I think, with Jamie Buchanan, we
3  met at least three times over that period
4  in Cyprus.
5     Q.   How about Majdi Halabi, how many
6  times did you meet with him in Cyprus?
7     A.   Once.
8     Q.   And did you meet in Cyprus with
9  at least some of these people on November
10  21st, 2018?
11     A.   There was one meeting --
12     MR. BARET:  What -- what's the
13  date of the -- the meeting you're referring
14  to?
15     MR. BEHRE:  November 21st, 2018.
16     THE INTERPRETER:  So I'll just --
17  "There was one meeting in Cyprus.
18  It was a -- a team meeting that -- and
19  Majdi was present for a short part of it,
20  the part that related to him.  I -- if I --
21  if I could see Majdi's affidavit, I would
22  be able to tell you exactly when it was."
23  BY MR. BEHRE:
24     Q.   So Majdi Halabi's affidavit was
25  accurate on this point?
```

95

```
1     A.   (In English.)  If -- if -- if
2  I can see the -- the affidavit, I can
3  refer to it.  But --
4     (Translated.)  If I could look
5  at it, I could tell you what is accurate
6  and what's not.
7     MR. BEHRE:  Okay.  I think we're
8  at -- why don't we take our break.  It's
9  2:00 o'clock.
10     MR. BARET:  Okay.
11     THE INTERPRETER:  Good idea.
12     THE VIDEOGRAPHER:  Going off the
13  record at 2:00 o'clock.
14     (Recess from 2:00 p.m. to 3:06 p.m.
15  Israel Daylight Time.)
16     THE VIDEOGRAPHER:  Going back on
17  record at 3:06.
18  BY MR. BEHRE:
19     Q.   Okay.  I'd like to go back to
20  something we talked about earlier, which
21  relates to Stuart Page's payments to Gadot.
22     Do you know about how much Stuart
23  Page, through his entities, paid to SDC-Gadot?
24     A.   Yes.
25     Q.   Do you know about how much?
```

96

```
1     A.   We have to go back to the records.
2  But in terms of the U.S. companies, it was
3  between two hundred, two hundred and one
4  per month.  Relating to this specific case.
5  Because there are other cases as well.
6     Q.   Okay.  Would it surprise you
7  if, into your Gadot account at Citibank
8  in the U.S., the total amount received
9  from Page Group, Page Group ME, and Page
10  Risk Management totals more than $2.6
11  million?
12     A.   It wouldn't surprise me.  And
13  it is not only for this specific case.
14     Q.   Okay.  How did you first meet
15  Stuart Page?
16     A.   I believe it was in 2008 or
17  2007.
18     Q.   And how did you meet him?
19     A.   I went to London.  And I was
20  requested to do some job for him.
21     Q.   Requested by who?
22     A.   Through a mutual acquaintance
23  for whom I was working at the time.
24     Q.   And who is that mutual
25  acquaintance?
```

1    A.   How is this connected to
2  this case?
3    Q.   It's directly related.  Stuart
4  Page paid you 2 point -- Stuart Page paid
5  you $2.6 million into the U.S. account.
6         And I want to know how it is you
7  first came in contact with Stuart Page.
8    A.   I met him through a mutual
9  acquaintance.  I believe it was Mr. Rafi
10 Pridan.
11        MR. BEHRE:  What's the name?
12        THE INTERPRETER:  Rafi Pridan.
13 Rafi Pridan.
14 BY MR. BEHRE:
15   Q.   And Mr. Pridan's been convicted
16 of hacking, hasn't he?
17   A.   I'm not familiar with this.
18 I don't think so.
19   Q.   He's been charged with hacking,
20 hasn't he?
21   A.   No.  To the best of my knowledge,
22 he was not accused of hacking.
23   Q.   Okay.  And what you -- you said
24 it was 2008 when you first met him?
25   A.   I think so.

1  we would make some arrangements that would
2  pacify the banks.  But to the best of my
3  recollection, there was no organized orderly
4  retainer agreement with him.
5    Q.   What was the purpose for which
6  you were hired?
7    A.   You mean on the Beech Project?
8    Q.   Yes.
9    A.   As I specified earlier, there
10 were concerns and suspicions on the part
11 of the boss that Khater Massaad was stealing,
12 was causing damage to the State, including
13 assistance given to political opponents,
14 including felonies that would embarrass
15 the boss very seriously vis-a-vis the
16 United States, in terms of violations
17 of the sanctions against Iran.
18   Q.   Did your investigation involve
19 at all Karam Al Sadaq?
20   A.   The correct name is Karam Al --
21 Karam --
22        THE INTERPRETER:  Karam Al --
23        THE WITNESS:  -- Al Sadeq.
24        THE INTERPRETER:  -- Sadeq.
25        THE WITNESS:  Karam.  Karam.

1    Q.   When were you first hired for
2  Project Beech?
3    A.   I believe it was March 2015.
4    Q.   So you worked with Stuart Page
5  for approximately seven years before this
6  project; right?
7    A.   Not consistently.  But between
8  2008 and 2015, on and off.
9    Q.   And did your work for Stuart Page,
10 relating to Khater Massaad and the others,
11 such as Farhad Azima, did they go by any
12 other name than Project Beech?
13   A.   I was working only on Khater
14 Massaad, as the subject of the investigation.
15 And it went only under Project Beech.
16   Q.   Was there ever a time when that
17 investigation was also called Project Oak?
18   A.   No.  Project Oak is something else.
19   Q.   Okay.  You testified earlier that
20 you did not have a retainer agreement with
21 Stuart Page; is that correct?
22   A.   To the best of my recollection,
23 there was no retainer agreement.
24        Occasionally, when we had problems
25 with funds transferring with Hong Kong,

1        THE INTERPRETER:  Karam Al --
2  Karama?
3        THE WITNESS:  Karam.
4        THE INTERPRETER:  Karam Sadeq.
5        THE WITNESS:  "Kaf," "aleph,"
6  "mem" -- "resh," "mem."
7        THE INTERPRETER:  Karam Sadeq.
8        THE WITNESS:  Karam Al Sadeq.
9        THE INTERPRETER:  Karam Al Sadeq.
10        THE WITNESS:  I also speak Arabic.
11        When we launched our investigation,
12 Karam was already arrested by the authorities
13 of RAK.  And we did -- we did get feedback
14 from -- concerning him from the investigation.
15 He had already been investigated by RAK, among
16 other things, concerning offshore companies
17 that he had.
18 BY MR. BEHRE:
19   Q.   The allegations against Al Sadeq
20 were similar to the allegations against
21 Massaad; right?  They were related?
22   A.   Not -- not exactly.
23        To the best of my recollection,
24 Sadeq assisted in creating the infrastructure
25 for Massaad's activity.  But the -- the

1  initiator was Massaad.
2      Q.   Were you present for any of the
3  interrogations of Al Sadaq?
4      A.   No.  And I've never been to Ras
5  Al Khaimah.
6      Q.   And how long did you work on
7  Project Beech for for which payments were
8  received by SDC-Gadot?
9      A.   I estimate that it was from the
10 beginning of 2018 and up to April 2020.
11     Q.   Right before we went to lunch,
12 we talked about a meeting that you recalled
13 in Cyprus.
14          Do you remember that discussion?
15     A.   Yes.
16     Q.   And that was on November 21st,
17 2018?
18     A.   (Translated.)  I have to see
19 the affidavit of Majdi Halabi in order
20 to remember --
21          (In English.)  The exact date.
22          (Translated.)  -- the exact date.
23     Q.   Well, wouldn't your travel records
24 show?
25     A.   Yes.  But I don't have them with

1  me right here.
2      Q.   Well, I'm -- I'm confused.
3          Because I thought you didn't --
4  you thought Mr. Halabi wasn't telling the
5  truth.
6          But you want to read his witness
7  statement to find out what the truth is?
8      A.   Mr. Halabi stated in -- two
9  meetings in his affidavit.  One of them
10 was not held.  If I see -- if I -- if
11 I see his affidavit, I will see in which
12 meeting -- to which meeting he relates
13 where Mr. Hughes was present.  And that
14 is the meeting that did take place indeed.
15 But I need to see the affidavit in order
16 to -- to ascertain that.
17     Q.   Well, putting aside the precise
18 day, was it November 2018?
19     A.   Once again, I think so.
20     Q.   Okay.  And that was the meeting
21 where Hughes was present, Gerard was
22 present, Buchanan was present; right?
23     A.   Yes.
24     Q.   And Halabi was present?
25     A.   In part of it.  And Stuart

1  also.
2      Q.   And Stuart Page.
3          What was discussed at that
4  meeting, if you recall?
5      A.   It was a coordination meeting
6  concerning the management of the case.
7  One of the subjects was the fact that
8  in the procedure -- or the proceedings --
9          THE INTERPRETER:  Sorry.
10         THE WITNESS:  -- involving
11 Farhad Azima, Stuart was requested to
12 tell who was it that divulged to him
13 the existence of the leaked materials.
14         Since the -- there was a fear
15 on the part of the client to divulge that
16 an Israeli firm was working for him and
17 that it would be mis-used by his political
18 opponents, we decided that Majdi Halabi,
19 who was working on the case, is the one
20 who will say that he is the one who told
21 Stuart about the leaked information or
22 the leaked files, leaked materials.
23         And I'd like to clarify that,
24 to this day, we do not know who it was
25 who had reported to Stuart the existence

1  of those leaked documents.
2  BY MR. BEHRE:
3      Q.   So when you attended that
4  meeting in Cyprus in November 2018,
5  you were paid by Page -- one of Page's
6  entities to SDC-Gadot; right?
7      A.   As I said before, the payment
8  was made for the entire activity on
9  this case, among other things for that
10 specific meeting.
11     Q.   And that specific meeting
12 concerned Farhad Azima; correct?
13     A.   This was -- this related
14 to a legal proceedings that the client
15 had requested us to refer to, legal
16 proceedings bearing on or touching
17 Farhad Azima.
18     Q.   So you were paid to attend
19 the meeting in Cyprus that concerned
20 Farhad Azima; correct?
21     A.   Yes.
22     Q.   Who ran that meeting in Cyprus?
23     A.   I think it was Neil.
24     Q.   You ran the meeting?
25     A.   (Comment in Hebrew.)

1    THE INTERPRETER:  (Comment in
2  Hebrew.)
3        MR. BARET:  He said "Neil."
4        THE INTERPRETER:  (Comment in
5  Hebrew.)
6        MR. BARET:  "Neil."
7        THE INTERPRETER:  "Neil."  "Neil."
8        MR. BEHRE:  Oh.  I'm sorry.  I
9  thought it was "me."
10       THE INTERPRETER:  Sorry.  "Neil."
11       MR. BARET:  No.  "Neil."
12       MR. BEHRE:  "Neil."
13       THE INTERPRETER:  No.  "Neil."
14  BY MR. BEHRE:
15       Q.  Okay.  So Neil Gerard ran the
16  meeting?
17            Apologies.
18       A.  "Kin."
19       Q.  And how many -- where did the
20  meeting occur?
21       A.  In a conference room of this
22  type in one of the hotels there.  But
23  I do not -- don't recall specifically
24  which.
25       Q.  How long did the meeting last?

1       A.  I estimate about two hours.
2       Q.  Did you stay -- did anybody
3  stay overnight?
4       A.  Not that I know of.
5       Q.  What did Neil Gerard say the
6  purpose of the meeting was?
7       A.  The -- the purpose was the --
8  the coordination of the management of
9  this case generally.  And one of the
10  specific subjects was the preparation
11  by Stuart for his testimony in the
12  trial.
13       Q.  And by the "management of
14  this case generally," you're referring
15  to the lawsuit involving Farhad Azima
16  and Rakia?
17       A.  One of the subjects was that.
18       Q.  You also attended a meeting in
19  Switzerland; correct?
20       A.  Yes.
21       Q.  Do you recall when that was?
22       A.  I believe it was the end of 2019.
23       Q.  Was it in December 2019?
24       A.  I believe so.
25       Q.  Was it at the Hotel Moosegg?

1       A.  Yes.
2       Q.  And who was responsible for
3  booking that hotel and for security
4  arrangements for all the parties to
5  get there?
6       A.  Stuart had asked me to organize
7  a meeting under the seal of secrecy that
8  would be secured and secluded.
9            At first I suggested to him
10  to hold it in Israel because, in Israel,
11  it's the easiest for me to arrange the
12  security.  Then he asked it to be in
13  Switzerland.  So I'm the one who reserved
14  the hotel.  I also booked security personnel,
15  cars, vehicles that would drive the people,
16  and all that on Stuart's request.
17       Q.  And were all those expenses
18  billed through and paid from Page to
19  SDC-Gadot?
20       A.  I assume so.  Yes.
21       Q.  How long did that meeting at
22  the Swiss hotel last?
23       A.  Two or three days.
24       Q.  And you rented out the entire
25  hotel for those two or three days; right?

1       A.  It was a hotel that was not
2  active during the week.  It was only
3  active on weekends.  So there -- that
4  is why it was convenient to -- to book
5  it for our purpose.  And it was easy
6  to -- to arrange the security arrangements.
7       Q.  And during your stay there, you
8  had a private chef and a private wine cellar
9  to use; right?
10       A.  I -- I believe it is a slightly
11  exaggerated or overrated description.
12            Someone was cooking for us.  And
13  I personally don't consume alcohol at all,
14  whatsoever.  But with the meals, there was
15  also alcohol served.
16       Q.  Well, Mr. Gerard likes his wine;
17  right?
18       A.  Mr. Stuart likes the honey that
19  he took from the hotel.  Each one has his
20  own likings.
21       Q.  What was the purpose of the
22  meeting?
23       A.  As far as I'm concerned, the
24  purpose was another coordination meeting
25  in the management of this case.

1    The atmosphere in the meeting
2  was, of course, more homely [sic], more
3  pleasant.  And he asked the people who
4  had submitted affidavits to do some sort
5  of rehearsal for the trial.
6    As I personally was no party
7  to this trial, in the parts that related
8  specifically to the trial, I practically
9  did not participate.
10   Q.   And the rehearsal of -- the
11 rehearsal of the trial testimony concerned
12 Mr. Page and Mr. Halabi; correct?
13   A.   Yes.  Correct.
14   Q.   And Mr. Gerard too, because
15 he was going to testify at the trial;
16 right?
17   A.   I would assume so.  I'm not
18 really very well-versed in, you know,
19 what was -- had to do with the running
20 of the trial.  I wasn't a party to it --
21 to that case.
22    So -- but yes, I would assume
23 that Gerard also was to give testimony
24 at that trial.
25   Q.   And you instructed everybody

1  personally guard people inside.
2    Q.   Okay.
3    A.   And -- and some of the time, I
4  actually let them go eat and I took over
5  for them.
6    Q.   Were you present when Mr. Halabi
7  was rehearsing his testimony?
8    A.   I don't recall.  It's possible
9  for part of the time.  But I -- I don't
10 recall specifically.
11   Q.   You're the one that asked Halabi
12 to be involved in the case; isn't it true?
13   A.   Halabi was involved in this case
14 long before 2018 or '19 or whenever it was.
15 Halabi, in fact, covered very large parts
16 of areas in the Gulf and Saudi Arabia.
17 And he was well-versed in the details of
18 the case.
19    It might have been me or perhaps
20 it was him who suggested this minor detail
21 that the leaked information was on the
22 Internet.
23   Q.   And you say that's a minor detail.
24    But that was a big issue in the
25 case, wasn't it?

---

1  that attended the meeting to leave their
2  phone home or to turn it off when they
3  were at the location so their location
4  device on the phone would not work; right?
5    A.   No.  I had my phone.  Majdi had
6  his phone.  The -- the security team had
7  theirs.  Nobody gave those instructions.
8    Q.   (Not translated.)  So what was
9  the purpose of the -- of a security team?
10   A.   At that stage, so the -- at that
11 time, the boss was extremely concerned that
12 somebody was trying to topple him or that
13 he was going to be toppled.  And he asked
14 Stuart -- because I got my instruction from
15 Stuart.  He asked Stuart -- he insisted that
16 there be the most stringent security measures
17 possible taken.
18   Q.   But as I understand what you're
19 saying, there were bodyguards who you hired
20 to guard the hotel.
21    Am I right?
22   A.   Yes.  The -- the -- the bodyguards'
23 job was to stand outside and to keep a lookout
24 to see if there were any surveillance teams
25 surveilling the hotel.  They -- they didn't

1    A.   I'm not a legal expert.  And I
2  didn't follow all the details of the case,
3  because that's not my job.  I consider it
4  a minor detail.
5    Q.   Well, you're aware, aren't you,
6  that by the time that meeting was held
7  in Switzerland, Farhad Azima had already
8  sued Rakia, the boss, for hacking him in
9  the United States; right?
10   A.   I don't -- I don't have no information
11 regarding who hacked into Farhad Azima's
12 computers.  But I do know that, in wake
13 of the trial in the U.K., it was decided
14 that the boss -- he was right, that he --
15 yeah, that he was right.
16   Q.   The boss was right about what?
17   A.   He won the trial in England,
18 his suit against Farhad Azima.
19   Q.   But you're aware now that two
20 of the witnesses who testified at the
21 trial admitted they committed perjury
22 and that the plot to commit that perjury
23 occurred at that Swiss hotel that you
24 set up?
25    Are you aware of that?

113

