**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FARHAD AZIMA,<br>ALG TRANSPORTATION, INC.,<br>MAIN 3260 LLC,<br>FFV W39 LLC, and<br>FFV DEVELOPMENT LLC,<br><br>                    Plaintiffs,<br><br>v.<br><br>DECHERT LLP,<br>DAVID NEIL GERRARD,<br>DAVID GRAHAM HUGHES,<br>NICHOLAS DEL ROSSO,<br>VITAL MANAGEMENT SERVICES, INC.,<br>AMIT FORLIT,<br>INSIGHT ANALYSIS AND RESEARCH LLC,<br>SDC-GADOT LLC,<br>AMIR HANDJANI,<br>ANDREW FRANK, and<br>KARV COMMUNICATIONS,<br><br>                    Defendants. | Case No. 1:22-cv-08728 (PGG) (JW) |

**REPLY DECLARATION OF LORD NEUBERGER OF ABBOTSBURY IN SUPPORT OF DEFENDANT DECHERT LLP'S MOTION TO DISMISS**

I, Lord Neuberger of Abbotsbury, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

### _Introductory_

1.  I was a practising barrister from 1975 to 1996 (appointed Queen's Counsel in 1987), and became a Judge of the High Court and then the Court of Appeal ("CA") of England and Wales in 1996 and 2004 respectively. In 2007, I became a member of the Appellate Committee of the House of Lords, the predecessor of the Supreme Court of the United Kingdom ("UKSC"). In 2009 I was appointed Master of the Rolls (the head of the Civil

Division of the CA), and from 2012 to 2017, I was President of the UKSC. I am currently a non-permanent member of the Hong Kong Court of Final Appeal, and a Judge of the Singapore International Commercial Court, and I practise as an arbitrator and mediator.

2. I have been shown the Declaration of Lord Hoffmann in these proceedings, and I note his brief summary of the relevant history in paragraphs 2 to 6, which there is no point in my repeating. However, it is worth mentioning that in proceedings issued by RAKIA against Mr Azima in England ("English proceedings") referred to by Lord Hoffmann in his paragraph 2, Mr Azima has asserted counterclaims against Dechert and others which, after a tortuous history, will involve an eight-week hearing in 2024. In the English proceedings, Mr Azima has raised the complaint that RAKIA and its agents (including Dechert) had hacked Mr Azima's computer, lied about it in court, and had obtained an earlier judgment against Mr Azima by fraud. These allegations, I am instructed, include many of the same allegations raised in these proceedings.

3. In paragraph 7 of his declaration, Lord Hoffmann identifies three points on which he then proceeds to express his view so far as English law is concerned, and I have been asked to express my view on those points, which I do below.

### _The first point: Dechert's right to rely on the Settlement Contract_

_Contractual enforcement_

4. Lord Hoffmann's first point is that it is not open to Dechert LLP to rely on clause 7 of the Settlement Agreement ("clause 7"), because it was not a party to it. I agree that a general rule of English law is that a person who is not a party to a contract cannot enforce its terms.

I understand that the question whether clause 7 can be enforced against Mr Azima is or may be decided in these proceedings by reference to U.S. federal law not English law.

5.   However, assuming that the question is to be decided by reference to English law, it is right to mention that there are exceptions to the principle that non-parties to a contract cannot enforce it: uncontroversial examples include successors-in-title, assignees, and principals of one or more of the contracting parties. In this very case, I note that in paragraph 115a of Mr Azima's Re-re-re-amended counterclaim in the English proceedings, his counsel has alleged, albeit in the alternative, that the claims against him "*are subject to English law in consequence of the choice of law in the Settlement Agreement and the fact that the Additional Defendants [who include Dechert] were acting as agents of RAKIA*".

*Non-contractual reliance*

6.   Quite apart from that, as Lord Hoffmann very fairly says, whatever view one takes of the three points he discusses, it is still open to Dechert and other Defendants in these proceedings to argue that New York is not the right forum for resolving this dispute. Accordingly, even if Dechert had no right to seek to enforce clause 7, that would not prevent them from relying on the fact that the parties to the Settlement Agreement (including Mr Azima) considered that the England was the appropriate forum for bringing claims falling within the ambit of clause 7.

