UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FARHAD AZIMA,
ALG TRANSPORTATION, INC.,
MAIN 3260 LLC,
FFV W39 LLC, and
FFV DEVELOPMENT LLC,

        Plaintiffs,

     - against -

DECHERT LLP,
DAVID NEIL GERRARD,
DAVID GRAHAM HUGHES,
NICHOLAS DEL ROSSO,
VITAL MANAGEMENT SERVICES, INC.,
AMIT FORLIT,
INSIGHT ANALYSIS AND RESEARCH LLC,
SDC-GADOT LLC,
AMIR HANDJANI,
ANDREW FRANK, and
KARV COMMUNICATIONS,

        Defendants.

22 Civ. 8728 (PGG) (JW)

**MEMORANDUM OF LAW IN
OPPOSITION TO DECHERT LLP'S
<u>MOTION TO DISMISS</u>**

Harry H. Rimm
Womble Bond Dickinson (US) LLP
950 Third Avenue
New York, New York 10022
Tel. (332) 258-8400
Fax (332) 258-8949
harry.rimm@wbd-us.com

Christopher W. Jones
Ripley E. Rand
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
Tel. (919) 755-2100
Fax (919) 755-2150
chris.jones@wbd-us.com
ripley.rand@wbd-us.com

Kirby D. Behre
Timothy P. O'Toole
Lauren E. Briggerman
Ian A. Herbert
Cody F. Marden
Calvin Lee
Miller & Chevalier Chartered
900 Sixteenth Street NW
Washington, D.C. 20006
Tel. (202) 626-5800
Fax (202) 626-5801
kbehre@milchev.com
totoole@milchev.com
lbriggerman@milchev.com
iherbert@milchev.com
cmarden@milchev.com
clee@milchev.com

*Attorneys for Plaintiffs Farhad Azima, ALG Transportation, Inc.,
Main 3260 LLC, FFV W39 LLC and FFV Development LLC*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................................1

RELEVANT ALLEGATIONS AGAINST DECHERT..................................................3

I.     TWO DECHERT PARTNERS DIRECTED THE ENTERPRISE WITH DECHERT'S SUPPORT...............................................................................3

II.    DECHERT FRAUDULENTLY INDUCED AZIMA TO ENTER INTO A SETTLEMENT AGREEMENT. ...................................................................5

III.   DECHERT USED THE SETTLEMENT AGREEMENT TO ATTACK AZIMA. ..................................................................................................7

IV.   DECHERT LAUNCHED A NEW PHASE TO RUIN PLAINTIFFS FINANCIALLY AND REPUTATIONALLY. ...................................................7

ARGUMENT ..........................................................................................................8

              1.     The Agreement Does Not Encompass Plaintiffs' RICO Claims. .......................................................................................12

              2.     The D.C. Circuit's 2019 Decision in Azima v. RAK Is Inapt. .....................................................................................13

V.     THE COMPLAINT ALLEGES RICO CLAIMS AGAINST DECHERT. .......................16

     A.     Dechert Is Vicariously Liable for Its Partners' Misconduct. ...............................16

     B.     Dechert Mischaracterizes Plaintiffs' Alleged Predicate Offenses as Inactionable "Litigation Misconduct."...................................................18

     C.     Dechert Was Involved in Predicate Acts of Racketeering....................................19

     D.     Dechert Engaged in a Pattern of Racketeering Activity. ........................................21

     E.     Dechert Participated in the Operation and Management of the Enterprise. ............................................................................................21

CONCLUSION........................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*131 Main St. Assocs. v. Manko,*
    897 F. Supp. 1507 (S.D.N.Y. 1995).......................................................................................17

*Armco Inc. v. N. Atl. Ins. Co.,*
    68 F. Supp. 2d 330 (S.D.N.Y. 1999)....................................................................................16

*Azima v. Handjani,*
    No. 21-mc-501 (S.D.N.Y. 2021)...........................................................................................15

*Azima v. RAK Inv. Auth.,*
    926 F.3d 870 (D.C. Cir. 2019) ..........................................................................7, 10, 12, 13, 16

*Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo,*
    346 F. Supp. 3d 432 (S.D.N.Y. 2018)........................................................................17, 19, 22

*Chadbourne & Parke LLP v. Troice,*
    571 U.S. 377 (2014)...............................................................................................................14

*Charter Oak Oil Co. v. Applied Underwriters, Inc.,*
    No. 17 Civ. 0689, 2018 WL 1046787 (D. Conn. Feb. 26, 2018) ...........................................15

*Charter Oak Oil Co. v. Applied Underwriters, Inc.,*
    No. 17-cv-00689, 2017 WL 4018845 (D. Conn. Sept. 12, 2017)....................................13, 16

*Chevron Corp. v. Donziger,*
    871 F.Supp.2d 229 (S.D.N.Y. 2012)....................................................................................18

*Chevron Corp. v. Donziger,*
    974 F.Supp.2d 362 (S.D.N.Y. 2014)....................................................................................22

*Coregis Ins. Co. v. Am. Health Found., Inc.,*
    241 F.3d 123 (2d Cir. 2001).................................................................................................14

*Curtis v. Greenberg,*
    No. 20-CV-824, 2021 WL 4340788 (E.D.N.Y. Sept. 23, 2021) ...........................................21

*D'Addario v. D'Addario,*
    901 F.3d 80 (2d Cir. 2018)..............................................................................................21, 22

*Democratic Nat'l Comm. v. Russian Fed'n,*
    392 F.Supp.3d 410 (S.D.N.Y. 2019)....................................................................................22

*Fasano v. Li,*
    47 F.4th 91 (2d Cir. 2022) ....................................................................................................11

*First Capital Asset Management, Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)...........................................................................21

*Landmarks Holding Corp. v. Bermant*,
   664 F.2d 891 (2d Cir. 1981)...........................................................................19

*Leviton Mfg. Co. v. Reeve*,
   942 F.Supp.2d 244 (E.D.N.Y. 2013) .............................................................11

*Martinez v. Bloomberg LP*,
   740 F.3d 211 (2d Cir. 2014)........................................................................9, 15

*Nisbet v. Patton*,
   1833 WL 3280, 123 (Pa. 1833 ......................................................................17

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
   416 F.3d 146 (2d Cir. 2005)...........................................................................12

*NuMSP, LLC v. St. Etienne*,
   462 F.Supp.3d 330 (S.D.N.Y. 2020)........................................................10, 11

*Phillips v. Audio Active Ltd.*,
   494 F.3d 378 (2d Cir. 2007)...........................................................................15

*Planck LLC v. Particle Media, Inc.*,
   No. 20 Civ. 10959, 2021 WL 5113045 (S.D.N.Y. Nov. 3, 2021) ..........................................15

*Prospect Funding Holdings, LLC v. Vinson*,
   256 F.Supp.3d 318 (S.D.N.Y. 2017)..............................................................11

*Rio Tinto PLC v. Vale S.A.*,
   No. 14 Civ. 3042, 2014 WL 7191250 (S.D.N.Y. Dec. 17, 2014).................................9, 12, 13

