UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FARHAD AZIMA,
ALG TRANSPORTATION, INC.,
MAIN 3260 LLC,
FFV W39 LLC, and
FFV DEVELOPMENT LLC,

        Plaintiffs,

     - against -

DECHERT LLP,
DAVID NEIL GERRARD,
DAVID GRAHAM HUGHES,
NICHOLAS DEL ROSSO,
VITAL MANAGEMENT SERVICES, INC.,
AMIT FORLIT,
INSIGHT ANALYSIS AND RESEARCH LLC,
SDC-GADOT LLC,
AMIR HANDJANI,
ANDREW FRANK, and
KARV COMMUNICATIONS,

        Defendants.

22 Civ. 8728 (PGG) (JW)

**OMNIBUS MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS**

Harry H. Rimm
Womble Bond Dickinson (US) LLP
950 Third Avenue
New York, New York 10022
Tel. (332) 258-8400
Fax (332) 258-8949
harry.rimm@wbd-us.com

Christopher W. Jones
Ripley E. Rand
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
Tel. (919) 755-2100
Fax (919) 755-2150
chris.jones@wbd-us.com
ripley.rand@wbd-us.com

Kirby D. Behre
Timothy P. O'Toole
Lauren E. Briggerman
Ian A. Herbert
Cody F. Marden
Calvin Lee
Miller & Chevalier Chartered
900 Sixteenth Street NW
Washington, D.C. 20006
Tel. (202) 626-5800
Fax (202) 626-5801
kbehre@milchev.com
totoole@milchev.com
lbriggerman@milchev.com
iherbert@milchev.com
cmarden@milchev.com
clee@milchev.com

*Attorneys for Plaintiffs Farhad Azima, ALG Transportation, Inc.,
Main 3260 LLC, FFV W39 LLC and FFV Development LLC*

**<u>TABLE OF CONTENTS</u>**

Page

PRELIMINARY STATEMENT ................................................................................................1

SUMMARY OF PLAINTIFFS' KEY ALLEGATIONS .................................................5

I.      THE ENTERPRISE AND ITS CO-CONSPIRATORS .....................................5

II.     THE ENTERPRISE'S COMPLEX SCHEME TO DESTROY AZIMA AND
        OTHERS ...............................................................................................................7

III.    THE ENTERPRISE EXECUTED ITS PLAN TO EMBROIL AZIMA IN
        BASELESS LITIGATION AND OBSTRUCT HIS EFFORTS TO SEEK
        LEGAL REDRESS. ..............................................................................................8

IV.     THE ENTERPRISE LAUNCHED A MEDIA SMEAR CAMPAIGN AND
        MANUFACTURED A CRIMINAL INVESTIGATION INTO AZIMA. .......................13

V.      THE ENTERPRISE INFLICTED SIGNIFICANT HARM ON PLAINTIFFS. ..............13

STANDARD OF REVIEW ....................................................................................................14

ARGUMENT ..........................................................................................................................16

I.      THE COMPLAINT ADEQUATELY PLEADS THE ELEMENTS OF A RICO
        CLAIM..................................................................................................................17

        A.      The Complaint Sufficiently Alleges the Existence of a RICO Enterprise............17

                1.      Plaintiffs Sufficiently Allege All Elements of a RICO Enterprise. ...........18

                2.      Plaintiffs Allege That Defendants are Distinct from the Enterprise. .........20

        B.      The Complaint Alleges a Pattern of Racketeering Activity..................................21

                1.      The Complaint establishes closed-ended continuity.................................22

                2.      The Complaint also establishes open-ended continuity through the
                        inherently unlawful practice of business by the Enterprise. .....................24

        C.      The Complaint Alleges Numerous Cognizable RICO Predicates. ........................26

                1.      Defendants cannot immunize their predicate offenses by claiming
                        they are "Litigation Activities."................................................................26

                2.      Plaintiffs' Obstruction-Related Claims Are Predicate Acts......................29

                3.      The Complaint Sufficiently Pleads a Mail and Wire Fraud Scheme. ........32

II.     THE COMPLAINT ALLEGES SUFFICIENT FACTS SHOWING THAT
        DEFENDANTS' RICO VIOLATIONS CAUSED COGNIZABLE INJURIES TO
        PLAINTIFFS. ........................................................................................................34

|   | A. | The Complaint Alleges Numerous Injuries That Are Cognizable and Recoverable Under RICO. | 35 |
|   | B. | The Plaintiff Entities Have Standing to Vindicate Cognizable Injuries. | 38 |
| III. | | THE COMPLAINT PROPERLY ALLEGES PROXIMATE CAUSE. | 38 |
| IV. | | PLAINTIFFS' CLAIMS ARE NOT TIME BARRED. | 43 |
| V. | | PRINCIPLES OF COMITY AND CLAIM-SPLITTING DO NOT JUSTIFY DISMISSAL. | 46 |
|   | A. | Only the "Clearest of Justifications" Warrants Dismissal on the Basis of International Comity, and None Exist Here. | 46 |
|   |   | 1.   No "Parallel" Proceedings Exist that Could Justify Dismissal. | 47 |
|   |   | 2.   No "Exceptional Circumstances" Exist That Warrant Abstention. | 50 |
|   | B. | The Claim Splitting Doctrine Does Not Bar Plaintiffs' Claims. | 54 |
| VI. | | PLAINTIFFS' 18 U.S.C. § 1962(D) CONSPIRACY CLAIM IS WELL-PLED. | 58 |
| CONCLUSION | | | 58 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*131 Main St. Assocs. v. Manko,*
    897 F. Supp. 1507 (S.D.N.Y. 1995)..........................................................................43

*4 K & D Corp. v. Concierge Auctions, LLC,*
    2 F. Supp. 3d 525 (S.D.N.Y. 2014) .........................................................................35

*Ahscroft v. Iqbal,*
    556 U.S. 662 (2009).................................................................................................15

*Alix v. McKinsey & Co.,*
    23 F.4th 196 (2d Cir.), *cert denied*, 143 S. Ct. 302 (2022)..............................41, 42

*Amimon Inc. v. Shenzhen Hollyland Tech Co.,*
    No. 20-cv-9170, 2021 WL 5605258 (S.D.N.Y. Nov. 30, 2021)..............................51

*Angermeir v. Cohen,*
    14 F. Supp. 3d 134 (S.D.N.Y. 2014).......................................................................36

*Azima v. Del Rosso,*
    No. 20-cv-954, 2021 WL 5861282 (M.D.N.C. Dec. 10, 2021)..................11, 12, 45

*Azima v. RAK Inv. Auth.,*
    926 F.3d 870 (D.C. Cir. 2019) ................................................................................10

*Baisch v. Gallina,*
    346 F.3d 366 (2d Cir. 2003)....................................................................................58

*Bankers Trust Co. v. Rhoades,*
    859 F.2d 1096 (2d Cir. 1988)........................................................................ *passim*

*Bartlett v. Société Générale de Banque au Liban SAL,*
    No. 19-cv-0007, 2021 WL 3706909 (E.D.N.Y. Aug. 6, 2021) ...............................51

*BCS Servs., Inc. v. Heartwood 88, LLC,*
    637 F.3d 750 (7th Cir. 2011) ..................................................................................39

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).................................................................................................15

*Bingham v. Zolt,*
    66 F.3d 553 (2d Cir. 1995)................................................................................45, 46

*Black v. Ganieva,*
 619 F. Supp 309 (S.D.N.Y. 2022), *aff'd*, No. 22-cv-1524, 2023 WL 2317173
 (2d Cir. Mar. 2, 2023) ................................................................................................29, 35

*Bouveng v. NYG Cap. LLC,*
 175 F. Supp. 3d 280 (S.D.N.Y. 2016) (Gardephe, J.) ............................................................28

*Boyle v. United States,*
 556 U.S. 938 (2009) ................................................................................................................18

*Brock v. Zuckerberg,*
 No. 2021 WL 2650070, at *5 (S.D.N.Y. June 25, 2021) ........................................................29

*Broidy v. Glob. Risk Advisors LLC,*
 No. 19-cv-11861, 2021 WL 1225949 (S.D.N.Y. Mar. 31, 2021) ...........................................56

*Browning v. Flexsteel Indus., Inc.,*
 955 F. Supp. 2d 900 (N.D. Ind. 2013) ...................................................................................31

*Butcher v. Wendt,*
 975 F.3d 236 (2d Cir. 2020) ...................................................................................................29

*Chevron Corp. v. Donziger,*
 871 F. Supp. 2d 229 (S.D.N.Y. 2012) ............................................................................ *passim*

*Chevron Corp. v. Donziger,*
 974 F. Supp. 2d 362 (S.D.N.Y. 2014), *aff'd, Chevron Crop. v. Donziger*, 833
 F.3d 74 (2d Cir. 2016) ...................................................................................................3, 19, 21

*Chevron Corp v. Donziger,*
 833 F.3d 74 (2d Cir. 2016) ................................................................................................19, 36

*Citadel Mgmt., Inc. v. Telesis Tr., Inc.,*
 123 F. Supp. 2d 133 (S.D.N.Y. 2000) .........................................................................29, 49, 50

*City of New York v. Bello,*
 579 F. App'x 15 (2d Cir. 2014) ...............................................................................................58

*City of New York v. Venkataram,*
 396 F. App'x 722 (2d Cir. 2010) ........................................................................................30, 31

*Cohen v. S.A.C. Trading Corp.,*
 711 F.3d 353 (2d Cir. 2013) ...................................................................................................44

*Colo. River Water Conservation Dist. v. United States,*
 424 U.S. 800 (1976) ...........................................................................................................47, 50

iv

*Com-Tech Assocs. v. Computer Assocs. Int'l Inc.*,
   753 F. Supp. 1078 (E.D.N.Y. 1990) ............................................24

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
   950 F. Supp. 48 (E.D.N.Y. 1996), *aff'd*, 126 F.3d 365 (2d Cir. 1997) ..................48

*Curtis & Assocs., P.C. v. L. Offs. of David M. Bushman, Esq.*,
   758 F. Supp. 2d 153 (E.D.N.Y. 2010) ...................................29, 55

*Curtis v. Citibank, N.A.*,
   226 F.3d 133 (2d Cir. 2000)............................................55

*D'Addario v. D'Addario*,
   901 F.3d 80 (2d Cir. 2018)........................................18, 36

*D'Orange v. Feely*,
   877 F. Supp. 152 (S.D.N.Y. 1995) ....................................29

*Daigneault v. Eaton Corp.*,
   No. 06-cv-1690, 2008 WL 2604929 (D. Conn. June 16, 2008) ...................21

*De Sole v. Knoedler Gallery, LLC*,
   974 F.Supp.2d 274 (S.D.N.Y. 2013)....................................18, 44

*De Sole v. Knoedler Gallery, LLC*,
   137 F. Supp. 3d 387 (S.D.N.Y. 2015)....................................39

*DeFalco v. Bernas*,
   244 F.3d 286 (2d Cir. 2001)........................................22, 24

*Democratic Nat'l Comm. v. Russian Fed'n*,
   392 F. Supp. 3d 410 (S.D.N.Y. 2019)....................................16, 31

*DPC N.Y., Inc. v. Scottsdale Ins. Co.*,
   No. 19-cv-1743, 2020 WL 2555241 (S.D.N.Y. May 19, 2020) ...................2, 15

*Eastman Kodak Co. v. Camarata*,
   No. 05-cv-6384, 2006 WL 3538944 (W.D.N.Y. Dec. 6, 2006) ...................30

*Elsevier, Inc. v. Grossman*,
   77 F. Supp. 3d 331 (S.D.N.Y. 2015)....................................16

*Elsevier, Inc. v. W.H.P.R., Inc.*,
   692 F. Supp. 2d 297 (S.D.N.Y. 2010)....................................37

*Emigrant Bank v. Suntrust Bank*,
   No. 20-cv-2391, 2023 WL 2647648 (S.D.N.Y. Mar. 27, 2023)....................15

*Empire Merchants v. Reliable Churchill LLLP*,
  No. 16-cv-5226, 2017 WL 5559030 (E.D.N.Y. Mar. 16, 2017)............................................43

*Erickson v. Pardus*,
  551 U.S. 89 (2007) (per curiam) ........................................................................................15

*Festinger v. Snitow Kaminetsky Rosner & Snitow, LLP*,
  No. 20-cv-9784, 2022 WL 901660 (S.D.N.Y. Mar. 28, 2022)....................................16, 19

*Finanz AG Zurich v. Banco Economico S.A.*,
  192 F.3d 240 (2d Cir. 1999)...............................................................................................52

*First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*,
  218 F. Supp. 2d 369 (S.D.N.Y. 2002)............................................................................16, 35

*Fresh Meadow Food Servs., LLC v. RB 175 Corp.*,
  282 F. App'x 94 (2d Cir. 2008) .....................................................................................23, 31

*Frydman v. Verschleiser*,
  172 F. Supp. 3d 653 (S.D.N.Y. 2016).................................................................................37

*G-I Holdings, Inc. v. Baron & Budd*,
  238 F. Supp. 2d 521 (S.D.N.Y. 2002).................................................................................40

*Gela Mikadze and Khater Massaad v. Dechert LLP, James Buchanan, Nicholas
  Del Rosso, and Vital Management Services, Inc.*,
  Claim No. KB-2023-001231 .................................................................................................7

*GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*,
  67 F.3d 463 (2d Cir. 1995)..................................................................................................22

*Global Tech Indus. Group, Inc. v. Go Fun Group Holdings, Ltd.*,
  No. 17-cv-3727, 2017 WL 5036665 (S.D.N.Y. Nov. 2, 2017)..............................................53

*Goel v. Bunge, Ltd.*,
  820 F.3d 554 (2d Cir. 2016)................................................................................................15

*Grunewald v. United States*,
  353 U.S. 391 (1957)............................................................................................................32

*Guzman v. Hecht*,
  No. 18-cv-3947, 2019 WL 1315888 (S.D.N.Y. Mar. 22, 2019)............................................33

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989)......................................................................................................22, 24

*The Haytian Republic*, 154 U.S. 118, 124 (1894)........................................................................55

*Hecht v. Commerce Clearing House, Inc.*,
    897 F.2d 21 (2d Cir. 1990)..................................................................................39

*Hollander v. Flash Dancers Topless Club*,
    340 F. Supp. 2d 453 (S.D.N.Y. 2004), *aff'd*, 173 F. App'x 15 (2d Cir. 2006)................36, 37

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)..........................................................................................39

*Jacobson v. Cooper*,
    882 F.2d 717 (2d Cir. 1989).............................................................................22

*Kelly v. United States*,
    140 S. Ct. 1565 (2020)......................................................................................34

*Kerik v. Tacopina*,
    64 F. Supp. 3d 542 (S.D.N.Y. 2014)................................................................37

*Kim v. Kimm*,
    884 F.3d 98 (2d Cir. 2018)..........................................................................28, 29

*Kimm v. Chang Hoon Lee & Champ, Inc.*,
    196 F. App'x 14 (2d Cir. 2006) .......................................................................37

*King v. Wang*,
    No. 14-cv-7694, 2020 WL 6875403 (S.D.N.Y. Nov. 23, 2020)......................37, 40

*Kingstown Cap. Mgmt., L.P. v. Vitek*,
    No. 19-cv-3170, 2020 WL 5350492 (S.D.N.Y. Sept. 4, 2020), *aff'd*, No. 20-
    3406, 2022 WL 3970920 (2d Cir. Sept. 1, 2022) .............................................48, 49

*Kitaru Innovations Inc. v. Chandaria*,
    698 F. Supp. 2d 386 (S.D.N.Y. 2010)..............................................................50

*Klonis v. Nat'l Bank of Greece, S.A.*,
    487 F. Supp. 2d 351 (S.D.N.Y. 2006)...............................................................53

*Koal Indus. Corp. v. Asland, S.A.*,
    808 F. Supp. 1143 (S.D.N.Y. 1992)..................................................................33

*Lateral Recovery LLC v. Queen Funding LLC*,
    No. 21-cv-9607, 2022 WL 2829913 (S.D.N.Y. July 20, 2022)........................34

*Lateral Recovery, LLC v. Capital Merchant Servs., LLC*,
    No. 21-cv-9336, 2022 WL 4815615 (S.D.N.Y. Sept. 30, 2022) ............................15

*Lefkowitz v. Bank of New York*,
    No. 01-cv-6252, 2003 WL 22480049 (S.D.N.Y. Oct. 31, 2003)......................26

*Levine v. Torino Jewelers, Ltd.*,
No. 05-cv-3159, 2006 WL 709098 (S.D.N.Y. Mar. 22, 2006).........................................30, 43

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013).........................................................................................16

*Locus Techs. v. Honeywell Int'l Inc.*,
___F. Supp. 3d. ____, 2022 WL 4592891 (S.D.N.Y. Sept. 30, 2022) ...................................15

*Marine Midland Bank, N.A. v. Miller*,
664 F.2d 899 (2d Cir. 1981).........................................................................................16

*Marini v. Adamo*,
812 F. Supp. 2d 243 (E.D.N.Y. 2011) ....................................................................21, 23, 24

*In re Merrill Lynch Ltd. P'ships Litig.*,
154 F.3d 56 (2d Cir. 1998).........................................................................................46

*Moore v. PaineWebber, Inc.*,
189 F.3d 165 (2d Cir. 1999).........................................................................................40

*Murray v. UBS Sec., LLC*,
No. 14-cv-927, 2015 WL 769586 (S.D.N.Y. Feb. 24, 2015) ..................................................54

*Bd. of Managers ex rel. Neiditch v. Palazzolo*,
346 F. Supp. 3d 432 (S.D.N.Y. 2018)........................................................................15, 29

