**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**JONATHAN SOLOMON,**

**Plaintiff,**

**v.**

**DECHERT LLP, _et al._,**

**Defendants.**

**Civil Action No. 22-3137 (JEB)**

**MEMORANDUM OPINION**

Jonathan "Jay" Solomon, former chief foreign-affairs correspondent for the Wall Street Journal, was no stranger to having his name appear in the news, although he was more accustomed to showing up in the byline than in the headlines. That all changed in June 2017, when a story broke accusing him of maintaining an improper business relationship with one of his sources, prompting the Journal to fire him. Plaintiff has brought this suit against multiple individuals and businesses allegedly responsible for leaking his communications with that source. He claims that Defendants embarked on a campaign to discredit and silence him and are thus liable under a number of statutes, including the Racketeering Influenced and Corrupt Organizations Act and the Computer Fraud and Abuse Act.

Now that certain Defendants — including a prominent law firm — have been dismissed, those remaining are two groups of alleged hackers and one communications consulting firm and its employees. They now separately move to dismiss all of Solomon's claims. As the Court agrees that the Amended Complaint does not adequately allege the elements of his federal causes of action, it will dismiss those counts and decline to exercise supplemental jurisdiction over his state-law claims.

1

## I.    Background

At this stage, the Court sets forth the facts as pled in the Complaint, assuming them to be true.  See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  They read in certain parts like a mashup of elements from international TV thrillers "The Bureau" and "Tehran."  Solomon was the chief foreign-affairs correspondent for the Journal's Washington, D.C., bureau for nearly two decades, where he "covered national security and U.S. foreign policy."  ECF No. 47 (Am. Compl.), ¶ 11.  Though a resident of the District, Solomon had postings in the Middle East and various regions of Asia.  Id.

In 2013, he "broke news on a money laundering scheme designed to help Iran evade U.S. sanctions."  Id., ¶¶ 11, 34.  His reporting was based on two types of sources.  The first was a series of briefings by "American and Israeli intelligence officials," from whom Solomon learned that Iran was attempting to circumvent American sanctions and launder money by having "three moneymen for the Islamic Revolutionary Guard Corps ('IRGC')" purchase various businesses within the Republic of Georgia.  Id., ¶ 33.  One of these transactions, and the one most critical to this case, involved a Georgian hotel sold to these moneymen by Sheikh Saud, the ruler of Ras Al Khaimah, one of the seven United Arab Emirates.  Id.  Solomon's other source was Farhad Azima, an international businessman, whom Plaintiff describes as "critical" to his reporting.  Id., ¶¶ 33, 37.  Azima helped broker some of the above-mentioned transactions and "at the time was on good terms with Sheikh Saud."  Id., ¶ 33.

Following the publication of Plaintiff's story, the Georgian government took swift action to prevent Iran from carrying out its unlawful scheme.  It reportedly began requiring visas for Iranian nationals in July 2013 and also "froze 150 Iranian bank accounts in the country" around the same time.  Id., ¶ 34.  The U.S. Treasury Department also got involved, placing the three

2

IRGC moneymen on the sanctions list in early 2014.  Id., ¶ 58.  These counter-responses consequently prevented Sheikh Saud from selling his Georgian hotel, upending what appears to have been a lucrative deal and exposing him to potential legal penalties by the United States for sanctions evasion.  Id., ¶ 34  Solomon believes that his reporting and the subsequent reaction it inspired led Saud to see him as a "person of concern" around this time.  Id.

The people Saud was really worried about, however, were Azima and his purported co-conspirators.  The Sheikh came to suspect that Azima was working for and with, *inter alia*, Khater Massaad, the former CEO of Ras Al Khaimah Investment Authority (RAKIA), as well as one of the Sheikh's brothers to "remove [him] with the assistance of Abu Dhabi."  Id., ¶ 59; see also id., ¶ 60 ("[The Sheikh] identified Mr. Azima as . . . a significant threat.").  In an effort to "eliminate any threats they and/or others posed to his power," Saud retained a team of lawyers from Dechert LLP that included David Gerrard and David Hughes.  Id., ¶ 60.  Under the guise of investigating fraudulent activity at RAKIA during Massaad's tenure, the Dechert team allegedly embarked on shocking conduct far beyond the pale for attorneys.  See id., ¶ 36 (alleging that enterprise comprising Dechert lawyers engaged in "fraud, human rights abuses, kidnappings, torture, extortion," and "attacks against the free press," among other acts of intimidation).

Their opening act, according to Solomon, was the kidnapping and illegal detention of Jordanian businessman Karam Al Sadeq.  Id., ¶¶ 61, 64.  On September 2014, Al Sadeq was forcibly taken from his home and interrogated by Gerrard and Hughes.  Id., ¶ 64.  They sought to get Al Sadeq to (falsely) confess that Azima and his co-conspirators had committed various kinds of fraud against RAKIA and Sheikh Saud.  Id., ¶¶ 68–69.  Gerrard and Hughes allegedly threatened Al Sadeq and his wife, and they also kept him in solitary confinement at an

unofficial prison site to coerce him into giving up any information he had on Azima. Id., ¶¶ 64, 67–68. Al Sadeq eventually broke and "signed statements confessing to his involvement in alleged fraud," and he remains in jail today despite promises that he would be set free if he confessed. Id., ¶¶ 70–71.

Azima learned of this treatment of Al Sadeq later in 2014, and he tried to expose these "human rights abuses" and the Dechert lawyers' role. Id., ¶ 73. It was at this point that Azima became the focus of the Dechert team's efforts to protect Sheikh Saud and themselves from criticism. Id., ¶¶ 73–74. The team joined up with Defendants Andrew Frank and Amir Handjani — the president of KARV Communications, Inc. and a special advisor at KARV, respectively — to devise a plan to "go after" Azima. Id., ¶ 74. Initially, they planned to harm him by filing civil and criminal lawsuits against him to "cause him to incur significant financial damages" and by planting negative stories about him in the media. Id., ¶ 75.

To this strategy was added the "hack and dump scheme" that is the crux of the case at hand. Id., ¶ 78. The scheme, in essence, was to hack Azima's email accounts and post his communications with third parties elsewhere on the internet where agents of Dechert could retrieve them. The enterprise set up at least three separate teams to assist in this effort. (The reader may take comfort in knowing that, while it is important to detail the alleged scheme in this RICO case, keeping all the Defendants straight is not critical to the resolution of the Motion.) The first team, which included Defendants Nicholas Del Rosso and his company, Vital Management Services, Inc., was tasked with gaining access to Azima's email account and dumping tranches of his data onto online locations that could then be accessed by the other teams. Id. To achieve this, Del Rosso hired a hacking firm that used "phishing and spear-phishing emails" to eventually lure Azima into providing his login information. Id., ¶¶ 83–85.

That hacking firm, CyberRoot, is located in India.  Id., ¶ 84.  At some point in 2016, Del Rosso was able to obtain "persistent access" to Azima's email accounts and to his communications with Solomon.  Id., ¶ 85.  Either directly or indirectly, Saud and Dechert paid Del Rosso substantial amounts for his work.  Id., ¶ 81.

The next team, which included Defendant Amit Forlit and his companies, Defendants SDC-Gadot and Insight Research and Analysis, LLC, worked with Gerrard purportedly to aid in investigating allegations of fraud at RAKIA.  Id., ¶¶ 8, 78, 87.  In reality, Forlit was to help Dechert lawyers "independently locate the hacked and dumped emails" and disclose their online locations to the law firm.  Id., ¶¶ 87–88.  Solomon speculates that Forlit was brought in to give Dechert and its lawyers "plausible deniability."  Id., ¶ 78.  It appears that in August 2016, Forlit and his team did what they were hired to do, sharing a link to Azima's data with Stuart Page, another team member, who then passed the link to Gerrard.  Id., ¶ 97.  This team, too, was paid handsomely for its work by Saud through "a variety of [Ras Al Khaimah] entities."  Id., ¶ 80.

