# EXHIBIT A

# Law

# Final curtain in drawn-out 'hacking' saga

Judgments set aside in businessman's battle with law firm and Gulf emirate. By **Jonathan Ames**



Farhad Azima has been involved in a dispute with the investment authority of Ras al-Khaimah, which Dechert represented

Fans of James Bond-style international intrigue and espionage will be disappointed with Mr Justice Michael Green.

Sitting in the business and property division of the High Court in London, the judge has effectively written the last chapter — at least in the UK — of an eight-year saga involving allegations of computer hacking by a Gulf emirate, corporate theft and misbehaviour by City lawyers.

Miriam González Durántez, the City lawyer and wife of Nick Clegg (whom those with longish memories will recall once led the Liberal Democrats and was deputy prime minister in the 2010 coalition government), was a member in 2017 of the London management team of Dechert, a US firm that is in part at the heart of this tale. To be fair, she was not implicated at all in the nitty-gritty, but González Durántez's name adds a bit more glamour and intrigue to an otherwise unlikely clash between a law firm based in Philadelphia and Farhad Azima, an Iranian-American businessman specialising in aviation.

It is almost impossible to summarise the history of the legal wrangling between the two, but it essentially involves claims by Azima that the law firm — and one former partner, Neil Gerrard, in particular — exploited personal messages stolen from a hacked computer and posted on pirate websites.

The accusation against Dechert emerged in a multimillion-dollar legal dispute between the investment authority of Ras al-Khaimah (RAK), one of the lesser-known parts of the United Arab Emirates, which the law firm represented, and Azima, who was a middleman in business deals.

In its claim on behalf of the investment authority, Dechert relied on the emails in a case filed at the High Court. Azima counterclaimed, alleging theft and improper use of electronic data for the purposes of extortion, with the businessman claiming that lawyers at Dechert had overseen the hacking operation.

At one of the many High Court hearings in the dispute, in 2020 Gerrard and a private investigator instructed by him gave evidence to the effect that Azima's emails had been discovered innocently on the internet by "a journalist". The pair said that they did not know how they had come to be online, letting the mystery hang in the courtroom air.

As a result of that evidence, the judge ruled that there was no proof the Gulf investment authority had been responsible for the hacking. Azima lost his case and was ordered to pay £3.4 million in damages.

However, about a year later, the private investigator retracted some of his evidence in a statement given during an appeal at the Supreme Court. Those judges were told that the story about "the journalist" had been invented to cover up the fact that the emails had been found by an investigator who had commissioned hacking for the emirate. Fast-forward to this year. In February Dechert agreed a £3 million settlement with Azima, in a move that came about 18 months after lawyers for the investment authority told the High Court that it was dropping its defence to Azima's counterclaim.

Now Green has applied the coup de grâce to the dispute in England — but he has given Dechert and its client one more kick. The judge ordered that

### 'Fraudulently obtained judgments plagued Farhad Azima for years'

three previous judgments obtained against Azima must be set aside on the basis that they had been obtained by "fraud".

The judge stated that the investment authority's conduct was "an egregious case" that "has had the somewhat extraordinary consequence that they obtained judgments by fraud from both first instance and the Court of Appeal". His final order has removed all previous judgments against Azima and awarded him substantial costs and damages. It also grants injunctive relief against the emirates that requires the investment authority to take all reasonable steps to remove any websites or other internet sources containing statements about Azima — and to return all copies of the businessman's private data.

No wonder, then, that representatives for Azima described the order as a "complete rout of Dechert and RAK".

Dominic Holden, a partner at Burlingtons Legal, who represented Azima in England, said that the order set aside "fraudulently obtained judgments" that had "plagued" his client for many years. The lawyer argued that the order "completely clears his name" and allowed Azima to concentrate on similar proceedings against Dechert that remained afoot in the US.