```
1        A.   I was not part of the trial.
2   I was asked -- I was asked to organize
3   the meeting and be in charge of security.
4   And I understand that there's a trial now
5   regarding the liability of the person who
6   did what he said he did.
7        Q.   But you're aware that two of the
8   people that attended that meeting, under
9   high security in Switzerland, Mr. Page and
10  Mr. Halabi, have now confessed to committing
11  perjury and have said they learned their
12  perjury in Switzerland and the headmaster
13  of that perjury school was Neil Gerard?
14       That's what they both say; right?
15       A.   I cannot relate to the content
16  of the conversations between Neil Gerard,
17  Stuart Page, and Majdi Halabi, because
18  I was not a part of those conversations.
19       What I can say -- what I can
20  say is that, upon reading the new affidavits
21  from Majdi Halabi and Stuart Page, I identify
22  certain statements that are not true.
23       Q.   And you're aware that Stuart Page
24  specifically says he hired you to hack; right?
25       That's what he says.
```

114

```
1        A.   And that's one of the parts that
2   are lies.
3        (Exhibit 4 marked.)
4   BY MR. BEHRE:
5        Q.   I'd like to next show you what
6   we've marked as Exhibit No. 4.  It's the
7   Citibank bank statements --
8        A.   (Comment in Hebrew.)
9        Q.   -- the first one being an account
10  statement for October 2017, the last statement
11  being an account statement for June 2021.
12       And they have a Bates number, so
13  a number at the bottom right-hand corner,
14  that starts with the last five digits 00044
15  through 00147.
16       A.   Okay.  (Examining.)
17       MR. BEHRE:  And apologies if my
18  sentences are too long.
19       THE INTERPRETER:  No, it's fine.
20  I have it --
21       MR. BEHRE:  You should --
22       THE INTERPRETER:  -- in front --
23       MR. BEHRE:  -- both feel free --
24       THE INTERPRETER:  -- of me.
25       MR. BEHRE:  -- to stop me.
```

115

```
1        THE INTERPRETER:  It's -- no, you're
2   fine.
3        MR. BEHRE:  Okay.
4        THE INTERPRETER:  You can go on as
5   long as you like.  We have it right in front
6   of us.  So --
7        MR. BEHRE:  Okay.
8        THE INTERPRETER:  -- we have the
9   true notes, the realtime, or whatever it's
10  called.
11  BY MR. BEHRE:
12       Q.   (Not translated.)  Are -- and --
13  and I -- I don't know if I said the obvious.
14       But these are SDC-Gadot LLC's
15  bank records; correct?
16       A.   I thank you, first of all, for
17  bringing it to me, because I didn't have
18  it.
19       (Pending question translated.)
20       THE WITNESS:  Yes, yes.  That's
21  correct.
22  BY MR. BEHRE:
23       Q.   And it appears that the account
24  was opened, from the first page that's
25  Bates number 44, on October 30th, 2017,
```

116

```
1   with a deposit of a thousand dollars;
2   right?
3        A.   Yes.  That's at the opening
4   of the account.
5        Q.   And you testified earlier
6   that you opened this account in person
7   in Florida; correct?
8        A.   Yes.
9        Q.   And when you opened the account,
10  what did you represent to Citibank the
11  business of SDC-Gadot was?
12       A.   I do not recall.
13       Q.   Did you fill out an application
14  form that you recall?
15       A.   I assume that I did.  But I do
16  not recall.
17       Q.   I'd like to turn your attention
18  to page 48.  And, again, the numbers are
19  in the lower right-hand corner.  It's the
20  bank statement for the period of December
21  1st through December 31st, 2017.
22       It should be five pages in.
23       A.   (Comment in Hebrew.)
24       (In English.)  Yes.
25       (Translated.)  Okay.  Yes.
```

117

```
1       Q.   And you see on December 20th,
2    2017, a credit for $5,000, which was a
3    wire from Insight Analysis and Research;
4    right?
5       A.   Yes.
6       Q.   And then two pages later, on
7    page 50, there's $45,000 wired again by
8    Insight Analysis.
9            Do you see that?
10      A.   (In English.)  Yes.
11           (Translated.)  Yes.
12      Q.   And Insight Analysis is your
13   other Florida-based LLC; correct?
14      A.   Yes.
15      Q.   (Not translated.)  And now going
16   to page 52, which is the statement for
17   February 2018, you'll see another deposit,
18   this time for $111,950.  And it's a wire
19   from Page Group ME.
20           Do you see that?
21      A.   "Kin."
22           (In English.)  Yes.
23      Q.   And that's a payment from Mr. Page,
24   who hired you for Project Beech; correct?
25      A.   (Translated.)  Yes.
```

118

```
1            (In English.)  I suppose so.
2            (Translated.)  I suppose so.  But
3    I'm not -- I'm not sure.  Because there were
4    other projects.  Mr. Page paid me for other
5    projects other than Beech.  So I'd have to
6    check to make sure.
7       Q.   And your invoices would indicate
8    if it was Project Beech; correct?
9       A.   (In English.)  Yes.
10           (Translated.)  Yes.
11      Q.   And you indicated you reviewed
12   some invoices to prepare for your testimony
13   today.
14           Did those invoices say "Project
15   Beech" on them?
16      A.   Yes.  But I don't have them here.
17   I can bring them tomorrow.
18      Q.   (Translated.)  Okay.  Would you
19   do that, please?
20           (Not translated.)  And if you
21   look on the same page, that's page 52,
22   on February 6 and February 13, just about
23   a week apart, there were two transfers,
24   one for 49,000 and one for 50,000, to
25   Fusion GPS.
```

119

```
1            Do you see that?
2       A.   "Kin."
3            (In English.)  Yes.
4            (Last question partially
5    translated.)
6            THE INTERPRETER:  "Yes."
7    BY MR. BEHRE:
8       Q.   And Fusion GPS is an
9    investigative firm; is that correct?
10      A.   Yes.  But there's no connection
11   whatsoever to Stuart Page or Project Beech.
12      Q.   And Fusion GPS was a subcontractor
13   to SDC-Gadot; correct?
14      A.   No.  They did not do any work for
15   SDC-Gadot.  But they -- they received payment
16   for something else.
17      Q.   (Partially translated.)  Well, SD --
18   let me -- let me rephrase it.
19           SDC-Gadot paid Fusion GPS $99,000
20   in February of 2018; right?
21           THE INTERPRETER:  2018?  2018.
22           MR. BEHRE:  Yes.
23           (Remainder of pending question
24   translated.)
25           THE WITNESS:  Yes.
```

120

```
1    BY MR. BEHRE:
2       Q.   And what were they paid for?
3       A.   I don't recall what the payment
4    was for.  But I can say that Fusion GPS
5    had no connection to Stuart Page or
6    Project Beech.
7       Q.   But if you can't recall what
8    it was for, how could you be sure?
9       A.   Because I know that Fusion had
10   nothing to do with this case.
11      Q.   If you turn the page, on page 53,
12   you'll see that Fusion gets another 50,000
13   on February 15, another 50,000 on February
14   20, and another 50,000 on February 27.
15           Do you see that?
16      A.   Yes.
17      Q.   And so --
18      A.   Same answer.
19      Q.   So for the month of February,
20   Fusion GPS was paid 250 --
21           (Brief telephone interruption.)
22   BY MR. BEHRE:
23      Q.   -- $250,000 by SDC-Gadot; right?
24      A.   That's correct.
25      Q.   And did the payments to Fusion
```

```
1   GPS relate to anything you were doing
2   for Stuart Page?
3       A.  Under no circumstances.  Not
4   at all.
5       Q.  Well, earlier today you said
6   this account was opened simply because
7   Stuart Page had trouble transmitting
8   funds to you; right?
9       A.  That's correct.
10      Q.  (Partially translated.)  And
11  the other entry on page 53 is a $275,000
12  credit, a wire from Insight, your other
13  Florida entity, to this Gadot account;
14  right?
15          THE INTERPRETER:  Two hundred
16  and seventy-five, you said; right?
17          MR. BEHRE:  Yes.
18          (Remainder of pending question
19      translated.)
20          THE WITNESS:  Yes.  That's
21  correct.
22  BY MR. BEHRE:
23      Q.  (Partially translated.)  There's
24  a $47,000 payment on February 22nd, a wire
25  to an Olam Hamachshevim.
```