7.   Indeed, Dechert could go further than this and rely on cases where it has been held that an exclusive jurisdiction clause which applies to all claims arising in connection with an agreement may extend to such claims even though they are brought against non-parties. In *Clearlake Shipping Pte Ltd v Xiang Da Marine Pte Ltd* [2019] EWHC 2284 (Comm)

(Appendix A hereto) at [20]-[25], Andrew Burrows QC, then sitting as a Deputy High Court Judge (he is now a member of the UKSC), followed what Lord Scott had said in the *Donohoe* case at [60]-[62], and indicated that in such a case (i) a contracting party would have a contractual right to seek to restrain any foreign proceedings against the non-party in breach of that clause, and (ii) the non-party would be able to seek relief from the Court on the basis that the foreign proceedings were "*vexatious or oppressive*" in the light of the exclusive jurisdiction clause.

8.  In these proceedings, as in the English proceedings, the Plaintiffs' case alleges that RAKIA and Dechert were joint conspirators. If, as I am instructed is the position, RAKIA has been intentionally omitted as a defendant in these proceedings because of clause 7, it appears to me that, while an English court would hold that, even if Dechert could not enforce clause 7 as a matter of contract, Dechert would be entitled to invoke clause 7 to support its case that the current proceedings should not continue. In that connection, I note that in a passage at [24] in *Clearlake*, Mr Burrows said that:

> "*[W]here one has an alleged joint tort committed in relation to a contract by a contracting party and a non-contracting party, the objective interpretation of the jurisdiction clause (covering all disputes 'arising out of the contract')* **will tend to include a tort claim against the non-party** *because this will help to prevent forum-fragmentation on essentially the same issues*" (emphasis added).

### *The second point: the scope of clause 7*

9.  That brings me to Lord Hoffmann's second point, namely that clause 7 is not apt to cover the present dispute. On that point, I disagree with him. Viewed on its own, clause 7 appears wide in its ambit. It applies to "*any dispute or claim arising out of*" the Settlement Agreement, and also to "*any dispute or claim arising out of, or in connection with, it or its*

*subject matter or formation*". However, it becomes clear that the ambit of clause 7 is very wide indeed when one turns to clause 3.1 of the Settlement Agreement ("clause 3.1"), which states that the Settlement Agreement "*is in full and final settlement of all claims in any jurisdiction, whether or not presently known to [the parties] or to the law*".

10. While it would be wrong for me to give the impression that I have mastered all the detailed facts and allegations raised in these proceedings, it seems to me that there is a powerful argument for saying that the present dispute raises matters which are or were "*in connection with*" and/or *"arising out of"* the Settlement Agreement itself (both its *"subject matter"* and *"formation"*), in that Mr Azima is contending that there was a long-term, multi-pronged orchestrated assault on him, of which the Settlement Agreement was part. However, even if that is not right, the hacking and other alleged activities of which he complains began before the Settlement Agreement was completed, and they therefore gave rise to "*claims*" which were not at the time of the Settlement Agreement "*presently known to*" Mr Azima. It therefore appears to me that such claims were within the ambit of the Settlement Agreement, and are therefore caught by clause 7.

11. The same argument would appear to me to apply to the hacking and other matters complained of which occurred after the date of the Settlement Agreement. But, even if that were not so, the fact that the activities before the Settlement Agreement should be heard in England would render it easy to justify the argument that the activities subsequent to that date should, as a matter of obvious convenience, be heard in England at the same time.