*The Cadel Co. v. Flanagan*,
   No. Civ. 301CV531AVC, 2006 WL 860063 (D. Conn. Mar. 31, 2006)................................18

*Thomas v. Ross & Hardies*,
   9 F.Supp.2d 547 (D. Md. 1998) .....................................................................17

*Van Orden v. City of Port Jervis*,
   No. 20-cv-07207, 2022 WL 1667024 (S.D.N.Y. May 25, 2022) ............................................17

*Zanghi v. Ritella*,
   No. 19 Civ. 5830, 2021 WL 4392756 (S.D.N.Y. Sept. 24, 2021) ...........................................10

**Statutes**

15 Pa.C.S. § 8201.............................................................................................17

15 Pa.C.S. § 8431............................................................................................................17

15 Pa.C.S. § 8642............................................................................................................17

18 U.S.C. § 1961.............................................................................................................18

28 U.S.C. § 1782.............................................................................................................15

**Other Authorities**

Contracts (Rights of Third Parties) Act 1999 ............................................................10

## PRELIMINARY STATEMENT

Dechert served as the Enterprise's nerve center, and its involvement in and knowledge of the Enterprise's misconduct was substantial.[1] *See generally* Compl. ¶¶ 8, 15, 184-203. The Complaint describes in great detail how Dechert partner Neil Gerrard served as the Enterprise's mastermind, aided by his partner in crime Dechert partner David Hughes. But in its Motion to Dismiss, Dechert argues that the Complaint offers no allegations to support holding Dechert liable for the acts of its partners. Dechert, like all corporate entities and partnerships, acts through the conduct of its employees and leaders. And as Dechert concedes in its Motion, the acts of partners can bind the firm. *See generally* Mem. of Law in Supp. of Def. Dechert LLP's Mot. to Dismiss ("Dechert Br.") (Feb. 28, 2023); *id.* at 15 n.3. The Complaint illustrates how Defendant Gerrard, a Dechert partner (as such a co-owner of the firm) and practice group leader, spent nearly a decade engaged in criminal conduct aimed at Plaintiffs' reputation and business interests. Additionally, the Complaint explains how former Dechert partner David Hughes committed obstruction of justice and wire fraud by transmitting false statements to U.S. courts and coaching witnesses to commit perjury to impede U.S. litigation. These detailed allegations are more than sufficient to survive a Motion to Dismiss. Dechert's misconduct was reprehensible enough that its own client, the Emirate of Ras Al Khaimah ("RAK"), implicated the firm and its agents (Gerrard and Hughes, among others) in the wrongdoing alleged in the Complaint and disavowed their representation. *Id.* ¶ 201.

Dechert argues that the Complaint fails to state a RICO claim against the firm. It says that litigation "misconduct" does not count here, but the firm is wrong on both the law and the facts.

---

[1] Plaintiffs adopt the definitions used in their Omnibus Opposition and Complaint for any capitalized term.

Not only is this claim rebutted by the four corners of the Complaint, *see, e.g.*, Compl. ¶¶ 184-203, but also the illegal acts of its partners are imputable to Dechert. So, although Dechert claims the Complaint fails to allege that it committed predicate acts of money laundering, witness tampering, wire or mail fraud, or obstruction of justice, it ignores the criminal conduct of its partners, including Gerrard and Hughes.

Dechert also says that it did not participate in the operation or management of the Enterprise, but it again turns a blind eye to the leading roles that Gerrard, Hughes, and indeed Dechert itself played in the Enterprise. Dechert not only acted through Gerrard and Hughes, but through its Chairman Andrew Levander, its former General Counsel Arthur Newbold, its former New York partner Linda Goldstein, and its former London partner and Defendant David Hughes. *See, e.g., id.* ¶¶ 91-108, 113-19, 194. Levander expanded his role after Gerrard's removal and continued the lies that Dechert had innocently discovered Azima's stolen data on the internet, *id.* ¶ 194, while former General Counsel James Croock directed firm members to stand behind Dechert and Gerrard even after learning of their misconduct, *id.* ¶ 198. Dechert even supplied the Enterprise with infrastructure, employees, and financial resources, including by providing Gerrard with "burner phones," to execute its ongoing criminal scheme. *Id.* ¶¶ 15, 196.

Dechert also seeks dismissal based on a seven-year-old forum selection clause (the "FSC") in a settlement agreement to which Dechert was not even a party, despite its role in fraudulently inducing Plaintiff Azima to sign. The conduct at issue in this case post-dates the settlement agreement, which was between Azima and RAK, and concerned a contract dispute which is entirely unrelated to the instant case. Dechert does not address these obvious defects, or the fact that four of the five plaintiffs were (like Dechert) not parties to the settlement agreement.

2

## RELEVANT ALLEGATIONS AGAINST DECHERT

**I.    TWO DECHERT PARTNERS DIRECTED THE ENTERPRISE WITH DECHERT'S SUPPORT.**

Dechert "itself [was] a central figure in the Enterprise, including its conspiracy, crimes, and subsequent coverup." *See* Compl. ¶¶ 184-203. Gerrard, a leader within the firm, directed the Enterprise. *Id.* ¶¶ 1, 8, 15-16. He served as Global Co-Head of Dechert's White-Collar and Securities Litigation Practice and also served on Dechert's Policy Committee. *Id.* ¶¶ 16, 185-86. In these roles, he used Dechert's substantial resources to direct and oversee the Enterprise's scheme, which generated millions in fees for Dechert and significant compensation for Gerrard. *Id.* ¶¶ 16, 186, 188, 207, 209. Gerrard and other Dechert partners, like Hughes, created a sprawling criminal Enterprise that targeted anyone seen as enemies. *Id.* ¶¶ 38-39, 186. RAK has since indicated some of this work was done without its knowledge. *Id.* ¶¶ 69 n.6, 183, 201. Dechert knowingly facilitated Gerrard's misconduct because it enriched both the firm and the on-the-ground managers of the Enterprise like Gerrard.

Hughes played a prominent role in the conspiracy, committing obstruction of justice and wire fraud by transmitting false statements to U.S. courts and coaching witnesses to commit perjury to impede U.S. litigation. *Id.* ¶ 240. Specifically, he sent documents by wire to Azima's counsel falsely representing that RAK had innocently discovered Azima's hacked materials on the internet after negotiating the 2016 Settlement Agreement in good faith. *Id.* Hughes also mailed stolen documents to a D.C. court for the purpose of obstructing the case filed by Azima. *Id.* Additionally, Hughes engaged in witness tampering by coaching witnesses in the U.K. proceedings to commit perjury which Hughes knew would influence litigation in the U.S. *Id.*

The Enterprise also benefitted from the active participation of Dechert's Chairman Andrew Levander, its former General Counsel Arthur Newbold, and its former New York partner Linda

Goldstein. *See*, *e.g.*, *id.* ¶¶ 91-108, 113-19, 194. After RAK removed Gerrard from its cases in 2019, Levander took a larger role in Dechert's representation of RAK and helped perpetuate the false narrative that Dechert had innocently discovered Azima's stolen data on the internet. *Id.* ¶ 194. Former General Counsel James Croock directed members of the firm to "establish a 'party line'" to stand behind and defend Dechert and Gerrard even after they became aware of inescapable evidence that Dechert and Gerrard had engaged in serious misconduct. *Id.* ¶ 198. Dechert supplied Gerrard with at least 15 different "burner phones" that allowed him to repeatedly scrub data from his cell phones during the height of the conspiracy. *Id.* ¶ 196. The Enterprise also relied on Dechert's infrastructure, partners, employees, financial resources, and reputation, and Dechert received millions in fees as its cut of the Enterprise's ongoing criminal conduct. *Id.* ¶ 15.