*Nielsen v. Rabin*,
746 F.3d 58 (2d Cir. 2014).........................................................................................15

*Nygård v. Bacon*,
No. 19-cv-1559, 2021 WL 3721347 (S.D.N.Y. Aug. 20, 2021)...........................................38

*Pavlov v. Bank of N.Y. Co.*,
25 F. App'x 70 (2d Cir 2002) .....................................................................................18

*Petroff Amshen LLP v. Alfa Rehab PT PC*,
No. 21-847, 2022 WL 480475 (2d Cir. Feb. 17, 2022) .........................................................41

*Pharr v. Evergreen Gardens, Inc.*,
No. 03-cv-5520, 2004 WL 42262 (S.D.N.Y. Jan. 7, 2004), *aff'd*, 123 F. App'x
420 (2d Cir. 2005).....................................................................................................46

*In re Platinum & Palladium Antitrust Litig.*,
61 F.4th 242 (2d Cir. 2023) .......................................................................................16

*Preway Inc. v. Touche Ross & Co.*,
No. 85-cv-645, 1987 WL 109924 (W.D. Wis. Feb. 18, 1987) ...............................................31

*Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*,
  879 F.2d 10 (2d Cir. 1989)................................................................22

*Reich v. Lopez*,
  38 F. Supp. 3d 436 (S.D.N.Y. 2014), *aff'd*, 858 F.3d 55 (2d Cir. 2017) .................................37

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993)................................................................27

*Rosendale v. Citibank, N.A.*,
  No 94-cv-8591, 1996 WL 175089 (S.D.N.Y. Apr. 15, 1996) .................................36

*Rotella v. Wood*,
  528 U.S. 549 (2000)................................................................16

*Royal & Sun All. Ins. Co. v. Century Int'l Arms, Inc.*,
  466 F.3d 88 (2d Cir. 2006).................................................47, 50, 51, 53

*Sacerdote v. Cammack Larhette Advisors, LLC*,
  939 F.3d 498 (2d Cir. 2019)................................................................55, 56

*Saluzzo v. Greenbaum*,
  No. 10-cv-649, 2011 WL 13234286 (N.D.N.Y. Feb. 4, 2011)................................29

*Schlaifer Nance & Co. v. Estate of Warhol*,
  119 F.3d 91 (2d Cir. 1997)................................................................21

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985)................................................................22

*SKS Constructors, Inc. v. Drinkwine*,
  458 F. Supp. 2d 68 (E.D.N.Y. 2006) ................................................................23

*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*,
  985 F.2d 102 (2d Cir. 1993)................................................................39

*Sterling Interiors Grp., Inc. v. Haworth, Inc.*,
  No. 94-cv-9216, 1996 WL 426379 (S.D.N.Y. July 30, 1996)................................34

*Stochastic Decisions, Inc. v. DiDomenico*,
  995 F.2d 1158 (2d Cir. 1993)................................................................36

*Sykes v, Mel Harris & Assocs., LLC*,
  757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010)................................................................28

*Tech. Opportunity Grp., Ltd. v. BCN Telecom, Inc.*,
  No. 16-cv-9576, 2019 WL 4688628 (S.D.N.Y. Sept. 25, 2019) ................................46

*Tera Grp., Inc. v. Citigroup, Inc.*,
 No. 17-cv-4302, 2019 WL 3457242 (S.D.N.Y. July 30, 2019)...............................................55

*U1it4less, Inc. v. FedEx Corp.*,
 871 F.3d 199 (2d Cir. 2017)...............................................................................................20, 21

*United States v. Applins*,
 637 F.3d 59 (2d Cir. 2011)........................................................................................................58

*United States v. Bowman*,
 260 U.S. 94 (1922)....................................................................................................................52

*United States v. Dist. Council of N.Y. & Vicinity*,
 778 F. Supp. 738 (S.D.N.Y. 1991) ..........................................................................................25

*United States v. Gatto*,
 986 F.3d 104 (2d Cir.), *cert. denied*, 142 S. Ct. 710 (2021) ....................................................34

*United States v. Greenberg*,
 835 F.3d 295 (2d Cir. 2016).....................................................................................................33

*United States v. Int'l Bhd. of Teamsters*,
 708 F. Supp. 1388 (S.D.N.Y.1989)..........................................................................................25

*United States v. Johnson*,
 945 F.3d 606 (2d Cir. 2019).....................................................................................................33

*United States v. Vilar*,
 729 F.3d 62 (2d Cir. 2013)........................................................................................................52

*von Spee v. von Spee*,
 514 F. Supp. 2d 302 (D. Conn. 2007) ......................................................................................47

*Weaver v. James*,
 No. 10-cv-6609, 2011 WL 4472062 (S.D.N.Y. Sept. 27, 2011) ..............................................21

*Wells Fargo Century, Inc. v. Hanakis*,
 No. 04-cv-1381, 2005 WL 1523788 (E.D.N.Y. June 28, 2005).................................................23

*WTA Tour, Inc. v. Super Slam Ltd.*,
 339 F. Supp. 3d 390 (S.D.N.Y. 2018)......................................................................................48

**Statutes**

18 U.S.C. § 1343................................................................................................................................33

18 U.S.C. § 1503................................................................................................................................52

18 U.S.C. § 1961......................................................................................................................18, 27, 29

18 U.S.C. § 1962 ............................................................................................16, 34, 56, 58

18 U.S.C. § 1964 .......................................................................................................16, 57

28 U.S.C. § 1782 ....................................................................................................... *passim*

**Other Authorities**

4 Modern Federal Jury Instructions-Civil ¶ 84.04, Instr. 84-23 (Matthew Bender
    2023) ...........................................................................................................................56

Fed. R. Civ. P. 8 .............................................................................................................14

Fed. R. Civ. P. 12 ...........................................................................................................15

116 Cong. Rec. 35,193 (1970) (statement of Rep. Poff) .................................................22

North Carolina Pattern Jury Instruction (Civil) § 103.31 (2019)....................................57

North Carolina Pattern Jury Instruction (Civil) § 813.92 (2019).....................................57

Plaintiffs Farhad Azima ("Azima"), along with ALG Transportation, Inc., Main 3260 LLC, FFC W39 LLC, and FFV Development LLC (collectively, the "Plaintiff Entities" and with Azima, "Plaintiffs"), by and through undersigned counsel, respectfully submit this opposition to Defendants' Joint Memorandum of Law in Support of Defendants' Motions to Dismiss, dated February 28, 2023.

## PRELIMINARY STATEMENT

The Complaint details rampant criminal conduct over many years by an Enterprise[1] led by disgraced former Dechert partner Neil Gerrard, supported and perpetuated by Dechert, and operated by each of the Defendants. The Enterprise engaged in a broad-scale campaign to destroy Azima, his businesses, and others. The Enterprise stole data from Azima and others, harmed him and others through negative media campaigns, and used baseless, costly litigation to bankrupt him. As part of its litigation strategy, the Enterprise engaged in obstruction and witness intimidation to prolong the litigation and make it more costly. As if this were not enough, Dechert and Gerrard provided stolen and other bogus information to law enforcement to create legal jeopardy for Azima. This case focuses on the distinct phase of the Enterprise's plan that was executed and caused harm to Azima between 2018 and 2022, and which focused on U.S. activities, including in the U.S courts, and involved U.S. parties. The Complaint alleges numerous predicate acts committed by the Enterprise—including mail fraud, wire fraud, witness intimidation, obstruction of justice and money laundering—that were intended to and did cause substantial harm to Azima and the Plaintiff Entities.

---

[1] If not otherwise defined herein, Plaintiffs adopt the definition used in the Complaint for any capitalized term.

Defendants' motions seek dismissal of a complaint that Plaintiffs have not filed. This is not a complaint about an individual's dispute with a single entity. Rather it involves, as pleaded, the coordinated criminal activity of multiple individuals and business organizations targeting multiple individuals and entities. It is not a complaint about old hacking activity that is the subject of ongoing litigation in a foreign court. Rather, as pleaded, it is about a years-long effort to leverage the result of that illegal hacking in combination with other illegal behavior to inflict financial and reputational harm on the targets of the Enterprise.[2] And it is certainly not a complaint lacking in detail or substance; the Complaint includes 82 pages of allegations and 155 pages of appendices, detailing extensive misconduct and crimes by Defendants based upon confessions from multiple members of the conspiracy in which they have admitted to perjury and other criminal misconduct. These confessions are detailed and corroborated in the Complaint by documentary evidence, including but not limited to bank records and so-called hacking reports that detail the Enterprise's plan to harm Plaintiffs and others, and the Enterprise's progress in inflicting that harm.

Defendants have improperly recast the Complaint because they have no legitimate defenses to the allegations as pleaded. At this stage, the Court must "accept as true all of the factual allegations contained in the complaint" and "draw[] all reasonable inferences in favor of the plaintiff." *DPC N.Y., Inc. v. Scottsdale Ins. Co.*, No. 19-cv-1743, 2020 WL 2555241, at *4 (S.D.N.Y. May 19, 2020) (Gardephe, J.) (internal citations omitted). Defendants' Motions to Dismiss must be denied.

---

[2] The Enterprise, which consists of Defendants as well as other parties, is a sophisticated and organized group of individuals and entities engaged in a global campaign against perceived enemies of the Emirate of Ras Al Khaimah ("RAK"), a former client of Defendant Dechert LLP ("Dechert"). *See* Compl. ¶¶ 1, 15-26.

The Complaint includes detailed allegations of a fraud on the U.S. court system that was designed to—and ultimately did—cause significant harm to Azima and his businesses. Most of Defendants' arguments are boilerplate and not tethered to this Complaint. For example, Defendants argue that the Complaint does not allege that the Enterprise had a shared purpose or a pattern of racketeering. But the argument is plainly contradicted by the allegations in the Complaint, which set forth a "multi-year, multi-faceted campaign" to harm Azima through witness tampering and intimidation, obstruction of justice, perjury, money laundering, and wire fraud.[3] Defendants also attempt to immunize their misconduct as "litigation activities" and/or "concealment" activities that Defendants claim are not actionable under RICO. However, the RICO statute specifically includes obstruction of justice and witness tampering as predicate acts, and courts in this District have found Defendants liable for false statements and falsifying evidence analogous to what is alleged in this Complaint. *See generally Chevron Corp. v. Donziger,* 974 F. Supp. 2d 362 (S.D.N.Y. 2014), *aff'd*, *Chevron Corp. v. Donziger*, 833 F.3d 74, 135 (2d Cir. 2016). RICO does not provide any immunity for criminal conduct simply because it is committed in connection with litigation. Nor does RICO have an exception for what Defendants mischaracterize as acts of "concealment." Where, as here, an Enterprise seeks to obstruct justice as part of a plan to harm its victims, that conduct is clearly actionable under RICO.

---

[3] In one particularly egregious example, Dechert argues in its individual brief that the Complaint does not "allege a single predicate act, let alone a 'pattern' of racketeering, committed by Dechert" and that the Complaint does not allege "that Dechert participated in the operation or management of the purported 'enterprise.'" Mem. of Law in Supp. of Def. Dechert LLP's Mot. to Dismiss at 1 (Feb. 28, 2023). But the entire Complaint is about an enterprise led by disgraced Dechert partner Neil Gerrard and supported by Dechert management. Dechert and Gerrard are mentioned more than 400 times in the Complaint, including dozens of times in the wire fraud chart, and Gerrard is described as an Enterprise "leader." It takes an extremely strained reading of the Complaint even to attempt to argue that Dechert was not involved in the operation of the Enterprise and that the Complaint alleges no predicate acts committed by Dechert.

Defendants' arguments regarding injury and causation are similarly infirm. The Complaint alleges that Defendants' obstruction of justice, witness tampering, and related wire fraud schemes directly caused Plaintiff Azima to suffer financial harm, including that which arose out of the Enterprise's litigation and obstruction. The Complaint alleges that Defendants' misconduct led directly to Plaintiff Entities losing contracts due to the negative media intentionally created by the Enterprise's multi-faceted campaign. This harm was not only foreseeable; the Defendants intended it as they documented their plan to damage Azima.

Defendants' statute of limitations argument is also based on a distortion of the allegations in the Complaint. This is a case about the actions the Enterprise took since 2018 to cause financial harm to Azima and his businesses, including repeated fraud on the U.S. court system between 2018 and 2022, instigation of a bogus law enforcement investigation, and a negative media campaign, all of which were designed to, and did, cause financial harm. The pleaded damages underlying the RICO claims are clearly within the statute of limitations. Specifically, the Enterprise's obstruction of justice in the U.S. has led directly to millions of dollars in attorneys' fees and litigation costs, including a U.K. judgment obtained as a result of the Enterprise's obstructive conduct, all since 2018. And the Plaintiff Entities suffered approximately $15 million in lost profits when loans were denied based on the Enterprise's actions. The Complaint's inclusion of relevant background information regarding the Enterprise's formation in 2014 and historical activities does not alter the fact that the injuries that are the subject of this Complaint are all from the four years prior to filing and are separate from the damages Azima suffered from the hacking.

Finally, Defendants argue that this Complaint—which is brought by U.S.-based plaintiffs who were harmed in the U.S. by Defendants who operated primarily out of New York—should be litigated in the U.K. because of the existence of another case in the U.K. in which initially Azima

4

was sued by RAK. Subsequently Azima brought a counterclaim for the hacking that occurred in 2015, and added as defendants to that counterclaim James Buchanan, Dechert, and Gerrard. In contrast, this case is about multiple attacks on Azima and his businesses over several years through the obstruction of justice, witness tampering, and wire fraud, among other crimes with a focus on misconduct that occurred since 2018. This case involves different parties, different issues, and different injuries. It is focused on U.S. conduct, including a fraud on the U.S. court system, which U.S. courts have a clear interest in resolving. There is no basis to dismiss this action in favor of a U.K. suit that was brought against Azima, has been pending for seven years and is set for trial early next year.

The purpose of a motion to dismiss is to determine whether Plaintiffs' allegations, taken as true, state a claim as a matter of law. Rather than develop a legal theory to match the Complaint, Defendants have ignored and distorted the Complaint to fit a smorgasbord of generic legal theories. Defendants' arguments also rely on fundamental errors of law and come nowhere close to showing that a case about the obstruction of United States courts belongs in the United Kingdom. This Court should accordingly deny Defendants' motions to dismiss.

## SUMMARY OF PLAINTIFFS' KEY ALLEGATIONS

### I.   THE ENTERPRISE AND ITS CO-CONSPIRATORS

The Complaint alleges that, for years, Defendants and their co-conspirators, under the leadership of Dechert and its partners, including mastermind Neil Gerrard, created and implemented a complex and detailed criminal scheme that was specifically designed to and in fact did injure numerous victims in the U.S. (and abroad), including Plaintiffs in this matter. Compl. ¶¶ 1, 7, 15, 16, 208-09. The Enterprise hid behind positions at seemingly reputable entities (such as Dechert) to conduct a broad campaign of hacking, theft, obstruction of justice, money laundering, and wire fraud. *Id.* ¶¶ 207-09, 213, 221, 231.

5

Gerrard led the Enterprise, *id.* ¶¶ 16, 209, and each Defendant played a critical role in attacking the Enterprise's enemies. Dechert served as a central figure, by providing personnel, infrastructure, offices, finances, and reputation to execute the scheme, involving firm leadership in the scheme, and making millions from the scheme. *Id.* ¶¶ 8, 15, 29, 184. And when Gerrard was later fired by Dechert's client, Dechert Chairman Andrew Levander stepped in to continue the representation. *Id.* ¶ 194. David Hughes, while a Dechert partner and after he left the firm, served as a high-level deputy and worked closely with Gerrard to organize and structure the Enterprise, coordinate its affairs, execute its illegal acts, file bogus litigation and direct other Dechert partners to carry out its illicit plan including in U.S. litigation. *Id.* ¶¶ 17, 87, 93, 102, 104, 106.

Dechert and Gerrard directed the campaign to ruin Azima and other opponents. *Id.* ¶¶ 2, 39, 61. Nicholas Del Rosso and his company Vital Management Services, Inc. (collectively, the "Del Rosso Defendants") were hired to steal data and information belonging to Azima and others, disseminate the stolen materials, obstruct U.S. court proceedings, and manipulate U.S. law enforcement into investigating Azima in order to cause harm to him and his businesses. *Id.* ¶¶ 18, 19, 26(g), 26(h), 26(i), 54, 68, 144. Amit Forlit and his companies Insight Analysis and Research LLC and SDC-Gadot LLC (collectively, the "Forlit Defendants"), at Gerrard's direction, orchestrated the hacking of Azima and obstructed U.S. court proceedings. *Id.* ¶¶ 20-22, 55-58, 102-06. Amir Handjani, Andrew Frank, and their company, KARV Communications, (collectively, the "Handjani Defendants") planned and coordinated the attack on Azima, *id.* ¶¶ 23-25, 45, 54, 59-61, and served as a braintrust for the Enterprise, *id.* ¶¶ 60, 130-31. In addition, Frank and KARV authored the detailed plan known as the Comprehensive Action Plan (the "Plan"), which set forth the attack against Azima and Khater Massaad. *Id.* ¶¶ 59-61. Handjani, alongside

Gerrard, directed the 2020 hacking by Forlit to identify whether Azima's litigation efforts were being funded. *Id.* ¶¶ 163, 169.

Plaintiffs are not the only victims of the Enterprise's criminal conduct. For example, Karam Al Sadeq ("Al Sadeq") has sued members of the Enterprise and alleged that Dechert, Gerrard and Hughes, and others violated international law by renditioning him to RAK and detaining him indefinitely in inhumane conditions. *Id.* ¶¶ 3, 38-40. Khater Massaad ("Massaad")[4] also was a target of the Plan. *Id.* ¶¶ 59-61. Many others were attacked by the Enterprise between 2018 and today. *See id.* ¶¶ 41-44, 54, 162-69.