The third team consisted of employees at NTi, "a firm recommended by" Del Rosso's lawyer, and their job was to download Azima's emails and provide them to the Dechert team.  Id., ¶ 78.  NTi eventually did download the data obtained from Azima's account and gave it to Gerrard and his team, although the timing of these events is unclear.  Id., ¶ 98.  Solomon alleges that this firm was also "directly or indirectly paid by [Ras Al Khaimah] entities or Defendant Dechert" but does not provide any specifics on payments to this team.  Id., ¶ 78.

After Del Rosso successfully gained access to Azima's accounts, Gerrard met with Azima on July 2016 to "threaten[] him."  Id., ¶ 90.  Azima returned the favor, vowing to go to Solomon with Dechert and Sheikh Saud's "human rights abuses and racketeering activity."  Id. ¶ 90.  Unfortunately for Solomon, "members of the enterprise" had become interested in taking

another look at the abortive sale of the Georgian hotel back in 2013 — a sale that Solomon, through his reporting, had a part in thwarting — around the time of this meeting.  Id., ¶¶ 91–92. These unhappy coincidences, Solomon fears, made him a new target of Defendants' efforts to silence the Sheikh's critics.

His fears were quickly confirmed when, a few days after the meeting between Azima and Gerrard, Del Rosso dumped the data he had obtained onto blog sites accusing Azima of fraud.  Id., ¶ 93.  Among these was a blog that linked to "an entire confidential file . . . dedicated to Mr. Azima's relationship with Mr. Solomon."  Id.  This data tranche was entitled "Fraud Between Farhad Azima and Jay Solomon."  Id., ¶ 94.  As if that were not enough, Defendants also shared this data tranche with Solomon's employer at the time, the Wall Street Journal.  Id., ¶ 99.  "[W]hen it posted and disseminated the stolen emails," the enterprise "falsely implicate[d]" Solomon in "hundreds of millions of dollars of fraudulent transactions."  Id. Specifically, Defendants' actions left the impression that Solomon had played a role in arms trafficking in the Middle East, working with others to instigate a coup against the royal family of Kuwait and agreeing to join a company established by Azima called Denx.  Id., ¶¶ 101, 106. The communications between Solomon and Azima were also shared with other media outlets in order to "plant[] false and disparaging stories" about the dealings between the two.  Id., ¶ 99.

In December of 2016, Solomon was confronted by lawyers from Dow Jones, the parent of the Journal, about the allegations against him relating to Denx.  Id., ¶¶ 101–103.  Plaintiff denied the allegations but noticed that his employer nevertheless began treating him differently. Id., ¶ 104.  For instance, it withdrew Solomon's nomination for the Pulitzer Prize and "declined to accept a National Press Club award" he had won.  Id.  Despite this, Plaintiff remained at his job until June 2017, when an AP reporter published a story accusing him of "potentially being

party to a string of criminal activities in tandem with" Azima.  Id., ¶¶ 104–05.  The story mostly recounted the allegations described above, but they proved too much for the Journal.  Id., ¶ 106. It consequently fired Solomon on June 21, 2017.  Id.

Defendants, however, were not done with Solomon and Azima.  Between 2019 and 2020 they published, or helped to publish, a number of articles describing the data obtained from Azima's accounts.  Id., ¶¶ 110–111.  According to Plaintiff, these articles led to his losing out on a potential book deal because he was "blacklisted by the publishing industry due to the negative press."  Id., ¶ 114.  They also cost him speaking engagements for the same reason, despite the fact that he had been giving speeches on international affairs regularly since 2017. Id., ¶ 115.

That was the end of it — or so Solomon thought.  Recent and independent litigation between Azima and Defendants revealed the extent to which Defendants have attempted to cover up their alleged misconduct "over the last four years."  Id., ¶ 108.  For example, they adopted complex protocols for ensuring that there were no paper trails of Forlit's reports on the hacking scheme.  Id., ¶¶ 116–119.  They also lied to American and British courts about how and from whom they got Azima's data.  Id., ¶¶ 125, 129.  In July 2018, Hughes submitted a filing to a court in this district stating that an independent PR firm "innocently found" Azima's data online.  Id., ¶ 125.  Then, in August 2018, Dechert stated in a D.C. Circuit brief that Azima's data was "obtained via publicly available internet sources."  Id.  During the proceedings before the district court, Dechert and Gerrard also hid until July 2021 the fact that Gerrard's various firm-assigned mobile devices — some fifteen in total — were either lost or destroyed.  Id., ¶¶ 149–150.

Across the pond, Dechert helped Stuart Page prepare a witness statement for a lawsuit between Ras Al Khaimah and Azima in which he attested that Madji Halabi, one of Forlit's subcontractors, was the person who discovered Azima's data online and notified Defendants about its existence. Id., ¶¶ 133–36. In a later witness statement filed in January 2022, Page recanted "most if not all of this testimony" and accused Gerrard and others of perjuring themselves. Id., 134 His corrected statement explained that he had negotiated with Forlit, who "was retained to perform certain hacking efforts." Id., ¶ 43. Hughes, moreover, submitted a sworn statement in November 2018 stating that the data was obtained "from an unnamed individual who was not an agent" of Sheikh Saud. Id., ¶ 129. That "unnamed individual" was Halabi, one of Forlit's subcontractors, according to a December 2018 statement submitted by Hughes in the same U.K. proceeding. Id., ¶ 131. In their own witness statement, Del Rosso "denied any involvement in the hacking" and hid the identity of the Indian firm with whom he had contracted, CyberRoot. Id., ¶ 146. The English court presiding over the proceedings between Azima and Ras Al Khaimah recently found that this story of innocent data discovery was "not true," though it believed that the "true facts" about how Azima's data was obtained were not yet known. Id., ¶ 144.

Armed with this knowledge, Solomon filed this suit in October 2022. See ECF No. 1 (Initial Compl.). After Defendants each independently moved to dismiss, Solomon filed an Amended Complaint, which is the operative pleading here. See Am. Compl. This Complaint alleges nine counts against all of the Defendants: Count I (RICO violation), Count II (Computer Fraud and Abuse Act (CFAA) violation), Count III (Federal Wiretap Act (FWA) disclosure violation), Count IV (FWA use violation), Count V (DC Wiretap Act disclosure violation), Count VI (DC Wiretap Act use violation), Count VII (Tortious interference with business

relationships), Count VIII (DC-law civil conspiracy), and Count IX (Punitive damages). Id., ¶¶ 180–268.

While no settlement appears on the docket, Plaintiff has since voluntarily dismissed his claims against Defendants Dechert, Gerrard, and Hughes. See ECF No. 75 (Pl. Voluntary Dismissal). The remaining Defendants can be grouped as follows: (1) the Forlit Defendants (Forlit, SDC-Gadot, and Insight); (2) the Del Rosso Defendants (Del Rosso and Vital); and (3) the KARV Defendants (KARV, Handjani, and Frank). They now move separately to dismiss Solomon's Complaint in full under Federal Rule of Civil Procedure 12(b)(6). See ECF Nos. 53 (Forlit Defs. MTD), 54 (Del Rosso Defs. MTD), 56 (KARV Defs. MTD).

## II.    Legal Standard

Rule 12(b)(6) provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted." Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations marks and citation omitted). In weighing a motion to dismiss, a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the court] may take judicial notice." EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997). The court "must treat the complaint's factual allegations as true and must grant [the] plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citations omitted). It need not accept as true, however, "a legal conclusion couched as

9

a factual allegation" or an inference unsupported by the facts set forth in the complaint.

Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

### III.    Analysis

Before engaging with the merits, Defendants raise two threshold issues — venue and statute of limitations — which the Court will contend with at the outset.  It next considers all of Plaintiff's federal causes of action.  In doing so, it explains why each count attempts to fit square-peg allegations into round-hole statutes.  As all thus fail to state a claim upon which relief can be granted, the Court will dismiss these counts and decline to exercise supplemental jurisdiction over what remains.