Azima said that he was "delighted" with the court order. He added that Gerrard had "threatened to destroy me ... if I did not co-operate with Dechert, but evidence has since shown that he was a party to the hacking of my emails at that time".

Dechert said that the dispute with Azima was resolved "without any admission of liability". It is understood that the firm's management is smarting at the crowing by Azima, who at the High Court had argued that the £3 million settlement figure was less than he would have received at trial.

Costs have yet to be assessed, but there are suggestions that Dechert could face a total bill of about £15 million. The judge said that the firm's client, the investment authority, was on the hook for several instances of indemnity costs, a formula used to punish litigants for misconduct during a court claim.

Gerrard has consistently denied any wrongdoing. His lawyer did not respond to a request for comment on the latest order.

For those who have not had enough of this tale, the saga carries on in a US court in proceedings brought under the intriguingly titled Racketeer Influenced and Corrupt Organizations Act.

# Libor ruling shines light on Court of Appeal decisions

### Comment
### Ken Macdonald KC

Judges in the criminal division of the Court of Appeal last week upheld the convictions of Tom Hayes and Carlo Palombo, two City of London traders who were convicted of fraudulently manipulating Libor, a key interest rate, and its European equivalent, Euribor.

Two arguments arose in their appeals. First, that the case theory on which they were convicted was recently considered by the US federal Court of Appeals in a similar case and found to be hopelessly wanting. The US judges declared that no crime could conceivably have been committed on facts such as those before the English courts. Second, that prosecuting traders for allegedly breaching Libor rules violated the requirements of legal certainty since no other country has criminalised what Hayes and Palombo had done.

The Court of Appeal gave short shrift to the first point. It simply did not matter what a US court thought, which had no bearing on an English judge's analysis of the law or on an English jury's finding of fact.

This was, perhaps, a surprisingly dismissive response to the closely argued reasoning of eminent fellow common law jurists, but the court's attitude to the second point was just as troubling. An analysis of the Libor cases makes it overwhelmingly likely that big institutions, including the British Bankers' Association, were fully aware of the practices for which the defendants were sent to prison. And yet those institutions, and the senior figures who ran them, were never pursued. It is always ugly when prosecutors feed off sprats and back away from the gurning sharks.

There is a wider question here: if the Court of Appeal was mistaken, as many believe, what now? The processes of criminal justice mark a free country, but having good judges and competent lawyers is not enough. To secure a justice system free from error, higher courts must exercise real supervision over those below them — and this must include proper supervision by the Supreme Court of the criminal appeal division.

Yet criminal — as opposed to civil — appeals to the Supreme Court may be brought only if Court of Appeal judges dismissing the appellant's case agree to certify a point of law involved in their decision. Not surprisingly their record in this is decidedly contested. Further, since the retirements of Lord Hughes of Ombersley and Lord Kerr of Tonaghmore, the Supreme Court has lacked a single specialist criminal judge.

It is high time that the Court of Appeal stopped marking its own homework, and that the Supreme Court decided for itself which criminal appeals to hear. And the judicial appointments process must acknowledge the importance of the criminal law in regulating civil rights and promoting confidence in our institutions of justice by ensuring permanent criminal law expertise on the Supreme Court bench. Hannah Quirk, editor of the Criminal Law Review, suggested last week that existing barriers to criminal appeals arguably represent the lingering detritus of a decrepit view that appellants, unlike their saintly civil law counterparts, are somehow playing the system to get away with something and do not deserve the smoother access to justice that, say, banks and large companies enjoy. One hopes that analysis is too harsh — but present arrangements inspire no confidence that it is.

Lord Macdonald of River Glaven KC is a crossbench peer and a former director of public prosecutions. He co-presents *Double Jeopardy*, the law and politics podcast

### Times Law
**Editor** Jonathan Ames
020 7782 5405 jonathan.ames@thetimes.co.uk

**Advertising and marketing**
For print and online: Jeanine Kiala
020 7782 7518 jeanine.kiala@news.co.uk