```
1           Who is that?
2           THE INTERPRETER:  Did I get that
3   right, Olam Hamachshevim?
4           THE WITNESS:  "Kin."  Olam
5   Hamachshevim.
6           (Remainder of pending question
7       translated.)
8           THE WITNESS:  (Translated.)  It's
9   a vendor who supplied me with equipment.
10  Again, it has nothing to do with --
11          (In English.)  Stuart Page.
12          (Translated.)  -- Stuart Page.
13  BY MR. BEHRE:
14      Q.  So it's your testimony that Olam
15  [sic] sold you equipment?
16      A.  Yeah.  It's a computer store, Olam
17  Hamachshevim.
18          THE INTERPRETER:  That -- interpreter's
19  note.  That means "computer world" in -- in
20  Hebrew.
21          "So yeah, I -- I guess it must
22  have been for equipment."
23  BY MR. BEHRE:
24      Q.  (Partially translated.)  And your
25  contact point at Fusion GPS was Glenn Simpson;
```

```
1   right?
2           THE INTERPRETER:  What was his name
3   again?
4           THE COURT REPORTER:  Glenn.  Glenn.
5           THE WITNESS:  Glenn.
6           MR. BEHRE:  Glenn Simpson.
7           (Remainder of pending question
8       translated.)
9           THE WITNESS:  Not only.  But yes,
10  him too.
11  BY MR. BEHRE:
12      Q.  And the other one was Peter French;
13  right?
14      A.  Yes.  Peter French too.
15      Q.  (Not translated.)  Directing
16  your attention to 54.  That's the SDC-Gadot
17  statement for March 2018.
18          There is a -- there's a wire on
19  March 1st for $30,000 to Aviram Hawk, which
20  is Aviram Azari's company; correct?
21          THE INTERPRETER:  Whose company?
22          THE COURT REPORTER:  Aviram's.
23          MR. BEHRE:  Aviram Azari.
24          THE INTERPRETER:  Azari.
25          (Pending question translated.)
```