12. I do not regard Lord Hoffmann's dictum in the *Premium Nafta* case as being inconsistent with my view. On the contrary, in that case, the House of Lords was faced with a choice

between giving an arbitration clause a narrow or wide effect, and it was held to have wide effect, on the basis that, as rational business people, the parties would have intended all their disputes to be covered by it. To that extent, it could be said to support the wider meaning which I think appropriate for clause 7, but I accept that only limited assistance can be derived from a decision which was concerned with a very differently worded clause, with a different purpose and in different circumstances from clause 7. Perhaps more in point, and supportive of my view, are the observations of Lord Bingham in *Donohue* at [14], of Lord Hope in *Premium Nafta* at [26] and of Mr Burrows in *Clearlake* at [23](i) as to the "*broad*" approach when it comes to interpreting exclusive jurisdiction clauses.

13. Referring back to the point made in paragraphs 6 to 8 above, I should add that the fact that clause 3.1 expressly refers to "*all claims, in any jurisdiction*" could be said to emphasise how Mr Azima and RAKIA at any rate considered England to be the right place to litigate.

### *The availability of treble damages*

14. I turn to Lord Hoffmann's third point, which concerns the treble damages which could be recovered in the present proceedings. As I mentioned, my understanding is that most of the allegations raised by Mr Azima in these proceedings have already been raised by him in the English proceedings in which they will be considered in March 2024. It also appears to me that England is the more natural forum for these allegations to be argued and resolved. Again, as I understand it, the primary reason justifying these parallel proceedings in New York against Dechert is the availability of treble damages.

*The English court perspective*

15. In my opinion, from the point of view of an English court, the fact that treble damages could be obtained in New York would not help Mr Azima in his contention that the present dispute should be tried in New York rather than, or in addition to, England.

16. Logically, there are two possibilities: either treble damages could be recovered in England if the present dispute were tried in England or they could not. If they could be recovered in the England, then, as I understand it, the plaintiffs' primary reason for wanting this dispute to be tried in New York dissipates. On the other hand, if (as was assumed by both parties but not actually decided in the *Donohoe* case), treble damages could not be recovered in England, then that would be regarded as a positive reason for enforcing a provision such as clause 7. That is clear from *Donohoe*, where it appears that the House of Lords would have enforced a clause giving exclusive jurisdiction to the English Courts if the plaintiffs in that case had not given an undertaking not to enforce any treble damages award – see paragraphs 39 and 47-48.

*The New York court perspective*

17. Lord Hoffmann has approached the effect of the possibility of treble damages from the perspective of the New York court. I am not competent to speak with any authority about that. However, I do not agree with Lord Hoffmann when he suggests that it is safe to assume that the English courts would not award treble damages if such damages are provided for by the foreign law applicable to the dispute (although that was assumed in *Donohoe*). The point is addressed at section 8-008 of *Dicey Morris and Collins on the Conflict of Laws* (in Appendix C to Lord Hoffmann's Declaration). Having explained the

general rule that English courts will not enforce a foreign law penalty, the authors state that "*the penalty must normally be exigeable by the State, and therefore an action for punitive damages by a private person will not be regarded as penal*". The footnote to this passage states that "*an action for treble damages under United States anti-trust law may be an action for a penalty since the right to treble damages is granted so that private parties may act as 'private attornies-general' to vindicate the anti-trust law*". However, the footnote goes on to mention a Canadian case and an Australian case in each of which it appears that US-law based treble damages were not penal.

18. For completeness, I should add that it may be that a foreign law providing for treble damages would be regarded as contrary to English public policy in the light of the Protection of Trading Interests Act 1980. However, *Dicey, Morris & Collins* is equivocal on that point: see paragraph 34-086, whose final sentence merely states that there is "*potentially*" an "*argument*" to that effect, but apparently no direct authority (see Appendix B hereto).

19. I presume that the New York courts would also take into account at least some of the points which the English Courts would take into account, including the facts that (i) the English proceedings are already well under way, (ii) the provisions and effect of clause 7, (iii) the close connection of these proceedings with England, (iv) English courts would enforce any other civil causes of action which arise under US law for compensatory damages arising from the same facts (assuming that US law is found to be the law applicable to the wrong-doing), and (v) if he proves his case, Mr Azima may well be able to obtain punitive (or exemplary) damages in addition to compensatory damages under English law, even if he could not recover treble damages.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 19, 2023

London                          By:

Lord Neuberger of Abbotsbury