Dechert's leadership knew of mounting evidence that Gerrard engaged in criminal wrongdoing but disregarded that evidence, continued to provide Gerrard with resources and support, and affirmatively defended Gerrard. *See id.* ¶¶ 186-91. Dechert was aware of significant red flags regarding Gerrard's unethical practices when they hired him in 2010, *id.* ¶ 186, and those concerns were validated when, less than three years later, one of Dechert's largest clients fired the firm and accused Gerrard of egregious ethical breaches intended to increase Dechert billings. *Id.* ¶¶ 187-88. Yet, less than a year later, Dechert introduced Gerrard to RAK, one of the firm's other largest clients. *See id.* ¶¶ 1-2, 187. Then, mere months after Gerrard took over RAK's representation, Dechert's leadership was told that Gerrard had been accused of engaging in human rights abuses on RAK's behalf. *Id.* ¶ 189. Still, Dechert did nothing to stop Gerrard, and in fact joined with him to advance the lucrative Enterprise.

It was obvious that Gerrard was engaging in crimes. After the Enterprise hacked Azima and made his files available online, it invented a convenient fairytale about finding the files online.

4

*See id.* ¶¶ 67-71. By 2017, Dechert knew Azima's stolen records could not, in fact, be accessed by anyone but Dechert. *Id.* ¶ 191. In May 2020, a U.K. court concluded that two witnesses (trained by Dechert to commit perjury) had given false testimony about "discovering" Azima's stolen data online; affidavits later confirmed that Gerrard ordered and cultivated the perjury. *Id.* ¶¶ 26(d), 26(j), 110.[2] In the meantime, in 2019, Gerrard was again fired by a major client—this time, by RAK—but then-Dechert Chairman Levander stepped in to continue the representation. *Id.* ¶ 194.

Despite a decade of evidence, Dechert failed to investigate or take any corrective action. Instead Dechert actively supported Gerrard. It provided him with "do not enter" rooms that were used to keep the Enterprise's crimes from being exposed and established a "party line" of defending Gerrard. *Id.* ¶¶ 185, 198. Dechert was so "[g]ripped by Gerrard's moneymaking powers" that it went along with his rampant misconduct and continued to benefit from it. *Id.* ¶ 185. Dechert defended its false story of innocent discovery, *id.* ¶¶ 93, 96, 191, 200, and even housed stolen documents on its servers. *Id.* ¶¶ 70, 191. It provided Gerrard with at least 15 different "burner phones," many of which were never disclosed in litigation, much less preserved. *Id.* ¶¶ 196-97. In 2018 and 2019, Gerrard organized meetings in Cyprus, London, and Switzerland at least one of which was attended by Dechert's New York partner Goldstein—to develop false testimony about Azima's hacked data. *Id.* ¶¶ 110, 192; *see also id.* ¶¶ 101-12.

In sum, the Complaint alleges Gerrard engaged in illegal behavior for years. Yet, Dechert continued to knowingly support Gerrard, provided him with the resources needed for his misconduct, and maintained a "party line" defending him despite clear evidence to the contrary. *Id.* ¶ 198.

## II.   DECHERT FRAUDULENTLY INDUCED AZIMA TO ENTER INTO A

---

[2] In May 2022, a U.K. court found that Gerrard too "lied continuously" during testimony in another lawsuit brought by a former client. *Id.* ¶ 187, n. 9.

**SETTLEMENT AGREEMENT.**

After Azima and others learned about Gerrard and Dechert's abuse and mistreatment of Karam Al Sadeq and others, they sought to secure Al Sadeq's release and expose Dechert's abuses. *Id.* ¶¶ 3, 39-41. Azima assisted Al Sadeq, and like RAK's former CEO Khater Massaad, Azima's assistance put Al Sadeq directly in the Enterprise's crosshairs. I*d.* ¶¶ 42-43. Gerrard and the Enterprise implemented a multi-year plan to retaliate against and intimidate Azima: They hired hackers to steal confidential and highly sensitive information and used the hacked information, which included privileged communications, to damage Azima, his businesses, and others. *Id.* ¶¶ 44, 52, 59-61, 67, 92, 96; *see also* ¶¶ 45-58 (description of the initial hacking scheme).

Next, Dechert laid a litigation trap for Azima. Using a years' old commercial dispute between Azima and RAK, and armed with real-time access to Azima's privileged communications, the Enterprise (through Dechert and others) induced Azima to enter into a settlement agreement with RAK (the "2016 Settlement Agreement" or the "Agreement"). *Id.* ¶¶ 62-63. It contained a duty of good faith toward RAK, *id.* ¶ 62, as well as the FSC, which provides that "any dispute or claim arising out of, or in connection with" the Agreement, "or its subject matter or its formation," must be litigated in the U.K. under U.K. law. *See* Dechert Br., Gopstein Decl., Ex. 1 ¶ 7. Azima was reluctant to sign, but eventually did so at the urging of two individuals secretly acting on behalf of the Enterprise. Compl. ¶ 62.

The 2016 Settlement Agreement was a trap designed to ensnare Azima in costly litigation. *Id.* ¶ 63. Indeed, before Dechert even negotiated the Agreement, the Enterprise was already in possession of Azima's stolen data that they planned to use to sue Azima for breach of that very Agreement. *Id.* ¶ 62. The Enterprise also monitored Azima's privileged communications during the negotiation of the Agreement. *Id.* RICO co-conspirator James Buchanan, who was hand-picked by Gerrard to assist the Enterprise, *id.* ¶ 26(c), described the good-faith clause as "the key" to

accomplishing the Enterprise's "wider objectives," which included harming Azima. *Id.* ¶ 64. The language of Buchanan's email even mirrored the "wide-scale legal action" contemplated by the Enterprise's Plan. *Id.* ¶ 61. The FSC was similarly included to enable Dechert to sue Azima in the U.K., where Gerrard and other loyal members of the Enterprise were located, even though neither RAK nor Azima nor their dispute had any significant connection to the forum. *Id* ¶ 64.