RAK has admitted Dechert's role in the illegal Enterprise and disavowed the actions of Dechert and its lawyers. RAK recently acknowledged in the U.K. High Court of Justice proceeding (the "U.K. Proceeding") that RAK "'may have been the victims of dishonest and unscrupulous former third party-advisors'—*i.e.*, Gerrard and Dechert—'who have taken steps to advance their own interests for their own gains.'" *Id.* ¶ 69 n.6. Notably, RAK also admitted that some of the members of the Enterprise met in December 2019 in Switzerland without RAK's knowledge or consent and disavowed the meeting and the conduct at that meeting, which included planning to commit perjury. *Id.* ¶ 110.

## II.    THE ENTERPRISE'S COMPLEX SCHEME TO DESTROY AZIMA AND OTHERS

In 2014, members of the Enterprise created a plan to target and harm Azima, his businesses, and other perceived RAK opponents though a "coordinate[d] . . . attack." *Id.* ¶ 45. Following instructions to "target" Azima, *id.*, in January 2016, the Enterprise implemented the Plan to

---

[4] Khater Massaad has also sued members of the Enterprise in the U.K., including Defendants Dechert, Del Rosso, and Vital. *See Gela Mikadze and Khater Massaad v. Dechert LLP, James Buchanan, Nicholas Del Rosso, and Vital Management Services, Inc.*, Claim No. KB-2023-001231.

decimate the Enterprise's victims financially and reputationally. *Id.* ¶¶ 59–61. The Plan uses unequivocal language detailing the steps that the Enterprise planned to take and the damage those steps were intended to inflict.

The five prongs of the Plan included: (1) launching an intelligence-gathering attack on targets, which included illegally hacking and stealing victims' data, *id*. ¶¶ 45-54; (2) launching a negative media campaign against victims by leaking harmful and confidential information to the press to ruin their victims' businesses, prestige, and personal reputations, *id.* ¶¶ 24-25, 74, 80-82, 179; (3) establishing a task force led by Dechert to set legal strategy to lodge baseless, costly litigation against Azima and others to bury the victims in legal fees, *id.* ¶¶ 44, 89, 127-169, 175-179, 181, 183, 229, 244-46, 256-58; (4) luring Azima into providing the Enterprise with information about his business dealings to benefit RAK, *id*. ¶¶ 26(a), 62-64; and (5) feeding U.S. law enforcement officials false and harmful fake intelligence regarding Azima in order to gin up a criminal investigation and silence him, id. ¶¶ 32, 35, 37, 74, 76-79, 181-82; *see also id*. ¶¶ 59-61 (describing the Plan).

## III. THE ENTERPRISE EXECUTED ITS PLAN TO EMBROIL AZIMA IN BASELESS LITIGATION AND OBSTRUCT HIS EFFORTS TO SEEK LEGAL REDRESS.

The Enterprise implemented its Plan, including from 2018 onward. After hacking Azima, the Enterprise wrote that it was entering "a new and decisive phase" to launch "wide-scale legal action . . . in multiple jurisdictions" against Azima and others. *Id.* ¶ 61. The goal of embroiling Azima in bogus litigation and thwarting his efforts to pursue legal redress for the harm he suffered was to drive up his legal fees and ruin him financially and reputationally. *Id.*; *see also id.* ¶¶ 86, 102-10, 238, 240-44. Accordingly, the Enterprise brought baseless litigation against Plaintiff Azima in the U.K. (the "U.K. Proceeding") for the purpose of harming Azima and his businesses,

*id.* ¶¶ 69-72, and the Enterprise engaged in widespread obstruction of litigation in D.C. and North Carolina federal courts ("D.C. District Court Proceeding" and "2020 North Carolina Proceeding," respectively), as well as Section 1782 litigation in support of the U.K. Proceeding, *id.* ¶¶ 83-160.

RAK sued Azima in the U.K. Proceeding for breach of a 2016 Settlement Agreement between Azima and RAK in furtherance of the Plan. *Id.* ¶¶ 62-64, 75, 89, 90, 182. Two of RAK's trial witnesses—Stuart Page and Majdi Halabi—have admitted to perjury and have confessed that they were coached to lie by Gerrard and other members of the Enterprise. *Id.* ¶¶ 26(d), 26(j), 110. Azima sued RAK in the D.C. District Court Proceeding for hacking Azima's computers. That case was pending until July 2020. *Id.* ¶¶ 83, 86. In 2020, Azima sued Del Rosso in the 2020 North Carolina Proceeding for his role in the hacking and publication of Azima's stolen data. *Id.* ¶¶ 144, 150. Both the D.C. District Court Proceeding and the 2020 North Carolina Proceeding threatened to reveal the crimes of the Enterprise, which would have thwarted the Enterprise's attempt to harm Azima through litigation. Thus, the Enterprise went to great lengths—including perjury and witness tampering—to prevent the truth from coming out and drive up Azima' legal costs. *Id.* ¶¶ 84, 101-11.

Beginning in 2018, Dechert, through Gerrard, organized a series of meetings of Enterprise members to create and rehearse false testimony regarding their role in the hacking and theft of Azima's confidential data in order to obstruct ongoing U.S. court proceedings. *Id.* ¶¶ 87, 90, 101-02, 104, 106, 109, 111, 192, 194. Dechert, on its own and through Gerrard and Hughes, and other Defendants, then purposefully submitted false statements in the D.C. District Court Proceeding and U.K. Proceeding where Azima sought to prove the 2015 hacking. *Id.* ¶¶ 87-90, 94-98, 100, 103, 105, 107, 110-11. These false statements prevented Azima from demonstrating that the 2016

Settlement Agreement was a trap,[5] caused the D.C. court to transfer Azima's case to the U.K. and resulted in a financial judgment against him. *Id.* ¶ 112. As a direct result of the Enterprise's obstruction, Plaintiffs did not learn about the Enterprise members' false statements until 2020, when RAK's trial witnesses confessed their involvement. *Id.* ¶¶ 86, 112.

The Enterprise sought to obstruct the D.C. District Court Proceeding again in 2019 by sending some of Azima's stolen emails to the D.C. court and others. *Id.* ¶¶ 120-21. Dechert, Gerrard, and Del Rosso anonymously mailed copies of the emails to the court, in an effort to mask their involvement in stealing the emails. *Id.* ¶¶ 122-23. The Enterprise also lied to Azima's counsel and the D.C. District Court, destroyed evidence and lied about it, concocted false testimony to mask their involvement in the hacking of Azima, and hid the fact that the 2016 Settlement Agreement was procured by fraud. *Id.* ¶¶ 91-93, 99, 107, 114-18, 124-25. Dechert (and RAK) successfully prevented Azima from obtaining discovery that would have revealed the Enterprise's role in the hacking. *Id.* ¶ 112, 126.

---

[5] Defendants fraudulently induced Azima into signing the 2016 Settlement Agreement, which paid Azima $2.6 million to resolve a contract dispute but imposed a duty of "good faith" and English jurisdiction clause that the Enterprise would use to instigate litigation in the U.K. Compl. ¶¶ 44-64. In the D.C. District Court Proceeding, the court found in favor of Azima and denied RAK's motion to dismiss. *Id.* ¶ 102. In 2019, the D.C. Circuit overturned that judgment and held that the forum selection clause in the bogus 2016 Settlement Agreement required that the case be litigated in the U.K. *Id.* ¶ 88. The D.C. Circuit did not consider whether the 2016 Settlement Agreement was entered into in good faith. *See Azima v. RAK Inv. Auth.*, 926 F.3d 870, 872 (D.C. Cir. 2019) (noting that the sole question before the court was whether "this litigation is covered by that [settlement] agreement"). Evidence had not yet come to light that Dechert, Gerrard, Hughes, Handjani, and others were illicitly obtaining and reviewing Azima's privileged communications with his counsel about the Settlement Agreement as it was being negotiated, or that they fraudulently induced Azima to sign the Settlement Agreement in accordance with their Plan in order to ensnare him in litigation. Compl. ¶¶ 52, 63-64, 86. Azima was therefore forced to attempt to litigate his hacking claim against RAK as a counterclaim in the U.K. That effort was frustrated, however, by the fraud and perjury that occurred in that trial. *Id.* ¶¶ 88, 112, 126.

In 2020 and 2021, the Enterprise again obstructed proceedings in the U.S. to prevent discovery of its crimes and disruption of its scheme to harm Azima through frivolous litigation. The Enterprise obstructed U.S. proceedings brought under 28 U.S.C. § 1782 ("Section 1782") in which Azima sought evidence for his U.K. Proceeding. Compl. ¶¶ 127-28. In 2021 and 2022, Azima filed Section 1782 applications seeking discovery from Handjani and Forlit relevant to the retrial of Azima's claims in the U.K. Proceeding. *Id.* ¶¶ 129, 133. Each submitted false and misleading statements in those proceedings regarding the 2015 hacking of Azima and the distribution of the stolen data. *Id.*; *see also id.* ¶¶ 129–40, 143. Forlit's companies, SDC-Gadot and Insight, also filed materially false statements denying the existence of responsive documents despite evidence of bank transactions linking the companies to Forlit's involvement in the hacking. *Id.* ¶¶ 141-42.[6]

Meanwhile, in the North Carolina action,[7] the Enterprise obstructed Azima's lawsuit by interfering with witnesses, manufacturing evidence, and making false statements to the court. *Id.*

---

[6] Defendants' suggestion that Azima misled this Court in connection with a Section 1782 application for Handjani is ludicrous. Omnibus Br. at 3 (citing Ex. 3 to Decl. of John C. Quinn in Supp. of Omnibus Br.). In connection with the U.K. Proceeding, Azima sought information from Handjani related to the hacking and the cover-up of that hacking. Efforts to cover-up the hacking is relevant to whether the U.K. defendants committed the hacking because it shows consciousness of guilt. But there are no claims in the U.K. for damages related to the obstruction of U.S.-based litigation and the related schemes to defraud Azima alleged in this lawsuit.

[7] As the truth regarding the Enterprise's crimes against Azima started to come to light, Azima sued North Carolina residents Del Rosso and Vital for their role in the 2015 hacking and the publication of his stolen data. Compl. ¶ 144. In 2021, the North Carolina court granted in part and denied in part a motion to dismiss. *See Azima v. Del Rosso*, No. 20-cv-954, 2021 WL 5861282, at *1 (M.D.N.C. Dec. 10, 2021). The remaining claims in North Carolina are (1) a claim for misappropriation of Azima's trade secrets related to the publication of those trade secrets in 2018 and 2019 and (2) a conspiracy claim regarding the plan to hack Azima and leak his documents through the misappropriation. *Id.* at *8-9. The North Carolina case does not relate to obstruction, the widespread fraud on the U.S. court system, or the plan to harm Azima through the media, litigation, and law enforcement investigations. The relief in the North Carolina case relates to the publication of Azima's stolen data, statutory damages, and related injunctive relief. There is no

*Continued on next page*

¶¶ 144-45, 156. Del Rosso deleted communications with his co-conspirators in violation of his preservation duties and destroyed evidence key to Azima's case. *Id.* ¶ 149. In November 2020, Del Rosso created a fake contract and false reports to cover up the fact that he had hired and paid an admitted hacker. *Id.* ¶¶ 151-52. In 2021, the Enterprise pressured the hacker not to cooperate with Azima or to provide truthful testimony in the 2020 North Carolina Proceeding. *Id.* ¶ 155.

The Enterprise also obstructed the 2020 North Carolina Proceeding by making false statements to the court. *Id.* ¶¶ 61, 156. For example, in November 2020, the Del Rosso Defendants lied about their involvement in the hacking of Azima. *Id.* ¶ 157. The court relied upon these false statements and rejected Azima's request to seek discovery from banks to corroborate the allegations in his complaint. *Id.* ¶ 158. Del Rosso—personally and also through his counsel— engaged in acts of witness intimidation, creation of false contracts, destruction of evidence, and submission of false statements to the court. These repeated acts obstructed Azima's ability to pursue his case and seek relief for the harm the Del Rosso Defendants caused him while also causing him to rack up significant, unnecessary legal fees. *Id.* ¶¶ 148, 151-56, 160, 170-74.

The Enterprise again turned to hacking in 2020, this time to determine who was funding Azima and others. *Id.* ¶ 161. In February 2020, Dechert's Gerrard and others engaged Forlit to hack and steal information about how Azima and others were paying to defend against the ongoing litigation. *Id.* ¶¶ 163-64, 169. Dechert's Gerrard instructed Del Rosso to assist in this effort, and Del Rosso hired Patrick Grayson to hack Al Sadeq's lawyers. *Id.* ¶¶ 165-66. Al Sadeq's attorneys subsequently sued its hackers in the U.K. and sought discovery from the Del Rosso Defendants through a Section 1782 application filed in the Middle District of North Carolina. *Id.* ¶ 171. Del

---

relief sought related to the fraud on the U.S. court system or damages to Azima's businesses. The Plaintiff Entities here are not parties to the North Carolina case.

Rosso attempted to conceal his role in the hacking by fabricating and destroying documents, pressuring a witness to conceal his role in the hacking through bribery and intimidation, and submitting false statements in the 1782 Proceeding. *Id.* ¶¶ 172-78.

Defendants' obstruction started to come to light in April 2019. *Id.* ¶ 85. Two Enterprise members admitted to perjury in the U.K. trial and confessed to their role in the crimes of the Enterprise. *Id.* ¶ 86. In June 2022, Azima obtained copies of hacking reports prepared by the Enterprise, which, for the first time, provided direct evidence that many critical statements made in the various court proceedings were false and misleading. *Id.*

## IV.    THE ENTERPRISE LAUNCHED A MEDIA SMEAR CAMPAIGN AND MANUFACTURED A CRIMINAL INVESTIGATION INTO AZIMA.

In 2018-2019, Dechert and others provided U.S. law enforcement agencies with information and documents in an effort to manufacture a criminal investigation into Azima and both damage and silence him. *Id.* ¶¶ 61, 76. In 2019, the Enterprise held multiple meetings with U.S. law enforcement authorities in New York and Texas and successfully instigated an FBI investigation of Azima. *Id.* ¶¶ 77-79. Azima incurred significant legal fees responding to law enforcement document requests and subpoenas before the FBI dropped the investigation. *Id.* ¶¶ 61, 79, 181, 245, 257.

The Enterprise also planted false and disparaging stories in the media in order to destroy Azima's reputation. *Id.* ¶¶ 80-81. In 2019, the Enterprise published Azima's stolen data on WeTransfer links on the internet, which triggered negative media coverage that caused new harm to Azima and his businesses, as described in Section V below. *Id.* ¶ 82.

## V.    THE ENTERPRISE INFLICTED SIGNIFICANT HARM ON PLAINTIFFS.

The Enterprise's crimes and misconduct injured Plaintiffs' businesses and property, including impairment of business interests, damage to reputation and good will, attorneys' fees

and costs, and payments made in connection with the fraudulent litigation. Compl. ¶ 245. Specifically, the Enterprise caused Azima to incur millions of dollars in attorneys' fees and costs defending himself in the U.K. Proceeding, exposing the Enterprise's pervasive fraud in the litigation in the U.S. and U.K., and interacting with U.S. law enforcement from 2018 to present. *Id.* ¶¶ 181-83. The lies and obstruction that Dechert and the Enterprise engaged in prolonged and complicated that litigation and resulted in Plaintiffs incurring more legal fees and expenses.

The Plaintiff Entities also were injured as a direct result of the actions taken by the Enterprise. *Id.* ¶¶ 246-50. Banks denied Azima and these companies loans and closed Azima's accounts as a result of the negative publicity caused by the Enterprise. *Id.* ¶ 179. In particular, in January 2019, a lender refused to provide Main 3260 with a $13.5 million loan to finance development of multi-unit apartment complexes in Kansas City, Missouri after the lender discovered during due diligence the negative media coverage of Azima instigated by the Enterprise. *Id.* ¶ 180. When the loan fell through, and Main 3260 could not secure alternative financing, the Plaintiff Entities suffered approximately $15 million in lost profits. *Id.*

The Enterprise specifically intended to harm Azima in this manner, as evidenced by their written Plan. *Id.* ¶¶ 59-61, 183. Attorneys' fees and expenses, judgments resulting from the fraud of the Enterprise, the impairment of Azima's businesses, and his loss of access to financial services were all specifically intended and therefore foreseeable by the Enterprise. *Id.*

## STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, a plaintiff is only required to set forth a "short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). However, "'once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint' . . . and a plaintiff must allege 'only enough facts to state a claim to relief that is plausible on its face.'" *Bd. of Managers ex rel. Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 452

(S.D.N.Y. 2018) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563, 570 (2007)). Only if a Plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible" should a court dismiss. *Id.* (quoting *Twombly*, 550 U.S. at 570). Under this standard, "'[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *DPC N.Y., Inc. v. Scottsdale Ins. Co.*, No. 19-cv-1743, 2020 WL 2555241, at *4 (S.D.N.Y. May 19, 2020) (Gardephe, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "'The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Emigrant Bank v. SunTrust Bank*, No. 20-cv-2391, 2023 WL 2647648, at *5 (S.D.N.Y. Mar. 27, 2023) (Gardephe, J.) (citations omitted).

In reviewing a motion to dismiss, "the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Locus Techs. v. Honeywell Int'l Inc.*, ___F. Supp. 3d. ____, 2022 WL 4592891, at *18 (S.D.N.Y. Sept. 30, 2022) (Gardephe, J.) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). Courts "do not look beyond 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken.'" *Lateral Recovery, LLC v. Capital Merchant Servs., LLC*, No. 21-cv-9336, 2022 WL 4815615, at *20 (S.D.N.Y. Sept. 30, 2022) (quoting *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)).