### A.  Venue

As an initial matter, the Del Rosso Defendants move to dismiss the Complaint for improper venue.  See Del Rosso Defs. MTD at 14.  The Court need not linger here because Solomon did not respond to this challenge in his Opposition.  See ECF No. 65 (Opposition); ECF No. 69 (Del Rosso Reply) at 7.  He has accordingly conceded the point, and the Court will dismiss the various counts in this case as to these Defendants.  See Wannall v. Honeywell, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").  Had Plaintiff successfully disputed this issue, moreover, the claims against the Del Rosso Defendants would still be dismissed for the reasons given below.

### B.  Statutes of Limitations

Next up is the question of whether the applicable statutes of limitations bar the federal counts.  Solomon filed this suit in October 2022.  See Initial Compl.  Defendants date the last

possible accrual of his claims to June 2017, when he lost his job as a result of reporting on his hacked emails.  See ECF No. 71 (Joint Reply) at 4; Am. Compl., ¶¶ 11–15.  If that is correct, Plaintiff does not dispute that all of his claims would be untimely, assuming that no tolling is called for.  Solomon points instead to the January 7, 2022, filing of Stuart Page's witness statement in Azima's U.K. proceedings — which revealed the identity and involvement of Forlit as well as key details about the hacking scheme — as the moment his claims sprung into being.  See Opp. at 6, 8; Am. Compl., ¶ 43.  Alternatively, he contends that even if they accrued earlier, they were tolled until that date because Defendants fraudulently concealed their alleged wrongdoing.  See Opp. at 6–7, 10–11.  Plaintiff also suggests that, at the very least, he may pursue RICO claims for the additional injuries he suffered as late as 2020, when new articles reported on his correspondence with Azima, prolonging and entrenching Solomon's reputational damage.  Id. at 15–16; Am. Compl., ¶¶ 110–15.  The Court first examines the accrual of RICO and CFAA claims, moves onto their tolling, and concludes with the FWA.

### 1. *RICO and CFAA Accrual*

RICO claims are subject to a four-year statute of limitations.  Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987).  CFAA claims, conversely, must be brought "within 2 years of the date of the act complained of or the date of the discovery of the damage."  18 U.S.C. § 1030(g).  For claims under both statutes, the clock starts when the claimant discovers the injury, not necessarily when he discovers the other elements of the claim.  See id.; Rotella v. Wood, 528 U.S. 549, 555 (2000).

The Court concludes that Solomon's RICO and CFAA claims accrued no later than June 2017, when he became aware of his glaringly obvious injury — namely, termination.  That conclusion flows from the crystal-clear holding in Rotella, see 528 U.S. at 555 ("[D]iscovery of

the injury, not discovery of the other elements of a claim, is what starts the clock."), and the equally unambiguous statutory text of the CFAA.  See 18 U.S.C. § 1030(g) (claims accrue no later than "the date of the discovery of the damage").  In arguing otherwise, Solomon at times conflates the accrual question with the tolling one.  See Opp. at 9 (citing Richards v. Mileski, 662 F.2d 65 (D.C. Cir. 1981)).  The Court will address those contentions in its subsequent tolling analysis.

Solomon also reads Rotella as holding that a plaintiff must know the identity of the perpetrators — which he allegedly did not until years after discovering his injury — for RICO claims to accrue.  For that reading, he relies on Rotella's discussion of another case, United States v. Kubrick, 444 U.S. 111 (1979), which noted that "a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury . . . is no longer at the mercy of" a defendant who holds all the facts.  Rotella, 528 U.S. at 556 (quoting Kubrick, 444 U.S. at 122).  Plaintiff takes this quotation out of context, however.  Rotella cited Kubrick in support of its categorical statement that "the justification for a discovery rule does not extend beyond the injury."  Id. at 555–56.  If Kubrick preferred Solomon's accrual rule, which is far from clear based on the quoted dicta, Rotella nowhere endorses it.  See Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer, 764 F.3d 1268, 1278 n.7 (10th Cir. 2014) (rejecting argument identical to Solomon's).

It is true that Rotella did not confront the particular question posed here — viz., whether a plaintiff must know his perpetrators' identities.  It instead resolved a circuit split concerning whether knowledge of a pattern of RICO activity is necessary for accrual, concluding that it is not.  Rotella, 528 U.S. at 555–58.  Still, the Court's broad holding that "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock," cannot be squared with

12

Plaintiff's interpretation.  Id. at 555 (emphasis added); see also Kirchhefer, 764 F.3d at 1278 ("[A] RICO victim need not have actual knowledge of exactly who committed the RICO predicate act resulting in the injury for a civil RICO claim to accrue.").  Solomon knew by June 2017 that he had been the victim of a so-called hack-and-smear operation.  See Am. Compl., ¶¶ 17, 106–07 (acknowledging that when he was fired, he knew his emails had been hacked). That he did not know all of the details regarding the cause of that injury, a separate RICO element, is irrelevant under Rotella.  As Plaintiff makes no separate arguments concerning the accrual of his CFAA claims, the Court will not ponder any further whether the clear text of § 1030(g) leaves room for an exception when a plaintiff has not identified the wrongdoer behind his harm.

### 2.  RICO and CFAA Tolling

Coming up short on accrual, Solomon alternatively maintains that tolling saves his bacon.  He asserts with some force that Defendants' fraudulent concealment made him unaware of their identities.  The Court agrees that even after a claim has accrued upon discovery of an injury, RICO is "subject to equitable principles of tolling."  Rotella, 528 U.S. at 560. "Fraudulent concealment . . . tolls the running of the statute of limitations" when "(1) defendants engaged in a course of conduct designed to conceal evidence of their alleged wrong-doing and (2) the plaintiffs were not on actual or constructive notice of that evidence, despite (3) their exercise of diligence."  Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (cleaned up).  The CFAA's statute of limitations is similarly tolled by a defendant's fraudulent concealment.  See Quick v. EduCap, Inc., 318 F. Supp. 3d 121, 143 (D.D.C. 2018) ("Fraudulent concealment is an 'equitable doctrine [that] is read into every federal statute of limitations.'") (quoting Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946)); Egilman v. Keller & Heckman,

LLP, 401 F. Supp. 2d 105, 111 (D.D.C. 2005) (applying fraudulent-concealment precedent in CFAA case).

Defendants do not dispute that their actions as alleged would amount to fraudulent concealment.  They maintain instead that because Solomon nonetheless had sufficient notice of his claim, tolling is not justified.  See Joint Reply at 5–8.  That rejoinder ignores a crucial gap in Solomon's knowledge.  In other words, the question is whether — his awareness of his injuries and some of those responsible aside — Solomon's blindness to the involvement of all of the remaining Defendants tolls the statute of limitations for these counts.  Although such blindness does not prevent accrual of these claims, it does toll the statute of limitations when a defendant is directly at fault for a plaintiff's lack of awareness.  See Solano v. Delmed, Inc., 759 F. Supp. 847, 854 (D.D.C. 1991) (applying different standards for accrual and tolling).

The notice required to defeat a tolling argument is "something closer to actual notice than the merest inquiry notice that would be sufficient to set the statute of limitations running in a situation untainted by fraudulent concealment."  Riddell v. Riddell Wash. Corp., 866 F.2d 1480, 1491 (D.C. Cir. 1989).  In addition, the Court "must probe a plaintiff's knowledge to determine whether he was on notice of all possible defendants, and not just a subgroup, as well as the particular cause of action."  Hobson v. Wilson, 737 F.2d 1, 36 (D.C. Cir. 1984), overruled in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit, 507 U.S. 163 (1993).  "[S]imply because a person knows he has been injured by one person cannot reasonably mean he should be held to know of every other participant."  Id.