```
1           THE WITNESS:  Yes.  That's
2   correct.
3   BY MR. BEHRE:
4       Q.  And Mr. Azari recently pled
5   guilty in Federal Court in New York to
6   hacking, didn't he?
7       A.  Yes.  He confessed to seven
8   separate incidents of computer hacking
9   in New York.
10      Q.  And the document in which he
11  pled guilty references an Israeli company.
12  But they don't name that company.
13          Was that company yours?
14      A.  No.
15      Q.  How do you know that?
16      A.  Because I've never commissioned
17  hacking and have never paid for hacking.
18      Q.  You're aware that Mr. Azari is
19  cooperating with Federal law enforcement
20  officials in the U.S.; correct?
21      A.  I wish him all the best.
22      Q.  Have you been contacted by those
23  prosecutors about this case?
24          MR. BARET:  It's not related to
25  SDC-Gadot.  You don't have to answer that.
```

1    THE WITNESS:  This has nothing
2  to do with this case or with Stuart.
3  BY MR. BEHRE:
4    Q.  Well, I beg to differ.
5    The SDC-Gadot bank statement,
6  which is directly related to this case,
7  has a wire out to a man who's confessed
8  to and now convicted of hacking.  This
9  case is all about hacking.  And I'm asking
10  the witness about his relationship with
11  the hacker.
12    MR. BARET:  You can ask about
13  the transaction, why it was paid.  And he
14  can confess to a -- confess to a murder.
15  I mean, it doesn't mean that it's got
16  anything to do with SDC-Gadot.
17    MR. BEHRE:  I am entitled to
18  explore it.  If you want to instruct him
19  not to answer, then we'll have to just
20  raise this issue too.  It's up to you.
21    MR. BARET:  I mean --
22    THE WITNESS:  I -- I have answered
23  that this has nothing to do with this case.
24  And Aviram Azari did other jobs, other than
25  hacking, that he was paid for.

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

1    "Rega."
2    THE INTERPRETER:  No.
3    THE WITNESS:  The prosecutors,
4  in the case of Aviram Azari, have never
5  contacted me or asked me for any information.
6  BY MR. BEHRE:
7    Q.  What work did Azari do for you,
8  if it wasn't hacking?
9    A.  For me he never did any work.
10    Q.  Yet he was paid $55,000 on March
11  1st and March 12, 2018.
12    A.  He did work for Gadot.  And
13  that work included economic investigations
14  or financial investigations.
15    Q.  And by --
16    THE INTERPRETER:  "Financial
17  investigations" or "economic."
18  BY MR. BEHRE:
19    Q.  And by "financial investigations,"
20  does that mean obtaining confidential
21  banking and financial records about
22  individuals who were being investigated?
23    A.  The investigations that Azari
24  did for me had nothing to do with Project
25  Beech or anything to do with Stuart at all.

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

1  And I asked him that any investigations he
2  did to me -- for me be done in accordance
3  with the law.
4    Q.  Why did you find it necessary to
5  tell him to act lawfully?
6    A.  I say that to every one of my
7  subcontractors.
8    Q.  If you look on the same page,
9  that's page 54, there are two entries on
10  March 15th, 2018, where you received wires.
11  And one of them -- the first one is from
12  Florida AP [sic] Telecom, Inc.
13    Do you see that?
14    It's $100,000 that came in from
15  a Florida entity; correct?
16    A.  This is -- this is a -- a different
17  customer.  It has nothing to do with Page
18  or any of this case.
19    And I can add that the investigation,
20  in this particular instance, was in South
21  America and has nothing to do with what's
22  going on.
23    Q.  In your affidavit that you
24  submitted in this case in Florida, you
25  indicated that you didn't transact business

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

1  in Florida.  And yet we have a transaction
2  where you received $100,000 from a Florida
3  company.
4    What business did you transact
5  with this Florida company?
6    A.  I did not transact any business
7  in Florida, as I said earlier.  And this
8  payment is for work that was done in South
9  America.
10    Q.  With a Florida company; right?
11    A.  The payment, as I see here,
12  came from Florida.  But again -- once
13  again, this has nothing whatsoever to
14  do with Stuart Page or Project Beech.
15    Q.  And if you go to the next page,
16  page 55, here's another wire from Florida
17  IP Telecom on March 16th for $200,000.
18    Do you see that?
19    A.  Yes.
20    Q.  (Partially translated.)  And
21  Florida IP Telecom is owned by Fernando
22  Alonzo Paredes; right?
23    THE INTERPRETER:  Could you
24  repeat the name?  Fernando?
25    MR. BEHRE:  Fernando Alonzo

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

129

1  Paredes, P-a-r-e-d-e-s.
2       (Remainder of pending question
3  translated.)
4       THE WITNESS:  That may be
5  correct.
6  BY MR. BEHRE:
7       Q.  (Partially translated.)  And
8  he also owns a company called Overseas
9  Consulting Limited, LLP, another Florida
10  company; correct?
11       THE INTERPRETER:  Could you
12  repeat the name of the company?
13       MR. BEHRE:  Overseas Consulting
14  Limited, LLP.
15       (Remainder of pending question
16  translated.)
17       THE WITNESS:  I have no idea.
18  I don't know the person.  I have no way
19  of confirming or denying that.
20  BY MR. BEHRE:
21       Q.  Well, if you look on March 23rd,
22  on page 55, you received $350,000 from
23  Overseas Consulting Limited, LLP; correct?
24       A.  There's no connection whatsoever
25  between these wires and Stuart Page.  And

130

1  I -- I can't answer beyond saying that
2  this has nothing to do with Project Beech,
3  Farhad Azima, or Stuart Page.
4       Q.  So in the month of March 2018,
5  you received $650,000 from Florida
6  companies; correct?
7       A.  This work was not executed
8  in Florida.  The customer is not a U.S.
9  citizen.  And apparently part of the
10  payment for this work was transferred
11  through an American -- through American
12  companies.
13       Q.  But are you aware that Overseas
14  Consulting Limited, LLP, is a Florida
15  corporation?
16       A.  It's not something I checked
17  then.  I believe you.
18       Q.  And then on that same page,
19  page 55, on March 19th and March 20th,
20  there are wires out to Gadot Information
21  Services, which, as I understand it, is
22  the Gadot entity here in Israel; correct?
23       A.  Correct.
24       Q.  And does it sound about right
25  that, between March 2018 and February 20 --

131

1  2021, in this bank account alone, you
2  transferred from the Citibank account
3  for Gadot SDC more than 2.5 million to
4  Gadot Information Services here in Israel?
5       A.  I didn't add it up.  But that
6  sounds about right.
7       Q.  And would it surprise you if
8  I said that the payments to Fusion GPS,
9  between just February 2018 and July 2018,
10  total more than $1.2 million?
11       A.  I do not understand the connection
12  between Page, the Beech Project, Azima,
13  and Fusion.
14       Q.  (Not translated.)  I'm just
15  asking you:  Does it surprise you that,
16  from February 2018 through July 2018,
17  there were payments from the SDC-Gadot
18  Citibank account with a Miami, Florida
19  address to Fusion, exceeding $1.2 million?
20       A.  My answer is that I'm not surprised.
21       Q.  Okay.  What is BM -- BMI Analysis
22  Limited?
23       A.  I don't remember.  It could be
24  one of the vendors or one of the customers.
25       Is it someone on the receiving

132

1  end?  On the paying end?
2       (Comment in Hebrew.)
3       Q.  If you look at March 30th.
4       A.  I'm looking for it.
5       Q.  March 30th.
6       A.  (In English.)  CBOL to BMI.  Aah.
7       (Translated.)  I paid.  So I guess
8  it's one of our vendors.
9       Q.  And it's true, isn't it, that BMI
10  Analysis Limited was also working on Project
11  Beech?
12       A.  I do not recall.
13       Q.  Okay.  Now let's go to April
14  2018, page number 56.
15       A.  Going backwards?
16       Q.  And you'll see that there are
17  five payments for $50,000 each to Fusion.
18  And there are several wires out to Gadot
19  Information Services for $50,000.
20       Why --
21       A.  Citibank restricted the amounts
22  of the transfers I could make to $50,000
23  each.  And that is why we divided payments
24  into several $50,000 payments.
25       Q.  And why did Citibank impose that

1  restriction?
2      A.   You have to ask them.
3      Q.   Did it -- was it always that way?
4  Or did they restrict you after you opened
5  the account?
6      A.   No.  It was from the start.
7      Q.   And in April of 2018, there were
8  several more wires out from SDC-Gadot to
9  Gadot Information Services here in Israel;
10  right?
11     A.   Correct.
12     Q.   (Partially translated.)  Throughout
13  these bank records, there are debit card
14  purchases for iPostall.
15          What are those?
16          THE INTERPRETER:  What's the name
17  again?
18          MR. BEHRE:  IPostall.
19          (Remainder of pending question
20      translated.)
21          THE WITNESS:  (Comment in Hebrew.)
22          (In English.)  Which date?
23          (Translated.)  Which -- which line?
24  Which date?
25  //

1  BY MR. BEHRE:
2      Q.   It is March 17th -- April.  I'm
3  sorry.
4      A.   (Comment in Hebrew.)
5          THE INTERPRETER:  "Kin."
6          MR. BARET:  April 20th.
7  BY MR. BEHRE:
8      Q.   And April 20th too.  And April
9  24th too.
10         MR. BARET:  It's like $10.  9.99.
11         You see it?
12         THE WITNESS:  (In English.)  It
13  might be Apple Music or whatever, I think.
14         (Comment in Hebrew.)
15  BY MR. BEHRE:
16     Q.   Well, could it be --
17         THE INTERPRETER:  "I don't remember."
18  BY MR. BEHRE:
19     Q.   (Not translated.)  Could it be an
20  electronic mailbox where you kept messages?
21     A.   (In English.)  No.
22         (Translated.)  First of all, you
23  don't pay for electronic mail.  But I don't
24  remember.
25     Q.   Okay.  Let's go to pages 60, 61,

1  62.  That's for May 2018.
2      A.   Yes.
3      Q.   And you'll see more wires to BMI
4  Analysis Limited.
5          Do you see that on May 1?
6      A.   (In English.)  Okay.
7          (Translated.)  Okay.
8      Q.   And there are numerous wires
9  out to your Gadot entity here in Israel,
10  starting on May the 2nd.
11          Do you see that?
12      A.   Yes.
13      Q.   (Partially translated.)  And
14  you'll see on May 21st, Page Group ME
15  sends you $187,000 -- 187,450?
16          THE INTERPRETER:  180,000?
17          THE WITNESS:  Yes.  But I do
18  not know if this is on account of the
19  Beech Project or other projects.
20  BY MR. BEHRE:
21      Q.   And would the invoices tell
22  you whether it's Project Beech?
23      A.   I assume so.  Yes.
24      Q.   And do you have that invoice?
25      A.   As I said before, I will bring

1  them tomorrow.
2      Q.   Because you would need to retain
3  those invoices for your tax purposes; right?
4      A.   The invoices in Israel, I do
5  have to preserve them.  The invoices for
6  the United States, I have to preserve them
7  only for two years.
8      Q.   And, finally, on page 62, you'll
9  see there are three more wires to Fusion
10  GPS, 50,000 each time, three.
11          So $150,000 between May 29th
12  and May 31st; right?
13      A.   Yes.  Correct.
14      Q.   Moving to June 2018, pages 64
15  and 65, two large wires coming in from
16  Florida companies, one on June 14th
17  for $100,000 and one on June 15th for
18  $350,000.
19          Do you see those entries?
20      A.   Yes, I see.
21      Q.   And then, on the next page,
22  page 65, four more payments to Fusion
23  GPS, 50,000 each, plus the one on the
24  prior page on June the 5th, totaling
25  $250,000 wired to Fusion GPS in June

**Page 137**

1  of 2018; correct?

2  A.  Yes.

3  Q.  Going to July 2018, pages 66,

4  67, 68, you'll see numerous wires out

5  to Gadot Information Services.  I haven't

6  totaled them all up.  But it looks to be

7  five, six, or seven of those.

8  Do you see those, starting on

9  May -- on July 9?  I'm sorry.  Starting

10  on July 2nd?

11  A.  Yes, I see.

12  Q.  And so that's in July 2018 alone,

13  almost a half a million dollars wired out

14  of the SDC -- SDC-Gadot account to --

15  THE INTERPRETER:  Sorry.

16  BY MR. BEHRE:

17  Q.  So my question is:  You went

18  through all this trouble to open the

19  SDC-Gadot LLC account with Citibank.

20  And yet you appear to be moving money

21  just about as fast as you get it out

22  to the Israeli entity.

23  Why?

24  A.  Most of the work was carried

25  out by Gadot Israel.  And as I explained

**Page 138**

1  before, these accounts in the United

2  States were opened merely for convenience's

3  sake, which proved itself over time.

4  As I can see now, in July, there's

5  a lot of activity that is not connected to

6  Page at all, to Stuart Page.

7  Q.  Let's look at August, then.

8  Let's go to page 70 and 71.

9  On August 8, Stuart Page wires

10  you $276,950; right?

11  A.  Yes.  I do see it.

12  Q.  And that month, there were nine

13  wires out to Gadot.

14  A.  As I explained before, the bank

15  restricted us to $50,000 transfers.  That

16  accounts for the numerous transfers.  If

17  we could make a bigger transfer, we would

18  have been -- we would have made it a larger

19  transfer.

20  Q.  So looking at the second entry,

21  on August 1st, 2018, it says:

22  "Wire to SDC-Gadot."

23  "$50,000."

24  Did SDC-Gadot LLC have another

25  account besides Citibank?

**Page 139**

1  A.  As I've explained before, we had

2  tried to open an account in Chase Manhattan.

3  We opened actually.  We didn't try.  We

4  opened.  And I'm guessing that this transfer

5  was in that direction.  But -- and I don't

6  even recall why we hardly used that account

7  at all.

8  Q.  And if you look at the wires on

9  August 2nd, August 8, August 9, August 13,

10  again on August 13, August 20, August 21,

11  August 22, they all go to SDC-Gadot.

12  A.  I can only say, again, ask for

13  a subpoena to Chase Manhattan.  And we'll

14  be able to see what happened there.

15  Q.  Is the Chase Manhattan account

16  still open?

17  A.  No.

18  And I do not have the capacity

19  to see things myself because it is no

20  longer open.

21  Q.  When was that account closed?

22  A.  Quite quickly -- quite quickly,

23  I believe.  I do not recall exactly.  But

24  I'm going to consult, of course, with --

25  with my attorney.  But I believe I can

**Page 140**

1  give you permission to go into there and

2  check the account.

3  Q.  And is the reason why, in this

4  particular month, you attempted to move --

5  make nine wires to the Chase Manhattan

6  account, is the reason because Citibank

7  had been starting to give you difficulties

8  regarding your account there with Citibank?

9  A.  Citibank had never caused any

10  difficulty to me in my account, with the

11  exception of that restriction to transfers

12  of $50,000.  And that is why I, in fact,

13  opened the account in Chase Manhattan,

14  because this was a way of trying to

15  circumvent that restriction of $50,000

16  that -- whose result was that we had

17  to make many transfers.

18  Q.  Isn't it true that Citibank

19  expressed money-laundering concerns to

20  you about this account?

21  A.  No.  Not in my ears.

22  THE COURT REPORTER:  "Years"

23  or "ears"?

24  THE INTERPRETER:  "Ears."

25  "Ears."  "In my ears."  "Not in my ears."

BY MR. BEHRE:

Q.   Moving to November 2018, that's
pages 76 and 77, I direct your attention
to the wire on November 20th from Page
Group ME.

THE COURT REPORTER:  From who?
From who?

MR. BEHRE:  Page Group ME.

THE WITNESS:  Yes.  But I still
do not know if that transfer was connected
to Project Beech or to other projects.

BY MR. BEHRE:

Q.   But the invoice would indicate
whether it was Project Beech; correct?

A.   Yes.  And I will bring them
tomorrow.

Q.   And since this payment in
November was presumably for an invoice
in October and because, in October, you
attended a Cyprus meeting, some of those
monies at least must have been related
to Project Beech; right?

A.   For the Beech product -- Project,
we had a monthly retainer.  So each month
we received a payment.  And I cannot say

if this payment was specifically for the
meeting in Cyprus or not.

Q.   But you didn't -- you didn't
go to Cyprus for free; right?

A.   No.

Q.   Somebody paid for it; right?

A.   You are not here for free either.

A.   No.

A.   (Comment in Hebrew.)

MR. BARET:  It's not pro bono?

THE INTERPRETER:  "Me neither."

THE COURT REPORTER:  Pardon?

MR. BARET:  No?  I was shocked.
I'm the only one who's not getting paid
here?

THE WITNESS:  (Comment in
Hebrew.)

THE INTERPRETER:  I hope so.

BY MR. BEHRE:

Q.   All right.  Directing your
attention to December 2018, page 79,
on December 10th, you wired $25,000
to Dinka Analysis Services.

And Dinka is owned by Raphael
Pridan; correct?

A.   Correct.

Q.   And Stuart Page has done
business with Dinka previously; correct?

A.   Stuart Page had done business
with Rafi Pridan previously.  But I do
not know which entity of Rafi Pridan
was used.

Q.   And Dinka was doing work for
Project Beech; correct?

A.   I do not remember.  Could be
yes.  Could be no.

Q.   (Not translated.)  Okay.  And
what about Ezekiel Golan Intellectual Pro,
there are several wires to that entity on
December 12th and 13th totaling $65,000.

THE COURT REPORTER:  She's going
to need the name again.

THE WITNESS:  (In English.)  Ezekiel
Golan.

MR. BEHRE:  Ezekiel Golan Intellectual
Pro.

(Pending question translated.)

THE WITNESS:  (Translated.)  Heskel
[sic] Golan is not connected in --

(In English.)  "Ezekiel."

(Translated.)  Ezekiel Golan
is not connected in any way whatsoever
to Stuart Page or to the Beech Project.

BY MR. BEHRE:

Q.   What services did Ezekiel Golan
Intellectual provide?

A.   I am prevented from answering
that.  This is not connected.  And it is
under privilege.

Q.   (Not translated.)  Under privilege
because you were acting under the -- at
the direction of a lawyer?

A.   No.  Because of my agreement
with Ezekiel Golan that commands a privilege.

Q.   Well, I don't think that's a valid
basis not to answer.

A.   I can -- I can tell you that it's
connected to some medical development, not
connected at all to these issues.

Q.   And directing your attention to
February 2019, page 83, there's a wire on
February 19th from Page Group ME.

Do you see that, for $82,455?

A.   Yes.  I do see.

Q.   Okay.  And that was for Project

1  Beech?

2      A.  I cannot know now.  I will know

3  tomorrow.

4      Q.  Okay.  Same question.  On March

5  20th, 2019, on page 84, you received a

6  wire from Page Group ME for $99,950.

7          Do you see that?

8      A.  Yes.  The same answer.

9      Q.  And then on April 10th, as

10  reflected on page 86, another wire in

11  from Page Group ME for $99,950.

12          Do you see that?

13      A.  Yes, I see.

14      Q.  And then just eight days later,

15  Page Group ME sends you another hundred --

16  $131,950 on April 18th.

17          Do you see that?

18      A.  Yes.

19      Q.  And then in May 2019, going to

20  May the 16th and May 31st, all found on

21  page 89, you receive two wires again from

22  Page Group ME, one for $99,950 and the

23  other one for $249,950.

24          Do you see that?

25      A.  Yes.

1      Q.  And why all of a sudden are you

2  going to being paid once a month by Page

3  to being paid twice a month?

4      A.  It could be for several projects.

5  And it could be also reflecting the fact

6  that he's paying me when he's being paid.

7      Q.  And that date would line up to

8  a meeting you had in London about Mr. Halabi's

9  witness statement for use in the U.K. hacking

10  case; right?

11          MR. BARET:  What -- what's the date?

12  What's the date?

13          THE WITNESS:  I don't recall meeting

14  Majdi Halabi in London.

15  BY MR. BEHRE:

16      Q.  (Not translated.)  Okay.  And then

17  in June 2019, on page 90, you receive from

18  Page $200,000 minus a five -- $50 wire fee;

19  right?

20          THE INTERPRETER:  200,000, you

21  said?

22          MR. BEHRE:  Yes.

23          THE INTERPRETER:  Okay.

24          (Pending question translated.)

25          THE WITNESS:  All the amounts are

1  round amounts.  But Stuart being somewhat

2  stingy, he always take the -- round down --

3  commissions from me.

4          MR. BARET:  The wire fee.

5          THE INTERPRETER:  The wire transfer

6  commission.

7          THE WITNESS:  (In English.)  You

8  ask.

9  BY MR. BEHRE:

10      Q.  And then, in July 2019, there's

11  a trip to Vegas.  You stayed at the --

12      A.  (In English.)  July?

13      Q.  (Translated.)  July 2019 you

14  went to the Prada store and spent $535.

15          (Not translated.)  You -- the

16  Montcler store --

17      A.  (In English.)  I bought a belt.

18      Q.  (Not translated.)  -- and spent

19  2,175.

20          You won a bet?

21      A.  (In English.)  I -- I bought

22  a belt --

23      Q.  (Not translated.)  Oh.  "Belt."

24      A.  (In English.)  -- in Prada.

25          I can bring it tomorrow.

1      Q.  (Not translated.)  Okay.  I'll

2  try it on.

3      A.  (In English.)  Yeah.  No.  You

4  are much thinner.

5      Q.  And you saw the Beetles on Broadway.

6  And you ate at Joel Robuchon.

7          Right?

8      A.  "Kin."

9      Q.  And then Mr. Page sends you again,

10  in September 2019, $196,000 minus a $50 wire

11  fee on September 6th; correct?

12      A.  Yes.

13      Q.  (Not translated.)  What's Pandaface?

14          THE INTERPRETER:  What's?

15  BY MR. BEHRE:

16      Q.  What is Pandaface?

17      A.  Where is it?

18      Q.  It's on page 107.

19          On December 26, you sent Pandaface

20  $15,000.

21          THE COURT REPORTER:  How much?

22          THE WITNESS:  (Comment in Hebrew.)

23          THE INTERPRETER:  Fifteen.

24          MR. BEHRE:  15,000.  Sorry.

25          THE WITNESS:  (In English.)  "Wire

**Page 149**

```
1    to Pandaface."
2            (Translated.)  I don't recall.
3    BY MR. BEHRE:
4        Q.   (Partially translated.)  And then
5    in January, January 16th, on page 108, you
6    send Pandaface another $7,500.
7            Do you see that?
8            THE INTERPRETER:  175,000?
9            MR. BARET:  7,500.
10           MR. BEHRE:  7,500.
11           (Remainder of pending question
12       translated.)
13           THE WITNESS:  I -- I don't know.
14   I think maybe -- maybe I sent someone, a
15   woman, some financial assistance.
16   BY MR. BEHRE:
17       Q.   (Partially translated.)  Okay.
18   And then, on January 27th, on page 108,
19   Page is sending you wires from a new
20   entity.  It's called Page Risk Management
21   DMCC.
22           Do you see that entry on January
23   27th?
24       A.   Yes.
25       Q.   Do you -- do you know why he
```

**Page 150**