## III.   DECHERT USED THE SETTLEMENT AGREEMENT TO ATTACK AZIMA.

Just months after the 2016 Settlement Agreement was signed, the Enterprise began posting Azima's stolen data on the internet, and Dechert immediately leveraged it to threaten Azima. *Id.* ¶¶ 65-67, 69. Dechert partner Hughes led the Enterprise's efforts, threatening to sue Azima in an extortionate letter that attached some of Azima's stolen documents as evidence to support the claims in the letter. *Id.* ¶ 69. Dechert then filed suit against Azima on behalf of RAK in the U.K. for breaching the Agreement (the "U.K. Proceedings"); the same day, Azima sued RAK in D.C. federal court for hacking him and stealing his data based in part upon the fact that Dechert's demand letter attached his stolen documents (the "D.C. District Court Proceeding"). *Id.* ¶ 72.

Dechert argued the D.C. District Court Proceeding had to be dismissed pursuant to the FSC that Dechert itself had fraudulently negotiated. The court rejected Dechert's arguments, but, in 2019, prior to Azima's discovery that the Enterprise had fraudulently induced him into signing the settlement agreement, the D.C. Circuit reversed and dismissed Azima's claims, sending his hacking claims to the U.K. *See Azima v. RAK Inv. Auth.*, 926 F.3d 870 (D.C. Cir. 2019).

## IV.   DECHERT LAUNCHED A NEW PHASE TO RUIN PLAINTIFFS FINANCIALLY AND REPUTATIONALLY.

After inducing Azima to enter into the Settlement Agreement, the Enterprise, with Gerrard at its helm, moved forward with "a new and decisive phase" of its Plan to ruin Azima and his businesses. Compl. ¶ 61. Gerrard was the leader of the Enterprise and directed nearly every action

of the Enterprise's Plan. *Id.* ¶¶ 1, 16. The Enterprise launched "wide-scale legal action . . . in multiple jurisdictions" against Azima and others in order to drive up his legal fees and ruin him financially and reputationally. *Id.*; *see also id.* ¶¶ 86, 102-10, 238, 240-44. Gerrard oversaw the obstruction of justice scheme with Hughes acting as his deputy: Gerrard developed the false witness testimony, *id.* ¶¶ 101-06, served as headmaster of the "perjury school," *id.* ¶¶ 109-11, directed the mailing of stolen documents to the D.C. court, *id.* ¶¶ 238-40, caused the filing of multiple false statements, *id.* ¶¶ 107, 111-12, 118-19, and directed hacking of lawyers as part of the obstruction scheme to determine how Azima was funding his litigation efforts, *id.* ¶¶ 162-64. He also oversaw Dechert lawyers who prepared a dossier that was provided to law enforcement. *Id.* ¶¶ 76-79. And he was involved in the plan to generate negative press about Azima, including through mailing of stolen documents to members of the press. *Id.* ¶¶ 80-81.

## ARGUMENT[3]

### I.    AZIMA'S 2016 SETTLMENT AGREEMENT WITH RAK IS IRRELEVANT TO PLAINTIFFS' CLAIMS AGAINST DECHERT.

Dechert attempts to invoke the FSC in the 2016 Settlement Agreement, and relies heavily on the D.C. Circuit's conclusion that the FSC required dismissal of Azima's hacking claims against RAK. This is a different case, however, and a different outcome is mandated here. The firm's central involvement in a years-long RICO Enterprise cannot be immunized by an FSC in *a fraudulently induced settlement agreement* relating to a *commercial dispute* solely between Azima and RAK, *to which Dechert was not even a party*.

*First*, Azima and RAK entered into the Agreement. Dechert was not a party, and it cannot

---

[3] Plaintiffs incorporate by reference the Opposition to Defendants' Omnibus Motion to Dismiss ("Omnibus Opp'n"). Accordingly, the standard of review is not repeated. *See* Omnibus Opp'n. at 14-15.

enforce the Agreement against Azima or the Plaintiff Entities, who were also not parties. U.K. law, which governs the Agreement, makes this clear. *See* Ex. 1, Decl. of Lord Leonard Hoffmann ¶ 9 (preeminent U.K. legal expert concluding Dechert cannot enforce the Agreement as a non-signatory). *Second*, by its terms, the FSC only covers claims related to the contract dispute between Azima and RAK. Plaintiffs' RICO claims are wholly unrelated to that dispute and do not, as a result, fall within the scope of the FSC. U.K. law, again, makes this clear. *See id.* ¶ 10 (concluding Plaintiffs' RICO claims cannot be covered by the Agreement). *Third*, even if Plaintiffs' claims were somehow covered by the 2016 Settlement Agreement, it is unenforceable. The Complaint's allegations—which must be accepted as true at this stage—make clear that it was procured by fraud orchestrated by Dechert in order to harm Plaintiffs.[4]

### A.     Dechert Cannot Enforce the Agreement's Forum Selection Clause.

"[C]ourts must apply the law contractually chosen by the parties to interpret [a forum selection clause]." *Martinez v. Bloomberg LP*, 740 F.3d 211, 220 (2d Cir. 2014). For example, "if [a court] [is] called upon to determine . . . whether [an FSC's] scope encompasses the claims or parties involved in a certain suit, [it] appl[ies] the law contractually selected by the parties." *Id.* at 218. Here, because the FSC states that disputes are governed by U.K. law, the Court must look to U.K. law to determine its scope. *See Rio Tinto PLC v. Vale S.A.*, No. 14 Civ. 3042, 2014 WL 7191250, at *1 (S.D.N.Y. Dec. 17, 2014) (applying *Martinez*); Gopstein Decl., Ex. 1 ¶ 7 ("This Settlement Agreement . . . is governed by and shall be construed in accordance with English law").[5]

---

[4] Gerrard and Hughes make the same FSC arguments as Dechert makes here. Plaintiffs incorporate their arguments here into their Gerrard and Hughes oppositions, and vice versa.

[5] The D.C. Circuit recognized as much in its previous decision and applied "general contract law principles" only because the parties made "little reference to English contract law." *Azima v. RAK*, 926 F.3d 870, 876 (D.C. Cir. 2019).

Under U.K. law, "a person who is not a party to a contract governed by English law cannot assert a claim to any benefit by virtue of that contract." *See* Hoffmann Decl. ¶ 8. Under U.K. law, a third party without privity can only seek to enforce a contract clause when that clause expressly names the purported beneficiary. *Id.* (contract itself must "purport[] to confer a benefit on him."); *see also* Contracts (Rights of Third Parties) Act 1999 (the "Act") §1(1)(b). Dechert is not named in the Agreement, and the Agreement includes no benefits directed toward Dechert. "The narrowness of this exception . . . plainly does not apply to any of the Defendants in this case," including Dechert. Hoffmann Decl. ¶ 9. Dechert drafted the FSC. Surely, if the firm was supposed to be a party that could enforce the FSC under U.K. law, it would have written the Agreement that way.