In considering dismissal under Rule 12(b)(2), a plaintiff need only make out a prima facie case of personal jurisdiction, *see Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013), which, prior to discovery, "'may be established solely by allegations'" that are pled in good faith. *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 341 (S.D.N.Y. 2015)

(citation omitted). The court must "accept as true all factual claims in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 253 (2d Cir. 2023) (cleaned up). "'[A] district court has considerable procedural leeway,'" *First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 387 (S.D.N.Y. 2002) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981), and "'may permit discovery in aid of the motion [or] conduct an evidentiary hearing on the merits of the motion.'" *Id.* (quoting *Marine Midland Bank*, 664 F.2d at 904).

## ARGUMENT

The Complaint includes two RICO claims for relief: a violation of 18 U.S.C. § 1962(c) (participating in an enterprise's affairs), Compl. ¶¶ 204-51, and a violation of 18 U.S.C. § 1962(d) (conspiracy to violate RICO), *id.* ¶¶ 252-62. "RICO provides for civil actions . . . by which '[a]ny person injured in his business or property' by a RICO violation may seek treble damages and attorney's fees." *Festinger v. Snitow Kaminetsky Rosner & Snitow, LLP*, No. 20-cv-9784, 2022 WL 901660, at *18 (S.D.N.Y. Mar. 28, 2022) (Gardephe, J.) (quoting *Rotella v. Wood,* 528 U.S. 549, 552 (2000) and (quoting 18 U.S.C. § 1964(c)). To state a claim under 18 U.S.C. § 1962(c), a "plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* at *20 (quoting *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 438 (S.D.N.Y. 2019) (internal quotations omitted)).

I.     **THE COMPLAINT ADEQUATELY PLEADS THE ELEMENTS OF A RICO CLAIM.**[8]

    A.     **The Complaint Sufficiently Alleges the Existence of a RICO Enterprise.**

Plaintiffs have sufficiently alleged facts satisfying each of elements of an enterprise under the RICO statute. Defendants half-heartedly claim that (1) the alleged Enterprise members do not share a "common purpose" and (2) Defendants are not "persons" distinct from the "enterprise." Joint Mem. of Law in Supp. of Defs.' Mots. to Dismiss (the "Omnibus Br.") at 23-25 (Feb. 28, 2023). Defendants rely upon generic case law criticizing RICO complaints that, in their view, "'frequently miss the mark.'" *Id.* at 23 (citation omitted). But this is not a garden variety RICO complaint of the kind courts in this District regularly examine. This Complaint includes 82 pages of allegations describing the Enterprise's purpose and execution of its campaign, as well as hundreds of documented instances of mail and wire fraud and money laundering committed in furtherance of the scheme. It is based on the Enterprise's own detailed, written Plan for Defendants' sweeping campaign of fraud. Rarely does a RICO complaint contain information pulled from writings by the defendants that admit to the allegations in the Complaint; and it is also rare for a RICO Complaint to be based upon witness statements, co-conspirator confessions of wrongdoing, and corroborating records such as hacking reports and bank records that reveal tens of millions of dollars flowing through small companies to support the Enterprise's crimes. Defendants are understandably silent regarding these devastating documents.

---

[8] Though the Defendants first argument relates to issues of comity, we start first by explaining why this Complaint properly alleges a RICO claim before addressing why this Court is the proper court to decide that claim, *infra* Section V.

1.    *Plaintiffs Sufficiently Allege All Elements of a RICO Enterprise.*

The RICO statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and <u>any</u> union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). The Second Circuit has held that the RICO statute must be "liberally construed" and given "broad and flexible reach to the term 'association-in-fact.'" *See D'Addario v. D'Addario*, 901 F.3d 80, 100 (2d Cir. 2018) (quoting *Boyle v. United States*, 556 U.S. 938, 9446 (2009)). The Supreme Court has "rejected attempts to graft onto the statute formal strictures that would tend to exclude amorphous or disorganized groups of individuals from being treated as RICO 'enterprises.'" *Id*. Rather, a RICO association in fact enterprise only needs three structural features: (1) a shared purpose to engage in a course of conduct, (2) relationships among the associates, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Id.* (cleaned up); *see also Pavlov v. Bank of N.Y. Co.*, 25 F. App'x 70, 71 (2d Cir 2002) (holding that an enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct"); *De Sole v. Knoedler Gallery, LLC*, 974 F.Supp.2d 274, 301 (S.D.N.Y. 2013) (Gardephe, J.) (An enterprise can be adequately pled even when it is "loosely and informally organized," lacks a "leader or hierarchy," and lacks a "master plan.") (cleaned up). 4 Modern Federal Jury Instructions-Civil ¶ 84.04, Instr. 84-24 (Matthew Bender 2023) (charging jurors with the three structural features of an enterprise and that an enterprise "may be organized for a legitimate and lawful purpose, or it may be organized for an unlawful purpose").

Defendants challenge only one of the three elements of a RICO enterprise:  a shared purpose to engage in a course of conduct. *See* Omnibus Br. at 24. The Complaint clearly alleges that "[t]he Enterprise's goal was to manufacture and prosecute claims against perceived enemies of RAK, including Plaintiffs, and to commit further crimes in the U.S. and overseas to cover up

their unlawful conduct and obstruct Plaintiffs' efforts to seek a legal remedy." Compl. ¶ 207 (noting the Enterprise's common purpose of carrying out . . . a multi-year, multi-faceted campaign of computer hacking, illegal surveillance, witness tampering and intimidation, obstruction of justice, perjury, money laundering, bank fraud, and wire fraud"); *see also id.* ¶¶ 59-61 (describing the Plan to harm Azima and his businesses, which the Enterprise created and committed to writing).

Defendants also argue that the Enterprise is not "separate and apart from the racketeering activity itself." Omnibus Br. at 24-25. But this case is analogous to *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 576 (S.D.N.Y. 2014), which, tellingly, Defendants fail to cite. In *Chevron,* the court found a RICO association-in-fact enterprise consisting of a number of plaintiff lawyers who came together with common purpose of "pursuing the recovery of money from Chevron . . . whether by settlement or by enforceable judgment, coupled with the exertion of pressure on Chevron to pay"), *aff'd*, 833 F.3d 74, 135 (2d Cir. 2016). That remarkable case demonstrates that lawyers can form RICO enterprises in conjunction with litigation. As in *Chevron*, the Defendants in this case worked together for the common purpose of pursuing money from Azima and others.

Instead of addressing *Chevron*, Defendants analogize their posture to the defendants in a divorce case, where the plaintiff alleged a scheme by his ex-wife and her divorce attorneys to file false statements in a divorce proceeding. *Festinger*, 2022 WL 901660, at *20. RICO allegations related to a simple divorce proceeding hardly can be analogized to the complex, multi-pronged scheme of fraud and obstruction that Defendants waged against Plaintiffs here. This Complaint alleges that the Defendants and others worked together with a common illicit purpose to use costly litigation to harm Azima and his businesses. Unlike in *Festinger*, the Enterprise members here are not merely parties who happen to be adversaries to litigation brought by Plaintiff Azima; rather,

the litigation was a critical part of the ongoing scheme to bankrupt and defraud Azima and was documented in the Plan.

2. *Plaintiffs Allege That Defendants are Distinct from the Enterprise.*

Defendants offer a perfunctory argument (in one paragraph) that Plaintiffs fail to meet the requirement that a plaintiff must allege the existence of two distinct entities: (1) a person and (2) an enterprise that is not simply the same person. The distinctiveness element merely requires that "[a] corporate entity can be sued as a RICO 'person' or named as a RICO 'enterprise,' but the same entity cannot be <u>both</u> the RICO person and the enterprise.'" *U1it4less, Inc. v. FedEx Corp.*, 871 F.3d 199, 205 (2d Cir. 2017) (internal citations omitted). The point of the distinctiveness requirement is to ensure that RICO liability does not "attach to any act of corporate wrong-doing" given that corporations can only act through their employees and agents. *Id.* at 205-06.

This Complaint alleges that a number of distinct corporate entities—including Dechert, Vital Management Services, KARV Communications, Insight Analysis and Research, and SDC-Gadot –and a number of individuals formed an association-in-fact enterprise with a common purpose to wage a campaign of fraud and obstruction against Azima and others. Compl. ¶ 207. Each of the corporate defendants is a RICO person distinct from the other Defendants and distinct from the Enterprise itself.

The Defendants were not mere agents of RAK as they now contend; indeed, the Complaint alleges that RAK has disavowed the Defendants' misconduct, claiming that they had been betrayed by Dechert and Gerrard. Compl. ¶¶ 69 n.6, 201. Thus, Defendants' citations to cases regarding wholly-owned subsidiaries acting within a single corporate structure or employees and lawyers acting as agents to carry out their employer's or principal's lawful business are unpersuasive. *See U1it4less, Inc.*, 871 F.3d at 206 (parent corporation and its wholly-owned subsidiaries were not distinct from the enterprise because they were "acting within the scope of a single corporate

20

structure" and "guided by a single corporate consciousness") (cleaned up); *Weaver v. James*, No. 10-cv-6609, 2011 WL 4472062, at *1 (S.D.N.Y. Sept. 27, 2011) (lawyer representing client in eviction proceedings); *Daigneault v. Eaton Corp.*, No. 06-cv-1690, 2008 WL 2604929, at *2-3 (D. Conn. June 16, 2008) (lawyer representing client in connection with EEOC complaint). The Complaint alleges a RICO Enterprise consisting of five entirely distinct corporate entities and associated individuals. As Defendants' own caselaw acknowledges, "[o]f course, the principle has its limits and does not foreclose the possibility of a corporate entity being held liable where it associates with others to form an enterprise that is sufficiently distinct from itself," as this Complaint alleges. *Ulit4less*, 871 F.3d at 206 (cleaned up).[9]

### B.    The Complaint Alleges a Pattern of Racketeering Activity.

To establish a RICO violation, a plaintiff must "'show that the predicate acts are related, and that they amount to or pose a threat of, continuing criminal activity.'" *Marini v. Adamo,* 812 F. Supp. 2d 243, 261 (E.D.N.Y. 2011) (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997)). For RICO purposes, predicate acts are "related" when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* (cleaned up). A threat of continued criminal activity can be shown either through closed-ended continuity—past criminal conduct extending over a substantial period of time—or open-ended continuity—the

---

[9] Defendants also cite *Daigneault* and *Weaver* to argue that the Complaint fails to allege an association-in-fact enterprise "[p]articularly because [it] does not allege that any Defendant acted outside the scope of their agency." Omnibus Br. at 25. Neither case stands for the proposition that an enterprise cannot include lawyers or entities and individuals working with lawyers. Indeed, another court in this District has recently found the existence of an enterprise that consisted of a client and its lawyers, where the client's lawyers and other agents were defendants. *See Chevron*, 974 F. Supp. 2d at 576 (finding an enterprise where Defendants consisted of lawyers and their agents).

threat of criminal activity continuing in the future. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). Both of these options for proving a pattern are designed to ensure that RICO targets persistent criminal activity, not one-off offenses. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985) (citing 116 Cong. Rec. 35,193 (1970) (statement of Rep. Poff)) (stating that the RICO pattern requirement is not aimed at an "isolated offender"); *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 468 (2d Cir. 1995) (stating that the pattern requirement was required "to effectuate Congress's intent to target 'long-term criminal conduct'") (citation omitted).

### 1.   *The Complaint establishes closed-ended continuity.*

The Complaint establishes long term, closed-ended continuity of the RICO scheme. Closed-ended continuity is demonstrated by "proving a series of related predicates extending over a substantial period of time." *H.J., Inc.*, 492 U.S. at 242. The Second Circuit has held that two years meets the minimum requirement to constitute a "substantial period of time" for a closed-ended scheme. *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001).

The Complaint alleges that numerous predicate acts occurred over at least the four-year period prior to the filing—far in excess of the minimum required to establish closed-ended continuity. *See Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) (finding approximately 8 years constituted a substantial period of time); *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 18 (2d Cir. 1989) (concluding, prior to Supreme Court's decision in *H.J. Inc.*, that allegations of predicate acts occurring over "period of nearly two years" as part of a five-part fraudulent scheme were sufficient to plead pattern of racketeering activity). In addition to the extensive duration of the conspiracy, additional factors weigh in favor of finding continuity. "[W]hile closed ended continuity is primarily concerned with the time period of the activities, the court also considers factors such as the 'number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes' as relevant when determining

whether closed ended continuity exists." *Marini*, 812 F. Supp. 2d at 262 (quoting *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 78 (E.D.N.Y. 2006)); *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94, 99 (2d Cir. 2008). Here, the substantial number of predicate acts, including obstruction of justice, witness tampering, money laundering, wire and mail fraud, and bank fraud, directed at multiple victims, also supports the establishment of a closed ended conspiracy. Compl. ¶¶ 15-24, 68-74

Defendants attempt to paint the RICO scheme as a single-victim hacking crime purportedly perpetrated against Plaintiff Azima and his businesses, *see* Omnibus Br. at 27-29, but this selective view of the allegations (again) ignores the scope of the Enterprise's scheme. The Plan included— and the Enterprise executed—conduct well beyond the hacking of Azima, including a multi-prong campaign against multiple targets to instigate criminal exposure, *id.* ¶¶ 76-79; an online disparagement campaign, *id.* ¶¶ 80-82; obstruction of legal proceedings, *id.* ¶¶ 61, 127-43, 170-78; and an additional, second round of hacking, *id.* ¶¶ 161-69. The Complaint details millions of dollars that were paid to and from members of the Enterprise for their active involvement. Additionally, the Enterprise conspired to and did inflict harm on numerous victims, including Massaad, Al Sadeq, and others referenced but not named in the Complaint. *See, e.g.*, *id.* ¶¶ 2-3, 59-61, 165-69, 175-78. The fact that these individuals are not plaintiffs in this action does not mean that they did not suffer harm at the hands of the Enterprise. *See SKS Constructors, Inc.*, 458 F. Supp. 2d at 80 ("While Plaintiff may not be able to collect damages with respect to the injuries of other, unnamed parties, it does not necessarily follow that Plaintiff may not allege injury to others in support of allegations of an ongoing fraudulent scheme, or pattern of racketeering activity."); *see also Wells Fargo Century, Inc. v. Hanakis*, No. 04-cv-1381, 2005 WL 1523788, at *5 (E.D.N.Y. June 28, 2005).

Even for "single victim" crimes (which this is not), closed-ended continuity can establish a pattern as long as "the scheme was carried out by the commission of two or more predicate acts and they are related and have some degree of continuity." *Com-Tech Assocs. v. Computer Assocs. Int'l Inc.*, 753 F. Supp. 1078, 1091 (E.D.N.Y. 1990); *Marini*, 812 F. Supp. 2d at 262-63. The Complaint alleges a scheme to harm Azima and others that features multiple predicate acts, including obstruction of justice, witness tampering, money laundering, wire and mail fraud, and bank fraud over multiple years. Compl. ¶¶ 15-24, 68-74. Defendants committed these acts to further a common goal of decimating Azima and others financially and reputationally, which is more than sufficient to establish a pattern. *Id.* ¶¶ 1, 59-61

        2.    *The Complaint also establishes open-ended continuity through the inherently unlawful practice of business by the Enterprise.*

In the alternative, the Complaint also establishes open-ended continuity of the RICO scheme. Open-ended continuity can be demonstrated when "the predicates . . . establish a *threat* of long-term racketeering activity." *H.J., Inc.*, 492 U.S. at 242 (emphasis added); *see Marini*, 812 F. Supp. 2d at 262 (citing *H.J., Inc.*, 492 U.S. at 241-43) (stating that open-ended continuity can be "established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes").

The Complaint alleges that the Enterprise operated as part of a multi-year association that existed for criminal purposes. *See, e.g.*, Compl. ¶ 207. This unified criminal purpose, dating to at least 2014, provides a clear-cut basis for a finding of open-ended continuity. *See DeFalco*, 244 F.3d at 323 (stating that, for purposes of determining whether open-ended continuity existed, "the nature of the RICO enterprise and of the predicate acts are relevant"); *H.J., Inc.*, 492 U.S. at 242-43 (stating that a threat of continuity for purposes of open-ended continuity "is sufficiently

established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes").

Defendants attempt to paint their illegal activity as legitimate work by lawyers and their agents. *See* Omnibus Br. at 26. Obstructing justice, tampering with witnesses, mail fraud, wire fraud, hacking, and laundering money are crimes, regardless of the occupation of the criminal. *See, e.g.*, Compl. ¶¶ 7, 15, 26, 208. The fact that a law firm—Dechert—was a central figure in this scheme does not make the conduct any less criminal and actionable. *See, e.g., id.* ¶¶ 1-9, 15-17. Indeed, Dechert's participation makes the facts all the more egregious. RICO was specifically designed to provide a cause of action to victims of associations united for criminal and unlawful purposes. *See United States v. Dist. Council of N.Y. & Vicinity*, 778 F. Supp. 738, 763-64 (S.D.N.Y. 1991) (citing *United States v. Int'l Bhd. of Teamsters*, 708 F. Supp. 1388, 1393-94 (S.D.N.Y.1989)) ("It is only *lawful* association that is protected [under RICO], not association for a criminal or unlawful purpose."). Defendants cannot cloak their criminal purpose under Dechert's purported provision of legal advice.