Defendants are correct that Solomon had actual knowledge by June 2017 that his communications with Azima had been hacked and released to his employer and the press.  See Am. Compl., ¶¶ 106–07.  They are also correct that the 2017 complaint Azima filed here and

14

the press coverage of the same sufficiently put Plaintiff on notice that now-dismissed Defendants Dechert, Gerrard, and Hughes were involved in the alleged scheme.  See Azima v. RAK Investment Auth., No. 16-1948, ECF No. 28 (Amended Complaint), ¶¶ 5, 23, 32, 35, 49, 53 (D.D.C. Sept. 30, 2016) (implicating Dechert, Gerrard, and Hughes in hacking scheme); ECF No. 55 (Dechert MTD) at 15 n.4 (collecting articles published about Azima's lawsuit); Joint Reply at 7 (citing collection of articles in Dechert MTD); In re Lorazepam & Clorazepate Antitrust Litig., 2004 WL 7081446, at *1 (D.D.C. May 18, 2004) (holding that highly public lawsuits gave notice); Nader v. Democratic Nat'l Comm., 567 F.3d 692, 701 (D.C. Cir. 2009) ("[I]t would be strange if the Washington Post could discover facts about Nader's life that he couldn't reasonably discover himself, especially because, unlike the Post writers, Nader could have read about it in the paper.").

Yet, nothing in Plaintiff's Amended Complaint or in the public domain of which the Court may take judicial notice suggests that Solomon was on notice of the remaining Defendants' involvement when his claims accrued.  Particularly so as to Defendants Handjani, Frank, and KARV, who were never named in one of Azima's lawsuits or identified in a witness statement.  Solomon was not put on notice of Del Rosso and Vital's involvement, moreover, until Azima filed suit against them in the Middle District of North Carolina on October 15, 2020.  Azima v. Del Rosso, No. 20-954, ECF No. 1 (Complaint), ¶ 1 (M.D.N.C. Oct. 15, 2020) ("Defendants Del Rosso and Vital oversaw and directed the hacking of Plaintiff Farhad Azima.").  The North Carolina suit was filed less than two years before Plaintiff filed his own suit on October 14, 2022, making all of Solomon's claims against Del Rosso and Vital timely if the Court concludes that tolling is appropriate.  Similarly, Solomon alleges that he was not on notice of Forlit, SDC-Gadot, and Insight's role in the scheme until January 2022, when Page

15

filed an amended witness statement in the U.K. judicial proceeding intimating as much.  See Am. Compl., ¶ 43.  Discovery might adduce additional facts about Solomon's awareness of Defendants' roles, but these are the only facts currently in play.  At this point, therefore, tolling preserves Plaintiff's claims.

One more related point of law deserves the Court's attention.  "[T]the relationship of the defendants, together with other facts, may establish as a matter of law that a reasonable plaintiff with knowledge of the misconduct of one coconspirator would have conducted an investigation as to the other."  Nader, 567 F.3d at 702 (cleaned up).  In Nader, presidential candidate Ralph Nader alleged a conspiracy between the DNC, the Kerry presidential campaign, and groups that brought frivolous ballot-access lawsuits to drain Nader's campaign resources.  Id. at 694–95.  Nader's awareness that the DNC was paying the lawyers bringing the frivolous suits put him on notice of his claims against the DNC.  Id. at 702.  The court further held that "given the relationship between the Kerry Campaign and the DNC at the time of the 2004 election, we cannot see how the campaign would have fallen outside the zone of reasonable suspicion."  Id.

In Fitzgerald v. Seamans, 553 F.2d 220 (D.C. Cir. 1977), a government employee alleged that he was terminated in retaliation for giving congressional testimony.  Id. at 222.  The court held that Fitzgerald's knowledge of claims against higher-level officials in the Air Force put him on notice of his claims against "lesser fry" in the Air Force whose "identity and participation were earlier unknown."  Id. at 229.  By contrast, Fitzgerald was not on notice of his claims against a White House aide, who was "a person of influence in a different center of power."  Id.  Together, Nader and Fitzgerald reveal that a plaintiff must make obvious inferences based on relationships between known and unknown defendants, but need not leap to conclusions where a connection between the bad actors is not readily discernible.

16

The Court cannot hold as a matter of law that Plaintiff was aware of an association between the bad actors he knew of and the Defendants moving to dismiss here. Considering what is pled in the Amended Complaint, the only public association between the relevant actors was that Handjani had served as a Foreign Registered Agent for Ras Al Khaima. See Am. Compl., ¶ 6. Even assuming that a FARA filing would sufficiently alert Solomon without any media attention, the association does not suffice to put him on notice without further factual development. See Firestone, 76 F.3d at 1209 ("[B]ecause statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred.") (emphasis added). In addition, Defendants point to no publicly known relationship between the known bad actors and the KARV or Forlit Defendants, so it cannot be said that Solomon should have discovered their role. The Court accordingly finds tolling of his RICO and CFAA claims warranted based on the facts as alleged in the Amended Complaint.

### 3. *Federal Wiretap Act*

Plaintiff contends that the same result should obtain for his Federal Wiretap Act count since "[a]t the time of [his] firing . . . , [he] believed that he [had been] hacked by Iran," rather than Defendants. See Am. Compl., ¶ 107. The FWA statute of limitations, however, operates differently from RICO's and the CFAA's. FWA claims "may not be commenced later than two years after the date upon which the claimant first has a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e). In other words, "if the plaintiff had such notice as would lead a reasonable person either to sue or to launch an investigation that would likely uncover the requisite facts," her FWA claims have accrued. Sparshott v. Feld Ent., Inc., 311 F.3d 425, 429 (D.C. Cir. 2002). FWA claims, unlike RICO and CFAA claims, are not tolled by an allegation

17

of fraudulent concealment.  Id. at 431 ("[W]here Congress has chosen a formula ('reasonable opportunity to discover') for a specific and obviously self-concealing crime such as wiretapping, we question whether it would make sense to suppose that fraudulent concealment could alter the test (as opposed to altering the underlying facts to which it is applied).").

The Circuit caselaw gives somewhat unclear guidance on whether a plaintiff must have an opportunity to uncover who caused her injuries for FWA claims to accrue.  The leading case, Sparshott, explains in *dicta* that "[a] plaintiff need not even know the perpetrators of an illicit wiretapping if knowledge of the wiretapping itself would lead to discovery of the perpetrators." 311 F.3d at 430.  It could thus be read to mean that an FWA claim does not accrue absent a likelihood of uncovering who had improperly listened in.

Complicating that interpretation, however, Sparshott also cites with approval two cases that point in the opposite direction.  First, it cites Dyniewicz v. United States, 742 F.2d 484 (9th Cir. 1984), and its holding that "[d]iscovery of the cause of one's injury, however, does not mean knowing who is responsible for it."  Id. at 486; Sparshott, 311 F.3d at 430.  In addition, Sparshott relies on Andes v. Knox, 905 F.2d 188 (8th Cir. 1990), which holds that FWA accrual occurs "when the claimant has a reasonable opportunity to discover the violation, not when she discovers the true identity of the violator or all of the violators."  Id. at 189; Sparshott, 311 F.3d at 430.  Sparshott could, therefore, stand for the contrary proposition that a plaintiff need not be able to identify the wiretapper for accrual to occur.  See, e.g., Directv, Inc. v. Thomas, 329 F. Supp. 2d 949, 952 (E.D. Mich. 2004) (citing Sparshott in explaining that "a wiretap plaintiff need not know the identity of the specific violator" for purposes of accrual); Maddalena v. Toole, 2013 WL 5491869, at *5 (C.D. Cal. Oct. 1, 2013) (similar).