```
1    started using a different entity to wire
2    you those funds that he says were for
3    hacking?
4        A.   No.  No idea.
5        Q.   And that's the same entity that
6    sent you $222,435 on March 23rd on page
7    112.
8            Do you see that?
9        A.   Yes.  I see that the commissions
10   are getting larger.
11       Q.   And --
12       A.   Now it's $65 instead of $50.
13       Q.   Now, a payment in March of 2020
14   would be for work you did in February.
15           And February is when Mr. Azima's
16   trial occurred in the U.K.; correct?
17       A.   I didn't do anything regarding
18   the trial in England.  And this -- the
19   money, the payment is for Project Beech,
20   which continued.
21       Q.   Were you in London in late February
22   and early March?
23       A.   I'd have to check.  I don't recall.
24       Q.   Have you ever been to the Royal
25   Automotive Club?
```

**Page 151**

```
1        A.   No.
2            MR. BEHRE:  Okay.  Why don't we
3    take a break.
4            THE VIDEOGRAPHER:  Going off the
5    record at 4:43.
6            (Recess from 4:43 p.m. to 5:02 p.m.
7        Israel Daylight Time.)
8            THE VIDEOGRAPHER:  Back on the record
9    at 5:02.
10   BY MR. BEHRE:
11       Q.   Mr. Forlit, we just looked at some
12   of your Citibank bank records for SDC-Gadot.
13   And I want to ask you just a big picture.
14           You received between $200,000
15   and $300,000 a month almost every month
16   for almost five years.
17           What did you do for that money?
18       A.   In my earlier answers, I more
19   or less broke down the details of the
20   investigation, which covered a lot of
21   jurisdictions.
22           This whole line of questioning,
23   there's something unclear to me.
24           If this whole trial is about
25   hacking done by -- in 2015 by Azima and
```

**Page 152**

```
1    Stuart, the liar, is saying that I've
2    been hacking from 2017 until 2020, how --
3    how does that have anything to do with
4    hacking that happened in 2015?
5            (Comment in Hebrew.)
6            THE INTERPRETER:  (Comment in
7    Hebrew.)
8    BY MR. BEHRE:
9        Q.   (Partially translated.)  My --
10   my question was:  What did you do to earn
11   two hundred to $300,000 a month for five
12   years?
13       A.   (Comment in Hebrew.)
14           MR. BARET:  Just for the record,
15   three years.  The -- the company opened in
16   2017 and to -- to 2020; right?
17           THE WITNESS:  So we carried out
18   investigations.  And in the three years
19   of the company's activities, we investigated
20   a large number of violations of the sanctions
21   on Iran, a lot of money-laundering done
22   through Lebanon --
23           (Comment in Hebrew.)
24           THE INTERPRETER:  You -- you
25   mean embezzling?  Or money disappearing?
```

153

```
1   Misappropriation of funds?
2           THE WITNESS:  And monies that
3   disappeared from the company in -- in
4   Saudi Arabia.
5           We managed to locate Khater
6   Massaad in Saudi Arabia and the authorities --
7   and get the authorities to arrest him.  We
8   had a regular source that visited him once
9   a month in Saudi Arabia.
10          We investigated financial offenses
11  in Sri Lanka and in Switzerland.
12          We investigated transactions in
13  Georgia.
14          THE INTERPRETER:  Georgia, not
15  the U.S., the country.
16          THE WITNESS:  And that's just
17  what I can recall off the top of my head.
18  BY MR. BEHRE:
19      Q.   And when you say you investigated
20  transactions, are you referring to transactions
21  in bank records?
22      A.   We got a lot of information that
23  had its source in the customer's servers,
24  computer servers.  And a lot of the
25  information Stuart Page brought from his
```

154

```
1   own sources.  We interviewed a lot of people.
2   And that wasn't even one of the company's
3   larger cases.
4       Q.   When you say the customer's
5   computer servers, are you talking about
6   Rakia's computer servers?
7       A.   Sometimes yes.  There was a lot
8   of data that we got from servers in the
9   free zone of RAK.  And a lot of materials --
10  yes, the customer gave us a lot of materials.
11      Q.   And some of those materials
12  included bank records that were confidential;
13  correct?
14      A.   I don't recall.
15      Q.   To the best of your recollection,
16  did you ever have access to bank records
17  for any of the people that were being
18  investigated or any of the entities
19  that were being investigated?
20      A.   I don't recall precisely.
21  It's possible.
22      Q.   Do you recall ever attaching
23  confidential bank records to any of the
24  reports that you prepared?
25      A.   I don't recall.
```

155

```
1       Q.   And do you recall ever attaching
2   copies of confidential e-mails, for example,
3   between Mr. Azima and his lawyers to your
4   reports?
5       A.   I don't recall.
6       Q.   And do you recall ever excerpting
7   and embedding into your reports confidential
8   e-mails belonging to others?
9       A.   I don't recall.  And everything
10  that appears in the reports were materials
11  that were presented legally.
12      Q.   And what types of materials did
13  Mr. Page provide to you, as you indicated
14  a few moments ago?
15          MR. BARET:  I'm -- I'm sorry.
16          Just for the -- when -- when
17  counsel's referring to "you," who are you
18  referring to?  Amit Forlit individually?
19          MR. BEHRE:  Yes.  As paid by --
20  for services by SDC-Gadot.
21          MR. BARET:  Right.  But --
22          THE WITNESS:  Amit Forlit did
23  not receive money from SDC-Gadot.  Gadot
24  Israel received money from SDC.  And I
25  was a representative of SDC-Gadot.
```

156

```
1           And Page provided materials.
2   He had his sources.  Maybe some of his
3   clients and other sources.  I don't know.
4   BY MR. BEHRE:
5       Q.   What types of materials did
6   Mr. Page provide?
7       A.   A list of companies, a list
8   of contacts of people who were involved,
9   legal -- legal cases that he -- that were
10  taken from various places.
11      Q.   Did he ever provide you with
12  confidential e-mails or financial data
13  belonging to others to which he wasn't
14  entitled to have?
15      A.   I don't think so.
16      Q.   Now, regarding Mr. Halabi's
17  testimony, as rehearsed in Switzerland,
18  why was it decided that Halabi would
19  claim to have found the data on the
20  Internet?
21      A.   I don't remember who or why it
22  was decided that Halabi would be the one
23  to tell this or to -- to relate this.
24          And to this day, we -- I don't
25  know who in Halabi's firm found these links.
```

157

```
1              (Comment in Hebrew.)
2         THE INTERPRETER:  Oh.  "Office."
3         THE WITNESS:  Halabi was -- not
4   his firm.  He was part of the office.
5         And everybody in the office learned
6   about the leak quite quickly, because --
7   because, you know, when there are people
8   involved in the investigation, you can
9   just put in a -- a Google alert.  And you
10  don't have to actually look for it.  It
11  just pops up.
12        The reason that it was Halabi
13  that testified to this was because he would
14  not be identified as an Israeli investigator.
15  He was known as a journalist who wrote for
16  local newspapers in the Emirates.  And he
17  volunteered.  And this pleased the client,
18  the customer.  And -- and Halabi said that
19  he told Stuart this and that wasn't a lie.
20  And that didn't embarrass the customer.
21  BY MR. BEHRE:
22        Q.  But Halabi is Israeli; right?
23        A.  Halabi is an Israeli Druze, who
24  has an Arab name.  Arab -- his name sounds
25  Arab.
```

158

```
1         So there's a difference between
2   coming with a name like mine or a typical
3   Israeli name or having a name like Majdi
4   Halabi, which is a very common name in
5   Syria, Iraq, in fact, the whole Middle
6   East.
7         Q.  Why was it so important not to
8   focus on the nationality of the speaker?
9         A.  At the time, Israel didn't have
10  diplomatic relations with the UAE.  And
11  according to what Stuart said, it was very
12  worrying to the client that it might be --
13  become known that he was using an Israeli
14  contractor.  He thought at that time that
15  his enemies would use this information
16  to topple him.
17        Q.  And Halabi didn't really find
18  the links, did he?
19        A.  I don't know.  As I said -- as
20  I said, it popped up for everyone.  And
21  you didn't need to be an analyst with a
22  Harvard education to figure it out.
23        Q.  But Halabi now says that was
24  all a lie.
25        You're aware of that; right?
```

159

```
1         A.  I read Halabi's affidavit.
2   He says we had at least four meetings
3   to coordinate this thing, including
4   visits in London to a number of places,
5   including in Cyprus.  And I can say
6   unequivocally that he is lying.
7         And, in Israel, there's no
8   way to leave or come back into the
9   country without having some record of
10  it at the -- by the borders authority.
11        And I can state that, on the
12  dates that he says I met with him in
13  London and in Cyprus, I was in Israel.
14  I can only guess why he's lying.
15        Q.  Well, with regard to his
16  admission, his confession that he lied
17  in court about finding the link, you
18  don't know of any reason why he would
19  lie about that, do you?
20        A.  I -- I don't think he lied to
21  the Court.  But as far as his affidavit
22  is concerned, it's riddled with lies.
23        And I -- I can't say right now
24  exactly what.  But I can say that, on the
25  dates that he says I was in London or in
```

160