Relying solely on U.S. law, which does not apply here, Dechert argues it can invoke the FSC because it is "closely related" to RAK. Dechert Br. at 9. Even if U.S. law applies (it does not), as a non-signatory, Dechert must still show that it was "closely related" to one of the Agreement's signatories. *NuMSP, LLC v. St. Etienne*, 462 F.Supp.3d 330, 350 (S.D.N.Y. 2020) (citation and quotations omitted). The key "is whether enforcement of the forum selection clause is **foreseeable** by virtue of the relationship between the signatory and the party sought to be bound." *Id.* (emphasis added). Dechert claims it can invoke the FSC because it was "closely related" to RAK. But Dechert's own case says simply representing a client in connection with a contract is insufficient. *See Zanghi v. Ritella*, No. 19 Civ. 5830, 2021 WL 4392756, at *6 (S.D.N.Y. Sept. 24, 2021). That is especially true here. RAK was simply Dechert's client, and RAK has accused Dechert of misconduct regarding its representation of RAK. *See* Compl. ¶ 201. Dechert did not "act[] in concert" with RAK to cause Azima to enter into the Agreement. *Leviton Mfg. Co. v. Reeve*, 942 F.Supp.2d 244, 259 (E.D.N.Y. 2013). Dechert and Gerrard, instead, acted for their own benefit

without their client's authority.

Regardless, Dechert's argument that it can enforce the FSC against Azima is irrelevant as to the Plaintiff Entities. "[T]he enforcement of . . . forum selection clause[s] against [a] non-party must have been foreseeable prior to suit, *which implies that the non-signatory must have been otherwise involved in the transaction in some manner*." *Prospect Funding Holdings, LLC v. Vinson*, 256 F.Supp.3d 318, 325 (S.D.N.Y. 2017) (emphasis added). For example, in *NuMSP*, the court refused to enforce an FSC against non-signatory defendants because there was no showing that they had any knowledge of the FSC. Here, the Plaintiff Entities played no role in the transaction involving Azima and RAK and they did not even suffer any injury until 2019, Compl. ¶ 180, more than three years after the Agreement was executed. Indeed, almost all of the Plaintiff Entities were founded *after* the Agreement was executed.[6]

**B.      The 2016 Settlement Agreement Does Not Cover this Dispute.**

FSC clauses, no matter how broadly written, don't cover every claim involving the same or related parties. The D.C. Circuit analysis on which Dechert relies acknowledges that the Agreement's FSC is "not unlimited." *Azima v. RAK*, 926 F.3d at 879. Whether a claim is covered depends on the language of the parties' agreement—and, here, the FSC covers only those

---

[6] In a footnote, Dechert further argues that the Plaintiff Entities are Azima's alter egos, and as such, the FSC applies with equal force. Piercing the corporate veil as Dechert seeks to do is a fact-intensive inquiry, which Dechert has not made any effort to do at the motion to dismiss stage. The Complaint does not support such a finding. *See* Compl. ¶¶ 11-24 (Azima wholly owns just one of the Plaintiff Entities). In the case relied upon by Dechert, the entity plaintiffs were themselves "involved in the [disputed] going-private merger" and also received written notice that they would be bound by the agreement containing the forum selection clause. *See Fasano v. Li*, 47 F.4th 91, 104 (2d Cir. 2022). That is not the case here. In fact, the Plaintiff Entities do not fall within any of the circumstances in which courts in this district have "generally found a close relationship." *See NuMSP*, 462 F. Supp. at 351 (listing (1) where the non-signatory had an active role in the transaction between the signatories, (2) where the non-signatory had an active role in the company that was the signatory, (3) non-signatory alter-egos, (4) corporate executive officers, (5) successors-in-interest, (6) third-party beneficiaries to a contract).

11

"dispute[s] or claim[s] arising out of, or in connection with [the *Settlement Agreement*] or ***its subject matter* or *its formation*.**" Gopstein Decl., Ex. 1 ¶ 7 (emphasis added). Plaintiffs' RICO claims deal with a sprawling criminal Enterprise to attack Plaintiffs, among others, and gouge RAK for fees. These claims clearly extend far beyond the Agreement, which resolved a simple commercial dispute, meaning that under both U.K. and U.S. law the Agreement does not (and cannot) bar Plaintiffs' claims against Dechert.[7]

### 1.   *The Agreement Does Not Encompass Plaintiffs' RICO Claims.*

U.K. law is clear that an FSC only "requires a connection between the dispute and subject-matter of the clause." Hoffmann Decl. ¶ 10. In other words, "the construction of an [FSC] should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute [arising out their contract]." *Id.* Applying this principle, it is "hard to see how [the Complaint's] allegations of elaborate unlawful conduct can be said to arise out of the relationship between [RAK and Azima] or the [2016] Settlement Agreement" under U.K. law. *Id.* ¶ 11.

Courts in this District have analyzed this precise issue, and have refused to dismiss RICO claims on the basis of U.K.-governed FSCs. In *Rio Tinto*, the agreement at-issue contained an FSC that required disputes "aris[ing] out of or in connection with" the agreement had to be litigated in the U.K. under U.K. law. *Rio Tinto*, 2014 WL 7191250, at *10. The court declined to dismiss, reasoning that, "[w]hile English courts have on occasion concluded that statutory and tort claims fall within a contract's forum selection clause, such a result [is] limited to situations . . . in which a party's statutory or tort claim depends upon '***the validity or enforceability of the contract*.'**" *Id.*

---

[7] Dechert focuses exclusively on the FSC, but even under a traditional *forum non conveniens* analysis, its arguments fail. For example, if this action were transferred to the U.K., Plaintiffs would be left without a remedy, because they cannot simply refile their claims in the U.K., Hoffmann Decl. ¶¶ 12-15, or graft them onto a 7-year-old litigation. *See Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (requiring an "adequate alternative forum").

at *11 (emphasis added). The court emphasized that "[n]one of [the RICO statute's] elements relate[d] in a meaningful way to the terms, validity, or enforceability of the [agreement]," and that it "need not determine [any] contractual issue[s] to resolve the fraud and RICO claims." *Id.* The same is true here.[8] Regardless of whether the Agreement is enforceable, Dechert committed injurious crimes.

### 2. *The D.C. Circuit's 2019 Decision in Azima v. RAK Is Inapt.*

Ignoring U.K. law, Dechert argues that the D.C. Circuit's analysis of the 2016 Settlement Agreement should apply here because (1) Plaintiffs' RICO claims are derivative of the hacking claims the D.C. Circuit already dismissed, and (2) the Complaint pleads facts relating to the fraudulently induced Agreement. Both arguments miss the mark.

The D.C. Circuit interpreted the FSC as requiring some "logical or causal connection" to the Agreement. *Azima v. RAK*, 926 F.3d at 878. In other words, the "origin of a [dispute] [had to be] related to that agreement." *Id.* at 877. It found Azima's hacking claims against RAK arose out of the "formation" of the 2016 Settlement Agreement: The hack was connected to Azima's service as a mediator between RAK and its former CEO, Khater Massaad, and the court found that the Settlement Agreement, which included a whereas clause about the Massaad mediation, was formed in part to compensate Azima for the mediation. *Id.* at 878; *see also* Compl. ¶¶ 41-42. There was, in sum, a direct connection between Azima's commercial dispute with RAK and the claims in the D.C. Proceedings. That is not the case here.