Nor does Defendants' argument that their purported criminal conduct has concluded or is "inherently terminable" hold weight. *See* Omnibus Motion at 26. The Enterprise hatched a multi-pronged blueprint to harm Azima and others in 2016 and has been carrying out that plan ever since. Compl. ¶¶ 59-61. Plaintiffs' financial and reputational injury continues to this day. Plaintiffs have continuously uncovered evidence of ongoing hacking and dissemination schemes and, according to the Enterprises' own written plan, this remains an objective of the Enterprise. *See, e.g., id.* ¶¶ 80-82, 162-64. And when RAK withdrew from the U.K. litigation, Dechert stepped into their shoes to continue to bring the claims against Azima. *Id.* ¶ 183.

This case is distinguishable from *Lefkowitz v. Bank of New York*, No. 01-cv-6252, 2003 WL 22480049, at *9 (S.D.N.Y. Oct. 31, 2003) and the other cases upon which Defendants rely, where the threat of criminal conduct ended with the resolution of a single case. Here, Defendants continue to instigate and impede litigation and attempt to destroy Azima's reputation in accordance with the Plan. *See* Compl. ¶¶ 59-61. For example, after Azima and Al Sadeq brought claims against RAK and Dechert for hacking and coerced interrogation, the Enterprise very recently executed a plan to hack Al Sadeq's lawyers to determine whether the litigation was being funded by a third party. *Id.* ¶¶ 162-69. Though the litigation that is the basis of this Complaint will ultimately end, the Enterprise's conduct suggests that the plan to harm perceived enemies and obstruct justice will continue, providing a basis for open-ended continuity.

### C.      The Complaint Alleges Numerous Cognizable RICO Predicates.

#### 1.      *Defendants cannot immunize their predicate offenses by claiming they are "Litigation Activities."*

Defendants lump Plaintiffs' alleged RICO predicate offenses together as purported in-court "litigation activities," which they argue cannot serve as RICO predicates. Omnibus Br. at 28-30. This argument stems from a selective and inaccurate reading of the Complaint and a misapplication of the law. The ambit of the Enterprise extends far beyond in-court conduct like submitting false declarations, *see, e.g.*, Compl. ¶¶ 97, 103, 105, 110, and suborning perjury, *id.* ¶¶ 101-11. Defendants committed these acts repeatedly, as alleged in the Complaint—and they are actionable. *Id.* But Plaintiffs additionally allege that the Enterprise engaged in a lengthy pattern of witness tampering, wire fraud, money laundering, document destruction, and obstruction of justice, all as part of the underlying conspiracy to harm perceived opponents of the Enterprise. *See, e.g.*, *id.* ¶¶ 101-12, 120-32 (detailing obstructions of various federal District Court proceedings); ¶¶ 113-

19 (destroying relevant evidence); ¶¶ 170-74 (bribing witnesses).[10] Indeed, the Complaint alleges

that the Enterprise engaged in criminal conduct that was unconnected to any ongoing litigation.

For example, the Enterprise sought to deceive and manipulate U.S. law enforcement in an effort

to manufacture a criminal investigation into Azima, *id*. ¶¶ 76-79; and conducted further hacking

of Azima and other perceived RAK opponents in order to undermine their ability to litigate, *id.*

¶¶ 161-69. All of these activities qualify as predicate acts under the plain text of the RICO Act.

*See, e.g.*, 18 U.S.C. § 1961(1) (listing crimes that qualify as racketeering activity, including

obstruction and witness tampering).

The Complaint's allegations focus on the widespread fraud perpetrated by the Enterprise

against the U.S. court system, and these activities are actionable under RICO. Courts in this District

have upheld RICO complaints based on exactly the kind of scheme involving litigation misconduct

that Plaintiffs allege here. In *Chevron*, the court denied defendants' motion to dismiss a complaint

alleging multiple RICO violations—including extortion, wire fraud, money laundering, witness

tampering, and obstruction—stemming from the defendants' attempts to enforce a fraudulently

obtained foreign judgment in a U.S. court. 871 F. Supp. 2d 229, 252 (S.D.N.Y. 2012) (finding that

plaintiffs "sufficiently alleges that the purpose of the alleged obstruction and witness tampering

were to keep evidence of the RICO Defendants' misconduct from being brought the attention of

the Ecuadorian courts and other tribunals in service of the alleged overall goal of obtaining a

baseless Ecuadorian judgment"). As in the instant case, the defendants in *Chevron* engaged in

predicate acts based on litigation misconduct, but those acts were part of a broader scheme. *Id.* at

249 (emphasizing that "[the Complaint] alleges that the RICO Defendants are executing a multi-

---

[10] In that respect, the litigation activities of Dechert and others not only aided the Enterprise, but
also constituted the "operation and management" of the Enterprise itself. *Reves v. Ernst & Young*,
507 U.S. 170, 185 (1993).

faceted, extortionate scheme that has included not only bringing . . . litigation, but also intimidating . . . judges, fabricating evidence, making false statements to U.S. courts, Congress, the SEC, and the media.").[11] Like the defendants in *Chevron*, the Enterprise injected false statements into U.S. courts and bribed witnesses to prevent them from testifying truthfully in order to mask their illegal conduct so that they could obtain a legal judgment against Azima.

Similarly, in *Sykes v. Mel Harris & Associates, LLC*, the plaintiffs filed RICO claims against a debt-buying company, debt collection agency, process service company, and others for a scheme to fraudulently obtain default judgments against them. 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010). The enterprise in *Sykes* focused on injuring the plaintiffs through litigation, and yet the court found the stated RICO claim cognizable. *Id.* Specifically, the court found that the "allegations sufficiently establish defendants' 'conscious misbehavior or recklessness' with respect to preparing false filings with state courts." *Id.* at 425. In addition, the court concluded that "defendants' pursuit of default judgments and attempts to enforce them against plaintiffs" caused injuries including "freezing of personal bank accounts and incurring legal costs to challenge those default judgments." *Id.* at 427-28.

Indeed, Defendants cite inapposite cases for its claimed "litigation bar" and attempt to shoehorn all sorts of criminal conduct into what is a narrow concept. In *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018), the Second Circuit held that RICO extends to the combination of litigation activities with "out-of-court [criminal] actions" such as those alleged here. In contrast, what courts have narrowly disallowed are claims that attempt to convert a single piece of litigation into a RICO predicate. *Id.* (declining "to reach the issue of whether all RICO actions based on litigation activity

---

[11] As this Court has recognized in a different context, normal litigation activities take on a different character when "not pursued by lawful methods alone." *See Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 320-324 (S.D.N.Y. 2016) (Gardephe, J.) (analyzing *Chevron*).

are categorically meritless" and "conclud[ing] only that where . . . a plaintiff alleges that a defendant engaged in a *single* frivolous, fraudulent, or baseless lawsuit, such litigation activity *alone* cannot constitute a viable RICO predicate act.") (emphasis added). The only case Defendants cite that involves more than a single piece of frivolous litigation[12] is *Curtis & Assocs., P.C. v. L. Offs. of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 159 (E.D.N.Y. 2010), which alleges only the filing of frivolous litigation, *id.* at 171, rather than a sweeping array of misconduct and crimes alleged here as part of Defendants' Plan to bury Azima and others financially and reputationally. *See* Compl. ¶¶ 113-19, 170-74. The distinction is plain.

2.     *Plaintiffs' Obstruction-Related Claims Are Predicate Acts.*

Defendants also attempt to dismiss the allegations of obstruction of justice and witness tampering as non-predicate concealment acts. Omnibus Br. at 30-32. However, the alleged acts of obstruction were part of the Enterprise's goal of using litigation to bury its targets financially and reputationally and therefore represent valid predicate offenses themselves.

The RICO statute specifically covers acts that by their nature involve concealment, such as witness tampering and obstruction of justice. *See* 18 U.S.C. § 1961(1). Acts of concealment constitute predicate offenses under RICO where they are "done in furtherance of the main criminal objectives" of the conspiracy. *See Bd. of Managers ex rel. Neiditch v. Palazzolo,* 346 F. Supp. 3d 432, 460 n.1 (S.D.N.Y. 2018) ("The concealment was allegedly designed to prevent detection and

---

[12] *See Butcher v. Wendt*, 975 F.3d 236, 239 (2d Cir. 2020) (claim involving single arbitration and subsequent court challenge to the arbitration award); *Citadel Mgmt., Inc. v. Telesis Tr., Inc.*, 123 F. Supp. 2d 133, 153 (S.D.N.Y. 2000) (claim related to two judgments issued in the same underlying U.K. action); *D'Orange v. Feely*, 877 F. Supp. 152, 155 (S.D.N.Y. 1995) (claim arising out of a single probate proceeding); *Saluzzo v. Greenbaum*, No. 10-cv-649, 2011 WL 13234286, at *1 (N.D.N.Y. Feb. 4, 2011) (claim related to a single N.Y. Supreme Court suit); *Brock v. Zuckerberg*, No. 2021 WL 2650070, at *5 (S.D.N.Y. June 25, 2021) (*pro se* claim seemingly related to the one-time enforcement a forum selection clause); *Black v. Ganieva*, 619 F. Supp. 3d 309, 317 (S.D.N.Y. 2022) (claim related to a single N.Y. Supreme Court suit).

prosecution of the organization's illegal activities, and [was] part of a consistent pattern, such that [it was] done in furtherance of the main criminal objectives of conspiracy, which may constitute a RICO predicate act.") (cleaned up); *see also City of New York v. Venkataram*, 396 F. App'x 722, 725 (2d Cir. 2010) (where money laundering was instrumental in covering up an embezzlement scheme, it constituted a predicate offense); *Levine v. Torino Jewelers, Ltd.*, No. 05-cv-3159, 2006 WL 709098, at *4-5 (S.D.N.Y. Mar. 22, 2006) (noting that acts of concealment can confer RICO liability on a defendant in denying motion to dismiss where defendants created phony invoices for jewelry purchases); *Eastman Kodak Co. v. Camarata*, No. 05-cv-6384, 2006 WL 3538944, at *11 (W.D.N.Y. Dec. 6, 2006) (collecting cases) ("[I]t is certainly conceivable that [the defendant's] alleged acts . . . had the effect not simply of concealing a completed crime, but allowed it to continue for longer than it otherwise would have. That is sufficient at this stage.").

Here too this case is analogous to *Chevron*, 871 F. Supp. 2d at 252, where the court found that the allegations of obstruction of justice and witness tampering regarding false affidavits, persuading a witness not to testify, and other litigation activities were actionable RICO predicates. As in *Chevron*, the Complaint here alleges that Defendants' obstruction of justice and witness tampering were part of the Enterprise's multi-faceted plan to harm Azima and others and that the purpose of these obstructive acts were to keep evidence of the RICO Defendants' misconduct from being brought to light as part of the overall goal of harming Azima through litigation. These are properly pled RICO predicates.

Defendants misinterpret *Democratic National Committee v. Russian Federation* ("*DNC*"), 392 F. Supp. 3d 410 (S.D.N.Y. 2019).[13] The acts of concealment in *DNC* occurred after the goal

---

[13] Defendants Gerrard and Hughes individually cite *DNC*. *See* Mem. of Law in Supp. of Def. David Neil Gerrard Mot. to Dismiss at 14-15 (Feb. 28, 2023); Mem. of Law in Supp. of Def. David

*Continued on next page*

of the conspiracy had been attained and were not part of the misconduct itself. *Id.* at 443-44.

Indeed, *DNC* cites several cases for the proposition that "in some cases, the acts of concealment are integral to the underlying criminal scheme itself and therefore cause the alleged harm just as much as the non-predicate acts." S*ee id.* (quoting *Browning v. Flexsteel Indus., Inc.*, 955 F. Supp. 2d 900, 919 (N.D. Ind. 2013) and citing *City of New York v. Ventakaram*, 396 F. App'x 722, 725 (2d Cir. 2010)) (money laundering found to be a predicate offense when instrumental to covering up an embezzlement scheme)); *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94, 99 (2d Cir. 2008) (mail fraud was a predicate offense where used to induce sale of contaminated property)).[14] Thus, *DNC* held that under the facts of that case the acts of concealment were not part of the "pattern of racketeering activity" and were therefore separate from the RICO enterprise alleged. *See DNC*, 392 F. Supp. 3d. at 444 ("'[a]cts of concealment done after the[ ] central objectives [of the conspiracy] have been attained, for the purpose of covering up after the crime,' are not considered part of the conspiracy.") (quoting *Grunewald v. United States,* 353 U.S. 391, 405 (1957)).

---

Graham Hughes' Mot. to Dismiss at 14 (Feb. 28, 2023). This Opposition rebuts their arguments here.

[14] Defendants also cite *Preway Inc. v. Touche Ross & Co.*, No. 85-cv-645, 1987 WL 109924, at *9 (W.D. Wis. Feb. 18, 1987) for the proposition that concealment cannot constitute a RICO predicate offense. Omnibus Br. at 31. This out-of-jurisdiction unreported case is not precedential in this court and is factually distinguishable. In *Preway*, a Western District of Wisconsin dismissed, on a summary judgement motion, a plaintiff's civil RICO claim where a corporation plaintiff alleged that the defendant audit firm had defrauded the plaintiff in connection with its purchase of an appliance company. *Id.* at *9-10. The court concluded that the plaintiff had alleged a scheme involving only a single victim and single injury rather than a pattern of misconduct because the audit firm's audit, review, and due diligence all related to a single objective—the sale and purchase of the appliance company. *Id.* at *9. The court also declined to find that the audit firm's alleged actions to cover up the purported wrongdoing constituted a separate predicate offense where the only injury was the sale of a business at an inflated price. *Id.*

By contrast, the conduct alleged in this Complaint that involved concealment was part of the ongoing crimes and is actionable. Defendants' instigation and obstruction of litigation was at the core of their Plan to destroy Azima financially, like in *Chevron*. Defendants repeatedly fabricated and destroyed evidence in the D.C. District Court Proceeding to prevent Azima from successfully litigating his claim and to force him to incur more legal fees (*e.g.*, Compl. ¶¶ 83-126); submitted false statements in two Section 1782 Proceedings in order to thwart Azima's efforts to support his claims and defenses in legal proceedings in the U.K. Proceeding (*e.g.*, *id.* ¶¶ 127-43); manufactured evidence, intimidated witnesses, and submitted false statements in the 2020 North Carolina Proceeding in order to block Azima's efforts to seek justice for his claims (*e.g.*, *id.* ¶¶ 144-60); bribed potential witnesses in the various U.S. proceedings relating to Defendants' involvement in the hacking of Al Sadeq's attorneys and submitted false testimony in a court proceeding to prevent Al Sadeq from developing evidence of the alleged hacking (*e.g.*, *id.* ¶¶ 170-78). These acts were designed to harm Azima and others and were not simply an afterthought to cover up prior activities.

### 3. The Complaint Sufficiently Pleads a Mail and Wire Fraud Scheme.

Finally, Defendants argue that the Complaint's wire and mail fraud predicates must fail because they do not allege that "Plaintiffs' money or property was the object of the fraudulent scheme" Omnibus Br. at 31-32. This misstates both the Complaint and the law.

First, Defendants wrote that depriving Plaintiffs of their money or property was one of the Enterprise's primary goals. The Enterprise created a written Plan that set "a strategy for attacking and harming those who had sought to expose the Enterprise's criminal conduct, with a particular focus on [Plaintiff] Azima," including by decimating him and others financially. Compl. ¶¶ 60-61. Indeed, the objective of the Plan "was to defraud Azima of money and property by harming his businesses and bankrupting him," *id.* ¶ 61, and this objective was achieved, *id.* ¶¶ 179-82 (alleging,

32

for example, lost financing of $13.5 million and lost profits of $15 million in 2019), *id.* ¶¶ 181-83 (alleging legal fees and litigation costs); *see also supra* at Section IV (discussing injuries incurred within the limitations period).

Moreover, *Plaintiffs'* money or property need not be the object of the scheme to defraud. *See* 18 U.S.C. § 1343 (requiring only a "scheme or artifice to defraud"); *Guzman v. Hecht*, No. 18-cv-3947, 2019 WL 1315888, at *5 (S.D.N.Y. Mar. 22, 2019) (quoting *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) ("'[T]he party whose money or property is the object of the scheme [need not be] the same party whom a fraudster seeks to deceive.'")). As explained above, part of the Enterprise's objective was to obtain RAK's money or property by expanding the scope of their representation. Indeed, the Enterprise intentionally perpetrated a fraud and damaged Plaintiffs to curry favor with RAK and obtain more legal fees. *See* Compl. ¶¶ 39, 207. Similarly, Dechert engaged in a wire fraud scheme to protect Gerrard's business and the firm's profitability. *Id.* ¶¶ 185-86, 223-30. These objectives alone are enough under relevant case law. *See Koal Indus. Corp. v. Asland, S.A.,* 808 F. Supp. 1143, 1161-62 (S.D.N.Y. 1992) (holding that a RICO wire fraud scheme between corporation, its director, and representatives, was adequately alleged where the scheme was "for the personal benefit of [the corporate chairman] and for the corporate benefit of [the company]"); *see also United States v. Johnson*, 945 F.3d 606, 610-11 (2d Cir. 2019) (affirming a bank executive's wire fraud conviction when his misrepresentations caused the victim to confer a benefit on the bank rather than himself).