18

In short, the caselaw does not provide a straightforward answer on the accrual of Plaintiff's FWA claim. It also does not fully contend with the particular circumstances of a plaintiff who, as here, has communications intercepted by shadowy private actors — as opposed to by the Government — which might make identification more difficult. The Court, accordingly, will not wade into such murky waters by taking a position on this issue. See Liff v. Off. of the Inspector Gen. U.S. Dep't of Labor, 156 F. Supp. 3d 1, 18 (D.D.C. 2016), rev'd on other grounds, 881 F.3d 912 (2018) (declining to decide statute-of-limitations issue at motion-to-dismiss stage because, in part, "the law appears sufficiently unsettled"); cf. Schubarth v. Federal Republic of Germany, 2020 WL 13065292, at *4 (D.D.C. Mar. 12, 2020) ("The timeliness of a claim is a nonjurisdictional threshold requirement.") (cleaned up) (quoting Matar v. Transp. Sec. Admin., 910 F.3d 538, 541 (D.C. Cir. 2018)). This course is particularly prudent here, where the Court will dismiss the FWA count for other reasons, as discussed below.

### C. RICO

Turning to the merits, Plaintiff alleges in Count I that Defendants conspired in violation of RICO. That statute makes it illegal to conspire to commit certain enumerated offenses. It is unlawful for anyone "employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §§ 1962(c), (d); see also United States v. Eiland, 738 F.3d 338, 360 (D.C. Cir. 2013). To articulate a RICO conspiracy, then, Solomon must allege that

Defendants participated in the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).

For purposes of this Motion, it is particularly relevant that hacking and disseminating private information do not count as racketeering activity. See 18 U.S.C. § 1961(1). Plaintiff has nonetheless alleged four sets of predicate crimes that are cognizable under RICO: (1) the kidnapping and extortion of Al Sadeq; (2) money laundering in the form of payments to facilitate the enterprise's activities; (3) obstruction of justice and wire fraud to cover up those activities; and (4) wire fraud associated with Defendants' hacking operation and their subsequent dissemination of Azima's emails. See Opp. at 31–49 (organizing offenses into roughly these categories).

In seeking dismissal, Defendants argue, among other things, that none of these alleged RICO predicate offenses proximately caused his injuries. To the extent that wire fraud conceivably could have done so, they say, that offense is facially deficient as pled.

1. *Proximate Cause*

A RICO plaintiff must show that a RICO predicate act proximately caused his alleged injuries. See Sedima, 473 U.S. at 495; Greenpeace, Inc. v. Down Chemical Co., 808 F. Supp. 2d 262, 269 (D.D.C. 2011). In elucidating RICO's proximate-cause requirement, the Supreme Court has focused on the need for a "direct relationship" between the injury and the predicate act. Holmes v. Sec. Inv. Protection Corp., 503 U.S. 258, 269 (1992). A direct relationship does not exist where "a plaintiff . . . complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts." Id. at 268–69. Put differently, if "the conduct

directly causing the harm [is] distinct from the conduct giving rise to the [offense]," causation is overly attenuated. Hemi Grp., LLC v. City of New York, 559 U.S. 1, 11 (2010).

Solomon's first challenge is thus to link one of the alleged predicate offenses to his injuries — namely, his loss of employment and business opportunities. His pickings for this endeavor are slim. The kidnapping and extortion offenses have next to nothing to do with Solomon, and his injuries cannot reasonably be traced to them. Indeed, Plaintiff's name does not appear once in his attestation of the kidnapping and extortion predicates. See Am. Compl., ¶¶ 63–71. Even setting aside the lack of temporal proximity — the kidnapping took place in 2014, nearly three years before Solomon was fired — Al Sadeq was allegedly kidnapped to obtain information about Azima, not Solomon. Id., ¶ 64. Any causal connection is so remote as to be nonexistent.

The alleged money laundering boasts an only slightly more robust connection to Plaintiff's injuries. Indeed, even in his Opposition, Solomon barely argues the causal link at all. He asserts without explanation that the "money laundering transactions were in furtherance of the scheme to defraud and deplatform," which in turn "cognizably damaged Solomon." Opp. at 48; see also Am. Compl., ¶ 194. As Plaintiff's contention recognizes, the payments from Ras Al Khaima to Defendants caused his injuries only to the extent that they promoted a "specified unlawful activity" that itself caused the injuries. See 18 U.S.C. § 1956(a)(2)(A). His argument on this score therefore rises and falls with his arguments as to the other predicate acts.

Solomon next maintains that the alleged cover-up — including acts of both obstruction and wire fraud — injured him because it "caused [him] to be unable to take legal steps to restore his reputation." Opp. at 55. That proposition is far too speculative to sustain. To start, reputational rehabilitation through legal action is an uncertain prospect. More importantly and

as previously discussed, Solomon was on notice of key aspects of his claims and could have brought suit against Dechert, Gerrard, and Hughes much earlier. It was Solomon's failure to do so, not Defendants' cover-up, that caused any prolonged reputational damage worked by the delay in legal action.

Last up are the remaining alleged acts of wire fraud, which present a closer question than the other malfeasance. The Court will follow Plaintiff's lead in separating these acts into email procurement (the hacking) and email dissemination (the smearing). See Opp. at 33–37. The email-procurement fraud was not the direct cause of any injury to Solomon because that offense was perpetrated against Azima. See Am. Compl., ¶¶ 78–79. It involved Azima's privacy and property, not Solomon's. Holmes, 503 U.S. at 268–69 (explaining that "harm flowing merely from the misfortunes visited upon a third person by the defendant's acts" do not create direct relationship).

Solomon nevertheless insists that his injuries were the "foreseeable and intended result" of Defendants' actions. See Opp. at 36. The Court has its doubts that harm to Plaintiff was a foreseeable result of the hacking, as there is no indication that Defendants had any inkling that they would uncover the emails in question by hacking Azima. See Am. Compl., ¶¶ 37–38, 76–77, 90 (recognizing that directions to look for communications with Solomon were given months after hacking scheme formulated). That aside, Solomon's reliance on foreseeability is misplaced, as the direct-relationship test primarily governs in RICO claims. See Hemi Grp., 559 U.S. at 11–12 (rejecting foreseeability inquiry); Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 458 (2006) (holding defendant's tax fraud did not bear direct relationship to competing business's injury even though fraud could have facilitated defendant's harmful price cuts). Moreover, "[t]he requirement of a direct causal connection is especially warranted where the

immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims," Anza, 547, U.S. at 460, and Azima has done just that in several lawsuits. See, e.g., Azima v. Del Rosso, No. 20-954 (M.D.N.C.); Azima v. RAK Investment Auth., No. 16-1948 (D.D.C.).

That leaves Solomon with one remaining path to satisfying the causation element: the email-dissemination fraud. It is certainly true that his injury most clearly stems from Defendants' broadcasting his emails to his employer and the press, but even that causal connection is not so simple because of intervening acts. Most notably, an AP reporter decided to publish a story about Solomon after he received the emails from Defendants. See Am. Compl., ¶ 105 (stating that reporter "received his information from the stolen emails" and proceeded to publish because he "was not placated" by Solomon's denial of wrongdoing). Additionally, the Journal decided to fire Solomon once the accusations were publicized. Id., ¶ 106. If the reporter's and the Journal's decisions are properly characterized as "the independent actions of third and even fourth parties," Solomon's chain of causation from email dissemination to injury is too attenuated to support his RICO claim. Hemi Grp., 559 U.S. at 15.

The weight of the cases suggests that when a RICO predicate act — here, wire fraud — was not decisive in influencing a third party's injurious action, that predicate act did not proximately cause the injury. In Hemi Grp., the fraudulent act indirectly deprived New York City of a list of consumers who owed the city cigarette sales taxes. Id. at 5–6. The Court held that consumers' independent decisions not to pay those taxes despite their obligation to do so

23

were too far removed from the fraud to make out a RICO claim.  Id. at 15.  In other words, the consumers made an independent choice, even if one enabled by the fraud.