```
1   Cyprus, I can say for a fact that I wasn't.
2         Q.  And I'm just focusing on the
3   fact that Halabi now confesses that he
4   lied to the Court about finding the links.
5         And you have no reason to
6   believe that that confession was itself
7   a lie, because why would somebody confess
8   to the crime of misleading a Court and
9   perjury if they hadn't done it?
10        A.  If a client -- if I have a client
11  that would ask me to investigate why he was
12  lying, then I'll investigate.  But I don't
13  know why.
14        Q.  Now, you testified earlier that
15  you're involved in private investigation;
16  correct?
17        A.  Yes.
18        Q.  And you don't provide IT services,
19  do you?
20        A.  I provide a security envelope
21  for computers, not necessarily IT, not
22  what you call IT.
23        We've, for example, developed
24  a telephone that can't be tapped into and
25  all kinds of technological developments.
```

1    Q.   (Not translated.)  But with regard
2  to Project Beech, you didn't provide any IT
3  security other than the open-ended e-mail
4  system where you put the reports; right?
5    A.   I did provide -- in Project Beech,
6  I actually did provide consultation services
7  regarding communication security.
8    Q.   But that was a very small part
9  of what you did for Project Beech; right?
10    A.   It was part.  I can't define it
11  as big or small.
12    Q.   (Not translated.)  But several
13  times today, I've asked you what you did
14  for the two or $300,000.
15        And you never mentioned that
16  service; right?
17        You just talked about doing
18  these investigations in all these
19  different countries.
20        But you never once mentioned
21  IT security, did you?
22    A.   It's much easier to describe
23  what happens in an investigation than
24  to -- than to explain IT security.  But
25  we did do it.

1    A.   Not correct.
2        First of all, I mentioned that
3  sometimes we had problems with money
4  transfers and that we sometimes made all
5  sorts of engagements in order to resolve
6  that problem.
7        Second, I do not -- do not see
8  here any signature of mine or anyone on
9  my behalf.
10        And, thirdly, once I finish
11  reading this -- I'm in the process of
12  reading it -- perhaps I will understand
13  what this is connected to.  Because it
14  definitely is not connected to the Beech
15  Project.
16    Q.   Okay.  Well, take your time to
17  read it, then.
18    A.   (Examining.)  I do not see here
19  any connection neither to SDC-Gadot nor
20  to the Beech Project.  And I do not see
21  any signature of Gadot on this document.
22        MR. BARET:  Just for the record,
23  this -- the -- this agreement is prior to
24  the creation of Gadot SDC, which is about
25  a year and change --

162

1    Q.   But much of what you did for
2  Project Beech was not IT security; right?
3    A.   I can't exactly tell you what
4  proportion.  But it was part of the scope
5  of work.  And I wouldn't call it IT security
6  in any case.  It was more security protocols
7  for computer, communications, and transfers.
8        (Exhibit 5 marked.)
9  BY MR. BEHRE:
10    Q.   (Not translated.)  Okay.  I'd
11  like to show you what we've marked as
12  Exhibit No. 5, which is a letter of
13  engagement between you, on behalf of
14  Gadot Information Services, and Page
15  Group Limited.
16        Previously you testified that
17  there was no written agreement between
18  you and Mr. Page; correct?
19    A.   (In English.)  Correct.
20        (Last question translated.)
21        THE WITNESS:  Correct.
22  BY MR. BEHRE:
23    Q.   So your testimony previously
24  that there was no written agreement is
25  inaccurate; correct?

164

1        MR. BEHRE:  Correct.
2        MR. BARET:  -- a year -- a year
3  and a half probably before.
4  BY MR. BEHRE:
5    Q.   So it's -- you don't recall seeing
6  this before?
7    A.   No.
8    Q.   You don't recall signing it?
9    A.   I am not a signatory to this
10  document.
11    Q.   Okay.  And its -- its content
12  is inaccurate, isn't it?
13    A.   The content could be accurate,
14  because we are engaged in such projects.
15        But this does not refer neither
16  to the dates of the U.S. companies nor to
17  the Beech Project.  As I said before, we
18  did other things for Stuart Page as well.
19    Q.   Well, this one provides for
20  almost two years of payments, the monthly
21  amount to be a hundred and fifty to 200,000
22  pounds, which equates to two hundred to two
23  fifty [sic] U.S. dollars per month; right?
24    A.   This is what is written here.
25  But to the best of my recollection, these

165

1    are not the amounts that we received from
2    Stuart Page to Gadot.
3            And I repeat again, this has no
4    connection whatsoever to SDC-Gadot or to
5    Project Beech.
6        Q.   Well, it refers, in the second
7    paragraph, to IT services for Page Group's
8    United Arab Emirates and Iraq clients.
9            Page Group's United Arab Emirates
10   client was RAK and the ruler of RAK, the
11   boss; right?
12       A.   RAK was not Stuart Page's only
13   client in the Emirates.
14       Q.   And you indicated that the
15   reason SDC-Gadot was created was because
16   of difficulty that Mr. Page was experiencing
17   in wiring money to Gadot Information
18   Services; right?
19       A.   When he was trying to transfer
20   funds from Dubai to Gadot Information
21   Services.  When he was transferring
22   from London, there was no problem.
23           (Exhibit 6 marked.)
24   BY MR. BEHRE:
25       Q.   I'd like to next show you what's

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

166

1    been marked as Exhibit No. 6.  And this
2    consists of seven invoices from SDC-Gadot
3    LLC to Page Group.
4        A.   (Examining.)  So I don't need
5    to bring them tomorrow?
6        Q.   This might not be all of them.
7        A.   May I keep this to compare?
8        MR. BARET:  Yeah.  That's yours.
9        MR. BEHRE:  No.  That's the court
10   reporter's.
11       MR. BARET:  No, no.
12       MR. BEHRE:  But you -- that's yours.
13       MR. BARET:  We have.  We have.
14       THE WITNESS:  (In English.)  Okay.
15           (Translated.)  So what's the
16   question?
17   BY MR. BEHRE:
18       Q.   Do you recognize these invoices?
19   Are they issued by SDC-Gadot, as indicated?
20       A.   Yes.
21       Q.   And you'll note that each one of
22   these invoices, in the "Description" area
23   says the payment requested is for Project
24   Beech; correct?
25       A.   Yes.  With a spelling mistake in

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

167

1    "beach."
2        Q.   But other than the spelling mistake,
3    they all concern Project Beech; right?
4        A.   Correct.
5        Q.   And the first two invoices state,
6    in the second line of the "Description,"
7    "according to agreement"; correct?
8        A.   Yes.  Correct.
9        Q.   What agreement is that?
10       A.   We would usually add this
11   particular sentence because that would
12   make the bank pay more easily.
13       Q.   So that would mislead the bank
14   into thinking there was an agreement when
15   there wasn't an agreement; correct?
16       A.   There was no written agreement.
17   But even an oral agreement is an agreement.
18       Q.   Were these invoices provided to
19   the bank in the case of the first invoice
20   to JP Morgan Chase?
21       A.   I don't recall.  It could be.
22   But -- I don't recall.  It could be.  But
23   I don't think that we supplied invoices
24   to the American bank.
25       Q.   What bank were you providing

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

168

1    invoices to?
2        A.   Normally to the Israeli bank.
3        Q.   And I note, in the first two
4    invoices, that the address provided for
5    SDC-Gadot in Miami Beach is not the same
6    as the one that is contained in your
7    corporate records, is it?
8        A.   I have to check that.  I have
9    no answer right now why is it so.
10       Q.   Whose address is 3200 Collins
11   Avenue, as indicated in the two invoices?
12       A.   I think -- I think -- I seem to
13   remember that we may have rented, in the
14   beginning, a physical mailbox.  But it's
15   not something that I remember precisely.
16       Q.   So the first invoice in Exhibit
17   6 is numbered Invoice 1019.
18           Do you see that?
19       A.   Yes.
20       Q.   The second -- the second invoice
21   is numbered Invoice 1024.  And that -- and
22   it's dated May 14, 2019.
23           Whereas, the first invoice is
24   dated November 6, 2018; correct?
25       A.   Yes.

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

1    Q.   So it would appear, between
2  November 18th -- November 2018 and May
3  2019, there were only four other invoices
4  that were issued by SDC-Gadot in six months;
5  correct?
6    A.   It is apparently correct.  I
7  have to check.  It is also possible that
8  the collection of funds due for the project
9  was done for Insight.
10     I can see that the 1024 was issued
11 twice to JP Morgan and to Citibank as well.
12 It would seem that we did not succeed in
13 operating the account correctly at JP Morgan
14 and that is why we -- we did it in Citibank.
15 It's the same number.
16     Q.   And you're referring to the third
17 invoice dated May 14th, 2019, on the third
18 page of the Exhibit 6; right?
19     A.   Yes.
20     Q.   And that particular invoice looks
21 like it's been cut and pasted.  If you look
22 at the -- the area right below the line at
23 the top of the page, that clearly was cut
24 and pasted from some other document and
25 placed on this.

1  two pertaining to Beech.
2    Q.   (Partially translated.)  Okay.
3  On the third invoice, the third page of
4  the Exhibit 6, it looks like SDC-Gadot
5  has gone deluxe and they have their own
6  stamp; is that right?
7        THE INTERPRETER:  They've gone
8  to?
9        MR. BARET:  They're what?
10       THE INTERPRETER:  They've gone
11 to?
12       MR. BEHRE:  They have their own
13 stamp.
14       THE COURT REPORTER:  "Gone deluxe."
15       THE INTERPRETER:  Hmm?
16       THE COURT REPORTER:  "Deluxe."
17 "Deluxe."  "Deluxe."
18       MR. BARET:  "Deluxe."  Oh, okay.
19       THE INTERPRETER:  Okay.
20       (Pending question fully translated.)
21       THE WITNESS:  Look at the amounts
22 that we started receiving.
23       MR. BARET:  So it has a New York,
24 New York.
25 //

1    A.   To me -- to me it seems that
2  we simply started using another software
3  for issuing invoices.  But since I did not
4  supply it, I -- I don't know who supplied
5  it.
6    Q.   Let me just go back to the invoice
7  numbers again.
8        In November 2018, you're on Invoice
9  1019.  In May 2019, six months later, you're
10 only on Invoice 1024.
11       That means SD -- SDC-Gadot only
12 issued four invoices between those two in
13 six months; right?
14     A.   If you give me a minute, I'll
15 go over it.  I'll see all the entries
16 from the bank.
17       (Examining.)  Yes.  There are
18 very few entries indeed.
19     Q.   Meaning that SDC-Gadot didn't
20 issue many invoices that weren't related
21 to Project Beech; correct?
22     A.   Are you talking about the entire
23 period or only about these four months?
24     Q.   It's six months.  But yes.
25     A.   Out of five invoices, there are

1  BY MR. BEHRE:
2    Q.   And who -- who obtained that stamp?
3    A.   I believe we probably bought it
4  in some shop.
5    Q.   And why is it only used on that
6  one particular invoice, if you know?
7    A.   Perhaps we lost it afterwards.
8  I really don't know.
9    Q.   Do you have any other invoices
10 besides the ones you've seen here?
11     A.   Tomorrow.  I have to check.
12 I have nothing on me here.
13       MR. BARET:  I should have been
14 a doctor.  I should have been a doctor.
15       (Exhibit 7 marked.)
16 BY MR. BEHRE:
17     Q.   I'm showing you next -- showing
18 you next more Gadot invoices.  It appears
19 to be 18 in number.  And these are 18
20 invoices issued in 2016 through August
21 2017.
22     A.   In August 2016 to August 2017,
23 the U.S. companies were not set up yet.
24     Q.   Correct.
25       But I'm directing your attention

1    to the "Description" line where we just
2    looked at a draft contract that you said
3    you didn't recall.  And yet these invoices
4    all say:
5           "IT security services Beech
6    Project."
7           Do you see that?
8    A.   (Examining.)  Yes.
9    Q.   And come 2017, the difficulties
10   you are having with getting wire transfers
11   caused these to stop and you to use SDC-Gadot;
12   correct?
13   A.   No.  The transfers by Stuart from
14   Dubai to Israel were not possible.
15   Q.   (Partially translated.)  Well, the
16   Stuart company is Page Protective Services.
17           And they have an address in Hong
18   Kong; right?
19   A.   To the best of my understanding,
20   we had agreed how we would focus on the
21   U.S. companies.  And because you came
22   all the way from the United States, I
23   was happy to expand and give you some
24   further information beyond what we had
25   originally agreed upon.

1    no.
2    Q.   We talked earlier about Avi,
3    who's pled guilty in New York to hacking;
4    correct?
5    A.   Correct.
6    Q.   And in your case in Florida,
7    you filed some text messages between
8    you and Stuart Page in that case.
9           Do you remember that?
10   A.   You mean about Avi's case?
11   Q.   (Not translated.)  Well, I'm
12   asking about a series of text message
13   exchanges between you and Stuart Page.
14           Do you remember that was attached
15   to your filing in the U.S. District Court
16   in Florida?
17   A.   But it's not connected to Avi.
18           (Exhibit 8 marked.)
19   BY MR. BEHRE:
20   Q.   Okay.  Well, let -- let me show
21   it to you.
22           I'm going to show you Exhibit 5
23   to your motion for protective order.  And
24   it's -- and it's -- it was filed electronically
25   in U.S. District Court in Florida on June

1           We are -- are in the midst of a
2    procedure vis-a-vis the Court to determine
3    what can be asked and what cannot be asked.
4    And these questions relate to Gadot Israel.
5    Q.   (Not translated.)  What is Project
6    Silk?
7           THE COURT REPORTER:  Project?
8    BY MR. BEHRE:
9    Q.   (Not translated.)  What is Project
10   Silk?
11           THE INTERPRETER:  "Silk"?
12           MR. BEHRE:  Like the fabric.
13           (Pending question translated.)
14           THE WITNESS:  Another project
15   which is not connected to the -- to the
16   client.
17   BY MR. BEHRE:
18   Q.   Does it involve Khater Massaad?
19   A.   If the truth be told, I do not
20   remember fully.  But generally speaking,
21   everything that was related to Khater
22   Massaad went into the Beech Project.
23   Q.   But Project Silk might have
24   involved Khater Massaad?
25   A.   To the best of my recollection,

1    14th, 2022.  And it's Document 26-5.  It
2    was filed by you through your counsel.
3    A.   Okay.  (Examining.)
4    Q.   You had a chance to look at that?
5    A.   Yes.
6    Q.   Directing your attention to the
7    last page of the e-mail exchange.
8           MR. BARET:  WhatsApp.  WhatsApp.
9           MR. BEHRE:  I'm sorry?
10          MR. BARET:  I think it's, like,
11   a WhatsApp.
12          MR. BEHRE:  WhatsApp.  I'm sorry.
13   BY MR. BEHRE:
14   Q.   Is this WhatsApp?
15   A.   (In English.)  Yeah.
16          (Translated.)  Yes.
17   Q.   And you recently pulled this off
18   of your WhatsApp so your lawyer could file
19   it in court; right?
20   A.   It wasn't recent.  I -- I had
21   saved it in the past as a picture.
22   Q.   And have you saved any other
23   WhatsApps between you and Stuart Page?
24   A.   I have to scan and see.
25   Q.   Okay.  And will you do that?