The Complaint seeks damages for conduct since the 2015 hack and the 2016 Settlement Agreement. Compl. ¶ 61. Since then, the Enterprise manufactured a U.S. criminal investigation,

---

[8] Some courts in the Second Circuit have, relatedly, refused to enforce FSCs if doing so would forcibly split the parties and litigation between jurisdictions. *See Charter Oak Oil Co. v. Applied Underwriters, Inc.*, No. 17-cv-00689, 2017 WL 4018845, at *12 (D. Conn. Sept. 12, 2017).

*id.* ¶¶ 76-79; waged a media campaign to harm Azima, *id.* ¶¶ 80-82; obstructed federal proceedings to obtain evidence, *id.* ¶¶ 127-43, 175-78; conducted additional hacking, *id.* ¶¶ 161-69; and bribed witnesses, *id.* ¶¶ 170-74. These attacks resulted in new injuries that are independent of the 2015 hack.[9] *Id.* ¶¶ 179-83; *see also* Omnibus Opp'n at 45-46. Dechert simply ignores these allegations and does not explain how they relate back to the 2016 Settlement Agreement, seeking instead to use the Agreement to permanently shield itself from any U.S. litigation related to Azima.

Dechert argues that this litigation is connected to the Agreement because the Complaint alleges it was used to fraudulently sue Azima in the U.K. Setting aside that Dechert seeks to benefit from its own fraud, *see infra* at Section I.C., the FSC's requirement that a claim arise "in connection with" the Settlement Agreement requires a showing of materiality. *Cf. Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) ("A fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals . . . to buy or to sell a 'covered security.'"). While some of the Complaint's allegations relate to Dechert's involvement in the fraudulent inducement of the Agreement, *see* Compl. ¶¶ 63-64, the Enterprise's overarching purpose went far beyond that misconduct, and most of the actionable conduct occurred well after the 2016 Settlement Agreement was signed. A seven-year-old settlement agreement between Plaintiffs and a non-party cannot indefinitely inoculate Dechert from all liability for any misconduct related to its representation of RAK, and its argument to this effect is contrary to established law. *See Planck LLC v. Particle Media, Inc.*, No. 20 Civ. 10959, 2021 WL 5113045, at *5 (S.D.N.Y. Nov. 3, 2021)

---

[9] That the Enterprise's subsequent misconduct was intended to (and actually did) cause new injuries easily distinguishes this case from Dechert's cases, where derivative "cover up" claims were dismissed. *See, e.g., Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 130 (2d Cir. 2001) (claims related to financial failure were covered by clause, therefore misrepresentations that were only "intended to hide . . . [that] financial failure was looming" were covered as well).

(refusing to apply a forum selection clause to disputes that were wholly unrelated to the parties' contractual relationship).[10]

### C.     The Agreement Is Unenforceable Because It Was Obtained By Fraud.

Even if the 2016 Settlement Agreement encompassed Plaintiffs' RICO claims (and it does not, *see infra* at 12-13), the Agreement is unenforceable. *See Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383-84 (2d Cir. 2007) (an FSC will not be enforced if there is "a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching").[11]

The Complaint alleges in detail that the Enterprise used stolen data, including privileged communications, to induce Azima into signing the 2016 Settlement Agreement so that it, led by Dechert, could bring litigation against him in the U.K. Compl. ¶¶ 62-64. Dechert and the Enterprise focused on two aspects of the Agreement—a good-faith clause and the FSC—that were "key" to the Enterprise's opening salvo against Azima. *Id.* The former supplied the cause of action and the latter allowed Dechert's U.K. lawyers (e.g., Gerrard and Hughes) to pursue it in the U.K. *Id.*

Courts have refused to enforce such clauses in similar circumstances. *See Charter Oak Oil Co. v. Applied Underwriters, Inc.*, No. 17 Civ. 0689, 2018 WL 1046787, at *6 (D. Conn. Feb. 26, 2018); *see also Armco Inc. v. N. Atl. Ins. Co.*, 68 F. Supp. 2d 330, 340-41 (S.D.N.Y. 1999) (FSC

---

[10] Dechert's only alternative argument is another distortion: that Azima purportedly admitted that his U.K. claims and Plaintiffs' RICO claims were the same in the context of a 28 U.S.C. § 1782 application seeking discovery in support of the U.K. Proceedings. *See generally Azima v. Handjani*, No. 21-mc-501 (S.D.N.Y. 2021). The Enterprise's attempts to cover-up the 2015 hack are relevant to the U.K. Proceedings because they show Defendants' state of mind and consciousness of guilt. But the U.K. Proceedings do not cover Plaintiffs' U.S.-specific claims here.

[11] Federal law, not U.K. law, applies to the Court's analysis here. *See Martinez*, 740 F.3d at 217 (federal law supplies framework governing FSC's enforceability, whereas the law the parties selected, U.K. law here, governs FSC's interpretation).

fraudulently induced when it was "not unreasonable to infer that [the defendant] may have included the Forum Selection Clause in order to further the alleged fraud"). In *Charter Oak*, for example, the court refused to enforce an otherwise valid FSC because the court could not "disentangle the extent to which the misrepresentations [alleged in the plaintiff's complaint] induced agreement to the Forum Selection Clause itself." *Id.* at *6. The same circumstances exist here.[12]

Dechert relies solely on the D.C. Circuit's 2019 decision finding that the Agreement's FSC applied to claims brought by Azima against RAK. *See* Dechert Br. at 4-8. But that court did not consider whether the Agreement had been procured by fraud because, at the time, the Enterprise had successfully concealed the extent of its misconduct. *See Azima v. RAK*, 926 F.3d at 879 ("the parties do not dispute that the clause is valid and enforceable"); *see also* Compl. ¶ 112. Azima could not have challenged the enforceability of the FSC at that time because he was not aware that, at the time he signed the Agreement, Dechert was in possession of his stolen data and intended to use the agreement to bring litigation against him. The Enterprise's fraud has since unraveled.

## V.    THE COMPLAINT ALLEGES RICO CLAIMS AGAINST DECHERT.

Dechert argues that the Complaint does not adequately plead a RICO claim for a flurry of reasons. *See* Dechert Br. at 10-15. These arguments are baseless. Dechert's lawyers were at the center of a criminal Enterprise making the firm vicariously liable for its partners' predicate acts and their operation and management of the Enterprise.