The case law Defendants cite fails to support their argument. Omnibus Br. at 31. Defendants rely on *Kelly v. United States*, where the Supreme Court held that wire and mail fraud claims "cannot stand when the loss to the victim is only an incidental byproduct of the scheme." 140 S. Ct. 1565, 1573 (2020). *Kelly* simply says that the loss "must play more than some bit part

in a scheme: It must be an 'object of the fraud.'" *Id.* (citation omitted) Here, that standard is met. Plaintiffs' loss was at the center of the Enterprise's scheme to bury Azima and other RAK opponents financially and reputationally. *See* Compl. ¶¶ 60-61; *see also Sterling Interiors Grp., Inc. v. Haworth, Inc.*, No. 94-cv-9216, 1996 WL 426379 at *3-4, 12 (S.D.N.Y. July 30, 1996) (denying RICO dismissal where wire fraud by defendant had goal of inflicting sales losses and reputation harm). *Kelly* does not require a benefit to be conferred on the members the Enterprise, as Defendants suggest. It is enough that Plaintiffs were deprived of their property. But regardless, the Enterprise obtained substantial benefits as the result of their frauds. Compl. ¶¶ 8, 15, 135, 159, 207 (alleging members of the Enterprise received millions of dollars for their misconduct). Plaintiffs have more than sufficiently pled mail and wire fraud predicates under the RICO statute.[15]

## II.   THE COMPLAINT ALLEGES SUFFICIENT FACTS SHOWING THAT DEFENDANTS' RICO VIOLATIONS CAUSED COGNIZABLE INJURIES TO PLAINTIFFS.

To demonstrate RICO standing, Plaintiffs need only allege injury to their business or property caused by Defendants' violation of 18 U.S.C. § 1962. *Lateral Recovery LLC v. Queen Funding LLC*, No. 21-cv-9607, 2022 WL 2829913, at *7 (S.D.N.Y. July 20, 2022). Plaintiffs "need allege only that [they have] suffered an injury directly resulting from some or all of the activities comprising the violation." *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 253 (S.D.N.Y. 2012) (internal quotation marks omitted). "So long as a plaintiff has adequately pleaded a pattern of racketeering activity, for purposes of damages, the plaintiff need only allege that it has suffered an

---

[15] *Kelly* is also distinguishable based on its facts. The primary question the Court grappled with was whether misuse of government authority—there, a scheme to restrict access to bridge lanes—could constitute a "property" crime with the meaning of the wire fraud statue. 140 S. Ct. at 1572-73. The Court ruled it could not because lane alignment was merely an exercise of the government's "regulatory power." *Id.* at 1573-74. There is no government actor here. *See also United States v. Gatto*, 986 F.3d 104, 116 n.4 (2d Cir.), *cert. denied*, 142 S. Ct. 710 (2021) (distinguishing *Kelly* as motivated by "political retaliation" and not taking of property).

injury from at least one or more of the predicate acts comprising the RICO violation." *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 543 (S.D.N.Y. 2014) (internal quotation marks omitted). The Court should reject Defendants' attempts to create artificial limitations on the causation requirements.

### A. The Complaint Alleges Numerous Injuries That Are Cognizable and Recoverable Under RICO.

The Complaint alleges numerous cognizable injuries under RICO. Indeed, Defendants concede that the legal fees Plaintiffs incurred because of the Enterprise's fraudulent litigation activities are recoverable under RICO. *See* Omnibus Br. at 34 ("[L]egal fees can, in certain circumstances, constitute cognizable injuries under RICO[.]");[16] Compl. ¶ 179 (alleging the Enterprise's attacks damaged Plaintiffs "not only by causing extensive damage to Azima's reputation but also by . . . forcing him to incur substantial debts associated with legal fees and related expenses"); ¶ 181 ("[O]ne of the objects of the Enterprise's scheme to defraud was to cause him to expend significant legal fees and expenses."); *see also id.* ¶¶ 9, 79, 160, 183. Indeed, such injuries may ground a civil RICO claim. *See Chevron Corp.*, 871 F. Supp. 2d at 253 (denying dismissal motion because plaintiff sufficiently alleged substantial attorneys' fees and professional costs incurred responding to defendants' fraudulent statements to courts in the United States, the Ecuadorian courts, and government agencies); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d

---

[16] Even the cases Defendants rely upon confirm that Plaintiffs may recover their legal fees incurred to fend off Defendants' obstruction of justice and fraud on courts. *See First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 383 (S.D.N.Y. 2002) ("In other words, the adversary proceeding, with its attendant costs, may be viewed as an expected and natural consequence of the type of conduct allegedly engaged in by [defendant].") (emphasis added); *see also Black v. Ganieva*, 619 F. Supp 309, 347 (S.D.N.Y. 2022), *aff'd*, No. 22-cv-1524, 2023 WL 2317173 (2d Cir. Mar. 2, 2023) (plaintiff could not recover legal fees not because they weren't cognizable but because the Court held that the defendant's single "civil lawsuit cannot be the basis for a RICO predicate act").

1158, 1166 (2d Cir. 1993) (allowing recovery of "legal fees incurred in (1) fighting the debtor's frivolous satellite lawsuits; (2) overcoming bribe-induced decisions in South Carolina; and (3) obtaining a revocation of the initial reorganization plan"); *Angermeir v. Cohen,* 14 F. Supp. 3d 134, 153 (S.D.N.Y. 2014) (ruling plaintiffs "allege[d] a sufficient injury to business or property to the extent that they allege monetary losses in the form of legal fees" where defendants submitted forged documents to court and engaged in scheme "designed to ensure that Plaintiffs had no real opportunity to raise defenses to the Enterprise's bogus lawsuits").[17]

Moreover, the Complaint alleges that the Enterprise intentionally damaged Plaintiffs' reputation, businesses, and property. *See* Compl. ¶¶ 245-50. Defendants claim, incorrectly, that personal injuries to reputation and goodwill are not recognized under RICO, and cite *Hollander v. Flash Dancers Topless Club*, 340 F. Supp. 2d 453, 459 (S.D.N.Y. 2004), *aff'd*, 173 F. App'x 15 (2d Cir. 2006) which is wholly inapposite.[18] *Hollander* involved emotional or reputational harm

---

[17] Defendants are incorrect that legal fees are not cognizable unless the Complaint alleges the precise amount incurred. The Second Circuit has held that plaintiffs may recover "an unspecified amount in legal fees and other expenses incurred in fighting defendants' frivolous lawsuits." *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988); *see also D'Addario v. D'Addario*, 901 F.3d 80, 96 (2d Cir. 2018) (rejecting defendant's argument that plaintiff's "claim is not ripe since the full extent of the expenses that she will ultimately have incurred—including, presumably, from this litigation—is yet unknown"); *see also Chevron Corp v. Donziger*, 833 F.3d 74, 135 (2d Cir. 2016) ("The imposition of a wrongful debt constitutes an injury to one's business or property."). In the case relied upon by Defendants, the Court noted that the plaintiff "has not alleged that Citibank has foreclosed on his mortgage *or that he has actually paid any legal fees*. Thus, these allegations are not ripe." *Rosendale v. Citibank, N.A.*, No 94-cv-8591, 1996 WL 175089, at *4 (S.D.N.Y. Apr. 15, 1996) (emphasis added). The Complaint clearly alleges that Plaintiff has incurred significant legal fees as the result of Defendants' misconduct, and the Second Circuit has found those damages to be cognizable.

[18] The sole other case Defendants cite, *Kerik v. Tacopina*, 64 F. Supp. 3d 542 (S.D.N.Y. 2014), similarly concerns a plaintiff who, unlike Plaintiffs here, failed to "show[ ] any actual, quantifiable injury to his business or property." *See id.* at 560. Plaintiffs in this matter have alleged specific pecuniary loss resulting from Defendants' conduct, including the loss of business financing and legal fees.

***not resulting in*** injury to business or property. 340 F. Supp. 2d at 458. Where the reputational

harm also results to injury to business or property, as alleged here, reputational harm is cognizable.

*Reich v. Lopez*, 38 F. Supp. 3d 436, 450 (S.D.N.Y. 2014), *aff'd*, 858 F.3d 55 (2d Cir. 2017). "'[A]

plaintiff can adequately plead RICO damages by alleging lost profits where, as here, they

constitute an injury to plaintiff's business, were proximately caused by the alleged racketeering,

and are not merely speculative.'" *King v. Wang*, No. 14-cv-7694, 2020 WL 6875403, at *25

(S.D.N.Y. Nov. 23, 2020) (quoting *Elsevier, Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 310

(S.D.N.Y. 2010)).

This Complaint alleges reputational harm resulting in quantifiable, non-speculative

business losses that courts have consistently held to be cognizable under RICO. For example, the

Complaint alleges that (i) "[b]anks have closed Azima's accounts and denied him loans[,] citing

the negative publicity brought on by the Enterprise's litigation against Azima in the UK based on

the hacked documents," Compl. ¶ 179, and (ii) the financing for a project with FFV Development

fell through because, "as a result of the actions taken by the Enterprise against Azima[], the

financing was rejected in January 2019" and "[t]he lender refused to provide financing due to the

negative publicity instigated by the Enterprise that the bank found when conducting its due

diligence," *id.* ¶ 180 (specifying harm in dollars amount). These allegations go well beyond

"generalized reputational harm[]," *Kimm v. Chang Hoon Lee & Champ, Inc.*, 196 F. App'x 14, 16

(2d Cir. 2006), and are more than sufficient to survive a motion to dismiss, *see, e.g.*, *Frydman v.

Verschleiser*, 172 F. Supp. 3d 653, 669-71 (S.D.N.Y. 2016) (denying dismissal because plaintiff

alleged loss of $10 million mortgage loan based on allegation that broker-dealers stopped working

with plaintiff after defendant sent them disparaging emails about plaintiff).

B.      **The Plaintiff Entities Have Standing to Vindicate Cognizable Injuries.**

The Plaintiff Entities have standing to bring their claims because they are parties to this litigation and brought RICO claims on their own behalf. That fact alone distinguishes this case from the case cited by Defendants, which relates only to a single plaintiff bringing claims on behalf of businesses for which he was indirect beneficial owner. *See Nygård v. Bacon*, No. 19-cv-1559, 2021 WL 3721347, at *4 (S.D.N.Y. Aug. 20, 2021). In this case, the Plaintiff Entities have sued on their own behalf and allege their own injuries and, as such, they have standing to recover their own damages. Compl. ¶¶ 11-14, 246-51, 258-61.

Moreover, as discussed above, the Complaint alleges in detail that the Enterprise sought to harm the Plaintiff Entities through a campaign of fraud and obstruction. Specifically, the Defendants' written Plan targeted Azima's companies, which would include the Plaintiff Entities, in an effort to bury them financially. *See* Compl. ¶ 59 ("One of the objectives of the Enterprise's scheme to defraud was to cause economic damages to Azima *and his businesses*" (emphasis added)); *see also id.* ¶ 61 ("The object of the scheme was to defraud Azima of money and property by harming his businesses and bankrupting him"); ¶ 74 ("as initially outlined in its Action Plan, in an effort to silence him and to harm and bankrupt Azima and his businesses"); ¶ 179 ("[a]s foreshadowed by the Action Plan . . . causing extensive damage to Azima's reputation but also by destroying his business ventures"). Accordingly, the Complaint more than sufficiently pleads injury to Plaintiff Entities.

## III.    THE COMPLAINT PROPERLY ALLEGES PROXIMATE CAUSE.

"Proximate cause for RICO purposes requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 408 (S.D.N.Y. 2015) (Gardephe, J.) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). This requires a showing that Defendants' acts were "'a substantial factor in the

sequence of responsible causation,'" and that Plaintiffs' injury was "'reasonably foreseeable or anticipated as a natural consequence'" of those actions. *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102, 104 (2d Cir. 1993) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23-24 (2d Cir. 1990)); *see also BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011) (causation "need only be probable"). There is little doubt that standard is met here.

The injuries described in the Complaint are directly connected to the Enterprise's misconduct. For example, Defendants' obstruction of justice, witness tampering, and related wire fraud schemes directly caused Azima to incur legal fees and led to a large financial judgment against him in the U.K.—just like in *Chevron*. 871 F. Supp. at 252. The Court in *Chevron* found that "the purposes of the alleged obstruction and witness tampering were to keep evidence of the RICO Defendants' misconduct from being brought to the attention of the [foreign] courts and other tribunals in service of the alleged overall goal of obtaining a baseless [foreign monetary] judgment for use in obtaining money from Chevron." *Id.* Here too, Defendants obstructed U.S.-based proceedings—starting with the D.C. District Court Proceeding, Compl. ¶¶ 98-100, 120-26, and later extending to various Section 1782 proceedings, *id.* ¶¶ 130-32, 133, 137-43—to keep evidence of their misconduct from being brought to the attention of the courts to further their goal of obtaining a foreign judgment against Azima and force him to expend legal fees and costs defending litigation based on a sham settlement agreement.

Defendants' misconduct caused the Plaintiff Entities to lose business contracts. The Complaint alleges that planned real estate developments fell apart "due to the negative publicity instigated by the Enterprise that the bank found when conducting its due diligence." *Id.* ¶ 180. That negative publicity was a direct result of (1) the publication of Plaintiff Azima's stolen documents

in 2018 and 2019, which led to a new round of negative media articles about Azima, ¶ 82; (2) Defendants' instigation of a law enforcement investigation, which Defendants not only started but also made public, *id.* ¶¶ 32, 35, 37, 74-82, and (3) the obstruction of U.S. proceedings designed to dupe the U.K. court regarding Defendants' misconduct in order to obtain a judgment against him based on the fraudulent settlement agreement, as described above, *id.* ¶¶ 98-100, 120-26. The causal link between Defendants' actions and Plaintiffs' injuries was intended, planned, and foreseeable. Defendants sought to damage Azima and his businesses through a multi-faceted attack. *Id.* ¶¶ 59-61, 181, 225. Then, in an effort to destroy Azima and his businesses financially and reputationally, Defendants obstructed U.S. proceedings, published Azima's stolen data to instigate media coverage, and manufactured a bogus law enforcement investigation. Defendants took these actions to harm Plaintiffs as intended.

Defendants claim that the chain of causation running from the Enterprise's criminal misconduct to Plaintiffs' injuries is too attenuated. *See* Omnibus Br. at 37-38. But proximate cause exists under RICO if Plaintiffs were "the intended targets of the RICO violations" or their "injur[ies] [were] the preconceived purpose of the RICO activities." *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 549 (S.D.N.Y. 2002) (cleaned up); *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999) (holding proximate causation was established when the resulting injury was consistent with what defendants foresaw and intended); *King v. Wang*, No. 14-cv-7694, 2020 WL 6875403, at *25 (S.D.N.Y. Nov. 23, 2020) (finding causation where "[t]he scheme's object was precisely to induce" the injury that the plaintiffs actually incurred). That is exactly the case here.[19] Defendants quote *Petroff Amshen LLP v. Alfa Rehab PT PC*, No. 21-847, 2022 WL

---

[19] Defendants argue the Complaint fails to allege the Enterprise specifically targeted "FFV Development or any of the [Plaintiff Entities]." Omnibus Br. at 37 n.10. That is not accurate. The

*Continued on next page*

480475, at *3 (2d Cir. Feb. 17, 2022), to argue "'reputational harm . . . in the form of lost business is too attenuated to satisfy the proximate cause requirement.'" Omnibus Br. at 37-38. But there, the plaintiff "made no showing that any lost business, even if concretely alleged, would be a proximate result of [the d]efendants' alleged scheme." *Petroff.* 2022 WL 480475, at *3. Unlike in *Petroff* and Defendants' other cases, the Plan here makes clear the Enterprise specifically intended to cause Plaintiffs' injuries. Defendants then executed the Plan, which predictably led to the very damage they sought to inflict.

Defendants argue that the chain of causation was disrupted by third parties, including the banks that canceled Plaintiffs' agreed-upon loans due to the Enterprise's fraud or the courts swayed into rulings by the Enterprise's misrepresentations. Omnibus Br. at 38. This is wrong as a matter of law. Plaintiffs' injuries can be directly and proximately caused by the Enterprise's misconduct even if its misrepresentations were directed to a third party like a court. *See Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir.), *cert denied*, 143 S. Ct. 302 (2022). In *Alix v. McKinsey*, the Second Circuit vacated the dismissal of a RICO claim alleging a scheme by the defendants to file false statements in bankruptcy courts. *Id.* at 201. The plaintiff argued that it lost out on engagements that were awarded to the defendants on the basis of their false filings. *Id.* The District Court dismissed the complaint, but the Second Circuit reversed because, at the motion to dismiss stage, it was a "reasonable inference" that the plaintiff *could have been* appointed in the absence of the defendants' fraud. *Id.* Similarly here, it is reasonable to infer at this stage that Plaintiffs'

Complaint alleges that the Plaintiff Entities were either owned by Azima, Compl. ¶ 11, or that he had a 50% stake, *id.* ¶¶ 12-14. It further alleges that the Enterprise intended to "defraud Azima of money and property by harming *his businesses* and bankrupting him." *Id.* ¶ 61 (emphasis added); *see also id.* ¶¶ 59, 74, 179. Because the Plaintiff Entities were Azima's businesses, they were being specifically targeted by the Enterprise.

injuries are "plausibly alleged to flow directly from [Defendants'] fraud [on the court system]." *Id.* at 205-06.[20]

As a secondary point, Defendants continue to redirect the focus from the Complaint's actual language to the 2015 hack of Plaintiff Azima, claiming that Plaintiffs' injuries during the past four years trace back to the initial hack of Azima and others. *See* Omnibus Br. at 39-40. This argument fails for the same reasons as Defendants' other arguments. *See supra* I(C)(2). The Complaint alleges that, since the 2015 hacking of Azima, the Enterprise engaged in repeated and significant crimes (obstruction, witness tampering, wire fraud, etc.) that caused new and independent injuries from 2018 forward, including millions of dollars in legal fees incurred in defending against Defendants' obstructionist litigation tactics. Again, the allegations detailing the Enterprise's Plan demonstrate that the laundry list of crimes since the initial hacking were intended to continually pummel Azima and cause him further injury. Clearly, one round of hacking was not enough to silence Azima, so the Enterprise continued with its criminal attack on him hoping to defeat Azima once and for all. To suggest that somehow the Enterprise gets a free pass for crimes that occur after the initial crime is non-sensical. As described above, *supra* Section IV, Defendants' obstruction, witness tampering and wire fraud schemes led directly to the foreseeable damage of Plaintiff Azima's legal fees and associated costs, as well as lost business opportunities.[21]

---

[20] The Second Circuit also reasoned that "the district court gave insufficient consideration to the fact that [the defendants'] alleged misconduct targeted the federal judiciary," calling on the court "to focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the [court system] and its processes." *Alix*, 23 F.4th at 204. Given that Plaintiffs' Complaint alleges a sprawling pattern of obstruction primarily targeting U.S. federal courts, similar considerations should govern here.