By contrast, in Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Industrial Materials Corp., 887 F. Supp. 2d 9 (D.D.C. 2012), the court found that fraudulent antidumping petitions filed with the International Trade Court proximately injured the plaintiff companies because the ITC had relied on those petitions in reaching its decision to impose antidumping tariffs.  Id. at 21–22.  In so finding, the court emphasized that the ITC had reversed its ruling after learning of the fraud, showing the petitions to be the deciding factor in the ITC's decision. Id. at 21.  The court thus distinguished a very similar antitrust case in which "it was impossible to tell if the ITC would have imposed antidumping duties[] independent of the alleged antitrust wrongdoing."  Id.; see also Midland Export, Ltd. v. Elkem Holding, Inc., 947 F. Supp. 16, 167–68 (E.D. Pa. 1996) ("Defendants can be said to have 'caused' the ITC's determination only to the extent that their alleged price fixing and the information they supplied actually influenced the ITC's decision.").  Reading these cases together, a RICO predicate that merely facilitates an injurious act taken by a third party who acts out of her own interests and in her own judgment does not proximately cause the injury.

Applying the foregoing cases, Plaintiff's allegations do not make out proximate cause. The AP reporter's decision to publish an article about Solomon was an exercise of independent journalistic judgment, much like the tax-evading cigarette consumer in Hemi Grp. and the ITC's overdetermined tariff decision in Midland.  Reporters are not required to publish every scoop they encounter, nor do they typically publish entirely unverified stories.  The AP reporter here published an article citing several sources in addition to the hacked emails, all of which confirmed the impression that Solomon had transgressed his ethical obligations.  See Jeff

24

Horwitz, *et al.*, Wall Street Journal Fires Correspondent Over Ethics Conflict, Associated Press (Jun. 21, 2017), https://perma.cc/AWB6-BWVC (citing Journal's statement that its investigation "concluded that Mr. Solomon violated his ethical obligations" and statements by two individuals involved in business dealings with Azima confirming that "Solomon was involved in discussing proposed deals with Azima").  He did so despite Solomon's denials of wrongdoing, which he included in the article.  Id.  In light of the reporter's "expertise and independent decision-making process," Solomon has not sufficiently alleged that the emails were decisive in the AP's decision to publish.  Midland, 947 F. Supp. at 167.

Nor did any of Defendants' actions play a decisive role in the Journal's decision to fire Solomon.  Defendants' only attempt to directly persuade the Journal to take such a step did not succeed.  See Am. Compl., ¶¶ 103–04 (alleging Solomon retained job after Journal received emails).  It was only when the AP reporter made his own independent decision to pursue the story that the Journal cut Solomon loose.  Id., ¶ 106.

Although the Amended Complaint alleges that Defendants "published or caused to be published" additional articles about him until 2020, including on "pay-to-play websites," id., ¶ 110, Solomon never argues in his Opposition that the proximate-cause analysis differs as to this allegation.  See Opp. at 53–58.  In any event, this generic term ("pay-to-play websites") is too vague to get him over the line.  Unlike the original AP article, which was published before the emails were otherwise public, see Am. Compl., ¶¶ 103, 105–06, Plaintiff provides no reason to conclude that these follow-on articles were not the work of journalists following Solomon's story through prior publications, including his own 2018 article about the debacle.  See Jay Solomon, How Hacked Emails and a Yacht in Monaco Ended My Career at the Wall Street Journal, Wash. Inst. Near E. Pol'y (Mar. 7, 2018), https://perma.cc/MN2D-C277.  Solomon's

25

attribution of these articles to Defendants' continued conspiracy finds no supportive allegations in the Amended Complaint, and the Court is not bound, even at this stage of litigation, to credit it unthinkingly.  See Twombly, 550 U.S. at 557 (alleged facts must be more than "consistent with" an inference of wrongdoing).  The Court will therefore dismiss Plaintiff's RICO claim for lack of proximate cause.

### 2. *Wire Fraud*

Even if the Court were to find that Solomon sufficiently alleges that the email dissemination proximately caused his injury, he would still run headlong into the separate obstacle that such dissemination does not amount to wire fraud.  That is so for two reasons.  First, he has not adequately alleged any false communications in connection with the dissemination of his emails.  Second, he has not alleged that the hack-and-smear scheme had as its object money or property.

### a. False Statements

A RICO claim cannot rely on "wire fraud allegations [that] identify no false statements or misrepresentations."  Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam, 387 F. Supp. 3d 71, 85 (D.D.C. 2019).  To overcome this hurdle, Plaintiff offers several allegations concerning the putative falsehood of Defendants' communications.  He first contends that the emails were "organized to falsely convey to an innocent viewer that Solomon engaged in fraud."  Opp. at 33; see Am. Compl., ¶¶ 99.  Solomon also leans on the fact that Defendants "disseminated the stolen emails under the heading 'fraud.'"  Am. Compl., ¶¶ 99.  An allegation also appears in the Amended Complaint that Defendants "planted false and disparaging stories in the press alleging that Mr. Solomon was in the middle of hundreds of millions of dollars of fraudulent transactions."  Id.  Because the Amended Complaint does not identify what false

information was disseminated beyond the emails, however, the Court understands this allegation to merely repeat the allegation that Defendants — by misleadingly packaging the emails and calling them evidence of fraud — encouraged news coverage of the story in that manner.  Indeed, Solomon alleges that the AP reporter "received his information from the stolen emails," not some other doctored evidence sent by Defendants.  Id., ¶ 105.  Most importantly, there is no allegation that the emails were altered in any way, leaving Solomon reliant on his packaging and labeling claims.

Plaintiff's misleading-packaging theory fails because it is not supported by any specific allegations as to how the emails were improperly curated, cherry-picked, or arranged.  Under Federal Rule of Civil Procedure 9(b), a complaint alleging fraud must "state the time, place and content of the false misrepresentations, the fact misrepresented, and what was retained or given up as a consequence of the fraud."  Cheeks v. Fort Myer Constr. Corp., 216 F. Supp. 3d 146, 157 (D.D.C. 2016) (cleaned up) (emphasis added).  Solomon's vague assertion of deceptive packaging cannot meet that higher-than-normal pleading standard.  See Bates v. Nw. Human Servs., Inc., 466 F. Supp. 2d 69, 91 (D.D.C. 2006) (noting Rule 9(b)'s requirement for complaint to specify "what fraudulent statements were made and in what context, . . . and the manner in which the statements were misleading") (cleaned up).  The thrust of Solomon's claim is that because the emails showed that he never rejected Azima's business propositions, they created the false impression that he was in fact in business with Azima.  See Opp. at 33 (noting that "the communications reflected an array of illegal and unethical conduct . . . that may have been requested of Solomon, but in which he in fact did not engage.").  Perhaps that kind of misimpression would be actionable if Defendants had held back communications in which Plaintiff refused Azima's offers.  Absent that kind of

tampering, it appears that Solomon's main quarrel is with himself for not creating a tidier paper trail.

That Defendants allegedly used the descriptor "fraud" when disseminating the stolen emails provides even less grist for Plaintiff's accusation of wire fraud. Such a descriptor plainly amounts to an expression of opinion, which cannot form the basis of a wire-fraud claim. See Ctr. for Immigr. Stud. v. Cohen, 410 F. Supp. 3d 183, 190 (D.D.C. 2019) (holding nonprofit's designation of plaintiff organization as hate group could not constitute RICO predicate act of wire fraud because opinion based). Indeed, the reporting on Solomon's emails did not accuse him of fraud as that term would be understood by a lawyer, but of unethical behavior. See Horwitz, *supra* (entitling article "Wall Street Journal fires correspondent over ethics conflict") (emphasis added). As such, Defendants' use of the term conveyed an opinion about the seriousness of Solomon's misconduct, not a false statement about what he did or did not do. Because the upshot of Solomon's argument is that Defendants "advanced a conclusion that was debatable, and that this expression of a flawed opinion harmed plaintiff's reputation," the Court finds no actionable misrepresentation occurred. Cohen, 410 F. Supp. 3d at 190. Defendants' dissemination of Solomon's genuine emails in this manner was therefore not fraudulent.