```
1       A.   Yes.
2       Q.   On the last page, you indicate --
3  and this is part of your -- the carry-over
4  statement:
5            "As you know, I'm not really
6  in the business since what happened"
7  to "Avi."  (As read.)
8            What did you mean by that?
9       A.   In my -- my meaning was that
10 it's a -- it's a date that we are both
11 familiar with.  It's a date that indicates
12 more or less when the activity in Israel
13 went down.  But it went down mostly because
14 of COVID.
15           Besides, what happened to Avi,
16 in my opinion, it's some type of miscarriage
17 of justice.  But it is not connected to --
18 to this.
19      Q.   Well, what happened to Avi is
20 Avi got arrested; right?
21      A.   I don't even recall if I meant
22 this Avi when I'm saying "Avi" here,
23 because the other guy is Aviram, not
24 Avi.  So I'm not even sure that I'm
25 referring to the same person.
```

```
1            (Comment in Hebrew.)
2            MR. BARET:  You don't have to
3  talk about that.
4            THE INTERPRETER:  "Furthermore,
5  my correspondence here -- here with Stuart
6  is -- well, never mind."
7  BY MR. BEHRE:
8       Q.   (Not translated.)  Well, the
9  "I'm not really in the business since
10 what happened to Avi," Avi was arrested
11 and charged with hacking.  Avi's pled
12 guilty and confessed to hacking.  And he
13 was in the business of hacking.
14           And the business you're referring
15 to is hacking, isn't it?
16      A.   (In English.)  No.
17           THE COURT REPORTER:  You said
18 "yeah"?  "No"?
19           THE INTERPRETER:  "No."
20           THE WITNESS:  (In English.)  "No."
21           THE INTERPRETER:  He said "no."
22           THE COURT REPORTER:  Okay.  Let
23 her translate.
24           THE INTERPRETER:  Okay.
25           MR. BEHRE:  He didn't need a
```

```
1  translation on that, did he?
2            (Last question translated.)
3            THE WITNESS:  First and foremost,
4  the person who was arrested was Aviram and
5  not Avi.  And, second, there's no connection.
6            And, thirdly, I'm corresponding
7  here with a person who is libeling me.
8  So what do you expect?
9  BY MR. BEHRE:
10      Q.   (Not translated.)  Would it
11 surprise you if Stuart Page was certain
12 you were talking about the Avi who's
13 arrested for hacking?
14           MR. BARET:  You don't have
15 to talk about this.
16           He doesn't need to --
17           MR. BEHRE:  Why not?
18           MR. BARET:  -- address this.
19           MR. BEHRE:  What's that?
20           MR. BARET:  Again, this was
21 provided to the Court with a motion for
22 protective order not to depose Amit Forlit
23 in his personal capacity.  It's got nothing
24 to do with SDC-Gadot.
25           Again, you are confusing two --
```

```
1  two different filings.  This -- this was
2  filed with a motion for protective order.
3  And you are bypassing our request for
4  protection order.
5            MR. BEHRE:  No.  It was.  It
6  was filed in Federal Court.
7            MR. BARET:  Correct.
8            MR. BEHRE:  It was filed on
9  PACER via electronic --
10           MR. BARET:  Correct.
11           MR. BEHRE:  -- means.
12           MR. BARET:  For the purpose of --
13           MR. BEHRE:  And it's -- it's --
14 it's arguably a statement about his business,
15 which is the same as Avi's, which is hacking.
16           MR. BARET:  He's -- he's --
17           MR. BEHRE:  Now --
18           MR. BARET:  He answered that.
19           MR. BEHRE:  -- if you want to --
20 if you want to say that that's not something
21 we can reach, you can say it.
22           MR. BARET:  I'm saying it.
23           MR. BEHRE:  But it's going to
24 be an -- okay.  Then you've instructed
25 him not to answer; right?
```

1    MR. BARET:  I'm instructing
2  him not to talk about this, because this
3  is -- relates directly to his motion for
4  protective order not to be deposed in his --
5            MR. BEHRE:  Well, he --
6            MR. BARET:  -- personal --
7            MR. BEHRE:  -- opened --
8            MR. BARET:  -- capacity.
9            MR. BEHRE:  -- the door -- he
10  opened the door to this.  And if you want
11  this to go before the judge in Florida, we
12  can do that.  But, you know -- you know how
13  that judge has already started to view him.
14  So if you want --
15            MR. BARET:  Because --
16            MR. BEHRE:  -- to instruct him not
17  to answer, you -- you -- be my -- if -- if
18  that's your instruction, you go ahead.
19            MR. BARET:  He answered.  But I
20  think this line of questioning is inappropriate
21  for the purpose of this deposition.
22            MR. BEHRE:  Okay.  I'll move on.
23  And we can raise it with the Court.  Okay?
24            (Exhibit 9 marked.)
25  //

1  record at 6:03.
2            (Recess from 6:03 p.m. to 6:12 p.m.
3      Israel Daylight Time.)
4            THE VIDEOGRAPHER:  Back on record
5  at 6:12.
6  BY MR. BEHRE:
7      Q.   (Not translated.)  Mr. Forlit,
8  you indicated you might have some documents.
9            Just so we're clear, do you have
10  any copies of the project updates left?
11      A.   (In English.)  No.
12            (Exhibit 10 marked.)
13  BY MR. BEHRE:
14      Q.   I'd like to show you what we're
15  going to mark as Exhibit No. 10.  It's --
16  it's labeled or titled:
17            "Project Beech Report - Farhad
18  Azima."
19      A.   (Examining.)
20            MR. BARET:  Looks good for his
21  age, actually.
22            MR. BEHRE:  What?
23            MR. BARET:  He looks good for
24  his age.
25  //

1  BY MR. BEHRE:
2      Q.   I'm showing you next what we're
3  marking as Exhibit 9.  It's a September 7,
4  2019, e-mail from your banker at Citi.
5  His name is Mario Ros, R-o-s.  And it's
6  regarding your account with Citi.
7      A.   (Examining.)
8      Q.   Do you recognize that exhibit?
9      A.   Yes.  But I do not remember this
10  mail.
11      Q.   And Mr. Ros at Citibank is e-mailing
12  you because at least he believes you're the
13  person responsible for that bank account
14  that we talked about earlier today; right?
15      A.   He's trying to sell some banking
16  service.
17            MR. BEHRE:  Okay.  Why don't we
18  take a quick break.
19            THE WITNESS:  (Comment in Hebrew.)
20            MR. BARET:  I think we're done
21  with our -- today.  It was set for -- from
22  11:00 to 6:00.
23            MR. BEHRE:  7:00.
24            MR. BARET:  Till 7:00?
25            THE VIDEOGRAPHER:  Going off the

1  BY MR. BEHRE:
2      Q.   Have you had a chance to look
3  at that report?
4      A.   Yes.
5      Q.   And this is one of the Project
6  Beech reports, isn't it?
7      A.   I can't tell.  I did not keep
8  it.
9      Q.   Well, you were involved in its
10  authorship, weren't you?
11      A.   This is -- this is dated four --
12  August 4, 2015 -- 2015.  It's, like, seven
13  years.  And I -- we have not kept any record.
14  We have destroyed everything.  So I can't
15  tell.
16      Q.   Well, at 11:24 this morning, you
17  stated as follows:
18            "I have never investigated Farhas --
19  Farhad Azima.  The investigation was of
20  Dr. Khater Massaad."
21      A.   Correct.
22      Q.   And this report starts and states
23  as follows:
24            "The following document presents
25  a full intelligence report on Farhad Azima."

1    And he's -- and he's given the
2 nickname of "the Generator"; right?
3    The second line.
4    A.  I say, once again, I do not know
5 who wrote this report.
6    Q.  And the third line states -- and
7 I'll quote:
8    "The main effort is placed in
9 order to assist the client in taking the
10 generator out of the dispute between KM
11 and the client."
12    End quote.
13    (Brief telephone interruption.)
14 BY MR. BEHRE:
15    Q.  So this report talks about taking
16 out Farhad Azima, doesn't it?
17    A.  I did not go through it thoroughly
18 right now.  It's possible that there is
19 a report.  But I'm saying again, I do not
20 know who wrote this report.
21    Q.  Well, let me direct your attention
22 to a few things.
23    Look at page 3.  There's a --
24    MR. BARET:  Again, same objection
25 as before.

1    He answered some questions regarding
2 this report.  He said he didn't write it or
3 know whose write it.  [sic]  It's -- again,
4 it's not SDC-Gadot.  It's two years before
5 the cooperation of which has been represented
6 today was created.
7    If you get a chance to depose --
8    MR. BEHRE:  His --
9    MR. BARET:  -- him on a personal
10 level, then we can go back --
11    MR. BEHRE:  He opened the door.
12 He opened the door to this by saying:
13 I never --
14    MR. BARET:  SDC --
15    MR. BEHRE:  -- investigated --
16    MR. BARET:  -- Gadot -- SDC --
17    MR. BEHRE:  Hold on.
18    MR. BARET:  -- Gadot --
19    MR. BEHRE:  No, no, no.
20    MR. BARET:  -- didn't open --
21    MR. BEHRE:  No.
22    MR. BARET:  -- the door.  It's
23 SDC-Gadot.
24    MR. BEHRE:  Let me read you the
25 quote.

1    "I have never investigated Farhad
2 Azima," period.
3    MR. BARET:  True.  And he said --
4    MR. BEHRE:  This --
5    MR. BARET:  And he --
6    MR. BEHRE:  -- report establishes
7 that not only did they investigate Farhad
8 Azima --
9    MR. BARET:  Who's "they"?
10    MR. BEHRE:  -- they targeted him.
11    MR. BARET:  Who's "they"?
12    MR. BEHRE:  This report was written
13 by your client.
14    MR. BARET:  He's -- he's saying he
15 didn't write it.
16    MR. BEHRE:  He can say that.  But
17 I can ask him about it.
18    MR. BARET:  But he already answered --
19    MR. BEHRE:  He can --
20    MR. BARET:  -- it.
21    MR. BEHRE:  -- deny it under oath,
22 if he'd like.
23    MR. BARET:  He just did.
24    MR. BEHRE:  But that doesn't prevent
25 me from asking the questions.

1    MR. BARET:  It -- it does, because --
2    MR. BEHRE:  So if you want to -- if
3 you want to instruct him not to answer, we'll
4 do this some more.
5    Is that what -- are you instructing
6 him --
7    MR. BARET:  I'm --
8    MR. BEHRE:  -- not to answer?
9    MR. BARET:  I'm saying that it's
10 not the subject of today's deposition.
11    MR. BEHRE:  It is --
12    MR. BARET:  It's not --
13    MR. BEHRE:  -- because --
14    MR. BARET:  -- the subject --
15    MR. BEHRE:  Let me tell you why
16 it is.
17    Because he opened the door to it.
18 By saying he didn't investigate Farhad Azima,
19 he can be impeached with his own report --
20    MR. BARET:  But that's not his
21 report.
22    MR. BEHRE:  -- that proves that
23 he lied earlier today about investigating
24 Farhad Azima.
25    MR. BARET:  That's what you're

1    saying.  He's saying --
2          MR. BEHRE:  I -- it is --
3          MR. BARET:  -- he didn't write --
4          MR. BEHRE:  -- what I'm saying.
5          MR. BARET:  -- this -- but he's
6    saying he didn't write this report.
7          Do you have any --
8          MR. BEHRE:  Well, he can --
9          MR. BARET:  -- proof --
10         MR. BEHRE:  -- he can say --
11         MR. BARET:  -- that he wrote
12   this report?
13         MR. BEHRE:  -- that all he wants.
14         MR. BARET:  He just did.
15         MR. BEHRE:  But I can examine,
16   because it's a deposition.
17         If you want to instruct him not
18   to answer, be my guest.  And we'll do this
19   all again.  And we will seek costs for
20   this entire trip.
21         MR. BARET:  All I'm saying is
22   that he answered it, that he said he's --
23   it's not his report.  Now, if he wants
24   to continue answering, it's his choice.
25         Go ahead, answer.

1    BY MR. BEHRE:
2          Q.   (Not translated.)  So if you look
3    at page 3, there's what clearly appears to
4    be a stolen copy of Farhad Azima's passport.
5    If you look at page 6, you'll see --
6          THE INTERPRETER:  May I?  Counsel,
7    may I?
8          (Last comment translated.)
9    BY MR. BEHRE:
10         Q.   If you look at page 6, there
11   is data about the specific balance, down
12   to the U.S. dollar, in his bank accounts,
13   stolen financial data.
14         And if you look at page 7, there's
15   more stolen financial data about his brokerage
16   accounts at HSBC and Credit Suisse, right
17   down to the dollar.
18         Do you see that?
19         A.   Yes.
20         Q.   Look at page 10 and 11.
21         Did you prepare these organizational
22   charts, or people under your direction?
23         A.   No.
24         Q.   Do you know who did?
25         A.   No.

1          Q.   And if you look at page 12 and
2    13, there's extracts of financial data
3    regarding business opportunities that
4    the, quote, "Generator," was involved
5    in.
6          And the same on page 14 and
7    15 and 16, all stolen financial data.
8    And then on page 18, there's another
9    stolen passport.
10         And then on page 21, another
11   stolen passport.  And 22, another stolen
12   passport.  And 24, another stolen passport
13   and a driver's license.
14         And then on page 27, extracts
15   of his stolen e-mails, from Farhad Azima.
16         Do you see that stolen e-mail
17   that's embedded in this report?
18         A.   Yes.
19         Q.   More stolen e-mails on 30 -- page
20   30 and 31 and 32 and 33.
21         Where did these e-mails come from?
22         A.   I do not know.  I can estimate
23   that, based on all his e-mails that were
24   leaked, someone prepared that report.
25         Q.   Well, this is almost a year

1    before the data was placed on the Internet.
2          The date --
3          A.   If you believe what is written
4    here.
5          Q.   The date?
6          A.   Yes.
7          Q.   So you think this is a falsified
8    date?
9          A.   I don't know.  I have no clue.
10         Q.   Well, at 11:41 this morning, you
11   said that the reports you wrote started with
12   an executive summary; right?
13         A.   Correct.
14         Q.   And you also stated that they were
15   followed by a breakdown of the findings of
16   the investigation; correct?
17         A.   Correct.
18         Q.   And that's exactly what this report
19   does, doesn't it?
20         A.   I also said that I -- I sent them
21   in an open format to Mr. Stuart Page.  And
22   I also said that I did not retain any report.
23         Q.   Were you involved in writing this
24   report?
25         A.   No.

1    Q.  A few minutes ago, you said you --
2  you weren't sure one way or the other.
3         Why are you now sure you weren't
4  involved in it?
5    A.  Because I see that this is a
6  report of an investigation on Farhad Azima.
7  And we never investigated Farhad Azima.
8         (Exhibit 11 marked.)
9  BY MR. BEHRE:
10   Q.  (Partially translated.)  I'm
11 showing you next what has been marked
12 as Exhibit No. 11.  It's entitled:
13        "Project Beech - Comprehensive
14 Action Plan."
15        It's dated January 26, 2016.
16        THE INTERPRETER:  What's the
17 date?
18        MR. BEHRE:  January 26, 2016.
19        Please --
20        (Remainder of pending question
21 translated.)
22        THE WITNESS:  (Examining.)
23 BY MR. BEHRE:
24   Q.  Have you had a chance to read
25 that?

1    A.  (In English.)  Yeah.
2        (Translated.)  Just I scanned
3  through it as quickly as I could.
4    Q.  And that's one of the Project
5  Beech reports you prepared, isn't it?
6    A.  I have no way of knowing, because
7  I didn't keep any of the documents.  It's
8  possible that we prepared part of it and
9  parts of it were added by Stuart afterwards.
10 I have no way of knowing.
11   Q.  Directing your attention to the
12 second page, there's a photograph embedded
13 in this graph, or this chart, with a
14 photograph of Farhad Azima and Khater
15 Massaad.
16        Do you see that?
17   A.  Yes.
18   Q.  And the legend of the chart says
19 those items in red suggest targets for
20 future attack.
21        Do you see that?
22   A.  Yes.
23   Q.  And so not only was Mr. Azima
24 being investigated, he was being targeted
25 and attacked, wasn't he?

1    A.  First of all, I don't remember
2  if this report was even produced by us.
3  And by "attack," it means an intelligence
4  attack.
5    Q.  (Not translated.)  Previously
6  you said that Farhad Azima was not
7  investigated.
8    A.  And that's why I have doubts
9  as to whether this is indeed a report
10 that we produced.
11   Q.  Look at the third page.  Quote:
12        "We have been supplying the
13 client with intelligence 'ammunition'
14 against KM and other relevant players
15 such as SI and FA."
16        End quote.
17        "FA" is Farhad Azima, isn't it?
18   A.  I don't know who the "we" is.
19   Q.  Look at page 6.  The heading is
20 entitled:
21        "PR and Media Tools against FA."
22        Do you see that?
23   A.  Yes.
24   Q.  And you can see there that it's
25 talking about, in the second paragraph:

1        "There are other issues
2  that can be" effectively -- "effective
3  regarding FA's reputation and even
4  pose him a criminal exposure."  (As read.)
5        End quote.
6        Do you see that?
7    A.  Yes.
8    Q.  So it's clear, from that entry
9  at this page 6, that Farhad Azima was
10 being investigated, he was being targeted,
11 and he was being exposed as a potential,
12 having criminal liability.
13        Do you see that?
14   A.  I didn't say he wasn't.  I just
15 said that I and the people that I represent
16 didn't do it.  Fact -- it -- the fact is
17 that somebody hacked him.
18   Q.  Look at page 7.
19        "We have access to a groundbreaking
20 technology."
21        And that's a quote.
22        That groundbreaking technology
23 was hacking, wasn't it?
24   A.  No.  First of all, I don't know
25 who wrote this document and who has this

1 technology. And if somebody has hacking
2 ability, they just write that they can
3 hack.
4     Q. And then on page 9, the war
5 terms continue:
6        "In order to eliminate FA's
7 activity" against the -- "regarding
8 the client," it says. (As read.)
9        Do you see that?
10     A. Where is it approximately on
11 the page?
12     Q. (Not translated.) Page 9 --
13        THE INTERPRETER: Page --
14 BY MR. BEHRE:
15     Q. (Not translated.) -- under:
16        "5. Involvement of" the "U.S.
17 Relevant Authorities." (As read.)
18     A. This looks like a strategic document
19 that somebody prepared. And this -- this
20 is not a subject we deal with.
21     Q. Well, not only does this document
22 entitled "Project Beech" --
23        MR. BARET: Excuse me. That's
24 not what he said.
25        He said: "It's not our document."

1        THE INTERPRETER: Aah, you're right.
2 Thank you.
3        MR. BARET: Okay.
4        THE INTERPRETER: "And it's not our
5 document."
6        Thank you.
7 BY MR. BEHRE:
8     Q. This document is labeled:
9        "Project Beech."
10        You were involved in Project Beech.
11 And this establishes, just like the last
12 document, contrary to your testimony, that
13 Farhad Azima was not only being investigated,
14 he was being attacked, he was being targeted,
15 and he was in jeopardy because of that.
16        Isn't that right?
17     A. As I said, my reports on Project
18 Beech were sent to Stuart Page in an open
19 format. I don't know who else Stuart used
20 the name Project Beech with. He made up
21 that name.
22        I know that we did not investigate
23 Farhad Azima. We did not target him as
24 a target. But it's quite clear that
25 somebody did, because somebody hacked

1 and leaked his computers.
2        And based on the procedures
3 that are used in the U.S., I think you
4 know who it is.
5     Q. And who would that be?
6     A. Nick Del Rosso. According --
7 based on the proceedings against Nick
8 Del Rosso, I conclude that.
9     Q. And what's your basis for
10 saying Nick Del Rosso is the party who
11 wrote this report?
12        Is that what you're saying?
13     A. I didn't say Nick Del Rosso
14 wrote this report. I said that we did
15 not write this report.
16        And based on all the proceedings
17 that are being carried out, the person
18 who is responsible for the hack and the
19 leaks of the hacking is Nick Del Rosso.
20     Q. Now, you indicated that Nick
21 Del Rosso and Stuart Page did not get
22 along; right?
23     A. I heard from Stuart that he
24 didn't like, to put it mildly, Nick Del
25 Rosso. But I -- I didn't even know if

1 they knew each other.
2     Q. And the reason Stuart Page
3 didn't like Nick Del Rosso is because
4 Stuart Page thought Nick Del Rosso was
5 taking business away from Stuart Page;
6 correct?
7     A. I don't know.
8     Q. (Not translated.) Nick Del
9 Rosso didn't report to Stuart Page,
10 did he, because they hated each other?
11     A. To the best of my knowledge,
12 no.
13     Q. And so, therefore, Nick Del
14 Rosso is not a likely suspect for the
15 content of this report, since he would
16 have had to give it to his archenemy,
17 Stuart Page, to incorporate it in the
18 report; right?
19     A. (Translated.) I'm not attributing
20 this report to anyone's authorship. I'm
21 just saying that we didn't write it and
22 we did not investigate --
23        (In English.) Farhad Azima.
24        THE INTERPRETER: Sorry. It's
25 late.