### A.    Dechert Is Vicariously Liable for Its Partners' Misconduct.

The Complaint more than sufficiently alleges Dechert's involvement in the Enterprise: Dechert's partners, lawyers and leaders were involved in the Enterprise's misconduct, firm

---

[12] If the Court concludes the FSC applies to Dechert and additional facts are needed to establish Dechert's fraud, jurisdictional discovery may be appropriate.

resources were used to further the Enterprise, and the firm benefited handsomely from the Enterprise's crimes. *See* Compl. ¶¶ 1, 8, 15-16, 91-108, 113-19, 184-203. Indeed, the Complaint places the firm at the center of the Enterprise's RICO scheme. *Id.* That is sufficient to establish the firm's liability. *See Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 459 (S.D.N.Y. 2018).[13] And yet, Dechert argues that the Complaint fails to allege that the firm *itself* committed any predicate racketeering offenses. Even if that were the case (and it is not), courts have found partnerships liable for the acts of its partners, even for RICO violations. *See 131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1533–34 (S.D.N.Y. 1995); *see also Thomas v. Ross & Hardies*, 9 F.Supp.2d 547, 555 (D. Md. 1998).

Dechert does not dispute that the firm is liable for RICO violations by its partners, like Gerrard and Hughes. Instead, Dechert merely asserts that "the Complaint does not adequately allege [any RICO violations] against Gerrard or Hughes"—without actually addressing any of the Complaint's allegations against them.[14] *See* Dechert Br. at n.14. This lack of argument waives the issue. *See Van Orden*, 2022 WL 1667024, at *4. Regardless, it is clear the Complaint alleges RICO violations against both Gerrard and Hughes. *See* Gerrard Opp'n at 10-15; Hughes Opp'n at 13-16. Every one of those predicates can be, and should be, imputed to Dechert, making the firm vicariously liable for their acts.

---

[13] Under Pennsylvania law, a partner binds his limited liability partnership whenever he acts with actual or apparent authority. *See* 15 Pa.C.S. §§ 8201(c), 8431, 8642; *see also Nisbet v. Patton*, 1833 WL 3280, 123 (Pa. 1833) (applying these principles to a law firm).

[14] Dechert claims to "reserve[] all rights" to contest the Plaintiffs' "factual bases [for vicarious liability]," *see* Dechert Br. at 15 n.3, but it had the opportunity to do so in its motion and failed to do so. *See Van Orden v. City of Port Jervis*, No. 20-cv-07207, 2022 WL 1667024, at *4 (S.D.N.Y. May 25, 2022) (argument not briefed in opening motion will not be considered).

**B.    Dechert Mischaracterizes Plaintiffs' Alleged Predicate Offenses as Inactionable "Litigation Misconduct."**

Dechert claims the racketeering acts alleged in the Complaint constitute "litigation activities" and therefore don't count as RICO predicates. Dechert says that because "[it] is a law firm" and the allegations against it are "exclusively . . . related to litigation," it is somehow immune from a RICO suit. *See* Dechert Br. at 10-11. This is wrong as a matter of law and fact.[15] The extensive crimes alleged in the Complaint are certainly not somehow immune from its crimes.

*First*, the RICO statute explicitly includes obstruction of justice and witness tampering as predicate acts, and it does not contain an exception for "litigation activity." *See* 18 U.S.C. § 1961(1). Courts in this Circuit, indeed, have routinely upheld RICO claims against attorneys and law firms engaged in similar conduct as alleged here. *See Chevron Corp. v. Donziger*, 871 F.Supp.2d 229, 250-51 (S.D.N.Y. 2012) (upholding RICO claims against attorney and his firm arising out of scheme to enforce fraudulent judgment in the U.S.); *see also The Cadel Co. v. Flanagan*, No. Civ. 301CV531AVC, 2006 WL 860063, at *9 (D. Conn. Mar. 31, 2006) (lawyers' conduct "far exceeded the rendering of legal advice and constituted participation in fraudulent conduct in violation of RICO"). *Second*, its misconduct obviously extended beyond any reasonable definition of "litigation activity." *See supra* at 14 (describing Gerrard's execution of the Plan); *see also* Compl. ¶¶ 38-40, 45-58, 59-61, 80-82, 101-12, 120-24, 165-67. Gerrard's actions alone— even excluding acts of Hughes, Goldstein, and others—are a far cry from normal lawyering, and it is all imputable to the firm, which can only act through its partners. *See infra* at 17-18. Indeed, Dechert makes no attempt to argue that it is not liable for the acts of its partners.

---

[15] Plaintiffs Omnibus Opposition firmly rebuts Dechert's "litigation misconduct" argument. *See* Omnibus Opp'n at VI(C)(1). Plaintiffs' Omnibus Opposition also explains why the cases on which Dechert relies are inapt. *See id.* at 29-32.

In addition, Dechert itself took significant actions to facilitate the Enterprise's misconduct. Among other things, it ignored mounting evidence that Gerrard was defrauding clients, Compl. ¶¶ 186-91; it stored Azima's hacked data on its servers, *id.* ¶¶ 70, 191; it provided Gerrard do-not-enter rooms to maintain Enterprise secrecy, *id.* ¶ 185; it gave Gerrard at least 15 different burner phones, *id.* ¶ 196; it perpetuated the "party line" that Gerrard had acted appropriately, long after that position was unjustifiable, *id.* ¶ 198; and it instigated a fraudulent law enforcement investigation in the U.S., *id.* ¶¶ 76-79. Dechert also "played an active and critical role in . . . concealing the Enterprise's misconduct." *Id.* ¶ 184.[16]

Dechert also makes a bald assertion that claims relating to the Enterprise's instigation of baseless investigations would be barred by the *Noerr-Pennington* doctrine. Dechert Br. at 11-12. That is not true, and among other things, its misconduct falls within the "sham exception," which does not explicitly protect "a pattern of baseless, repetitive claims," like the Enterprise made here. *See Landmarks Holding Corp. v. Bermant*, 664 F.2d 891, 895-96 (2d Cir. 1981).

## C.      Dechert Was Involved in Predicate Acts of Racketeering.

Dechert also claims that the Complaint contains no allegations that the firm engaged in predicate acts. *See* Dechert Br. at 12 (citing Compl. ¶¶ 217-20, Ex. A). This too is disproven by the four corners of the Complaint.

*First*, the Complaint alleges money laundering offenses against Gerrard. Eleven of the money laundering transactions alleged in the Complaint's Exhibit A relate to payments made "for hacking . . . and meeting with Enterprise members, including Neil Gerrard." *See* Compl., Ex. A

---

[16] The most charitable reading of these allegations is that Dechert was willfully blind to Gerrard overbilling RAK for fees and unlawfully targeting its purported enemies. That alone would be enough to establish Dechert's liability, *see Palazzolo*, 346 F. Supp. 3d at 459, but the Complaint makes clear that Dechert itself was an active participant in the fraud.

Lines 370, 373, 375, 381, 386, 388-89, 393, 395, 400, 405. The Complaint also alleges Dechert received millions in fees as a direct result of the Enterprise's racketeering, *see* Compl. ¶¶ 8, 15, 207, and paid members of the Enterprise at least $1 million to hack Azima. *Id.* ¶¶ 47, 159.

*Second*, the Complaint alleges that Gerrard engaged in witness tampering. Plaintiffs specifically allege that "Gerrard engaged in witness tampering by secretly coaching witnesses to commit perjury directed at least in part toward the U.S. litigation." *Id.* ¶ 238; *see also id.* ¶¶ 101-11 (describing efforts to craft false testimony); ¶¶ 76-79 (creating dossier used to open a bogus criminal investigation).