[21] This renders inapposite the cases Defendants cite. For example, Defendants cite *Empire Merchants v. Reliable Churchill LLLP*, No. 16-cv-5226, 2017 WL 5559030, at *14 (E.D.N.Y. Mar. 16, 2017) as saying "[m]ost courts in this Circuit have held that concealment of underlying illegal activity *cannot* be the proximate cause of a plaintiff's injury," but they fail to include the

*Continued on next page*

Finally, Defendants repackage their concealment argument as one of proximate cause. This argument fails for the same reasons addressed above: The alleged acts of obstruction were their own separate acts that were part of the Enterprise's goal of using litigation to bury its targets financially and reputationally, not simply concealment of prior conduct. *See supra* Section I(C)(2). Regardless, "[c]ontrary to [D]efendants' suggestion . . . courts have not drawn a clear line between acts of proximate causation that precede an injury and acts of 'mere' concealment that follow it. Indeed, some courts in this Circuit have ruled that the latter type of action can confer RICO liability on a defendant." *Levine v. Torino Jewelers, Ltd.*, No. 05-cv-3159, 2006 WL 709098, at *4 (S.D.N.Y. Mar. 22, 2006) (cleaned up).

## IV.   PLAINTIFFS' CLAIMS ARE NOT TIME BARRED.

Plaintiffs allege injuries well within the statute of limitations. The RICO statute of limitations regime is "unique," *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1514 (S.D.N.Y. 1995), because "'a plaintiff may sue for any injury he discovers or should have discovered within four years of the commencement of his suit, regardless of when the RICO violation causing such injury occurred.'" (quoting *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988)). "Until such injury occurs, there is no right to sue for damages . . . and until there is a right to sue . . . , a civil RICO action cannot be held to have accrued." 859 F.2d at 1102. Because this inquiry is so fact specific, "'determining whether a plaintiff had sufficient facts to [be] on inquiry notice is often inappropriate for resolution on a motion to dismiss.'" *De Sole v. Knoedler Gallery,*

---

second half of this sentence which says "*because the plaintiff would have suffered the same injury from the underlying illegal activity regardless of whether the concealment occurred.*" (second emphasis added). That is not the case here because Plaintiffs suffered new injuries as a result of Defendants' obstructive conduct.

*LLC*, 974 F. Supp. 2d 274, 296 (S.D.N.Y. 2013) (Gardephe, J.) (quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 362 (2d Cir. 2013)).

The Enterprise inflicted numerous injuries within the four-year limitations period, which began on October 13, 2018. For example, the Enterprise injured Azima through fraudulent representations that forced him to incur millions of dollars in attorneys' fees and costs. Compl. ¶ 181. Many of these costs were incurred as a result of obstructive acts that Defendants committed within the limitations period. For example, beginning in 2018, Dechert and Gerrard met with other members of the Enterprise in Cyprus, London, and Switzerland to fabricate false testimony and then purposefully used that false testimony to obstruct proceedings involving Azima in both the U.S. and U.K., resulting in legal fees and costs to Azima, as well as a judgment against him. *See, e.g.*, *id.* ¶¶ 101-11 (efforts to obstruct U.K. proceedings in 2019 and 2020); ¶¶ 98-100, 120-26 (efforts to obstruct D.C. District Court proceedings in 2018 and 2019). And the Enterprise obstructed proceedings that *began* during the limitations period. *Id.* ¶¶ 129-132 (obstruction by Defendant Handjani beginning in 2021); ¶¶ 133-43 (obstruction by the Forlit Defendants beginning in 2022); ¶ 144 (obstruction by Del Rosso and Vital beginning in 2020).[22]

In addition, the Complaint alleges injuries to the Plaintiff Entities within the four-year limitations period. Plaintiff FFV Development planned to develop land owned by Plaintiffs 3260 Main and FFV W39 into apartment complexes. *Id.* ¶ 180. These developments depended on previously agreed-upon $13.5 million financing that was only pulled in January 2019 because of "the negative publicity instigated by the Enterprise that the bank found when conducting its due

---

[22] Defendants' primary argument is not that these injuries fall outside of the statute of limitations, but rather that they are not cognizable under RICO. *See* Omnibus Br. at 22 n.7. That argument is incorrect as discussed in detail, *infra* Section III(C). Thus, if the Court finds that Azima's legal fees and costs are proper damages, Defendants' statute of limitations argument falls away.

diligence." *Id.* "As a result, Azima and his companies suffered approximately $15 million in lost profits . . . ." *Id.* This was the first time the Enterprise injured the Plaintiff Entities, and Plaintiffs filed this Complaint within four years of their injuries.

Defendants claim that Plaintiffs' recent injuries were all caused by their first of many crimes:  the hacking of Azima in 2015. *See* Omnibus Br. at 20. That argument distorts the Complaint and is wrong on the law. The Complaint seeks relief for Defendants' subsequent criminal activity, including their efforts to embroil Azima in costly litigation, obstruct litigation in the U.S., and destroy Plaintiffs' businesses. Those efforts all postdate October 13, 2018. *See, e.g.*, Compl. ¶¶ 101–11, 120–26, 129–44. The statute of limitations for the first of the Enterprise's crimes against Azima is thus beside the point. *See* Omnibus Br. at 20 (discussing *Azima v. Del Rosso*, No. 20-cv-954, 2021 WL 5861282 (M.D.N.C. Dec. 10, 2021)).

Moreover, this argument contravenes the Second Circuit's "separate accrual" rule, which provides that a new limitations period begins each time a RICO violation causes a new and independent injury. *Bingham v. Zolt*, 66 F.3d 553, 559 (2d Cir. 1995); *Bankers Tr. Co.*, 859 F.2d at 1103 ("Multiple injuries, spread over time, frequently result from the very nature of a RICO violation."). For example, in *Bankers Trust*, the officers of a bankrupt corporation fraudulently concealed assets of the bankruptcy estate through a complicated series of transactions and instituted frivolous lawsuits to prevent the plaintiffs from recovering a legitimate debt. *See* 859 F.2d at 1098–99. The court held that the plaintiffs' claims for legal fees accrued when they first became obligated to pay those fees, without regard to the date of the initial fraudulent concealment. *Id.* at 1105. For the purposes of its statute of limitations analysis, Plaintiffs' claims accrued on the dates they incurred their legal fees and suffered their other injuries, without regard to the date of

the initial hacking. *See also Bingham*, 66 F.3d at 561 (ruling "each illegal diversion" by an enterprise pilfering an estate was "a new and independent legally cognizable injury").

Defendants acknowledge the separate accrual rule but argue that Plaintiffs' injuries are not "'new and independent'" from the initial hacking. Omnibus Br. at 21 (citation omitted). But unlike the present case, each of Defendants' cited authorities involves a continuum of the same misconduct. *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59–60 (2d Cir. 1998) ("the collection of annual fees [] in each year of the life of [allegedly fraudulent] partnerships"); *Tech. Opportunity Grp., Ltd. v. BCN Telecom, Inc.*, No. 16-cv-9576, 2019 WL 4688628, at *8 (S.D.N.Y. Sept. 25, 2019) (a "single continuous scheme" to obtain "continuing payments . . . at regular intervals"); *Pharr v. Evergreen Gardens, Inc.*, No. 03-cv-5520, 2004 WL 42262, at *2 (S.D.N.Y. Jan. 7, 2004) (the mailing of "allegedly unlawful rent bills each month up to the present"), *aff'd*, 123 F. App'x 420 (2d Cir. 2005). This Complaint alleges a wide variety of criminal conduct— including hacking, mail and wire fraud, witness tampering, and obstruction of justice—united only by the common goal of causing harm to Azima and his businesses. It is accordingly controlled by *Bingham*, which held that the separate accrual rule applies when a plaintiff's new injuries are "caused by a variety of schemes which were related only in their ultimate goal." *Merrill Lynch*, 154 F.3d at 59 (citing *Bingham*, 66 F.3d at 561).

## V.     PRINCIPLES OF COMITY AND CLAIM-SPLITTING DO NOT JUSTIFY DISMISSAL.

### A.     Only the "Clearest of Justifications" Warrants Dismissal on the Basis of International Comity, and None Exist Here.

Though most of the Defendants (and all the Plaintiffs) are U.S.-based, Defendants seek to dismiss this case based upon the U.K. Proceeding that was filed against Azima in 2016. They fail to provide the "clearest of justifications" for blocking Plaintiffs' access to U.S. justice, as is

required. The Supreme Court has explained that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 819 (1976). International comity is "'not an imperative obligation of courts, but rather is a discretionary rule of practice, convenience, and expediency.'" *von Spee v. von Spee*, 514 F. Supp. 2d 302, 317 (D. Conn. 2007) (quoting *Royal & Sun All. Ins. Co. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006)). Indeed, '[o]nly the clearest of justifications will warrant dismissal.'" *Royal & Sun All. Ins. Co.*, 466 F.3d at 93 (quoting *Colo. River*, 424 U.S. at 819). In deciding whether comity warrant dismissal, courts must first determine that there is a "parallel proceeding," meaning that "substantially the same [parties are] litigating substantially the same issues." *Id.* at 94. Courts may then only defer to the foreign jurisdiction where "exceptional circumstances exist that justify the surrender of that jurisdiction." *Id.* at 93. Here, the proceedings are not parallel because they involve different parties, issues, and relief, and it is not clear that a U.K. court would even exercise jurisdiction to hear Plaintiffs' claims given that the vast majority of the parties, conduct, and harm are in the U.S. Azima was unaware of the underlying RICO misconduct at the time he brought his counterclaims in the U.K. Proceeding in 2019 because Defendants deliberately concealed their actions through a campaign of perjury, fraud, and obstruction of legal proceedings. And the U.S. court system has an interest in having this case litigated here because this case is brought by U.S. plaintiffs against primarily U.S. defendants relating to obstruction of U.S. court proceedings.

### 1.   No "Parallel" Proceedings Exist that Could Justify Dismissal.

No "parallel proceeding" exists because Plaintiffs' RICO claims involve dramatically different parties, issues, and remedies than the U.K. Proceeding. *See Royal & Sun*, 466 F.3d at 94.

First, there are significant differences among the parties in this Action and the U.K. Proceeding. Indeed, there are sixteen (16) parties named here, only three (3) of which are also

parties to the U.K. Proceeding—Azima, Dechert, and Gerrard. Dechert's former client, RAK, the primary plaintiff/counter-defendant in the U.K. Proceeding, is entirely absent here. This case also involves four U.S.-based plaintiffs not involved in the U.K. Proceeding—Plaintiffs ALG, Main 3260 LLC, FFV W39, and FFV Development. These four Plaintiff Entities only suffered injuries for the first-time *years* after the U.K. Proceeding was filed against Azima. *See* Compl. ¶ 180. Accordingly, they would not be able to seek relief in the U.K. Proceeding.

Courts in this Circuit have regularly found that cases are not in parallel when they involve different and unrelated parties. *See Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 950 F. Supp. 48, 54 (E.D.N.Y. 1996), *aff'd*, 126 F.3d 365 (2d Cir. 1997) (finding proceedings were not parallel when the foreign action included two parties not present as defendants in the U.S. action and there was no privity between the non-present parties and the U.S. defendants); *see also WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 404 (S.D.N.Y. 2018) ("[T]he Second Circuit has consistently demanded that the parties to the foreign suit be the same."). Furthermore, the nine Defendants that are not party to the U.K. Proceeding are not merely "ancillary," as Defendants suggest. *Compare* Omnibus Br. at 15 *with* Compl. ¶ 17 (David Hughes served as a high-level deputy to Gerrard); *id.* ¶ 19 (Del Rosso Defendants hacked Azima and others, disseminated the stolen materials, obstructed U.S. court proceedings, among other things and were paid millions of dollars); *id.* ¶ 20 (Forlit Defendants orchestrated the hacking and theft of Azima's emails and then assisted the Enterprise in obstructing U.S. court proceedings and were paid millions of dollars); *id.* ¶¶ 23-25 (Handjani Defendants planned and coordinated the attack on Azima). Unlike in *Kingstown Cap. Mgmt., L.P. v. Vitek*, the sole case upon which Defendants rely, these Defendants played a key operational role within the Enterprise. No. 19-cv-3170, 2020 WL 5350492, at *5 (S.D.N.Y. Sept. 4, 2020), *aff'd*, No. 20-3406, 2022 WL 3970920 (2d Cir. Sept. 1, 2022).

Second, the issues are not substantially the same. The U.K. Proceeding counterclaims concern the 2015 hack of Azima and the judgment that was obtained against Azima using that hacked data. But as the Complaint explains, "the Enterprise's criminal conduct did not stop there." Compl. ¶ 74. The Complaint alleges that the Enterprise "continues to this day to engage in an extensive and prolonged effort to cover up its crimes," including through "an effort to silence [Azima] and to harm . . . [him] and his businesses." *Id.* The Complaint contains specific allegations about the Enterprise's efforts to unlawfully influence U.S. law enforcement, *see id.* ¶¶ 76–79, to obstruct federal judicial proceedings, *id.* ¶¶ 80–160, to conduct additional hacks, *id.* ¶¶ 161–69, and to tamper with witnesses against it, *id.* ¶¶ 170–74. Plaintiffs' RICO claims thus cover substantially different misconduct than the U.K. proceeding, which accordingly does not constitute a parallel proceeding under Second Circuit precedent.

Third, the relief Plaintiffs seek here is different and far more expansive than available in the U.K. Proceeding.[23] The damages Azima seeks in the U.K. Proceeding are related to money he had to pay for new devices related to the hacking, emotional distress, and disgorgement, and do not include damages to Azima's businesses or damages to the Plaintiff Entities. Ex. 5 to Decl. of John C. Quinn in Supp. of Omnibus Br. ¶ 167. Nor has Azima sought treble or punitive damages in the U.K. Proceeding because he cannot, as a matter of U.K. law. *Id.* ¶¶ 266-69; Compl. ¶¶ 251, 262. The Complaint alleges the obstruction of U.S. judicial proceedings, not an offense "against

---

[23] Defendants cite *Citadel Management, Inc. v. Telesis Trust, Inc.,* 123 F. Supp. 2d 133, 153 (S.D.N.Y. 2000) to argue that the instant claims "belong in those proceedings where those courts are best situated to oversee their own proceedings." Omnibus Br. at 16. Even if true, the Complaint here alleges a fraud on the U.S. court system, which should be adjudicated by U.S. courts, not U.K. courts. But in addition, *Citadel* stands for no such generalization and does not even address international comity. In that case, the court found that the plaintiff had not properly pled the element of causation related to alleged racketeering conduct. *Citadel*, 123 F. Supp. 2d at 153-54.

the issuing [U.K.] court." Omnibus Br. at 16 (quoting *Citadel Mgmt.*, 123 F. Supp. 2d at 153–54).

Accordingly, the remedies available to Plaintiffs in the two proceedings are different.[24]

> ### 2.   No "Exceptional Circumstances" Exist That Warrant Abstention.

This Circuit has held that the "mere existence of parallel foreign proceedings does not

negate the district courts' 'virtually unflagging obligation . . . . to exercise the jurisdiction given to

them.'" *Royal & Sun All. Ins. Co.*, 466 F.3d at 92 (quoting *Colorado River*, 424 U.S. at 817). Even

if this proceeding were parallel to the U.K. Proceeding, "absent exceptional circumstances, parallel

proceedings should ordinarily be allowed to proceed simultaneously." *Kitaru Innovations Inc. v.

Chandaria*, 698 F. Supp. 2d 386, 391 (S.D.N.Y. 2010) (Gardephe, J.) (cleaned up).[25] These

"exceptional circumstances . . . must . . . raise considerations which are not generally present as a

result of parallel litigation." *Royal & Sun All. Ins. Co.*, 466 F.3d at 93 (emphasis added). When

determining whether "exceptional circumstances" exist, the court may consider a variety of

factors, which may include: the adequacy of the foreign forum, potential prejudice to the parties,

convenience, "connection between the litigation and the United States," and "connection between

the litigation and the foreign jurisdiction." *Id.* at 94.

---

[24] Defendants' argument that this case cannot be decided without the U.K. court first determining who was responsible for the initial hack of Azima is incorrect. Demonstrating that these Defendants engaged in witness tampering through a perjury school and bribe payments does not require a threshold showing of hacking.

[25] In *Kitaru*, this Court declined to dismiss on comity grounds, but did dismiss under the doctrine of forum non conveniens. Here, Defendants only forum non conveniens argument is that the 2016 Settlement Agreement requires the dispute to be litigated in the U.K., and we refute that argument in the responses to Dechert and Gerrard. However, the traditional forum non conveniens factors also favor this dispute being litigated in the U.S. Forum non conveniens starts with a strong presumption in favor of the plaintiff's choice of forum. *Kitaru*, 698 F. Supp. 2d at 393. In addition, there is no indication that Defendants are amendable to service of process in the U.K. *Id.* at 394. And, without addressing all the factors, this is a case about fraud on the U.S. court system that is based in U.S. law with most of the parties in the U.S.