### b. Money or Property Objective

Another flaw in Solomon's resort to wire fraud as a RICO predicate is that only fraudulent activity with money or property as its object suffices. See 18 U.S.C. § 1343; Kelly v. United States, 140 S. Ct. 1565, 1571, 1573 (2020) ("[P]roperty must play more than some bit part in a scheme: It must be an 'object of the fraud.'") (quoting Pasquantino v. United States, 544 U.S. 349, 355 (2005)). Solomon alleges in the main that Defendants sought to "discredit," "silence," and "deplatform" him. See Am. Compl., ¶¶ 40, 191. Those goals have little to do with money or property. No doubt, a journalist's platform also happens to be his means of making money. Still, a "fraud conviction

28

cannot stand when the loss to the victim is only an incidental byproduct of the scheme." Kelly, 140 S. Ct. at 1573.

That is true even when the incidental property loss is an unavoidable consequence of the scheme. In Kelly, the Court gave the example of a practical joke in which the victim is induced to attend a nonexistent birthday party. Id. at 1573 n.2. The object of the scheme is merely to embarrass the victim. That he expends resources to get to the nonexistent party does not convert the scheme into one meant to deprive the victim of property. Id. Likewise, a scheme to discredit a journalist is not necessarily a scheme to cause him financial harm, even if that outcome inevitably flows from the scheme's success. Several courts have held as much in cases involving an attack on a professional's reputation that affects her livelihood. See Manax v. McNamara, 660 F. Supp. 657, 658, 660 (W.D. Tex. 1987) (holding, in case involving "an alleged conspiracy to harm [a doctor's] medical practice," that scheme to defame doctor with damaging press coverage was "one to damage [his] reputation . . . and is in no way a 'fraud' on his tangible or intangible rights"); Kimm v. Lee, 2005 WL 89386, at *4 (S.D.N.Y. Jan. 13, 2005) (dismissing claim that "false information was transmitted via the wires and mails to harm [plaintiff lawyer's] business and reputation"); cf. Frydman v. Verschleiser, 172 F. Supp. 3d 653, 660, 670 (S.D.N.Y. 2016) (holding that defendant committed wire fraud by making misrepresentations directly to plaintiff's business partners resulting in "lost contracts, loans, and leases," rather than waging broader reputational battle).

To be sure, Plaintiff also alleges that the scheme was intended to "harm . . . his business and his properties." Am. Compl., ¶ 108. The Court will not credit that conclusory allegation about Defendants' intentions, however, as it is belied by the fact that Defendants took aim at his good name, not at his bank account or any of his physical property. Plaintiff himself refers to his termination as "a direct result of the Defendants['] intentional campaign to silence and deplatform" him rather than a goal of the scheme. See Opp. at 34; id. at 58 ("Defendants' larger purpose . . . was to silence and deplatform Solomon."). Elsewhere, he contends that "the goals and objectives of the

29

enterprise . . . were to neutralize the threats against [Ras Al Khaima] and the enterprise and cover up the enterprise's illegal activities." Id. at 55. Solomon's boilerplate effort to satisfy the elements of wire fraud falls flat.

Plaintiff offers one final allegation meant to demonstrate the money or property objective of the scheme. He claims that "[t]he affairs of the enterprise were intended to, and have in fact resulted in, great financial gain for the Defendants through, *inter alia*, millions of dollars for their criminal services." Am. Compl., ¶ 182. In other words, Ras Al Khaima paid Defendants for their work. That allegation misses the mark. Wire fraud does not require that Defendants had money as their personal object in carrying out the scheme, as true as that may be. It requires that the scheme have as its object money or property. See Kelly, 140 S. Ct. at 1573. Payments made by a co-conspirator to other members of the conspiracy result in no net gain to the enterprise. Such payments cannot be repackaged as the scheme's goal rather than a method of achieving its object.

In sum, Solomon's RICO cause of action stumbles on the proximate-cause requirement; as to wire fraud, the only RICO predicate even marginally causative of his injuries, the claim does not satisfy two required elements. As in tennis, two faults is enough; the Court need not consider Defendants' additional arguments for dismissal.

### D. Computer Fraud and Abuse Act

Defendants next assert that Count II, which alleges a violation of the CFAA, is also deficient. A plaintiff bringing a civil action under the CFAA must show that he suffered "damage or loss" resulting from a violation of the Act, 18 U.S.C. § 1030(g), and he must also allege one of five factors found elsewhere in the statute. See id. § (c)(4)(A)(i)(I)-(V). The only possibly relevant factor here is (c)(4)(A)(i)(I), which requires an allegation of "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." "[L]oss, in turn, is defined 'to include the costs of responding to a violation and any revenue lost, cost incurred, or

other consequential damages incurred because of interruption of service.'" Lightfoot v. Koonz, McKenney, Johnson & DePaolis LLP, 2022 WL 2176923, at *3 (D.D.C. June 16, 2022) (quoting 18 U.S.C. § 1030(e)(11)). As the Supreme Court has noted, the statutory definition of loss "focus[es] on technological harms" and is "ill fitted . . . to remediating 'misuse' of sensitive information." Van Buren v. United States, 141 S. Ct. 1648, 1660 (2021); cf. Andrews v. Sirius XM Radio Inc., 932 F.3d 1253, 1263 (9th Cir. 2019) ("[T]he CFAA is an anti-hacking statute, not an expansive misappropriation statute.") (cleaned up).

Plaintiff's theory of why he has alleged a cognizable loss is as follows: Defendants' alleged hacking of Azima's account caused Solomon harm because the communications between him and Azima, which were obtained from the latter's account, were disclosed to Solomon's employer. See Am. Compl., ¶ 212. This in turn caused Solomon "to lose his job and suffer damage to his property and business and reputation." Id. The loss of his job and the hit to his reputation, in turn, caused him to lose out on publishing deals and speaking engagements. Id., ¶ 213. And since these losses "far exceed[] $5,000 in value," Solomon maintains that he has adequately pled a cognizable loss. Id., ¶ 214. Defendants respond that this is not the kind of loss that the CFAA makes actionable. See Forlit Defs. MTD at 34; KARV Defs. MTD at 28–29; see also Joint Reply at 31–32 (CFAA "provides relief for only a narrow band of computer-related 'losses' that Plaintiff has not, and cannot, allege").

Defendants have the better of the argument. Solomon certainly does not contend that his losses, including his lost revenue, were "incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Nor does he contend that his economic losses resulted from efforts to respond to the CFAA violation, such as "conducting a damage assessment" or "restoring the data, program, system, or information to its condition prior to the offense." Id. This makes sense, since it was

Azima's email account, not Solomon's, that was allegedly accessed by Defendants.  The real

cause of Solomon's woes, as the Court has already concluded, is not the hacking of Azima's

account nor even the subsequent disclosure of the communications between him and Azima, but

a journalist's decision to write an article about the communications.

Under the CFAA, however, Plaintiff's loss must fall into one of the aforementioned two

buckets to qualify as an actionable loss.  See Psychas v. Dist. Dep't of Transp., 2019 WL

4644503, at *11 (D.D.C. Sept. 24, 2019) (holding that loss "must relate" to costs "incurred in

connection with responding to a violation" or "incurred as a result of the interruption of

services"); Brown Jordan Int'l, Inc. v. Carmicle, 846 F.3d 1167, 1174 (11th Cir. 2017) (noting

agreement on this interpretation of "loss" between only Circuits to have addressed issue).

Because Solomon claims neither "any losses incurred in responding to the alleged violation, nor

. . . any losses incurred as a result of the interruption of services," his CFAA cause of action

cannot proceed.  Psychas, 2019 WL 4644503, at *11; Lightfoot, 2022 WL 2176923, at *4

(dismissing CFAA claim for similar reasons).