```
 1        MR. BARET:  Say "FA."  Just
 2  use --
 3        THE INTERPRETER:  "FA."
 4        MR. BARET:  -- "FA."
 5        THE INTERPRETER:  Yeah.  It's
 6  late in the day.
 7  BY MR. BEHRE:
 8     Q.   Stuart Page paid you millions
 9  of dollars and your company, including
10  SDC-Gadot; correct?
11     A.   That is correct.
12     Q.   And -- he paid you to
13  perform work for Project Beech; correct?
14     A.   Yes, he paid me.  But I don't
15  know how much he charged for it.  I don't
16  know what proportion of what he got he
17  paid me.
18        The bottom line is I don't know
19  what reports were submitted to the client.
20  I know what I sent to Stuart Page.  But
21  I don't know what he submitted afterwards.
22     Q.   Do you know what portion of this
23  particular report, Exhibit 11, you provided
24  to Stuart Page?
25     A.   No.  We don't have any documentation
```

```
 1  in your presence?
 2        MR. BARET:  Yes.
 3        MR. BEHRE:  Okay.  One second.  I'm
 4  almost done.  Okay.  That's all I have.  Thank
 5  you very much.
 6        THE VIDEOGRAPHER:  Going off the
 7  record at 6:49.
 8        (The deposition concluded at 6:49 p.m.
 9  Israel Daylight Time.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

202

```
 1  of these reports in our records.  I don't
 2  know.
 3     Q.   Well, Stuart Page was your boss.
 4  And he paid you millions of dollars.  And
 5  he said you and your team authored every
 6  one of these project updates about Project
 7  Beech.
 8        Is that accurate?
 9     A.   Stuart Page told me, before
10  he gave his affidavit, that he tried
11  to commit suicide twice because they
12  pressured him and forced him to cooperate.
13        What I know is that we sent
14  reports to Stuart Page, at his request
15  the reports were left open, and that
16  we did not investigate Farhad Azima.
17     Q.   (Not translated.)  Earlier
18  today you had some, I think, ten or
19  eleven pages of notes.  And we'd ask
20  that that be marked as an exhibit since
21  the witness had it in front of him.
22        MR. BARET:  He did not use it.
23  It's privileged.  It's notes we prepared
24  just going over --
25        MR. BEHRE:  His notes were prepared
```

204

```
 1            CERTIFICATE OF REPORTER
 2
 3        I, BRENDA MATZOV, CSR NO. 9243, do
 4  hereby certify:
 5        That, prior to being examined, the
 6  witness named in the foregoing deposition was
 7  asked to acknowledge that their testimony will
 8  be true under the penalties of perjury and will
 9  be the truth, the whole truth, and nothing but
10  the truth.
11        That the foregoing deposition was taken
12  before me, at which time the aforesaid proceedings
13  were stenographically recorded by me and thereafter
14  transcribed by me;
15        That the foregoing transcript, as typed,
16  is a true record of the said proceedings;
17        And I further certify that I am not
18  interested in the action.
19
20        Dated this 30th day of July, 2022.
21
22        _____
23        BRENDA MATZOV, CSR NO. 9243
24
25
```

```
 1              CERTIFICATE OF WITNESS

 2

 3          I, AMIT FORLIT, witness herein, do

 4    hereby certify and declare the within and

 5    foregoing transcription to be my examination

 6    under oath in said action taken on July 20,

 7    2022, with the exception of the changes

 8    listed on the errata sheet, if any;

 9          That I have read, corrected, and

10    do hereby affix my signature under penalty

11    of perjury to said examination under oath.

12

13

14

15

16    _____      _____
17          AMIT FORLIT, Witness           Date

18

19

20

21

22

23

24

25
```

---

```
 1              ERRATA SHEET

 2    Case:    FARHAD AZIMA vs. INSIGHT ANALYSIS AND

 3             RESEARCH LLC AND SDC-GADOT LLC

 4    Date:    JULY 20, 2022

 5    Witness: AMIT FORLIT

 6

 7    Page _____ Line _____ Change _____

 8    Reason _____

 9    Page _____ Line _____ Change _____

10    Reason _____

11    Page _____ Line _____ Change _____

12    Reason _____

13    Page _____ Line _____ Change _____

14    Reason _____

15    Page _____ Line _____ Change _____

16    Reason _____

17    Page _____ Line _____ Change _____

18    Reason _____

19    Page _____ Line _____ Change _____

20    Reason _____

21    Page _____ Line _____ Change _____

22    Reason _____

23

24    _____      _____
            AMIT FORLIT, Witness           Date

25
```