*Third*, the Complaint alleges that members of the firm engaged in mail and wire fraud. *See* Compl., Ex. B Lines 45, 48, 49, 85 115; *see also* Omnibus Opp'n at 32-34. And Dechert itself engaged in wire fraud to protect Gerrard's book of business and the firm's profitability. Compl. ¶¶ 185, 223-30; *id.* Ex. B Lines 50, 53, 57, 64, 68-69, 78, 82-88, 92, 118-19, 130, 172. The passages in the Complaint regarding the accusations of Dechert's own client RAK support this same point– that Dechert and Gerrard engaged in fraud out of greed. *Id.* ¶ 201.

*Finally*, Dechert argues the Complaint's obstruction of justice predicates relate only to the U.K. Proceedings, but that is not what the Complaint alleges. *See id.* ¶¶ 83-126. The Complaint specifically alleges that Dechert's obstruction was "intended . . . to obstruct the D.C. District Court Proceeding," Compl. ¶¶ 101–11, and supports that allegation with specifics. It alleges Goldstein, the Dechert partner responsible for the D.C. Proceedings, attended Gerrard's meetings to rehearse false testimony for the U.K. Proceedings. *Id.* ¶ 104. The D.C. Proceedings remained pending during this time. *Id.* ¶¶ 83, 102. The Enterprise also expressed a desire for litigation to "stay over there" in the U.K., and not in the U.S., where more expansive discovery would reveal the extent of their misconduct. *Id.* ¶ 174. It is reasonable to infer Goldstein participated in these meetings

because Dechert expected to use that false testimony in both the U.S. and U.K.[17]

### D.   Dechert Engaged in a Pattern of Racketeering Activity.

Dechert engaged in many other fraudulent acts that were undertaken by the firm's leadership, *see* Compl. ¶¶ 1, 8, 15-16, 91-108, 113-19, 184-203, by its agent Gerrard, *see*, *e.g.*, *id.* ¶ 238 (summarizing Gerrard's pattern of racketeering), and by others, which establish a "pattern of racketeering activity." Dechert again ignores clear language establishing that the allegations against it are not simply derivative of the 2015 hack. *See supra* at 18-19. It tries to analogize to *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004), a case in which the defendant "engaged in a single scheme to defraud . . . by quickly moving his assets . . . and then concealing [their] existence . . . during [a] bankruptcy proceeding." *Id.* at 182. Once the initial transfer occurred, "the scheme essentially came to its conclusion." *Id.* at 181.[18] Here, in contrast, the 2015 hack was the beginning, not the end. Acting with and through Gerrard and others, Dechert committed a variety of subsequent predicate offenses.

### E.   Dechert Participated in the Operation and Management of the Enterprise.

Showing that Dechert participated in the "operation or management" of the Enterprise is a "relatively low hurdle for plaintiffs to clear," because Plaintiffs only need to show that Dechert played "*some* part in directing the enterprise's affairs." *D'Addario v. D'Addario*, 901 F.3d 80, 103-04 (2d Cir. 2018). This test is satisfied if Dechert was the alleged mastermind or in "ultimate command." *Chevron Corp. v. Donziger*, 974 F.Supp.2d 362, 576 (S.D.N.Y. 2014), or if Dechert

---

[17] Dechert also argues that its false statements are inactionable "litigation conduct," but this argument is misplaced. *See supra* at 18-19; *see also* Omnibus Opp'n at 29-32.

[18] Dechert's other cases reflect similar patterns. *See Curtis v. Greenberg*, No. 20-CV-824, 2021 WL 4340788, at *12 (E.D.N.Y. Sept. 23, 2021) ("[T]he SAC suggests [a] . . . scheme tied to a single . . . transaction.").

"actively assisted" the effectuation of the mastermind's schemes. *D'Addario*, 901 F.3d at 104. This element is easily satisfied under either standard because the Complaint contains a long list of specific activities that clearly establish Dechert's significant management role in the Enterprise.

Gerrard, a high-ranking Dechert partner, acted as the Enterprise's mastermind. *See* Compl. ¶¶ 1, 16. His misconduct is attributable to Dechert, putting the firm vicariously in command. *See supra* at 17-18; *Palazzolo*, 346 F. Supp. 3d at 459. Dechert supported Gerrard's operation and management of the Enterprise. *See supra* at 3-6. Dechert minimizes its role as merely providing "goods and services," Dechert Br. at 14-15, but that does not really aid its argument. Its own precedent explains that providing goods and services are sufficient if facts are alleged that "*would demonstrate some degree of control over the enterprise.*" *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F.Supp.3d 410, 441 (S.D.N.Y. 2019) (cleaned up) (emphasis added). But the Complaint goes much further, alleging Dechert: was aware Gerrard overbilled clients before it hired him, *id.* ¶ 186; introduced Gerrard to RAK after he was fired for defrauding another client, *id.* ¶ 187; used lawyers to prepare an extensive dossier of stolen documents to provide to law enforcement, *id*. ¶ 76; continued the litigation through other Dechert partners, including then-Chairman Levander, after RAK removed Gerrard from its cases, *id*. ¶ 194; supported Gerrard's false statements, including through Goldstein and then-General Counsel Newbold, *id*. ¶¶ 91-94; provided him with 15 "burner phones" and did not keep track of the data, as well as "do not enter" rooms to keep his work secret, *id*. ¶¶ 185, 196; and ruthlessly defended Gerrard as allegations against him mounted, *id*. ¶¶ 186-87, 188-91, 198-99. Dechert did much more than just provide "goods and services." It gave shelter to, and actively facilitated, the Enterprise's criminal activities.

## CONCLUSION

Plaintiffs respectfully request that the Court deny this Motion to Dismiss in its entirety.

Dated:  May 22, 2023
        New York, New York

/s/ Harry H. Rimm
Harry H. Rimm
Womble Bond Dickinson (US) LLP
950 Third Avenue
New York, New York 10022
Tel. (332) 258-8400
Fax (332) 258-8949
harry.rimm@wbd-us.com

/s/ Christopher W. Jones
Christopher W. Jones
Ripley E. Rand
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
Tel. (919) 755-2100
Fax (919) 755-2150
chris.jones@wbd-us.com
ripley.rand@wbd-us.com

/s/ Kirby D. Behre
Kirby D. Behre
Timothy P. O'Toole
Lauren E. Briggerman
Ian A. Herbert
Cody F. Marden
Calvin Lee
Miller & Chevalier Chartered
900 Sixteenth Street NW
Washington, D.C. 20006
Tel. (202) 626-5800
Fax (202) 626-5801
kbehre@milchev.com
totoole@milchev.com
lbriggerman@milchev.com
iherbert@milchev.com
cmarden@milchev.com
clee@milchev.com

*Attorneys for Plaintiffs Farhad Azima, ALG Transportation, Inc.,*
*Main 3260 LLC, FFV W39 LLC and FFV Development LLC*