No exceptional circumstances exist warranting abstention. It is not clear that a U.K. court would allow new plaintiffs[26] to join a proceeding to which they are not parties six years into the case and to litigate claims wholly separate from the underlying counterclaims, particularly when those new claims relate overwhelmingly to U.S. conduct, U.S.-based persons, and harm that occurred in the U.S. And even if this case could be litigated in the U.K., forcing U.S.-based Plaintiffs to litigate their claims in the U.K. would result in substantial prejudice to Plaintiffs. Finally, this litigation is much more connected to the U.S., as it relates to a fraud on the U.S. courts, about which the U.S. courts have a much stronger interest than U.K. courts.

Defendants have failed to meet their burden to identify any U.K. cause of action that would allow Plaintiffs to raise comparable claims abroad. *See Bartlett*, 2021 WL 3706909, at *10 (defendants "have not shown that [the relevant Lebanese bankruptcy law] (or any other Lebanese law) offers Plaintiffs the ability to assert claims . . . for having aided and abetted terrorist attacks" like they could have in the U.S. under the ATA). This reason alone is sufficient to reject Defendants' comity arguments.

Defendants have likewise failed to show that any U.K. cause of action would afford Plaintiffs' requested relief. *See Amimon Inc. v. Shenzhen Hollyland Tech Co.*, No. 20-cv-9170, 2021 WL 5605258, at *8 (S.D.N.Y. Nov. 30, 2021) (declining to dismiss when a foreign proceeding only permits injunctive relief). Indeed, one of the remedies Plaintiffs seek here (treble damages) is not available in the U.K.

---

[26] "When the Second Circuit has sanctioned comity-based abstention, it has done so based on the understanding that the plaintiffs may pursue their claims in the foreign forum." *Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-cv-0007, 2021 WL 3706909, at *10 (E.D.N.Y. Aug. 6, 2021). Only one of the Plaintiff LLCs is wholly owned by Plaintiff Azima. Requiring them to litigate these claims in the U.K. would be illogical and prejudicial.

Furthermore, the comity doctrine applies only when the "'foreign court [has] proper jurisdiction.'" *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999) (citation omitted). But Plaintiffs' obstruction allegations necessarily focus on the Enterprise's actions targeting the U.S. court system because the statute only applies to obstruction of a U.S. proceeding. *See* 18 U.S.C. § 1503; *see also* Compl. ¶¶ 82–160 (alleging the obstruction of U.S. judicial proceedings). Defendants have failed to show that the U.K. courts have jurisdiction over such conduct, let alone that those courts have jurisdiction over the U.S. Defendants: Del Rosso, Frank, Handjani, Insight, KARV, SDC-Gadot, and Vital. Compl. ¶¶ 18, 19, 21-25.

Finally, this lawsuit is uniquely connected to the U.S.: It was brought by U.S.-based plaintiffs for actions taken against them in the U.S., including obstruction and fraud on the U.S. court system. The federal judiciary has a clear interest in resolving cases concerning the "right of the Government to defend itself against obstruction." *United States v. Vilar*, 729 F.3d 62, 73 (2d Cir. 2013) (quoting *United States v. Bowman*, 260 U.S. 94, 98 (1922)) (holding that this interest displaces the presumption against extraterritoriality) (emphasis omitted). The Complaint also alleges that Dechert's New York office served as the Enterprise's nerve center, and most of the Enterprise's criminal misconduct either occurred in or was directed from this District. *See, e.g.*, Compl. ¶ 15. By contrast, little of the alleged misconduct occurred in the U.K. Thus, the discretionary factors this court may consider strongly weigh in favor of refraining from abstention.

Defendants argue exceptional circumstances exist because the U.K. action is further along; some of the same events are relevant to both cases; there are factual disputes common to both cases; and there is overlap between the members of the Enterprise and the key players in the U.K.

Proceeding. *See* Omnibus Br. at 17-18.[27] But, "[g]enerally, concurrent jurisdiction in United States courts and the courts of a foreign sovereign does not result in conflict" that raises comity concerns. *Royal & Sun All. Ins. Co. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006). "Rather, parallel proceedings [involving the same claims] should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other." *Id.* (cleaned up.) In *Global Tech Industries Group, Inc. v. Go Fun Group Holdings, Ltd.*, for example, the court refused to give way to an earlier-filed action in Hong Kong and rejected many of the same contentions Defendants raise here. No. 17-cv-3727, 2017 WL 5036665, at *3-5 (S.D.N.Y. Nov. 2, 2017) (declining to find exceptional circumstances warranting dismissal because "[s]imilarity of parties and issues commonly will exist in parallel actions"); *see also Klonis v. Nat'l Bank of Greece, S.A.*, 487 F. Supp. 2d 351, 356 (S.D.N.Y. 2006) ("Most of the arguments advanced by defendant relate to facts which will generally exist in parallel litigations, including the identity of the parties and issues and the adequacy of the foreign forum, which are insufficient to overcome the obligation of this Court to exercise its jurisdiction."). Dismissal of this case would effectively shut the door on Plaintiffs to *any* legal remedy for the RICO claims raised in this case and allow Defendants to get off scot-free for the massive conspiracy committed upon the U.S. court system.

---

[27] The fact that the U.K. Proceeding is much further along in the litigation lifecycle than Plaintiffs' RICO claims in this litigation actually undercuts Defendants' arguments. In the U.K., the parties are awaiting a *re*-trial on claims that were originally brought by RAK against Azima in 2016. In 2021, a U.K. appellate court remanded the case and ordered a retrial on Azima's hacking claims. Compl. ¶ 69 n.6. Defendants' suggestion that Plaintiffs could simply introduce nine new parties and new, complicated claims into a 7-year-old case during discovery and on the eve of trial is implausible.

### B.      The Claim Splitting Doctrine Does Not Bar Plaintiffs' Claims.

In a half-hearted argument made in a single page, Defendants assert that Plaintiffs' claims should be dismissed on claim splitting grounds in light of the 2020 North Carolina Proceeding. Omnibus Br. 18-20. But the rule against claim splitting does not apply because Azima could not have brought his RICO claims against Defendants in North Carolina. *See Murray v. UBS Sec., LLC*, No. 14-cv-927, 2015 WL 769586, at *4 (S.D.N.Y. Feb. 24, 2015) ("[A] plaintiff cannot be precluded from litigating a claim on the basis of an earlier claim where, for factual or procedural reasons, he could not bring the later claim at the same time as the earlier claim."). Plaintiffs' RICO claims are based largely on conduct that occurred or came to light *after* Azima filed the 2020 North Carolina Proceeding, including destruction of evidence following the filing of the Complaint in that case and submission of false witness testimony in New York, Florida, and North Carolina Section 1782 Proceedings. *See, e.g.*, Compl. ¶¶ 85-86. 110, 117, 129-31, 133-43, 151-55, 175-76.[28] Moreover, much of the damages Plaintiffs claim in this Complaint, including, for example, attorneys' fees incurred by Azima in connection with Defendants obstructive conduct, occurred after the North Carolina complaint was filed—and other damages, such as the contracts lost by the Plaintiff Entities, are unrelated to the publication of Azima's trade secrets at issue in that case. The Second Circuit has held that causes of action cannot be dismissed on claim splitting grounds if they are based on conduct that occurred after an earlier-filed case. *Curtis v. Citibank, N.A.*, 226 F.3d 133, 141 (2d Cir. 2000).

---

[28] Moreover, this case involves nine Defendants based outside of North Carolina with substantial connections to New York. At the time Azima sued Del Rosso and Vital in North Carolina in 2020, it did not appear that the Middle District of North Carolina had personal jurisdiction over the non-North Carolina Defendants.

The claim-splitting doctrine also does not bar Plaintiffs' claims because this case and the 2020 North Carolina Proceeding involve different parties, arise out of separate transactions, and seek distinct forms of relief.[29] For a court to dismiss a suit under the claim splitting doctrine, "'the case must be the same.'" *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504 (2d Cir. 2019) (citation omitted). "'[T]here must be the same parties, or, at least, such as represent the same interests; there must be the same rights asserted and the same relief prayed for; the relief must be founded upon the same facts, and the title, or essential basis, of the relief sought must be the same.'" *Id.* at 504 (quoting *The Haytian Republic*, 154 U.S. 118, 124 (1894)); *see also Tera Grp., Inc. v. Citigroup, Inc.,* No. 17-cv-4302, 2019 WL 3457242, at *9-10 (S.D.N.Y. July 30, 2019).

First, this case and the 2020 North Carolina Proceeding involve different parties. Courts "generally do not apply the rule against duplicative litigation when the defendants in two similar actions are different." *Sacerdote*, 939 F.3d at 505. The Second Circuit has explained that "a plaintiff has as many causes of action as there are defendants to pursue" and that "if a plaintiff suffers the same harm at the hands of two defendants, the plaintiff may institute one suit against one defendant and a separate suit against another defendant alleging that each caused his injury." *Id.* (internal quotation marks omitted). In this case, Azima and four co-plaintiffs—ALG Transportation, Inc., Main 3260 LLC, FFV W39 LLC, and FFV Development LLC—brought

---

[29] Only Del Rosso and Vital are parties to the North Carolina litigation, but all the Defendants make this argument. To do so, Defendants inaccurately cite *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) to support their argument that "where, as here, Defendants—including, some who are not parties to the North Carolina case—are facing broad non-party discovery requests from Plaintiff on the same conduct at issue in this action, dismissal is appropriate to 'protect parties from the vexation of concurrent litigation over the same subject matter.'" Omnibus Br. at 19 (quoting *Curtis*, 226 F.3d at 138). In *Curtis*, the two cases involved the same parties, and the Second Circuit made no holding that recipients of third-party subpoenas may invoke the rule against claim splitting to dismiss a case. *Curtis*, 226 F.3d at 136.

RICO claims against Del Rosso, Vital, and nine other defendants. *See* Compl. ¶¶ 15-25. In North

Carolina, Azima is the only plaintiff, and Del Rosso and VMS are the only defendants. *See* 2020

North Carolina Proceeding, ECF No. 1 ¶¶ 15-17; 20-25. Moreover, it is not clear whether a North

Carolina court would have jurisdiction over many of the Defendants in this action, who are either

based in New York or are foreign defendants with substantial contacts in New York.[30]

Second, this case and the 2020 North Carolina Proceeding allege different causes of action

that will rely on different evidence to prove different facts.[31] Here, Plaintiffs allege two civil RICO

claims—violations of the RICO statute (18 U.S.C. § 1962(c)) and conspiracy to violate RICO (18

U.S.C. § 1962(d)). To prevail on the underlying RICO claim, Plaintiffs must prove: (1) the

existence of an enterprise; (2) the enterprise affected interstate or foreign commerce; (3) each

defendant was associated with, or employed by, the enterprise; (4) each defendant engaged in a

pattern of racketeering activity; and (5) defendants conducted, or participated in, the conduct of

the enterprise through that pattern of racketeering activity, *see* 4 Modern Federal Jury Instructions-

Civil ¶ 84.04, Instr. 84-23 (Matthew Bender 2023). In contrast to the sweeping fraud and

---

[30] Defendants do not—and cannot—argue that the narrow privity exception to the same party rule applies here. The privity rule only applies in six limited circumstances, none of which is relevant here. *See Sacerdote*, 939 F.3d at 506. A Court in this District recently denied a dismissal motion on claim splitting grounds under similar circumstances. *See Broidy v. Glob. Risk Advisors LLC*, No. 19-cv-11861, 2021 WL 1225949, at *7 (S.D.N.Y. Mar. 31, 2021).

[31] In the 2020 North Carolina Proceeding, the Del Rosso Defendants take the opposite position, arguing that the case is extremely limited and involves discrete and narrow issues separate from those in this case. For example, Del Rosso and Vital have stated in court pleadings that the North Carolina case is about "only a narrow state-law trade-secrets claim for a third-party re-posting internet links to 'copies' of documents in 2018 and 2019, and a related state-law civil-conspiracy claim," 2020 North Carolina Proceeding, ECF No. 68 at 1, and that "[n]otably, the S.D.N.Y. Action . . . involve[s] a broader range of conduct than the present [North Carolina] lawsuit." *Id.*, ECF No. 206 at 6 (emphasis added). Del Rosso and Vital have repeatedly tried to limit discovery in the North Carolina on that basis. Del Rosso and Vital have not produced a single document in response to broad discovery requests in that case on the basis that the case in North Carolina is so narrow that they do not have a single relevant document.

obstruction-related RICO claims at issue here, the 2020 North Carolina Proceeding involves two state law claims: for the misappropriation of trade secrets and a conspiracy to misappropriate those trade secrets.[32] The North Carolina misappropriation of trade secrets claim requires Azima to prove different facts: (i) the existence of a trade secret and (ii) that Del Rosso and Vital misappropriated the trade secret by acquiring, disclosing, or using the trade secret without Azima's consent. *See* North Carolina Pattern Jury Instruction (Civil) § 813.92 (2019). The claim for civil conspiracy will require Azima to prove that Del Rosso and Vital formed an agreement with one or more co-conspirators to misappropriate Azima's trade secrets and that Del Rosso, Vital, and/or a co-conspirator committed an overt act in furtherance of the conspiracy. *See id.* § 103.31. The elements of each sets of claims are different and are based on different transactions.

Third, this case and the 2020 North Carolina Proceeding involve different relief. Plaintiffs here seek general damages, treble damages, prejudgment interest, and reasonable attorney's fees from 11 defendants as a result of the injuries they caused Plaintiffs through their campaign of obstruction and fraud against him. *See* Compl., Prayer for Relief ¶¶ 1-4; *see also* 18 U.S.C. § 1964(c). In North Carolina, Azima is seeking compensatory and punitive damages related to the misappropriation of Azima's trade secrets and an injunction requiring the return and removal of Azima's misappropriated trade secrets. 2020 North Carolina Proceeding, ECF No. 1 ¶¶ 3-4, 113, 117-18. Whereas the relief in North Carolina is tied to the value of the trade secrets (and punitive damages), the damages in this litigation relate to the harm to Azima and the Plaintiff Entities that was caused by the Enterprise's wide-ranging scheme.

---

[32] The North Carolina complaint included additional claims related to hacking, which are also distinct from this case, as explained repeatedly.

## VI.   PLAINTIFFS' 18 U.S.C. § 1962(D) CONSPIRACY CLAIM IS WELL-PLED.

Plaintiffs' Complaint sufficiently pleads a conspiracy claim under 18 U.S.C. § 1962(d). Defendants' sole argument for dismissing the claim is that Plaintiffs have not sufficiently pled substantive underlying RICO violations. Omnibus Br. at 40. For the reasons stated above, Plaintiffs have sufficiently pled the underlying substantive RICO claims.

Moreover, Defendants have manufactured a heightened pleading standard for a RICO conspiracy claim, contrary to Second Circuit precedent. *See City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014) (plaintiff need only show that defendants knew about and agreed to the scheme in order to prevail on a RICO conspiracy claim); *see also United States v. Applins*, 637 F.3d 59, 74-75 (2d Cir. 2011) (no underlying violation of the RICO statute required in order to prove a RICO conspiracy claim). The Second Circuit has held that "'the requirements for RICO's conspiracy charges under [18 U.S.C.] § 1962(d) are less demanding' than those for substantive violations." *See Bello*, 579 F. App'x at 17 (quoting *Baisch v. Gallina*, 346 F.3d 366, 376 (2d Cir. 2003)). In civil cases, RICO plaintiffs need only allege that defendants "knew about and agreed to facilitate the scheme." *Id.* (cleaned up). Establishment of a RICO enterprise is not even an element of a RICO conspiracy offense. *See id.* (citing *Applins*, 637 F.3d at 75). Nor must a plaintiff allege that a substantive RICO offense has been committed in order to prevail on a RICO conspiracy claim. *Applins*, 636 F.3d at 74. Here, Plaintiffs have pled that Defendants knew about and agreed to the underlying scheme to harm Azima and others through a campaign of fraud and obstruction, as set forth in the Plan. Compl. ¶¶ 61, 252-56.

## **CONCLUSION**

Plaintiffs respectfully request that the Court deny the Motions to Dismiss in their entirety.

Dated:  May 22, 2023
       New York, New York

*/s/ Harry H. Rimm*                                             */s/ Kirby D. Behre*
Harry H. Rimm                                               Kirby D. Behre
Womble Bond Dickinson (US) LLP            Timothy P. O'Toole
950 Third Avenue                                      Lauren E. Briggerman
New York, New York 10022                      Ian A. Herbert
Tel. (332) 258-8400                                  Cody F. Marden
Fax (332) 258-8949                                   Calvin Lee
harry.rimm@wbd-us.com                    Miller & Chevalier Chartered
                                                 900 Sixteenth Street NW
*/s/ Christopher W. Jones*                   Washington, D.C. 20006
Christopher W. Jones                       Tel. (202) 626-5800
Ripley E. Rand                                       Fax (202) 626-5801
Womble Bond Dickinson (US) LLP            kbehre@milchev.com
555 Fayetteville Street, Suite 1100         totoole@milchev.com
Raleigh, North Carolina 27601             lbriggerman@milchev.com
Tel. (919) 755-2100                                  iherbert@milchev.com
Fax (919) 755-2150                                  cmarden@milchev.com
chris.jones@wbd-us.com                    clee@milchev.com
ripley.rand@wbd-us.com


*Attorneys for Plaintiffs Farhad Azima, ALG Transportation, Inc.,*
*Main 3260 LLC, FFV W39 LLC and FFV Development LLC*

59