Plaintiff makes a final attempt to resist this conclusion by citing to a string of cases

purportedly showing that "courts have found damage as reasonable costs to a victim."  Opp. at

70.  This argument does not move the needle for the simple reason that none of the cases he

cites contradicts the understanding of "loss" adopted by "virtually every other district that has

addressed this issue."  Psychas, 2019 WL 4644503, at *10.  Take, for instance, EF Cultural

Travel BV v. Explorica, Inc., 274 F.3d 577 (1st Cir. 2001), abrogated on other grounds by Van

Buren, 141 S. Ct. at 1653 n.2, 1655.  There, the First Circuit concluded that "having to expend

substantial sums to assess the extent, if any, of the physical damage" caused by the alleged

CFAA violation counted as "loss."  Id. at 585.  This kind of harm, though, is plainly covered by

32

the Act, <u>see</u> 18 U.S.C. § 1030(e)(11) (covering "the cost of . . . conducting a damage assessment"), and bears no resemblance to Solomon's alleged losses.  Consider also <u>I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.</u>, 307 F. Supp. 2d 521 (S.D.N.Y. 2004). The court there held that plaintiff had adequately pled a CFAA claim because it alleged that the unauthorized access by defendant "impaired" the integrity of its data and "forced [it] to incur costs of more than $5,000 in damage assessment and remedial measures."  <u>Id.</u> at 525–26.  Once more, these harms fit comfortably within the statutory definitions of damage and loss and look nothing like the losses Solomon has alleged here, which were not incurred in response to or as a result of Defendants' alleged hacking.  Like the previous ones before it, this attempt comes up short.  The Court, accordingly, will dismiss this count as well.

     E.  <u>Federal Wiretap Act</u>

Next up is the Federal Wiretap Act.  To state a claim under the FWA, <u>see</u> 18 U.S.C. § 2520(a), Solomon must allege that Defendants "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication (5) using a device."  <u>Richards v. Duke Univ.</u>, 480 F. Supp. 2d 222, 240 (D.D.C. 2007) (citation omitted).  As courts in this district have previously explained, Plaintiff must also allege that the interception was "contemporaneous with the communication's transmission."  <u>McPherson v. Harker</u>, 2021 WL 1820290, at *10 (D.D.C. May 6, 2021); <u>Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz</u>, 793 F. Supp. 2d 311, 329 (D.D.C. 2011) ("[T]he Wiretap Act is concerned with the contemporaneous interception of communications . . . .").  "In other words, these courts . . . hold that for information to be 'intercepted' within the meaning of the Act, it must be accessed at the same time that the

communication is sent." Henson v. Howard Univ., 2020 WL 619853, at *3 (D.D.C. Feb. 10, 2020).

Defendants contend that Solomon has not alleged that any acquisition of his emails occurred in real time. See Forlit Defs. MTD at 35–38; KARV Defs. MTD at 29–30. Plaintiff retorts that the D.C. Circuit has never explicitly adopted the interpretation of "interception" that requires contemporaneity. See Opp. at 72. Even if that interpretation is correct, Solomon continues, the Amended Complaint "sets forth enough allegations that some . . . of the interceptions of the communications could have indeed occurred" contemporaneously. Id. at 73.

Plaintiff's first position can be quickly dispensed with. While it is true that the D.C. Circuit has never explicitly held that an "interception" must be contemporaneous with transmission to be unlawful under the FWA, courts in this district have so held. See McPherson, 2021 WL 1820290, at *10; Gaubatz, 793 F. Supp. 2d at 329; Henson, 2020 WL 619853, at *3. And "[a]ll of the circuit courts that have considered the issue have" similarly concluded that "the acquisition of a communication must be contemporaneous with its transmission in order for an 'intercept' to occur." Luis v. Zang, 833 F.3d 619, 628 (6th Cir. 2016) (collecting cases). In any event, Plaintiff never offers a contrary interpretation of "interception," much less one that would move the Court to deviate from the consensus on this issue. It will accordingly apply the same interpretation of "interception" that its colleagues have.

Moving to Plaintiff's alternative contention, he acknowledges that he "did not expressly state in the [Amended Complaint] that the interceptions of the communications were contemporaneous with their transmission." Opp. at 73. He nevertheless believes that his

allegations that Defendants had "persistent access" to Azima's email accounts, see, e.g., Am. Compl., ¶ 85, permit an inference that some of his communications could have been acquired in real time.  See Opp. at 72–73.  Assuming that Solomon is not trying to amend his Complaint through his Opposition — which he cannot do, see Arbitraje Casa de Cambio S.A. de C.V. v. U.S. Postal Serv., 297 F. Supp. 2d 165, 170 (D.D.C. 2003) — his argument still does not "raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  He never points to any one email communication between him and Azima that was intercepted in real time, a fact he readily admits.  See Opp. at 73.  Nor does he provide any additional facts, such as the date on which the intercepted communications were sent, that would allow an inference of contemporaneous acquisition.  All he alleges is that the data containing his emails was obtained from Azima's account at some point in 2016 and was published in August and September 2016.  See Am. Compl., ¶¶ 76–77, 81, 84–85, 93.

The Complaint never explains what it means by "persistent" access, nor how Defendants retained such access to Azima's accounts.  And it similarly fails to describe how this supposedly continuous access is relevant to this case, since the data tranche that contained Solomon's communications appears to have been accessed by Defendants in August 2016.  See id., ¶¶ 97–99.  All that is left is an allegation that Defendants unlawfully acquired email communications that had already been transmitted and were stored in Azima's account.  Id.  This is not the stuff of an FWA violation.  See McPherson, 2021 WL 1820290, at *10 (concluding that defendant did not violate FWA because acquisition took place "only after transmission was completed").  The Court will thus dismiss these counts.

35

F.   D.C. Law Counts

Solomon also brings various counts under D.C. law.  See Am. Compl., ¶¶ 234–264.

With the Complaint shorn of its federal claims, this Court lacks subject-matter jurisdiction over

what remains, and it will decline to exercise supplemental jurisdiction.  Federal district courts

are given supplemental (or "pendent") jurisdiction over state claims that "form part of the same

case or controversy" as federal claims over which they have original jurisdiction.  See 28 U.S.C.

§ 1367(a).  By the same token, they "may decline to exercise supplemental jurisdiction over

[such] claim[s] . . . if . . . the district court has dismissed all claims over which it has original

jurisdiction."  Id. § 1367(c)(3).  The decision of whether to exercise supplemental jurisdiction

where a court has dismissed all federal claims is left to the court's discretion as "pendent

jurisdiction is a doctrine of discretion, not of plaintiff's right."  United Mine Workers of Am. v.

Gibbs, 383 U.S. 715, 726 (1966); see also Shekoyan v. Sibley Int'l, 409 F.3d 414, 423 (D.C.

Cir. 2005).  When deciding whether to exercise supplemental jurisdiction over state claims,

federal courts should consider "judicial economy, convenience, fairness, and comity."

Shekoyan, 409 F.3d at 424 (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7

(1988)).  When all federal claims are eliminated before trial, however, those factors "will point

toward declining to exercise jurisdiction over the remaining state-law claims."  Carnegie-

Mellon, 484 U.S. at 350 n.7; see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n,

48 F.3d 1260, 1267 (D.C. Cir. 1995) (finding the discretion set out in Carnegie-Mellon

"unaffected by the subsequent enactment of 28 U.S.C. § 1367(d), in the Judicial Improvements

Act of 1990").

These factors weigh against retention here. The Court is dismissing all of the federal

claims against Defendants, this case has not progressed in federal court past this Motion to

Dismiss, and the Court has developed no familiarity with the additional issues presented. Cf. Schuler v. PricewaterhouseCoopers, LLP, 595 F.3d 370, 378 (D.C. Cir. 2010) (holding that district court appropriately retained pendent jurisdiction over state claims where it had "invested time and resources" in the case). The state-law counts will thus be dismissed without prejudice, and Plaintiff is free to file in the appropriate state or local court if he so desires.

**IV.    Conclusion**

For the foregoing reasons, the Court will grant Defendants' Motions to Dismiss in full. A separate Order to that effect will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  September 18, 2023