UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
AZIMA *et al*,

                            Plaintiffs,

              -against-

DECHERT LLP *et al*,

                       Defendants.
-----------------------------------------------------------------X

**REPORT &
RECOMMENDATION**

**22-CV-8728 (PGG) (JW)**

**JENNIFER E. WILLIS, United States Magistrate Judge:**

## I. PRELIMINARY STATEMENT

This RICO suit alleges that in an attempt to silence a critic of human rights abuses, the Emirate of Ras al Khaimah paid millions to the Defendants, including the renowned law firm, Dechert LLP,[1] to develop a scheme to hack Plaintiff Farhad Azima, to use the fruits of that hack to destroy his reputation, to ruin his businesses, and to embroil him in expensive litigation. Yet even assuming all these allegations to be true, Plaintiffs' RICO claims must still be dismissed.

While Plaintiffs allege hundreds of acts of racketeering, not one qualifies as a timely, cognizable predicate under RICO. This is because all the alleged acts are

---

[1] On September 19, 2024, Plaintiffs voluntarily dismissed the claims against Defendants Dechert LLP, David Neil Gerrard, and David Graham Hughes with prejudice. Dkt. No. 197. All Defendants joined Dechert LLP's joint memoranda of law. Dkt. Nos. 156 and 158. Moreover, the Plaintiffs opposed the joint Motion to Dismiss in a joint Opposition. Dkt. No. 167. Finally, even though Defendants Dechert LLP, Gerrard, and Hughes have been dismissed from the case, the Plaintiffs' theory of the case relies upon those Defendants' alleged acts to establish a RICO enterprise, a RICO pattern, and cognizable RICO injuries within the limitations period. Therefore, whether their alleged actions are RICO predicates remains identically relevant even though they are no longer named Defendants. The same is true for nonparty RAK.

either 1) exempt litigation activities, 2) mere acts of concealment, 3) did not proximately cause injury to Plaintiffs' business or property, or 4) beyond the statute of limitations. Thus, there are insufficient qualifying racketeering acts and injuries to assert a timely RICO claim.

The Plaintiffs are Farhad Azima, a wealthy defense contractor, and his network of businesses, ALG Transportation Inc., Main 3260 LLC, FFV W39 LLC, and FFV Development LLC (the "Plaintiffs"). The Defendants initially included the law firm Dechert LLP, and Dechert attorneys David Neil Gerrard and David Graham Hughes. The remaining Defendants are Nicholas Del Rosso, Vital Management Services, Inc., Amit Forlit, Insight Analysis and Research LLC, SDC-Gadot LLC, Amir Handjani, Andrew Frank, and Karv Communications (the "Defendants").

Plaintiffs allege that Azima criticized the government of Ras al Khaimah ("RAK") over its treatment of Al Sadeq, a former official in the investment authority of RAK ("RAKIA"). Al Sadeq alleges that "he was blindfolded with his hands tied behind his back while being interrogated" by Gerrard, then a partner at Dechert. Dkt. No. 1 at ¶ 40. Azima "sought to expose RAK's history of human rights abuses against Al Sadeq and Gerrard's role in Al Sadeq's mistreatment." Dkt. No. 1 at ¶4. As a result of Azima's "campaign against…human rights abuses," Plaintiffs allege the Defendants were directed by the government of RAK to "decimate" Azima. Dkt. No. 167 at 36.

According to the Complaint, beginning in 2014, the Defendants conspired to launch a set of schemes against Azima and developed a "Comprehensive Action Plan"

to "ruin" him. Dkt. No. 1 at ¶ 76. The Plan allegedly "involved hiring hackers to unlawfully access and steal Azima's confidential and highly sensitive documents…publishing the hacked data to discredit Azima, and then using that hacked data to embroil Azima in litigation." Dkt. No. 1 at ¶ 44.

Plaintiffs claim this case is about more than just the hack. They claim Defendants' use of the hacked materials and Defendants' deployment of "force multipliers"—the lies, bribes, and denials made along the way—were RICO predicates that cost Azima financing and harmed his businesses. Dkt. No. 177 at 11; Dkt. No. 1 at n. 2.

An important aim of the alleged Plan was to "embroil Azima in litigation." Dkt. No. 1 at ¶ 44. Key to this aspect of the scheme (as Plaintiffs describe it) is that the Defendants induced Azima to sign a 2016 settlement agreement that included a U.K. forum selection clause for all disputes. At the time, Defendants and RAKIA allegedly already possessed hacked documents they would later use as evidence to sue Azima. Thus, after the agreement was signed, RAKIA sued Azima in the U.K. for breach of the 2016 agreement. Then, when Azima sued RAKIA in 2016 over the hack, the case was transferred to the U.K. pursuant to that agreement's forum selection clause. Plaintiffs allege that Defendants intended to force Azima to expend exorbitant amounts on legal fees navigating this international web of litigation and defending himself from lawsuits Defendants brought based on hacked documents.

To prevail, under RICO, Plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity. Sedima, S.P.R.L. v. Imrex Co., Inc.,

473 U.S. 479, 496 (1985); <u>DeFalco v. Bernas,</u> 244 F.3d 286, 306 (2d Cir. 2001). Plaintiffs plausibly allege (1) conduct and (2) an enterprise, since Plaintiffs allege the Defendants acted with a common unlawful purpose, had relationships with each other, were adequately distinct from the enterprise itself, and the alleged enterprise operated for a sufficient period of time—eight years. Dkt. No. 1 at ¶¶ 208-209.

However, the RICO claim still fails. Plaintiffs cannot establish the requisite "pattern of racketeering activity" for six reasons.[2]

**First**, many of the alleged "fraudulent" statements and alleged acts of obstruction occurred in the context of Defendants denying Plaintiffs' allegations and making alleged misrepresentations in various court filings. The Second Circuit has ruled that these categories of litigation activities cannot be RICO predicates. <u>See</u> <u>Kim v Kimm</u>, 884 F.3d 98 (2d Cir. 2018). Permitting RICO claims for such activities would lead to excessive derivative litigation, would chill open access to the courts, would expand the narrow grounds for sanctions for misrepresentations made to courts, and would deprive litigants of finality and repose.

**Second**, the remaining alleged witness tampering, obstruction, and money laundering claims all relate to activities undertaken either to pay for the hack or to cover up the hack. These "mere acts of concealment" are not RICO predicate acts that can be separated from the original hack.  <u>In re Merrill Lynch Ltd. Partnerships</u>

---

[2] Plaintiffs allege hundreds of different predicate acts they assert establish a RICO pattern. Included in this Report and Recommendation is a chart of alleged predicate acts identifying the paragraph in the Complaint where the act is alleged and the section of the R&R where the category of alleged predicate acts is addressed.

Litigation, 154 F.3d 56, 59–60 (2d Cir. 1998); Democratic Nat'l Comm. v. Russian Fed'n, 392 F. Supp. 3d 410, 444 (S.D.N.Y. 2019). Thus, these acts of concealment are not separate qualifying RICO predicates.

**Third**, Plaintiffs fail to allege all the elements of mail and wire fraud as they do not allege an intent to obtain any victim's "money or property." See 18 U.S.C. § 1343; Kelly v. United States, 590 U.S. 391, 398 (2020). Plaintiffs' mail and wire fraud claims fail for the additional reason that they lack the specificity required of Rule 9(b). See De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 295 (S.D.N.Y. 2013) (Gardephe, J.). Thus, the alleged wire and bank frauds here are also not RICO predicates.

**Fourth,** even if Plaintiffs could show that these alleged acts could amount to RICO predicates, Plaintiffs cannot show that the Defendants proximately caused their business injuries, which were directly caused by the independent decisions of third parties. See Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006).

**Fifth**, the claims here are untimely. RICO actions are subject to a four-year statute of limitations. See Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987). Azima indisputably was aware of the hack as early as 2016. While Plaintiffs timely sued over the hack in 2016, those claims were transferred to the U.K., and, after several rounds of litigation, have since settled. Dkt. No. 174-2. Thus, even though the alleged involvement of many of the Defendants did not come to light until well after the 2016 suit, all the claims for injuries flowing from the hack,

and all the acts of racketeering done to conceal the hack, are beyond the statute of limitations and should be dismissed.

**Sixth**, the legal fees Plaintiffs incurred—in lawsuits Plaintiffs themselves brought—cannot "restart the limitations clock." See Bingham v. Zolt, 66 F.3d 553, 560 (2d Cir. 1995); see also Bankers Tr. Co. v. Rhoades, 859 F.2d 1096 (2d Cir. 1988).

Thus, for these six reasons, there is no RICO pattern and no timely RICO injury. Without alleging a "pattern of racketeering activity," the Plaintiffs cannot satisfy all the necessary elements of a civil RICO claim. Grace Int'l Assembly of God v. Festa, 797 F. App'x 603 (2d Cir. 2019); DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001). Nor can Plaintiffs establish RICO standing, as Plaintiffs cannot show a direct "injury to the plaintiff's business or property," or proximate causation of the injury by the defendant's violation. See Anza, 547 U.S. at 461 (2006); see also 18 U.S.C. § 1964(c). So, the RICO claims under 1962(c) and 1962(d) should be dismissed.

On Defendants' request to dismiss the case on international comity grounds, the Court disagrees with the Defendants that the "clearest of justifications" exists to defer to the U.K., especially now that the U.K. case has settled. See Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 93 (2d Cir. 2006); Dkt. No. 174-2. The same is true of Defendants' attempt to dismiss in favor of the North Carolina proceedings, which involve different claims and different parties. Sacerdote v. Cammack Larhette Advisors, LLC, 939 F.3d 498, 504 (2d Cir. 2019). Thus, the District Court should exercise jurisdiction here. Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976).

Finally, if the District Court disagrees with this Court's recommendation on the joint Motion to Dismiss, this Court has analyzed the individual Defendants' various arguments to dismiss and found them to be unpersuasive.

In sum, the joint Motion to Dismiss should be GRANTED, and the case should be dismissed.

## II. BACKGROUND

### 1. Factual History[3]

Plaintiff Farhad Azima ("Azima") is a businessman who was involved in various commercial ventures with the emirate Ras Al Khaimah ("RAK") beginning in 2007. Dkt. No. 1 at ¶ 4. Plaintiffs ALG Transportation, Inc., Main 3260 LLC, FFV W39 LLC, and FFV Development LLC (collectively, the "Corporate Plaintiffs") are businesses owned, in whole or in part, by Azima. Id. ¶¶ 11–14.

In 2014, RAK hired Dechert LLP ("Dechert") to investigate Khater Massaad, the former chief executive officer of RAK's sovereign wealth fund, the Ras Al Khaimah Investment Authority ("RAKIA") on allegations that he had defrauded RAK. Id. ¶¶ 2, 26(a), 38. Two then-partners at Dechert, Defendants David Neil Gerrard ("Gerrard") and David Graham Hughes ("Hughes"), as well as non-parties James Edward Dennison Buchanan ("Buchanan") and Stuart Robert Page ("Page"), were hired to conduct investigations of Khater Massaad's associates and other perceived enemies of RAK. Id. ¶¶ 2, 16–17, 26(a), 38-39. Karam Al Sadeq ("Al Sadeq"),

---

[3] The following facts are taken from Plaintiff's Complaint, Dkt. No. 1, and presumed true for the purposes of this motion to dismiss. See Meyer v. JinkoSolar Holdings Co., Ltd., 761 F.3d 245, 247 (2d Cir.2014).

former Deputy Chief Executive Officer of RAKIA, became a target of this investigation. Id. ¶¶ 3, 39. Al Sadeq was renditioned to RAK, indefinitely detained in prison, and subjected to human rights abuses. Id. ¶¶ 3, 40.

When Azima learned of these abuses in the fall of 2014, he sought to expose RAK's treatment of Al Sadeq and history of human rights abuses against enemies of RAK. Id. ¶¶ 4, 41. Azima alleges that he became a target of Dechert's investigation when he tried to bring this conduct to light. Id. ¶¶ 42, 43.

### A. The Hacking of Azima

Gerrard developed a plan to retaliate against Azima that "involved hiring hackers to unlawfully access and steal Azima's confidential and highly sensitive documents, data, and other information, publishing the hacked data to discredit Azima, and then using that hacked data to embroil Azima in litigation." Id. ¶¶ 44. Gerrard hired Defendant Nicolas Del Rosso ("Del Rosso") and his company Defendant Vital Management Services, Inc. ("Vital") to aid in this hacking campaign. Id. ¶ 47. Del Rosso, in turn, hired and paid others to hack Azima, including non-parties Cyber Root Risk Advisory Private Limited ("Cyber Root"), Aditya Jain ("Jain"), Jain's company Cyber Defense and Analytics ("Cyber Defense"), and Defendant Amit Forlit ("Forlit"). Id. ¶¶ 26, 48–49; Dkt. No. 1-1.

Beginning in 2015, Azima and his unidentified associates received "'phishing' emails designed to gain unlawful access to their email accounts and computers." Dkt. No. 1 at ¶46. Thereafter, Defendants unlawfully accessed Azima's accounts without his knowledge, including on one specific occasion in October 2015 when "computers

located in Florida and New York" accessed Azima's accounts. Id. ¶ 50. Gerrard worked closely with Buchanan, Page, Forlit, and U.S. resident Eitan Arusy ("Arusy") to prepare reports "detailing the substance of the information they had unlawfully obtained" from Azima and share them with other Defendants. Id. ¶¶ 26(e), 51–54. The reports included confidential emails, financial records, and privileged communications between Azima and his lawyer. Id. ¶ 52. Defendants "[sought] to bring civil and criminal charges against Azima based upon [this] hacked material." Id. ¶ 45.

"The Enterprise spent millions of dollars on its hacking campaign." Id. ¶ 45. Page, through his company Page Group, and Arusy, through his company Global Impact Services LLC, transferred millions of dollars to Forlit's companies Insight Analysis and Research LLC ("Insight") and SDC-Gadot LLC ("SDC-Gadot"), which Forlit then used to pay various other hackers. Id. ¶¶ 49, 55–58, 135; Dkt. No. 1-1. "Bank records showed that Vital paid CyberRoot… more than $1 million during the same period the Enterprise was hacking Azima and stealing his documents and information." Dkt. No. 1 at ¶ 157. Forlit and Page also "fabricated false and misleading invoices" to convince banks to open accounts and approve wire transfers that were actually moving the hacking proceeds in furtherance of the underlying scheme. Id. ¶¶ 232-236. As this scheme unfolded, Dechert was aware "that Gerrard masterminded the hacking of Azima and suborned perjury before U.S. and U.K. courts." Id. ¶ 190.

### B. The 2015-2016 Action Plan

In December 2015, Gerrard met with Defendant Andrew Frank ("Frank"), Defendant Amir Handjani ("Handjani"), and others in New York to discuss their plan to attack and harm Azima. Id. ¶¶ 59–60. Frank and his company Defendant KARV Communications ("KARV") put together a comprehensive plan (the "Action Plan") to take down Azima through "civil litigation, criminal investigations, and planting stories with media." Id. ¶¶ 59, 61. As part of this Action Plan, Defendants "sought to develop a basis to 'target' Azima with civil and criminal litigation." Id. ¶ 62. Plaintiffs allege, "[t]he object of the scheme was to defraud Azima of money and property by harming his businesses and bankrupting him." Id. ¶ 61.

### C. The 2016 Settlement Agreement

Part of the Action Plan included inducing Azima to enter into a settlement agreement with RAK (the "2016 Settlement Agreement"), "which imposed on Azima (1) a duty of "good faith" towards RAK and (2) an English jurisdiction and choice of law clause, even though neither party was located in England." Id. ¶ 62. Plaintiffs allege, "[t]he English jurisdiction benefited the Enterprise." Id. "Azima was reluctant to sign the 2016 Settlement Agreement, but eventually did so at the urging of Handjani and Buchanan, who were acting on behalf of the Enterprise." Id. As part of the settlement, RAK paid Azima $2.6 million dollars. Id. ¶ 63.

Azima now contends that the 2016 Settlement Agreement was a "trap" because Dechert negotiated the agreement with the intent to sue Azima for violating it "based on the documents and communications the Enterprise had already unlawfully obtained." Id. ¶ 63. Buchanan described the "good-faith clause" as "the key clause"

10

that would "neutralize" Azima. Id. ¶ 64. Dechert "included the forum-selection provision" to force Azima to litigate in "a highly inconvenient and expensive forum" for a U.S. resident. Id.

Weeks after the 2016 Settlement Agreement was signed, "Azima met with Buchanan, Gerrard, and another Dechert lawyer. During this meeting, Gerrard threatened to make Azima "collateral damage" in the Enterprise's attacks against Massaad." Id. ¶ 65.

### D. The Leak of Azima's Hacked Data

In August and September 2016, Azima's stolen information started to appear on anonymous blog sites. Id. ¶ 67. Plaintiffs contend that Defendants published these materials on the internet in order to create "a plausible and innocent explanation for how [Defendants] came into possession of the materials." Id. ¶ 66. Defendants also "created a false exculpatory data trail intended to show they had innocently found the data on the internet." Id. ¶ 68. Using these now-public documents as a basis, Hughes sent a letter to Azima's U.S. counsel in September 2016 "claiming that Azima had breached the 2016 Settlement Agreement" and "threaten[ing] to sue Azima on behalf of RAK unless Azima paid $4.2 million within seven days." Id. ¶ 69. Defendants subsequently "brought suit against Azima in the English High Court on behalf of RAKIA." Id.

This U.K. action is the first of many proceedings in the web of civil litigation that forms the basis for Plaintiffs' RICO claims.

### E. The Web of Civil Litigation

RAKIA sued Azima in the U.K. (the "U.K. Proceeding") on September 23, 2016, and that same day, Azima sued RAKIA in the U.S. in the District of Columbia (the "D.C. Proceeding") "for hacking him and stealing his data." Id. ¶¶ 69, 72, 83.

- **D.C. Proceeding *Brought by Azima***

In September 2016, "Azima filed his own suit against RAKIA in the United States District Court for the District of Columbia, seeking compensation for the hacking of his accounts and theft of his emails, documents, and other information." Id. ¶ 83. At that time, the D.C. Proceeding was the only ongoing case that threatened to expose Defendants' hacking operations. Id. ¶ 84.

Throughout the D.C. Proceeding, Defendants "repeatedly fabricated and destroyed evidence" and made "false, misleading, and/or deceptive" statements. Id. ¶¶ 85–86. From 2016 through 2018, Gerrard and Hughes induced others at Dechert to make false statements regarding Defendants involvement in the hacking in sworn affidavits, in filed briefs, and during hearings in front of the district court and the court of appeals. Id. ¶¶ 87, 91–100. For example, in 2016, Gerrard told Dechert's then-general counsel Arthur Newbold to deny Dechert's knowledge of the hacking, and Hughes caused Dechert Partner Linda Goldstein to repeat his "false claim that the hacked documents in Dechert's possession were found by the firm through publicly available internet sources." Id. ¶¶ 91–93. Defendants Dechert, Gerrard, and Hughes also allegedly destroyed evidence relevant to the D.C. Proceeding and made false statements "regarding document retention and preservation." Id. ¶¶ 114–119.

In another instance in 2019, Defendant Del Rosso and non-party Patrick Tristram Finucane Grayson ("Grayson") allegedly mailed a copy of Azima's hacked emails "directly to the district court judge" presiding over the D.C. Proceeding. Id. ¶¶ 120–123. Plaintiffs also note that Defendants transmitted many more false statements over U.S. wires. Id. ¶ 112; see Dkt. No. 1-2.

Plaintiffs allege that while the D.C. proceeding was being litigated from 2016 to 2020, Defendants "[lied] to Azima's counsel and the district court on multiple topics; destroy[ed] evidence…[and] concoct[ed]ing false testimony designed to mask…the hacking of Azima and…[the submission of] stolen documents to the D.C. district court under false pretenses." Dkt. No. 1 at ¶¶ 115–118, 125. "In 2019, the U.S. Court of Appeals for the D.C. Circuit held that the case must be transferred to the U.K. based on the venue provision of the 2016 Settlement Agreement. The D.C. District Court subsequently did so in 2020." Id. ¶ 88. At the time that Plaintiffs filed this Complaint, these transferred claims remained pending in the U.K. Id. ¶ 126. The Parties have since settled the claims against Defendant Dechert LLP, Gerrard, and Hughes. Dkt. No. 174-2.

Plaintiffs contend that Defendants obstructed the D.C. Proceeding and made false statements to the court in order to conceal their misconduct and prevent Azima from securing proof of the hack through discovery. Id. ¶¶ 86, 88–90. Furthermore, Plaintiffs state that Halabi (a journalist alleged to have taken part in the scheme) has admitted he was asked to provide false testimony in relation to the D.C. Proceeding. Id. ¶ 110. They also argue, "as a direct result of the obstruction…Azima

did not learn about the extent of the RICO Conspirators' false statements until years later, starting in 2020, when individuals involved in the hacking began confessing their involvement." Id. ¶ 112.

- **U.K. Proceeding *Brought by RAK***

In 2016, Dechert LLP filed a lawsuit on behalf of RAKIA against Azima in the English High Court. Dkt. No. 1 at ¶ 69. RAKIA asserted that Azima breached the 2016 settlement agreement.

To support its claim of breach of the 2016 Settlement Agreement in the U.K. Proceeding, Dechert submitted a letter "attach[ing] excerpts from Azima's hacked documents and data," which were at the time "inaccessible to all but Dechert and the RICO Conspirators." Id. ¶¶ 70–71. Nevertheless, Hughes repeatedly claimed that Defendants found Azima's data through publicly available links. Id. ¶¶ 70, 103, 105. Gerrard also continued to deny his participation in the hacking. Id. ¶ 107. RAK removed Gerrard from its cases in 2019, but Gerrard continued to orchestrate the alleged cover-up campaign. Id. ¶ 194.

"In 2020, RAKIA secured a favorable trial decision in the U.K. against Azima." Id. ¶ 69 n.6. However, RAKIA has since offered to settle its claims, acknowledging that it "'may have been the victims of dishonest and unscrupulous former third-party advisors.'" Id. Similarly in 2022, RAK stated that it "was also a victim of 'criminal wrongdoing' by Gerrard" and "took the remarkable step of withdrawing from the U.K. proceeding, claiming it had been misled and lied to by Gerrard and Dechert." Id. ¶¶

194, 201. Litigation in the U.K. "remains ongoing"[4] as the trial decision "was recently vacated and remanded for a new trial regarding whether RAKIA, Dechert, Gerrard, and Buchanan were responsible for the hacking of Azima." Id. ¶ 69 n.6. However, the Parties have since settled Azima's transferred counterclaims. See Dkt. No. 174-2.

- **Section 1782 Proceedings *Initiated by Azima***

After Azima's claims in the D.C. Proceeding were transferred to the U.K., Azima "filed proceedings in New York, North Carolina, and Florida under 28 U.S.C. § 1782 ("Section 1782")," seeking discovery in the U.S. "to obtain evidence for use in their respective U.K. cases." Id. ¶127.

"On June 29, 2021, Azima filed a Section 1782 application in the U.S. District Court for the Southern District of New York (the 'New York § 1782 Proceeding') seeking discovery from Handjani" in relation to the U.K. case. Id. ¶ 129. Handjani made "false and misleading" statements in filings with the court denying his involvement in the hacking. Id. ¶¶ 129–132. Plaintiffs contend that they have since obtained "confessions from three of Handjani's co-conspirators" linking Handjani to the Action Plan and demonstrating that Handjani's statements to the New York court were "materially false, misleading, and corruptly made with an intent to obstruct that matter." Id. ¶¶ 130, 132.

---

[4] On March 26, 2024, Plaintiffs reported to this Court that the U.K. High Court of Justice set aside the original decision in the U.K. Proceeding as "fraudulently obtained" and entered a default judgement for Azima against RAKIA. Dkt. No. 186 at 1; Dkt. No. 186-2 at 5–8. Defendants subsequently disputed the relevance of the U.K. High Court's decision. Dkt. No. 187.

"On March 8, 2022, Azima filed another application under Section 1782 in the U.S. District Court for the Southern District of Florida (the 'Florida § 1782 Proceeding') seeking discovery from Forlit, Insight, and SDC-Gadot relevant to Azima's claims in the U.K. Proceeding." Id. ¶ 133. Forlit made "materially false" statements in affidavits and depositions, misrepresenting his work in Florida and the income of his companies SDC-Gadot and Insight "in order to conceal his company's role in laundering payments" for Defendants. Id. ¶¶ 134–41. Plaintiffs allege that they have obtained "voluminous bank records" that demonstrate Forlit's statements in the Florida § 1782 Proceeding "were materially false, misleading, and corruptly made." Id. ¶¶ 135-36, 142-43.

● **North Carolina Proceeding** *Brought by Azima*

"In October 2020, Azima sued Del Rosso [and Vital] in the U.S. District Court for the Middle District of North Carolina (the 'North Carolina Proceeding')". Id. ¶¶ 144, 150; see Azima v. Del Rosso, No. 20-cv-954 (M.D.N.C. Oct. 15, 2020). Del Rosso allegedly destroyed and manufactured evidence related to this case and made false statements to the court. Dkt. No. 1 ¶¶ 145, 149–52, 156–60.

To prevent disclosure of the hacking, Del Rosso allegedly "threatened and tampered with" the hacker Aditya Jain ("Jain") who was to be an important witness in this proceeding. Id. ¶ 145. "On August 29, 2020, Del Rosso contacted Jain, accusing him of working with Azima's lawyers… and instructing Jain to stop." Id. ¶ 147. In September, "Del Rosso messaged Jain again and accused him of assisting with Azima's case." Id. ¶ 148. During November and December of 2020, Del Rosso twice

16

"tried to entice Jain to travel to Dubai," but Jain declined both invitations "for fear that the meeting was a pretext to detain and subject him to coercive interrogation in the same manner as Al Sadeq." Id. ¶ 153. Defendants also "attempted to hack Jain…to prevent him from providing truthful testimony in the North Carolina Proceeding." Id. ¶154. After this, Del Rosso coordinated with the Indian hacking firm Cyber Root to intimidate, pressure, and hack Jain to "stop him from cooperating with Azima and providing truthful testimony and information in connection with the North Carolina Proceeding." Id. ¶¶ 26(h), 153–55.

Plaintiffs contend that Del Rosso's obstruction of the North Carolina Proceeding caused Azima to incur "unnecessary legal fees and associated costs in connection with the litigation." Id. ¶ 160.

- **The Al Sadeq Legal Proceeding**

Other victims of the alleged Enterprise also brought claims of their own against Defendants. Id. ¶ 161. "Al Sadeq sued Dechert, Gerrard, and others in the U.K." in January 2020." Id. ¶¶ 127, 162. Al Sadeq's lawyers allegedly received phishing emails and were hacked in relation to that proceeding. Id. ¶¶ 163–69. In 2020, Del Rosso allegedly destroyed documents related to the hacking of Al Sadeq's lawyers and bribed non-party hackers Paul Robinson ("Robinson") and Grayson in order to buy their silence. Id. ¶¶ 26(g), 171-74. Al Sadeq's lawyers filed a Section 1782 proceeding in North Carolina in 2021 seeking discovery from Del Rosso, but Del Rosso again denied his involvement in the hacking of Azima and Al Sadeq's lawyers. Id. ¶¶

175–177. Al Sadeq's case against some of the Defendants named here remains pending. Id. ¶ 178.

### F. "Perjury School"

Plaintiffs also allege that Defendants obstructed the above proceedings by coordinating lies and rehearsing false stories in what the Plaintiffs label "perjury school." Dkt. No. 192 at 42.

In October 2018, "Gerrard convened a series of meetings of RICO Conspirators in Cyprus, London, and Switzerland designed to provide key members of the Enterprise with the opportunity to rehearse and perfect false testimony" in an effort "to obstruct the D.C. District Court Proceeding." Id. ¶ 101. "Dechert partner Goldstein (who was handling the U.S.-based D.C. District Court Proceeding at the time) participated in at least two of the meetings" aimed at orchestrating the hacking cover-up. Id. ¶ 192.

At meetings in Cyprus in October and November of 2018, Defendants Gerrard, Hughes, Buchanan, Page, and Forlit met with "purported journalist" Majdi El Halabi ("Halabi") to develop and rehearse Halabi's false testimony "attest[ing] that he had discovered Azima's hacked data on the internet" and rehearse this false testimony. Id. ¶¶ 26(j), 102, 104. In May 2019, Defendants Gerrard, Hughes, and Forlit again met with Halabi, this time in London, to allegedly prepare "false testimony" in that case. Id. ¶106.

Then, in December 2019, "Gerrard, Forlit, Page, and Halabi met at the Moosegg hotel outside of Bern, Switzerland…. While dining with a private chef and

enjoying an extensive selection of fine wines, Gerrard, Page, Forlit, and Halabi engaged in a mock trial, with Gerrard acting as judge and cross-examining counsel in an effort to perfect" their false testimony in the U.K. trial. Id. ¶ 109. "Page, Halabi, Gerrard, and Buchanan subsequently offered their well-refined perjury to the U.K. court in January 2020." Id. ¶ 110. At all relevant times herein, Plaintiffs allege Dechert was "aware that Gerrard was engaging in unethical and illegal behavior." Id. ¶ 199.

### G. The U.S. Criminal Investigation

Plaintiffs also contend, "the Enterprise used [Azima's] data to lobby law enforcement to investigate Azima." Id. ¶¶ 74. From at least 2016 through 2019, Defendants "provided U.S. federal law enforcement agencies with a selection of documents stolen from Azima through hacking and an extensive dossier prepared by Dechert lawyers" in order to "manipulate U.S. law enforcement agencies into launching a criminal investigation of [Azima]." Id. ¶¶ 76–79. However, "the RICO Conspirators did not disclose to U.S. law enforcement that they had obtained Azima's data illegally." Id. ¶ 76. "Azima…was forced to incur significant legal and professional fees responding to document requests and subpoenas[, and] [t]he investigation was subsequently terminated." Id. ¶79.

### H. The Media Campaign to Harm Azima

Beginning in at least 2017, Defendants also "induce[d] media outlets to write false and damaging stories about Azima in an attempt to harm him and his businesses. Id. ¶¶ 74, 81. To execute this aspect of the Action Plan, Defendants

"planted false and disparaging stories in the press alleging that Azima had defrauded RAK," but they "did not reveal that they had stolen the information that they provided to reporters" or "that some of their information was produced through coerced interrogations of Al Sadeq in violation of international law." Id. ¶ 80. Many journalists published negative information about Azima based on the information in the hacked documents, and these disparaging stories...caused extensive damage to [Azima's] reputation and business interests." Id. ¶ 81.

### I.  The Alleged Injuries

Plaintiffs allege that Defendants actions outlined above have caused substantial, ongoing damage to Azima's business and property. Id. ¶ 179. "Banks have closed Azima's accounts and denied him loans citing the negative publicity brought on by the Enterprise's litigation against Azima in the U.K. based on the hacked documents." Id. For example, Plaintiff FFV Development LLC "was expecting to receive a loan of approximately $13.5 million," but "the financing was rejected in January 2019" when "[t]he lender refused to provide financing due to the negative publicity instigated by the Enterprise that the bank found when conducting its due diligence." Id. ¶ 180.

Plaintiffs further contend that Azima "incurred millions of dollars in attorneys' fees and costs" as a result of Defendants' actions. Id. ¶ 181. "But for" the alleged witness tampering and manipulation of evidence, Azima would not have been "forced to participate in costly and burdensome litigation" in the U.K. and would have "obtained a favorable judgment in the D.C. District Court Proceeding against RAK

20

and the North Carolina Proceeding against Del Rosso." <u>Id.</u> ¶182. Plaintiffs contend that these losses were "foreseeable" and "the intended result of the Enterprise's actions." <u>Id.</u> ¶ 183. Defendants allegedly intend to "continue driving up Azima's legal costs." <u>Id.</u>

## 2. **Procedural History**

Plaintiffs filed this action against Defendants on October 13, 2022, alleging that Defendants violated RICO and conspired to violate RICO. <u>Id.</u> at 70–86. Many of the Defendants subsequently requested leave to file Motions to Dismiss. Dkt. Nos. 82, 85, 87, 96, 99. Plaintiffs opposed these requests. Dkt. Nos. 86, 90, 91, 100, 103. On January 18, 2023, District Judge Paul G. Gardephe granted Defendants' requests to file Motions to Dismiss and encouraged the Parties to file joint briefs to avoid duplicative briefing. Dkt. No. 104. After Defendants submitted their Motions to Dismiss, Dkt. Nos. 138–159, the Parties requested oral arguments on these motions. Dkt. No. 160; 168.

On September 19, 2023, Judge Gardephe referred Defendants' Motions to Dismiss to this Court for a Report and Recommendation. Dkt. No. 169. This Court subsequently granted the Parties' request for oral argument. Dkt. No. 171. This Court then held two lengthy oral arguments on February 8, 2024, and March 11, 2024. <u>See</u> Dkt. No. 177.

On September 19, 2024, Plaintiffs voluntarily dismissed the claims against Defendants Dechert LLP, David Neil Gerrard, David Graham Hughes with prejudice. Dkt. No. 197.

## III. LEGAL STANDARDS

### 1. Motions to Dismiss Under Rule 12(b)(6) and 9(b)

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Dennis v. JPMorgan Chase & Co., No. 16-CV-6496 (LAK), 343 F. Supp. 3d 122, 161 (S.D.N.Y. 2018). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." In re New Energy Sys. Sec. Litig., No. 12–CV–01041 (LAK) 66 F. Supp. 3d 401 (S.D.N.Y. 2014) (citing Ashcroft v. Iqbal, 556 U.S. at 678).

For plaintiffs "to 'nudge[] their claims across the line from conceivable to plausible,' they must 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" Citizens United v. Schneiderman, 882 F.3d 374, 380 (2d Cir. 2018). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Emigrant Bank v. SunTrust Bank, No. 20-CV-2391 (PGG), 2023 WL 2647648, at *5 (S.D.N.Y. Mar. 27, 2023).

Furthermore, Rule 9(b) sets standards for pleading fraud claims, and requires that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); see also De Sole v.

Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 295 (S.D.N.Y. 2013)(Gardephe, J.)(citing In re Pfizer Inc. Sec. Litig., 584 F.Supp.2d 621, 632–33 (S.D.N.Y.2008)). Rule 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." See Frommer v. MoneyLion Techs. Inc., No. 23-CV-6339 (JMF), 2024 WL 2158589, at *5 (S.D.N.Y. May 14, 2024)(citing Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 108 (2d Cir. 2012)); see also De Sole, 974 F. Supp. 2d at 295 (citing Kottler v. Deutsche Bank AG, 607 F.Supp.2d 447, 462 (S.D.N.Y.2009) and Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir.1999)).

Finally, the Court "accept[s] all factual allegations in the complaint as true and draw[s] all reasonable inferences in the plaintiffs' favor" when considering a motion to dismiss. Rombach v. Chang, 355 F.3d 164, 169 (2d Cir. 2004); Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); Carroll v. Trump, No. 20-CV-7311 (LAK), 2023 WL 5017230, at *4–5 (S.D.N.Y. Aug. 7, 2023), aff'd in part, 88 F.4th 418 (2d Cir. 2023).

### 2. Applicable Law - RICO

To wage "war against organized crime" Congress "provided civil remedies" to divest criminal associations of their "ill gotten gains." See United States v. Turkette, 452 U.S. 576, 584–87 (1981); 18 U.S.C. § 1961 et seq. RICO thus provides a private right of action to "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]..." 18 U.S.C. § 1964(c).

§ 1962(a) and (b) "address the infiltration by organized crime of legitimate businesses." <u>Turkette</u>, 452 U.S. at 584. Section (a) is focused on investing proceeds of racketeering in an enterprise, and Section (b) is focused on taking over a legitimate enterprise by racketeering. <u>See</u> Rakoff, Goldstein, & Queen, at § 7.04[1](b). Section (c), on the other hand, is "focused on operating an enterprise through a pattern of racketeering activity." <u>Id.</u>

To establish a violation of 18 U.S.C. § 1962(c), a plaintiff must show, for each defendant, "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." <u>DeFalco v. Bernas,</u> 244 F.3d 286, 306 (2d Cir. 2001). The terms "enterprise," "racketeering activity," and "pattern of racketeering activity" are defined in 18 U.S.C. § 1961.

On "conduct," the Supreme Court has held that "in order to 'participate, directly or indirectly, in *the conduct* of such enterprise's affairs,' one must have some part in directing those affairs." <u>See</u> <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 179 (1993) (quoting § 1962(c)); <u>D'Addario v. D'Addario</u>, 901 F.3d 80, 103 (2nd. Cir. 2018). RICO plaintiffs must show such conduct for each defendant.

A RICO "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). <u>See</u> <u>DeFalco</u>, 244 F.3d at 306. The Supreme Court has said that an "association in fact" enterprise "must have at least three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these

associates to pursue the enterprise's purpose." <u>Boyle v. United States</u>, 556 U.S. 938, 946 (2009).

"Racketeering activity" encompasses, among other things, any "predicate act" indictable for crimes enumerated under 18 U.S.C. § 1961(1)(B), which includes, for purposes relevant to the present case, 18 U.S.C. § 1503 (obstruction of justice), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. 1956(a)(2)(A) (money laundering), and 18 U.S.C. §§ 1341, 1343, and 1344 (mail, wire, and bank fraud).

The "pattern of racketeering activity" elements are "adequately pled where a plaintiff makes factual allegations sufficient to demonstrate that defendants committed two or more predicate acts as part of a pattern of racketeering activity." <u>De Sole v. Knoedler Gallery</u>, LLC, 974 F. Supp. 2d 274, 299 (S.D.N.Y. 2013). To establish a RICO pattern, "it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity — commonly called the continuity requirement." <u>Democratic Nat'l Comm. v. Russian Fed'n</u>, 392 F. Supp. 3d 410, 444 (S.D.N.Y. 2019)(citing <u>H.J. Inc. v. Nw. Bell Tel. Co.</u>, 492 U.S. 229, 240 (1989)). RICO predicate acts must be "related to each other (horizontal relatedness) and to the enterprise (vertical relatedness)". <u>See</u> Rakoff, Goldstein, & Queen, at § 1.04(2)(citing <u>United States v. Daidone</u>, 471 F.3d 371, 376 (2d Cir. 2006).

To have standing to bring a private cause of action under RICO, a plaintiff must allege not only the defendant's violation of 18 U.S.C. § 1962, but also "an injury to the plaintiff's business or property," and "causation of the injury by the defendant's

violation." De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 299 (S.D.N.Y. 2013)(citing Lerner v. Fleet Bank, N.A., 459 F.3d 273, 283 (2d Cir. 2006); see also 18 U.S.C. § 1964(c). A RICO plaintiff must thus plead facts sufficient to demonstrate that the plaintiff's injury "was caused by the defendant's racketeering activities." See De Sole, 974 F. Supp. 2d at 300 (citing Ideal Steel Supply Corp. v. Anza, 652 F.3d 310, 323 (2d Cir. 2011).

Furthermore, to establish RICO claims based on fraud, a complaint must allege "the existence of a fraudulent scheme." De Sole, 974 F. Supp. 2d at 299 (citing McLaughlin v. Anderson, 962 F.2d 187, 190–91 (2d Cir. 1992). A RICO complaint "must provide a detailed description of the underlying [fraudulent] scheme and the connection of the [fraudulent] communications to the scheme." De Sole, 974 F. Supp. 2d at 299 (citing In re Sumitomo Copper Litig., 995 F.Supp. 451, 456 (S.D.N.Y. 1998).

Where, as here, an alleged RICO violation is predicated on acts of fraud, a plaintiff must allege that the defendant's acts were not only the *but for* cause of the plaintiff's injury, but the *proximate cause* as well, necessitating a "direct relation between the injury asserted and the injurious conduct alleged…a link that is too remote, purely contingent, or indirect is insufficient." De Sole, 974 F. Supp. 2d at 300 (citing Hemi Grp., LLC v. City of New York, 559 U.S. 1, 8 (2010) (internal quotation marks and alteration omitted).

Finally, RICO actions are subject to a four-year statute of limitations. Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987). The Second Circuit has recognized a "separate accrual" rule under which "the four-year limitation

period begins anew each time a plaintiff discovers or should have discovered a new and independent injury." In re Merrill Lynch Ltd. Partnerships Litig., 154 F.3d 56, 59 (2d Cir. 1998). Thus, the Court must determine when the Plaintiffs "discovered or should have discovered each injury, which establishes when the four-year statute of limitations period begins." World Wrestling Ent., Inc. v. Jakks Pac., Inc., 530 F. Supp. 2d 486, 524 (S.D.N.Y. 2007), aff'd, 328 F. App'x 695 (2d Cir. 2009) (cleaned up).

## IV. DISCUSSION

## 1. PLAINTIFFS DO NOT ADEQUATELY PLEAD THE ELEMENTS OF A RICO CLAIM

As explained above, to prevail, Plaintiffs must allege the (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985); DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001); Elsevier, Inc. v. Grossman, No. 12-CV-5121 (KPF), 2013 WL 6331839, at *7–9 (S.D.N.Y. Dec. 5, 2013).

**First,** on "(1) conduct," the individual motions to dismiss argue that several individual Defendants did not "direct the affairs of any racketeering enterprise or conspiracy." See e.g. Dkt. No. 140 at 21. The Court will address the individual arguments after the joint argument in Section VII. Ultimately, the Court finds that the Defendants did allegedly direct the affairs of the alleged enterprise, and thus the first prong is met.

**Second**, on "(2) enterprise," the Court finds that, as alleged, the Defendants shared a "common purpose" that was unlawful: the alleged common set of schemes to

hack Azima in order to impose legal, financial, and reputational costs on him and his businesses, and to lie in various federal court proceedings about whether such hacking occurred. See First Cap. Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 174 (2d Cir. 2004); Black v. Ganieva, 619 F. Supp. 3d 309, 331 (S.D.N.Y. 2022), aff'd, No. 22-CV-1524, 2023 WL 2317173 (2d Cir. Mar. 2, 2023). Additionally, Plaintiffs plausibly pled connections between each of the individual Defendants and their various roles in the alleged Enterprise. See generally Dkt. Nos. 167 at 30; Dkt. No. 156; Dkt. No. 158. Moreover, the alleged scheme lasted a sufficiently long time—over eight years. Dkt. No. 1 at ¶ 208. Furthermore, the alleged enterprise is adequately distinct from the Defendants themselves. Thus, all four aspects of the Boyle test are satisfied, and Plaintiffs plausibly pled a RICO enterprise.

**Third**, on "(3) pattern of (4) racketeering activity" the Court finds that *if the alleged acts were deemed cognizable RICO predicates,* the duration, number, and variety of alleged predicate acts would be sufficient to establish "closed-ended continuity" and would satisfy the pattern element.

However, the Court finds that due to policy concerns over providing repose, preventing retaliation suits, and restricting access to courts, the litigation activities here cannot be RICO predicates. Moreover, because acts done merely to conceal do not cause any new and independent injuries, the alleged actions taken to hide the 2014 hacking are also not cognizable RICO predicates. Finally, because many of the alleged frauds were not made with any intent to obtain Azima's "money or property,"

the fraud claims also fail. Without these alleged predicate acts, no pattern of racketeering exists.

The Court discusses each element in turn.

### A. ENTERPRISE

A RICO "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Congress adopted an "obviously broad" definition of "enterprise" as the RICO statute provides that its terms are to be "liberally construed to effectuate its remedial purposes." See Boyle v. United States, 556 U.S. 938, 944 (2009) (citing § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961); see also, e.g., National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 257 (1994). An enterprise is proven by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981).

A RICO enterprise may be a lawful entity or an "association-in-fact." See Boyle v. United States, 556 U.S. 938, 944 (2009). Here, Plaintiffs allege that the "RICO Defendants and their co-conspirators constitute an association-in-fact enterprise…" Dkt. No. 1 at ¶ 210.

The Supreme Court has held that an association-in-fact enterprise must have at least three structural features: 1) a common purpose, 2) relationships among those associated with the enterprise, and 3) longevity sufficient to permit these associates to pursue the enterprise's purpose. See Boyle, 556 U.S. at 946. Moreover, a plaintiff

must also "allege an enterprise" that is "sufficiently distinct from the RICO person." Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir. 1999).

i.    **Purpose**

a.  **The "Common Purpose" Must be Unlawful**

The Supreme Court has not explicitly ruled on whether an alleged enterprise's "common purpose" must be an unlawful one. In Boyle, the Supreme Court defined an enterprise as "simply a continuing unit that functions with a common purpose." Boyle, 556 U.S. at 948.

However, the Second Circuit has required "a nexus…between the enterprise and the racketeering activity that is being conducted." First Cap. Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 174 (2d Cir. 2004). In Satinwood, the Second Circuit concluded that for "an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." Id.

As explained in Black v Ganieva, "following Satinwood, district courts in this Circuit have held that the common purpose element requires that the enterprise's members have had a common intent to violate RICO or to act unlawfully." See Black v. Ganieva, 619 F. Supp. 3d 309, 331 (S.D.N.Y. 2022), aff'd, No. 22-CV-1524, 2023 WL 2317173 (2d Cir. Mar. 2, 2023)(citing Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 120 (2d Cir. 2013)(quoting First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 174 (2d Cir. 2004), Moss v. BMO Harris Bank, N.A., 258 F. Supp. 3d 289, 299 (E.D.N.Y. 2017), Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc., 745 F. Supp. 2d

343, 351 (S.D.N.Y. 2010), and <u>Godlewska v. Human Dev. Ass'n</u>, No. 03 Civ. 3985, 2005 WL 1667852, at *7 (E.D.N.Y. Jul. 18, 2005)); <u>see also</u> <u>In re Firestar Diamond, Inc.</u>, No. 18-10509 (SHL), 2024 WL 496252, at *8 (Bankr. S.D.N.Y. Feb. 8, 2024); <u>see also</u> <u>Purchase Real Est. Grp. Inc. v. Jones</u>, No. 05-CV-10859 (LAP), 2010 WL 3377504, at *6 (S.D.N.Y. Aug. 24, 2010); <u>see also</u> <u>First Nationwide Bank v. Gelt Funding, Corp.</u>, 820 F. Supp. 89, 98 (S.D.N.Y. 1993), <u>aff'd</u>, 27 F.3d 763 (2d Cir. 1994); <u>but see</u> <u>United States v. Hutchinson</u>, 573 F.3d 1011, 1020 (10th Cir. 2009)(Gorsuch, J.)(expressing "no doubt" that a jury instruction that an enterprise "may be organized for a legitimate and lawful purpose, or it may be organized for an unlawful purpose" satisfies test); <u>but see also</u> Rakoff, Goldstein, & Queen, <u>RICO: Civil and Criminal Law and Strategy</u> (2022) at § 1.05(2)("most courts now agree that virtually any combination of persons or entities can constitute an association in fact…").

Thus, in the Second Circuit, a "separate purpose or objective that does not involve illegal conduct will not do." <u>Black v. Ganieva</u>, 619 F. Supp. 3d at 331. Alleging that "illegal means were used to obtain a lawful objective" is not enough to demonstrate unlawful purpose. <u>Democratic Nat'l Comm. v. Russian Fed'n</u>, 392 F. Supp. 3d 410, 440 (S.D.N.Y. 2019).

Nevertheless, while the common purpose must have "a nexus" to the racketeering activity, the common purpose need not be a shared intent to commit *RICO predicate acts* to meet the definition of "enterprise." <u>See</u> <u>Satinwood</u>, 385 F.3d at 174. An association of individuals "can be an enterprise if it is formed for the purpose of engaging in *any* type of illicit activity." <u>Elsevier Inc. v. W.H.P.R., Inc.</u>,

No.09-CV-6512 (CM), 692 F. Supp. 2d 297, 306 (S.D.N.Y. 2010)(emphasis added). The members of an enterprise must have a "common intent to violate RICO *or* to act unlawfully." <u>Black v. Ganieva</u>, 619 F. Supp. 3d at 331 (emphasis added). Thus, while the common purpose must be unlawful and have a nexus to the racketeering activity, the common purpose need not be to engage in RICO predicate acts.

### b. Plaintiffs Allege a Common Unlawful Purpose

The Complaint details several goals of the alleged Enterprise. Plaintiffs allege the overall goal of the enterprise was to "engage[] in a global campaign against perceived enemies of Ras Al Khaimah." Dkt. No. 1 at ¶ 1. Accordingly, Plaintiffs assert "the Enterprise's goal" was to inflict "reputational harm and massive litigation costs on Azima." Dkt. No. 1 at ¶¶ 30, 31, 35, 37. Plaintiffs allege that Defendants prepared a "ten-page Action Plan" that "identified steps the Enterprise would take to damage Azima's reputation...including "an online campaign against U.S. individuals." Dkt No. 1 at ¶ 61. But bringing lawsuits, imposing litigation costs, and damaging Azima's reputation are not *per se* unlawful goals. So, those allegations do not establish the common unlawful purpose necessary for a RICO enterprise.

However, Plaintiffs also allege that the Enterprise's purpose was "to manufacture and prosecute claims against perceived enemies of RAK...and to commit further crimes in the U.S. and overseas to cover up their unlawful conduct and obstruct Plaintiffs' efforts to seek a legal remedy." Dkt. No. 1 at ¶ 207. Plaintiffs argue that the allegation that Defendants "united for criminal and unlawful purposes[ ]" properly pleads a common unlawful purpose. Dkt. No. 167 at 37.

Defendants contend that "respond[ing] to Azima's allegations, in litigation, once he made them" is not an unlawful objective. Dkt. No. 156 at 35. Defendants further argue that this purpose is conclusory as pled. Dkt. No. 158 at 22.

Defendants rely on <u>Black v. Ganieva</u>, where the court found that the complaint did not plead a common purpose sufficient to establish a RICO enterprise because individual defendants had differing objectives and goals. See <u>Black v. Ganieva</u>, 619 F. Supp. 3d at 331. In that case, the court rejected the plaintiff's argument that the individual defendants had a common unlawful purpose because they had a "common objective" to "take down and destroy" the plaintiff. <u>Id.</u> (cleaned up). The court noted that the complaint did not "allege that [individual defendants] shared any common intent to violate the law." <u>Id.</u> Defendants claim that the alleged Enterprise members here similarly only have "shared enmity" for Plaintiff. Dkt. No. 156 at 35 (quoting <u>Black</u>, 619 F. Supp. 3d at 333).

However, the Complaint here alleges a greater nexus between the Enterprise's goals and unlawful objectives than in <u>Black</u>. The Complaint squarely alleges that Defendants are "associated together in fact for the common purpose of carrying out an ongoing criminal enterprise…through a multi-year, multifaceted campaign of computer hacking, illegal surveillance, witness tampering and intimidation, obstruction of justice, perjury, money laundering, bank fraud, and wire fraud." Dkt. No. 1 at ¶ 207. The Complaint also states that the Forlit Defendants wired money to hackers and that hackers have since admitted they were directed by the Del Rosso Defendants to hack lawyers in the U.K. Dkt. No. 1 at ¶¶ 146, 166, 232. Several

members of the conspiracy prepared "hacking reports" which were "frequently reviewed by other members of the Enterprise, detailing the substance of the information they had unlawfully obtained." See Dkt. No. 1 at ¶ 51.

In De Sole v. Knoedler Gallery, LLC, the court noted that "Boyle establishes a low threshold for pleading an association-in-fact enterprise" and found allegations that the defendants "joined forces for the purpose of selling forged artworks" sufficient to establish an enterprise. De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 300 (S.D.N.Y. 2013)(Gardephe, J.); see also D'Addario v. D'Addario, 901 F.3d 80 (2d Cir. 2018).

So too here. Plaintiffs have alleged a broad scheme with a common purpose to direct, utilize, and conceal the "illicit activity" of hacking.  See Elsevier 692 F. Supp. 2d at 306. Because Plaintiffs have claimed that Defendants had a common intent to act unlawfully, the Plaintiffs have sufficiently alleged a common unlawful purpose. Thus, Plaintiffs have established the purpose element of an association-in-fact enterprise.

## ii.    Relationships

An association "requires both interpersonal relationships and a common interest." Boyle, 556 U.S. at 946. To establish the relationship feature, "a plaintiff must demonstrate the relationships between the various members and their roles in the purported RICO scheme." New York v. United Parcel Serv., Inc., No. 15-CV-1136 (KBF), 2016 WL 4203547, at *3 (S.D.N.Y. Aug. 9, 2016). This requires a plaintiff to "allege something more than the fact that individuals were all engaged in the same

34

type of illicit conduct during the same time period." <u>Elsevier</u>, 692 F. Supp. 2d at 307. However, the "group need not have a name…'a hierarchical structure or a 'chain of command' [and] [i]ts members "need not have fixed roles." <u>United States v. Gershman</u>, 31 F.4th 80, 96 (2d Cir. 2022), <u>cert. denied</u>, 143 S. Ct. 816 (2023)(quoting <u>Boyle</u>, 556 U.S. at 948).

Defendants do not challenge the relationship element. <u>See generally</u> Dkt. Nos. 167 at 30; Dkt. No. 156; Dkt. No. 158. Moreover, Plaintiffs plausibly plead connections between each of the individual Defendants and their various roles in the alleged Enterprise.

Plaintiffs have pled that the Defendants "organized their operation into a cohesive group with specific and assigned responsibilities and command structure." Dkt. No. 1 at ¶ 208. They allege "Gerrard was a leader of the Enterprise, and he relied upon and utilized the vast resources of Dechert in executing the plan of the Enterprise. Dechert, through Gerrard, oversaw and directed the use of hacking coordinators, Del Rosso and Page, each of whom engaged hackers to participate in the affairs of the Enterprise as described above." <u>Id.</u> at ¶ 209. Furthermore, Plaintiffs describe several meetings that clearly establish sufficient interpersonal relationships between Enterprise members. <u>See e.g.</u>, Dkt. No. 1 at ¶¶ 102, 104, 106, 109-111, 163. The Complaint also details a structure through which senior members of the Enterprise directed others to do their bidding. <u>Id.</u> at ¶¶ 166, 209, 238. Thus, the relationship element of the alleged RICO enterprise is satisfied.

### iii.    Longevity

The Supreme Court has described longevity as "sufficient duration to permit an associate to 'participate' in those affairs through 'a pattern of racketeering activity.'" Boyle v. United States, 556 U.S. at 946. While no specific duration is required, courts in this district have found allegations of an enterprise lasting less than a decade to be sufficient. See e.g., Equinox Gallery Ltd. v. Dorfman, 306 F. Supp. 3d 560, 573 (S.D.N.Y. 2018) (enterprise lasting "over six years").

Defendants do not challenge longevity. See generally Dkt. Nos. 167 at 30; 156; 158. Here, the Complaint alleges that the "Enterprise has operated continuously since 2014" and "continues to this day." Dkt. No. 1 at ¶¶ 208–209. An Enterprise that allegedly lasted for over eight years sufficiently pleads longevity. Thus, the longevity element is satisfied.

### iv.    Distinctiveness

Under §1962(c), "the alleged RICO 'person' and RICO 'enterprise' must be distinct." DeFalco v. Bernas, 244 F.3d 286, 307 (2d Cir. 2001) (quoting Cedric Kushner Promotions, Ltd. v. King, 219 F.3d 115, 116 (2d Cir.2000)). To plead this distinctness requirement, a plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." U1it4less, Inc. v. FedEx Corp., 871 F.3d 199, 205 (2d Cir. 2017) (quoting Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001)). "[A]lleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs

36

of the defendant" does not satisfy this distinctiveness requirement. <u>Riverwoods</u> <u>Chappaqua Corp. v. Marine Midland Bank, N.A.</u>, 30 F.3d 339, 344 (2d Cir. 1994).

Defendants contend that Plaintiff has not sufficiently pled distinctness because "the entire purported enterprise consists of RAK and a group of lawyers, consultants, and contractors engaged to do work on its behalf." Dkt. No. 156 at 36 (citing <u>Daigneault v. Eaton Corp.</u>, No.06-CV-1690 (JCH), 2008 WL 2604929, at *3 (D. Conn. June 16, 2008) and <u>Weaver v. James</u>, No. 10-CV-6609 (NRB), 2011 WL 4472062, at *3 (S.D.N.Y. Sept. 27, 2011)).

The Second Circuit has noted that "a corporate entity [may be] held liable as a defendant under section §1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself." <u>Riverwoods Chappaqua Corp. v.</u> <u>Marine Midland Bank, N.A.</u>, 30 F.3d 339, 344 (2d Cir. 1994). In <u>Securitron Magnalock</u> <u>Corp. v. Schnabolk</u>, the Second Circuit found that "two corporations…in distinct lines of business" and an individual who served as an agent of both "constitute[d] an enterprise that, while consisting of no more than those three RICO persons, [was] distinct from each of them." <u>See</u> <u>Securitron Magnalock Corp. v. Schnabolk</u>, 65 F.3d 256, 263 (2d Cir. 1995). As such, "[w]here the overlap between the defendants and the alleged RICO enterprise is only partial, a RICO claim may be sustained." <u>Jacobson v. Cooper</u>, 882 F.2d 717, 720 (2d Cir. 1989).

Here, the Complaint alleges a RICO Enterprise "consisting of five entirely distinct corporate entities and associated individuals." Dkt. No. 167 at 32–33. Second, while Dechert began investigating Plaintiff Azima and leaking his documents on

behalf of RAK, RAK terminated its relationship with the Enterprise Defendants in 2022 and accused Defendants of "[taking] steps to advance their own interests for their own gains." See e.g., Dkt. No. 1 at ¶¶ 4, 62, 201. Third, the Complaint alleges unlawful activities intended to frustrate proceedings that did not involve RAK. Id. at ¶¶144–160, 170–174. There is nothing in the Complaint alleging that the Defendants took these actions in the regular course of their agent-principal relationship with RAK, and this Court "must confine its consideration 'to facts stated on the face of the complaint'" when deciding this motion. Leonard F. v. Israel Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999) (quoting Allen v. WestPoint–Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991)).

There certainly is some overlap between the several distinct entities named as Defendants, the individual Defendants, and their work as agents of RAK in the instant case–but the overlap is not complete. First, Plaintiffs plausibly plead that Defendants acted outside the scope of their representation of RAK. See e.g., Dkt. No. 1 at ¶¶ 4, 62, 201. Second, many of the Defendants and their associates had no direct connection to RAK themselves but rather worked for other individuals and entities who were agents of RAK. Dkt. No. 1 at 47–49.

This is a far cry from the wholly owned subsidiaries in U1it4less and the attorneys in Weaver and Daigenault who were merely representing their clients. Thus, Plaintiffs have sufficiently alleged that the enterprise was made up of separately existing entities and individuals distinct from the enterprise itself.

Plaintiffs have alleged a common unlawful purpose, sufficient relationships, longevity, and an enterprise distinct from the individual Defendants themselves. Therefore, the Plaintiffs have satisfactorily alleged a RICO enterprise.

## B. RICO PREDICATE ACTS

To sustain their RICO claim, the Plaintiffs must also allege "a pattern of racketeering activity." DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)). The term "racketeering activity" is defined in 18 U.S.C. § 1961 and includes mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), witness tampering (18 U.S.C. § 1512), and money laundering (18 U.S.C. § 1956).[5] A RICO plaintiff must plead "at least two" **predicate acts** constituting a "pattern of racketeering activity" and also show that "the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity." Moore v. Guesno, 301 F. App'x 17, 18 (2d Cir. 2008) (quoting Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 97 (2d Cir.1997)) (cleaned up).

Defendants contend that the Complaint does not allege "cognizable RICO predicates." Dkt. No. 156 at 39.

## C. SUMMARY OF RICO § 1962(c) CLAIM

---

[5] Plaintiffs allege hundreds of different predicate acts they assert establish a RICO pattern. Included in this Report and Recommendation is a chart of alleged predicate acts identifying the paragraph in the Complaint where the act is alleged and the page of the R&R where the category of alleged predicate acts is addressed.

Plaintiffs allege hundreds of different predicate acts they assert establish a RICO enterprise, pattern, and timely damages to business or property. Ultimately, none of the alleged predicate acts run the gauntlet to survive the several significant legal hurdles RICO imposes.

Below is a chart of the alleged predicate acts prepared by the Court, identifying the paragraph in the Complaint where the act is alleged and the page of this R&R where the category of alleged predicate acts is addressed.

| Alleged Activity | Complaint ¶ | Predicate Act Under 18 USC § 1961 | Holding | Section of R&R |
|---|---|---|---|---|
| Distribution of the Hacking Reports | ¶¶ 53, 164, 169 | Wire Fraud | Act of Concealment; Untimely | IV.1.B(i); IV.3 |
| Manipulation of US Law Enforcement through the Dossier | ¶¶ 76-79 | Obstruction of Law Enforcement | No Injury to Business or Property; No Injury Proximately Caused by RICO Activity | IV.2.A; IV.2.B |
| False factual assertions in the D.C. Proceeding | ¶¶ 87 | Obstruction of Justice | Exempt Litigation Activity | IV.1.B(i) |
| Dechert lawyers stating that hacked documents were found online in emails and court filings | ¶¶ 91-100 | Obstruction of Justice; Wire Fraud | No Injury to Business or Property; No Injury Proximately Caused by RICO Activity; Exempt Litigation Activity | IV.2.A; IV.2.B; IV.1.B(i) |
| The Rehearsal of Halabi's false testimony | ¶¶ 101, 102, 104, 106-110 | Witness Tampering | Exempt Litigation Activity; Act of Concealment | IV.1.B(i); IV.1.B(ii) |

| Gerrard signed a witness statement denying involvement in the hacking | ¶ 107 | Obstruction of Justice; Wire Fraud | Exempt Litigation Activity;  Act of Concealment; No Intent to Obtain Money or Property | IV.1.B(i); IV.1.B(ii); IV.1.B(vi) |
|---|---|---|---|---|
| Hughes made false statements in the U.K. Proceeding | ¶ 105 | Obstruction of Justice | Exempt Litigation Activity; Act of Concealment | IV.1.B(i); IV.1.B(ii) |
| Page, Halabi, Gerrard, and Buchanan provided perjurious testimony to the U.K. court | ¶ 110 | Obstruction of Justice | Exempt Litigation Activity; Act of Concealment | IV.1.B(i); IV.1.B(ii) |
| Making false statements over US Wires | ¶ 112 | Wire Fraud | No Intent to Obtain Money or Property; Lacks Requisite Specificity | IV.1.V(vi) |
| Dechert, Gerrard, and Hughes destroyed evidence and made false statements regarding document retention | ¶¶ 114-119 | Obstruction of Justice | Exempt Litigation Activity; Act of Concealment | IV.1.B(i); IV.1.B(ii) |
| Mailing of hacked documents to District Judge in D.C. Proceeding | ¶¶ 120-123 | Obstruction of Justice; Mail Fraud | Exempt Litigation Activity; Act of Concealment; No Intent to Obtain Money or Property; Lacks Requisite Specificity | IV.1.B(i); IV.1.B(ii); IV.1.V(vi) |
| Lying to Azima's Counsel and the District Court | ¶¶ 125-126 | Obstruction of Justice | Exempt Litigation Activity; Act of Concealment | IV.1.B(i); IV.1.B(ii) |
| Handjani's misleading statements in the New York § 1782 Proceeding | ¶¶ 129-132 | Obstruction of Justice | Exempt Litigation Activity; Act of Concealment | IV.1.B(i); IV.1.B(ii) |

| | | | | |
|---|---|---|---|---|
| Forlit's false statements in the Florida § 1782 Proceeding | ¶¶ 134-141 | Obstruction of Justice | Exempt Litigation Activity; Act of Concealment | IV.1.B(i); IV.1.B(ii) |
| Forlit received money and wired money to Page and Arusy's companies | ¶¶ 135, 142 | Wire fraud; Money Laundering | No Intent to Obtain Money or Property; Lacks Requisite Specificity; Act of Concealment; No New & Independent Injury | IV.1.B(vi); IV.1.B(v); IV.1.B.(ii); IV.3.B |
| Threats to Hacker Aditya Jain | ¶¶ 145-148, 153-155 | Witness Tampering | Act of Concealment; No New & Independent Injury | IV.1.B.(ii); IV.3.B; IV.1.B(iii) |
| Phishing emails and attempts to hack Jain | ¶ 154 | Wire Fraud | Act of Concealment; No New & Independent Injury; No Intent to Obtain Money or Property; Lacks Requisite Specificity; | IV.1.B.(ii); IV.3.B; IV.1.B(iii); IV.1.B(vi) |
| Del Rosso's destruction of evidence in the North Carolina Proceeding | ¶¶ 149-152, 156-160 | Obstruction of Justice | Act of Concealment; No New & Independent Injury | IV.1.B.(ii); IV.3.B |
| Bank records showing Vital paid CyberRoot during the period Azima was hacked | ¶ 160 | Money Laundering | Act of Concealment; No New & Independent Injury | IV.1.B(v); IV.1.B.(ii); IV.3.B |

| Hacking of Al Sadeq's lawyers | ¶¶ 163-169 | Obstruction of Justice; Wire Fraud | No Injury to Business or Property; No Injury Proximately Caused by RICO Activity | IV.2.A; IV.2.B |
|---|---|---|---|---|
| Del Rosso bribes Paul Robinson and Grayson | ¶¶ 173-174 | Witness Tampering | Act of Concealment; No New & Independent Injury | IV.1.B.(ii); IV.3.B; IV.1.B(iii) |
| Del Rosso's lies in the Al Sadeq Proceeding | ¶¶ 175-177 | Obstruction of Justice | No Injury to Business or Property; No Injury Proximately Caused by RICO Activity; Act of Concealment; No New & Independent Injury | IV.2.A; IV.2.B; IV.1.B.(ii); IV.3.B; IV.1.B(iii) |
| Fraudulent statements to banks regarding the purpose of wiring money | ¶¶ 232-236 | Money Laundering | Act of Concealment; No New & Independent Injury | IV.1.B(v); IV.1.B.(ii); IV.3.B |

### i. Litigation Activities

Perhaps the most significant issue in this case is whether the alleged litigation activities can constitute predicate acts under RICO. Defendants argue that the alleged acts connected to the various court proceedings cannot constitute RICO predicates as a matter of law. Dkt. No. 156 at 39. Conversely, Plaintiffs contend that

"RICO does not provide any immunity for criminal conduct simply because it is committed in connection with litigation." Dkt. No. 167 at 15.

The key case in determining "what a complaint must plead for litigation activity to be the basis of a RICO predicate act" is Kim v. Kimm. See Black v. Ganieva, 619 F. Supp. 3d 309, 342 (S.D.N.Y. 2022), aff'd, No. 22-1524-CV, 2023 WL 2317173 (2d Cir. Mar. 2, 2023)(citing Kimm, 884 F.3d 98 (2d Cir. 2018)).

In Kimm, a victorious defendant in a breach of contract and trademark infringement case brought a RICO suit against the attorneys and plaintiffs in the original lawsuit. Kim v. Kimm, 884 F.3d at 101. The Second Circuit dismissed the RICO suit, holding that such "litigation activities" were not RICO predicate acts. Kimm, 884 F.3d at 104. Crucially, the Second Circuit explained that "frivolous, fraudulent, or baseless litigation activities—*without more*—cannot constitute a RICO predicate act." Kimm, 884 F.3d at 104 (emphasis added). But what is the *"more"* that Kimm requires for a litigation activity to be a predicate act?

Looking first at the policy reasons behind the Kimm litigation bar, and second, at the unique nature of the cases Plaintiff cites where such activities were deemed predicates, the Court determines that the litigation activities here are not RICO predicate acts.

### a. Policy

As the Second Circuit explained, there are "compelling policy arguments" for the Kimm litigation activity bar. Kim v. Kimm, 884 F.3d at 104. The Circuit recognized that including litigation activities under RICO would risk "spawning

retaliatory actions" whenever a lawsuit was unsuccessful. Id. (citing Nora Engstrom, *Retaliatory RICO and the Puzzle of Fraudulent Claiming*, 115 MICH. L. REV. 639, 696 (2017)).

Retaliatory RICO suits would be problematic for several reasons. **First,** the deluge of retaliation suits "would inundate the federal courts" with RICO claims. Kim v. Kimm, 884 F.3d at 104. Every victorious defendant could plausibly claim the plaintiff lied in filings submitted to the court.

**Second,** permitting RICO retaliation suits would infringe on the "narrowly tailored remedies carefully crafted by courts, state legislatures, and Congress" for litigation misconduct. See Engstrom, 115 Mich. L. Rev. at 680, 692 (explaining narrow but available grounds for redress under Federal Rules of Civil Procedure 11 and 60(b)(3) (and state court counterparts), 28 U.S.C. § 1927 (and state court counterparts), courts' inherent authority, and lawsuits for malicious prosecution)).

In proceedings brought under these provisions, the party to be sanctioned is afforded specific procedural protections, and there are limitations on the severity of the sanction. See generally Fed. R. Civ. P. 11; Nuwesra v. Merrill Lynch, Fenner & Smith, Inc., 174 F.3d 87 (2d Cir. 1999)(finding procedural safeguards mandatory); Robinson v. De Niro, 614 F. Supp. 3d 73 (S.D.N.Y. 2022), report and recommendation adopted, No. 19-CV-09156 (LJL), 2022 WL 7091518 (S.D.N.Y. Oct. 12, 2022)(finding high bar for frivolousness under Rule 11); On Time Aviation, Inc. v. Bombardier Cap., Inc., 354 F. App'x 448 (2d Cir. 2009)(sanctions were limited to amount sufficient to accomplished deterrence). RICO has no analogous safeguards or guardrails.

**Third,** permitting RICO claims for litigation activities raises "serious questions of comity" since redress is sought from one federal court for litigation misconduct in a different federal, state, or international proceeding. Such redress ought to be sought from those courts directly. As discussed in <u>Rajaratnam</u>, "a civil RICO action in a neighboring federal district is not the appropriate mechanism to seek redress for false statements made in court filings by a litigation adversary. More appropriate measures may include a motion for Rule 11 sanctions, motions to preclude or strike testimony, and, if necessary, a motion for relief under Federal Rule of Civil Procedure 60(b)(3) for fraud" directed to the court where the misrepresentations occurred. <u>See</u> <u>Rajaratnam v. Motley Rice</u>, LLC, 449 F. Supp. 3d 45, 72 (E.D.N.Y. 2020).

**Fourth**, permitting RICO claims for litigation activities could "erode the principles undergirding the doctrines of res judicata and collateral estoppel," as such claims would "frequently call into question" the judicial decisions that relied upon the alleged litigation activity. <u>Kim v. Kimm</u>, 884 F.3d at 104. The Second Circuit has expressed a concern that if such litigation-related acts were RICO predicates, plaintiffs could use the attorney fees flowing from those litigation activities to "restart the limitations clock". <u>Bingham v. Zolt</u>, 66 F.3d 553, 560 (2d Cir. 1995); <u>see also</u> <u>Bankers Tr. Co. v. Rhoades</u>, 859 F.2d 1096, 1105 (2d Cir. 1988). Other SDNY decisions that limited RICO's reach into litigation activities also endorsed the policy goals of providing "repose, elimination of stale claims, and certainty...." <u>See</u> <u>Tech. Opportunity Grp., Ltd. v. BCN Telecom, Inc.</u>, No. 16-CV-9576 (KMK), 2019 WL

4688628, at *9–10 (S.D.N.Y. Sept. 25, 2019)(citing <u>Rotella v. Wood</u>, 528 U.S. 549, 554 (2000).

**Finally**, the Second Circuit in <u>Kimm</u> expressed an anxiety that "endorsing this interpretation of RICO would chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts because any… pleading … in an unsuccessful lawsuit could lead to drastic RICO liability." <u>Kim v. Kimm</u>, 884 F.3d at 104; <u>see also</u> <u>FindTheBest.com, Inc. v. Lumen View Tech. LLC</u>, 20 F. Supp. 3d 451, 457 (S.D.N.Y. 2014).

This Court will bear in mind the important policy considerations behind the <u>Kimm</u> litigation bar when assessing which litigation activities could be predicate acts and which cannot.

### b. Litigation Activities May Be RICO Predicates Only in Unique Circumstances

"Rare" is the complaint that successfully alleges that "litigation activity contributed to pleading a viable civil RICO predicate act." <u>See</u> <u>Black</u>, 619 F. Supp. 3d at 343. Plaintiffs identify cases where litigation activities were deemed to be RICO predicate acts. Ultimately, however, there are unique features to each of these cases that places them outside the policy concerns of the <u>Kimm</u> bar.

As discussed in greater detail below, a review of the relevant case law indicates that whenever a Court has determined that allegations cleared the <u>Kimm</u> bar, the litigation activity featured either (1) a mass scheme, (2) corruption of the decision-makers in the court proceedings, or (3) the fraudulent securing of default judgments.

- **Chevron**

Plaintiffs contend that "courts in this District have found defendants liable for false statements and falsifying evidence analogous to what is alleged in this Complaint." Dkt. No. 167 at 15 (citing Chevron Corp. v. Donziger, 974 F. Supp. 2d 362 (S.D.N.Y. 2014), aff'd, Chevron Corp. v. Donziger, 833 F.3d 74, 135 (2d Cir. 2016)).

In Chevron, the court held that a class of plaintiffs in an Ecuadorian suit, led by attorney Steve Donziger, coerced a judge into appointing a "neutral" expert to make a damages assessment, secretly paid that expert to sign off on a report written by the plaintiffs themselves, and then ultimately bribed the judge overseeing the case into issuing a multi-billion-dollar judgment against Chevron, which was also secretly written by the plaintiffs. See Chevron v. Donziger, 974 F. Supp. 2d at 460, 483, 501-503.

The Plaintiffs argue that like "the defendants in Chevron, the Enterprise injected false statements into U.S. courts and bribed witnesses to prevent them from testifying truthfully in order to mask their illegal conduct so that they could obtain a legal judgment against Azima." Dkt. No. 167 at 15.

Plaintiffs allege that the Defendants here, "fabricated and destroyed evidence in the D.C. District Court Proceeding to prevent Azima from successfully litigating his claim and to force him to incur more legal fees, submitted false statements in two Section 1782 Proceedings in order to thwart Azima's efforts to support his claims and defenses in legal proceedings in the U.K. Proceeding, manufactured evidence, intimidated witnesses, and submitted false statements in the 2020 North Carolina

48

Proceeding in order to block Azima's efforts to seek justice for his claims, and bribed potential witnesses in the various U.S. proceedings relating to Defendants' involvement in the hacking of Al Sadeq's attorneys and submitted false testimony in a court proceeding to prevent Al Sadeq from developing evidence of the alleged hacking." Dkt. No. 1 at ¶¶ 83–178; Dkt. No. 167 at 15.

There are three important features that distinguish the <u>Chevron</u> decision from the instant case. First, while it is true that <u>Chevron v. Donziger</u> permitted Chevron to recover for fees incurred in § 1782 proceedings Chevron initiated, those proceedings were primarily defensive since the § 1782 proceedings were initiated to secure discovery for use in the Ecuadorian suit where Chevron was the defendant. <u>Chevron Corp. v . Donziger</u>, 871 F. Supp. 2d 229, 251 (S.D.N.Y. 2012).[6] The false statements allegedly made in the § 1782 proceedings here were not made in defensive proceedings like in <u>Chevron</u>.[7]

----

[6] There are several <u>Chevron v. Donziger</u> decisions referenced herein with different docket numbers.

[7] While RAK initiated one suit in the U.K. against Azima for breach of the 2016 Settlement Agreement, the alleged obstruction in the § 1782 proceeding is best understood as aimed to frustrate a the counterclaims Azima brought when the DC lawsuit was transferred to the U.K. <u>See</u> Dkt No. 1. Thus, it is better classified as offensive. Plaintiffs characterize the allegation as intended to support the defense of the suit intiated by RAK, but allege the § 1782 proceeding was intended to secure discovery for use in supporting Azima's "counterclaim". <u>See</u> <u>Dkt No. 1</u> at ¶ 127 ("After Azima's claims in the D.C. District Court Proceeding were transferred to the U.K., he re-asserted them as counterclaims in the pending U.K. Proceeding brought by RAKIA against Azima for breach of contract…Azima and Al Sadeq subsequently filed proceedings in New York, North Carolina, and Florida under 28 U.S.C. § 1782 ("Section 1782") in which they sought the aid of U.S. federal courts to obtain evidence for use in their respective U.K. cases." Plaintiffs themselves connect the § 1782 proceedings to the transferred DC claims Azima originally brought: "Throughout this period, the D.C. District Court Proceeding was pending, meaning that all of the Enterprise's efforts to develop false and misleading testimony – including those relevant to the U.K. Proceeding

Second, the <u>Chevron</u> case involved allegations of bribes and other actions that undermined the neutral decision-making process. <u>See Chevron v. Donziger</u>, 974 F. Supp. 2d at 460, 483, 501-503. Here, there are allegations that potential witnesses were threatened and bribed. Dkt. No. 1 at ¶¶ 144–60; 179–78. If those alleged acts amount to obstruction or witness tampering, they may be predicate acts. But, unlike allegations of a bribed judge or court expert in <u>Chevron</u>, the alleged bribes of witnesses here do not infect the entire adversarial process, so there is a weaker connection between other alleged litigation acts and the goal of the scheme than in <u>Chevron</u>.

Third, <u>Chevron v Donziger</u> (2016), was decided prior to <u>Kim v Kimm (2018).</u> There is no guarantee that <u>Chevron</u> would be decided the same way today.

Because of these distinguishing features, <u>Chevron</u> did not implicate the same policy concerns addressed in <u>Kimm</u>. A decision secured by bribing a judge does not present the same claim preclusion, comity, and repose concerns of a decision reached because one of the litigants convincingly lied to the court during the ordinary course of litigation. Similarly, the <u>Chevron</u> decision does not raise the same concerns about chilling valid claims because under <u>Chevron</u>, litigation activities only amount to RICO predicates when the court itself is corrupted. Moreover, it would have been futile to direct the <u>Chevron</u> plaintiffs to seek redress in the same Ecuadorian court they allege was corrupted. Because <u>Chevron</u> involved the corruption of the court's

---

– were also intended, in large part, to obstruct the D.C. District Court Proceeding." <u>See</u> Dkt. No. 1 at ¶ 101.

decision-making process, the policy concerns for the <u>Kimm</u> bar were not squarely present.

- **<u>Sykes</u>**

Plaintiffs also point to <u>Sykes v. Mel Harris & Assocs.</u>, LLC, 757 F. Supp. 2d 413 (S.D.N.Y. 2010). Dkt. No. 167 at 40. Plaintiffs argue that the "enterprise in Sykes focused on injuring the plaintiffs through litigation, and yet the court found the stated RICO claim cognizable." <u>Id.</u> (citing <u>Sykes</u>, 757 F. Supp. 2d at 418). As Plaintiffs acknowledge, the <u>Sykes</u> plaintiffs alleged "a scheme to fraudulently obtain default judgments." Dkt. No. 167 at 40.

As the court in <u>Black</u> explained, <u>Sykes</u> involved a "concerted abuse of the legal system," <u>Black</u>, 619 F. Supp. 3d at 342. <u>Sykes</u> did not only feature "conscious misbehavior or recklessness" with respect to "preparing false filings." Dkt. No. 167 at 40 (citing <u>Sykes</u> 757 F. Supp. 2d at 425). As The <u>Rajaratnam</u> court found, <u>Sykes</u> involved "industrial scale state court litigations filed for the exclusive purpose of obtaining default judgments." <u>See</u> <u>Rajaratnam</u>, 449 F. Supp. 3d at 71; <u>Sykes</u> 757 F. Supp. 2d at 419 (104,341 fraudulent collection actions).

Here, while Plaintiffs allege the enterprise intended to impose litigation costs on Azima, Dkt. No. 1 at ¶¶ 181–83, the Complaint does not allege a mass scheme of hundreds of thousands of fraudulent filings similar to <u>Sykes</u>. Thus, <u>Sykes</u> presented a logical exception to the <u>Kimm</u> bar that does not extend to the allegations here.

To begin, where an alleged enterprise is filing hundreds of thousands of actions in order to "fraudulently obtain default judgments" (Dkt. No. 167 at 40) the comity,

preclusion, and repose concerns motivating the <u>Kimm</u> bar are not present. First, comity concerns are reduced when there is a default judgment since there is no decision on the merits by a fellow federal, state, or international tribunal to show deference to. Second, there can be no preclusion where a party has not yet had its "day in court." <u>See</u> Samuel Issacharoff, <u>Civil Procedure</u>, FOUNDATION PRESS (3d. ed. 2012) at 170; <u>see also</u> <u>Straight-Out Promotions, LLC v. Warren</u>, 467 B.R. 684 (S.D.N.Y. 2012), <u>aff'd sub nom</u>. <u>In re Tyson</u>, 511 F. App'x 120 (2d Cir. 2013). Third, the repose concerns are less salient in a default case, since Rule 55 has a "more forgiving" standard for lifting a default judgment than vacating a final judgment under Rule 60. <u>State Farm Mut. Auto. Ins. Co. v. Cohan</u>, 409 F. App'x 453, 456 (2d Cir. 2011).

Moreover, parties seeking redress for litigation misconduct in a mass, "industrial-scale" action would have greater difficulty dissuading the unlawful conduct via Rule 11 sanctions motions, since such motions (and the requisite opportunity to be heard) would have had to occur in each of the many thousands of courts in which the <u>Sykes</u> defendants brought fraudulent suits.

Finally, the concern of a chilling effect on potential plaintiffs is not present when an enterprise files thousands of actions with the intent of obtaining default judgments. The RICO claim in <u>Sykes</u> was not based on the insufficiency of the allegations in the underlying proceedings or the untested nature of the claims, but rather the RICO suit was based on the fraudulent misrepresentations that the RICO plaintiffs were properly served, when they never were, and thus they had no

knowledge of the proceedings against them until their bank accounts were frozen. Sykes, 757 F. Supp. 2d at 427. That is vastly different from the allegations here where the fraudulent representations to the Court, as alleged, involve refusals to produce requested discovery and denials of wrongdoing in the ordinary course of litigation.

Thus, Sykes, too, is not on all fours with this case.

- **Carroll**

During oral argument, Plaintiffs mentioned another case that discussed the Kimm bar, Carroll v. U.S. Equities Corp., No. 1:18-CV-667, 2020 WL 11563716 (N.D.N.Y. Nov. 30, 2020); see Dkt. No. 192 at 99.

In Carroll, the RICO defendants "conspired with one another to buy uncollectable consumer debt, initiate actions against the debtors, improperly serve them, and then file fraudulent affidavits of service and merit so as to obtain unwarranted default judgments against thousands of individuals." Carroll, 2020 WL 11563716 at *9.

While Carroll does note that "Kimm leaves open the door for RICO claims premised on abusive litigation activities involving conduct beyond a single lawsuit," the facts in Carroll were far more similar to Sykes than to the facts alleged in the complaint here. See Carroll, 2020 WL 11563716, at *9. Because Carroll, like Sykes, involved mass litigation, and fraudulently obtained default judgments, it too did not present the same comity, preclusion, and repose concerns as Kimm. For that reason, the policy basis for the Kimm bar was not implicated in Carroll.

Carroll, Sykes, and Chevron each presented unique circumstances where the general policy reasons for the Kimm litigation activity bar would not have been applicable. On the other hand, the alleged conspiracy to hack Azima and attack his reputation was indeed a *massive scheme*, but it was not a scheme featuring *mass litigation* or *corruption of the court's decision-making process*. Thus, many of the alleged predicate acts here, especially the mere denials of wrongdoing and alleged discovery misconduct cannot form RICO predicates under Kimm.

### ii. Concealment Activities

Defendants contend that many of Plaintiff's allegations do not constitute RICO predicate acts because they are merely acts of concealment. See Dkt. No. 156 at 41–42. Acts of concealment that do not further an ongoing scheme do not cause "new and independent injuries" separate from harms caused by the original scheme. In re Merrill Lynch Ltd. Partnerships Litigation, 154 F.3d 56, 59–60 (2d Cir. 1998). Thus, mere acts of concealment do not count for purposes of establishing a RICO pattern or restarting the statute of limitations clock.

Defendants rely heavily on Democratic Nat'l Comm. v. Russian Fed'n, 392 F. Supp. 3d 410, 444 (S.D.N.Y. 2019) to support this proposition. In that case, the court held that alleged acts of concealment could not be considered predicate acts where "the harm suffered by the DNC—theft and publication of its internal documents and communications—had already taken place before the alleged acts of concealment." Id. Defendants argue that this mirrors the alleged cover-up of the hacking of Azima's information here. Dkt. No. 156 at 42.

However, the Supreme Court has made "a vital distinction…between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." Grunewald v. United States, 353 U.S. 391, 405 (1957). The Second Circuit too has found acts of concealment designed not only *to conceal* fraudulent activities but also *to further* an underlying fraudulent scheme can be predicate acts. City of New York v. Venkataram, 396 F. App'x 722, 725 (2d Cir. 2010)(summary order). In Venkataram, the defendant submitted fraudulent invoices to the City, and later argued these were not RICO predicate acts because the fraudulent invoices were submitted merely to conceal his embezzlement. Id. The Second Circuit found that the submissions of fraudulent invoices were "essential to the overall scheme" because they were designed not only "to conceal" his previous fraud but also to pass off the transfers as legitimate, and "receive the money…in the first place[,]" and therefore, these acts of concealment were cognizable predicate acts. Id. at 725.

Here, many of the predicate acts alleged by Plaintiff are mere acts of concealment. For example, Plaintiff alleges that from 2016–2020, Defendants "repeatedly fabricated and destroyed evidence in order to obstruct" the DC District Court proceeding. Dkt. No. 1 at ¶84–85. They also allege that several of the Defendants gathered together at a Swiss hotel for "perjury school" to "perfect the narrative" over "fine wine." Dkt. No. 1 at ¶¶ 109–10. Plaintiffs themselves allege that Defendants took these steps "to cover up their involvement in the hacking." Dkt. No.

1 at ¶¶ 86, 111. Even taking the allegations in the Complaint as true, these acts were taken for the purpose only of covering up previous acts, not enabling future acts.[8] Thus, the perjury school at the Moose Egg Hotel and the numerous allegations of destruction of evidence were acts of concealment that cannot be considered cognizable RICO predicates. Dkt. No. 1 at ¶¶ 116, 118, 170, 173, 219.

However, other acts, as alleged, were taken in furtherance of the Enterprise's objectives. The over 400 alleged acts of money laundering were made to enable future bank transfers to compensate hackers for illegal activity. Dkt. No. 1 at ¶¶234–36. These acts, as alleged, were more similar to the acts in Venkataram which furthered the underlying fraudulent scheme. Thus, they are not mere acts of concealment, and could be considered RICO predicates. Ultimately, however, this Court finds that the acts of money laundering related to the hacking (while not mere acts of concealment) still fail to cause any separate new and independent injuries within the four-year statute of limitations.  See infra, Section 7, Statute of Limitations.

Therefore, this Court finds that many of the alleged predicate acts were done merely to conceal previous illegal activity (the alleged perjury school, the denials to courts, the destruction of electronic evidence), and for that reason alone are not RICO predicate acts. However, this Court also finds that other acts which allegedly enabled

---

[8] To the extent Plaintiffs argue that the alleged perjury and destruction of evidence were done with the intent of forcing Azima to incur additional legal fees, the Court finds those allegations to not amount to predicate acts for reasons to be discussed in Section 2, Litigation Fees.

future illegal activity (such as money laundering and wire fraud) could be cognizable RICO predicates but ultimately fail for other reasons. [9]

### iii. Witness Tampering

Witness tampering is a RICO predicate under 18 U.S.C. § 1961. 18 U.S.C. § 1512 defines tampering with a witness in relevant part as: "Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so…with intent to-- (1) influence, delay, or prevent the testimony of any person in an official proceeding; (2) cause or induce any person to-- (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding; (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding…"

An "official proceeding" is "a proceeding before a judge or court of the United States." 18 U.S.C. § 1515; Park S. Assocs. v. Fischbein, 626 F. Supp. 1108, 1113 (S.D.N.Y.), aff'd sub nom. Park S. Assoc. v. Fischbein, 800 F.2d 1128 (2d Cir. 1986). Neither state court nor foreign court proceedings meet the definition of "official proceeding" under 18 U.S.C. § 1515. See generally Park S. Assocs., 626 F. Supp. at 1113.

---

[9] A chart of the alleged predicate acts and the Court's recommendation as to each is included in this Report & Recommendation.

In the Complaint, Plaintiffs allege multiple acts of witness tampering against two different witnesses: Robinson[10] and Jain.[11] The Court finds that neither allegation of witness tampering constitutes a RICO predicate act.

### a. Alleged Intimidation of Robinson

First, Plaintiffs allege that in July 2020, Defendant Del Rosso bribed Robinson, a potential witness. Dkt. No. 1 at ¶ 170–174. Plaintiffs allege that Defendant Del Rosso bribed Robinson to "[obstruct] both the Stokoe Proceeding in the U.K. and potential litigation in the US." Id. at ¶ 172. However, this allegation does not amount to an attempt to obstruct a U.S. court proceeding, as the Stokoe Proceeding was in the U.K. See Park S. Assocs. at 626 F.Supp. at 1113. The § 1782 application filed in support of the U.K. Stokoe proceeding was not initiated until February 2021. Dkt. No. 1 at ¶175. Because there was no "official proceeding" pending at the time of the alleged bribe in July 2020, this allegation cannot constitute witness tampering under 18 U.S.C. § 1512.

### b. Alleged Intimidation of Jain

---

[10] As described above, Paul Robinson ("Robinson") is a resident of the U.K. He was paid by the Enterprise to hack certain victims on behalf of the Enterprise and to steal their data, documents, and information. Robinson also conspired with other members of the Enterprise to conceal the Enterprise's unlawful conduct through the destruction of documents. Dkt. No. 1 at ¶ 26(g). Robinson reported to Del Rosso and was at times supervised by Grayson. The Complaint asserts Robinson has since admitted to involvement in the hacking. Dkt. No. 1 at ¶ 166.

[11] As described above, Aditya Jain ("Jain") is a resident of India and the owner of Indian cyber company Cyber Defense and Analytics ("Cyber Defense"). The Complaint alleges that "at the direction of Del Rosso, Jain and Cyber Defense hacked and stole private emails, documents, records, and other information from Azima and his associates." Dkt. No. 1 at ¶ 26(i). In 2020, "Jain confessed to his involvement with the Enterprise and its illegal conduct and detailed his role in the Enterprise." Dkt. No. 1 at ¶ 146.

Second, Plaintiffs allege that Defendants intimidated and threatened Jain, a hacker connected with Defendants. Dkt. No. 1 at ¶¶ 146–155. The Complaint alleges that in November 2020, Del Rosso "tried to entice Jain to travel to Dubai, where he would be vulnerable to kidnapping…" Jain was "concerned for his safety" and "declined to meet in Dubai for fear that the meeting was a pretext to detain and subject him to coercive interrogation in the same manner as Al Sadeq." Id. at ¶ 153. Plaintiffs allege that Enterprise Defendants pressured and threatened Jain "to prevent him from providing truthful testimony in the North Carolina Proceeding." Dkt. No. 1 at ¶ 154. Plaintiffs further state that "Jain felt threatened and thought it to be a coordinated effort by the Enterprise to intimidate him and stop him from cooperating with Azima and providing truthful testimony and information in connection with the North Carolina Proceeding." Id. at ¶ 155. The Complaint claims that "in August 2021, while the North Carolina Proceeding was pending, the Enterprise further tampered with Jain and pressured him not to cooperate…." Id. at ¶ 155. Thus, like in Chevron, Defendants allegedly tampered with witnesses in pending § 1782 proceedings. Chevron, 871 F. Supp. 2d at 252. Thus, as alleged, the witness tampering of Jain aimed to interfere with an "official proceeding" under 18 U.S.C. § 1512. But the Jain allegations still do not amount to RICO predicate acts because they were done merely to conceal the completed scheme to hack.

In Chevron, the court denied Donziger's motion to dismiss RICO claims based on alleged witness tampering predicates. See Chevron Corp. v. Donziger, 871 F. Supp. 2d 229, 252 (S.D.N.Y. 2012). Similar to the allegations here, Chevron claimed

Donziger engaged in obstruction of justice and witness tampering in order to "(1) dissuade U.S. courts from ordering Section 1782 disclosure in connection with the Ecuadorian litigation, (2) persuade [a witness] to decline to testify at a U.S. deposition, and (3) suborn a false affidavit…." <u>Chevron</u>, 871 F. Supp. 2d at 252.

The court found the complaint in <u>Chevron</u> sufficiently alleged that the predicate acts were "in service of the alleged overall goal of obtaining a baseless…judgment" and not merely "efforts to cover up the alleged conspiracy to extort money from Chevron." <u>Chevron</u>, 871 F. Supp. 2d at 252.

Here, on the other hand, Plaintiffs assert that the witness tampering was "part of the Enterprise's multi-faceted plan to harm Azima… through litigation." Dkt. no. 167 at 41. Plaintiffs claim this was part "of the Enterprise's goal of using litigation to bury its targets financially and reputationally." Dkt. No. 167 at 55. But discouraging Jain from testifying furthers neither of those purposes. <u>Cf. City of New York v. Venkataram</u>, 396 F. App'x 722, 725 (2d Cir. 2010)(summary order).

Rather, the Complaint alleges a "hacker warned Jain not to reveal the hacker's role in the Enterprise." Dkt. No. 1 at ¶ 155. Based on Plaintiffs' own allegations, Jain was discouraged from testifying to conceal hacking. Thus on balance, tampering with Jain did not further any scheme aside from concealing the hack. Thus, unlike the witness tampering in <u>Chevron</u> or <u>Venkataram</u>, the alleged witness tampering of Jain did not enable any continuing wrongdoing.

Because the alleged tampering of Robinson did not impair an "official proceeding" and the alleged tampering of Jain did not further the already completed

scheme to hack or the ongoing scheme to impose litigation costs, neither allegation of witness tampering constitutes a RICO predicate act.

### iv. Obstruction

Plaintiffs allege that several "acts of obstruction were part of the Enterprise's goal of using litigation to bury its targets financially and reputationally." Dkt. No. 167 at 41. However, none of these allegations amount to a RICO predicate act. Each of these allegations is either a barred litigation activity under <u>Kimm</u> or mere concealment of prior, completed schemes.

Plaintiffs allege "Defendants repeatedly fabricated and destroyed evidence in the D.C. District Court Proceeding to prevent Azima from successfully litigating his claim and to force him to incur more legal fees." Dkt. No. 167 at 44 (citing Dkt. No. 1 at ¶¶ 83–126). Many of these allegations are denials of tortious conduct by attorneys in one form or another, whether via email, affidavits, false statements in § 1782 proceedings, or briefs submitted to court. <u>Id.</u> ¶¶ 93, 97, 100, 127–43. Other allegations amount to witness preparation, and failures to preserve evidence or other discovery violations. <u>Id.</u> ¶¶ 106, 120–23.

Even the allegation of a "perjury school" in the Swiss Alps—for all its fine wine, private chefs, and extreme efforts at secrecy—is only alleged as an effort to "perfect the narrative" and prepare for trial. <u>Id.</u> ¶ 109–110.  While scandalous, and perhaps unethical, the alleged rehearsal of "false stories" dances too close to standard attorney activity to be a RICO predicate.  <u>Id.</u> ¶ 110.  These allegations do not strike this Court

as "more" than the mere fraudulent litigation activities that were rejected by the court in <u>Kimm</u>. <u>See</u> <u>Kimm</u>, 884 F.3d at 104.

Even if all these allegations were true, and the witnesses based upon the rehearsed testimony lied in those proceedings, the policy reasons for the <u>Kimm</u> bar prevent these acts from constituting RICO predicates. The risks of excessive knock-on litigation and chilling core attorney activities exceed the deterrence benefit of extending RICO's reach to these acts. <u>See generally</u> <u>Kim v. Kimm</u>, 884 F.3d at 104. This is especially so when Plaintiffs have another avenue of redress: seeking sanctions in the courts that were lied to and whose discovery orders were disobeyed. <u>See generally</u> Engstrom, 115 Mich. L. Rev. at 680, 692; Federal Rules of Civil Procedure 11 and 60(b)(3); 28 U.S.C. § 1927; <u>see also</u> Fed. R. Civ. P. 37.

Plaintiffs claim that "this case is analogous to Chevron" as several allegations of obstruction here are similar to those that survived the motion to dismiss in Chevron, such as "suborn[ing] a false affidavit…." Dkt. No. 167 at 42 (citing <u>Chevron</u>, 871 F. Supp. 2d at 252).

However, the submission of a false affidavit is very similar to the false affidavits the <u>Kimm</u> court held were outside the reach of RICO. Ultimately, post-<u>Kimm</u>, it is unlikely the suborning of a single false affidavit could be a RICO predicate act. To the extent <u>Chevron</u> found a single false affidavit to be a RICO predicate, this Court does not believe that issue would be similarly decided after <u>Kimm</u>. Simply put, <u>Chevron</u> may no longer be good law.

However, even if <u>Chevron</u> would be decided the same way, the facts, policy concerns, and holding of <u>Kimm</u> are directly on point here. Thus, the <u>Kimm</u> bar is binding, and the alleged litigation activities are not RICO predicates.

### v. Money Laundering

Plaintiffs also allege hundreds of acts of money laundering, but because these acts all merely concealed the original hack, because they do not cause any new and independent injuries, and because they are untimely, they do not constitute RICO predicates here.

- **Elements of a Money Laundering Claim**

To state a claim for money laundering, a plaintiff must allege "(1) that the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity as defined in § 1956(c)(7); [and] (3) that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity." <u>Tymoshenko v. Firtash</u>, 57 F. Supp. 3d 311, 322–23 (S.D.N.Y. 2014) (quoting <u>United States v. Maher</u>, 108 F.3d 1513, 1527–28 (2d Cir.1997)). "A plaintiff 'need not allege money laundering with great particularity, [but the] plaintiff must plead all elements of the offense.'" <u>Id.</u> (quoting <u>Casio Computer Co., Ltd. v. Sayo</u>, 98CV3772, 2000 WL 1877516, at *16 (S.D.N.Y. Oct. 13, 2000) (Knapp, J.)).

- **Alleged Money Laundering**

Here, Plaintiffs allege that Defendants lied about the purpose of transactions wired through U.S. banks. <u>See e.g.</u>, Dkt. No. 1 at ¶ 232. Plaintiffs contend that

payments were made to various Defendants and nonparties to commit and conceal illegal hacking. <u>Id.</u> at ¶¶ 134, 232. Acts of concealment, like money laundering, that further ongoing schemes could be RICO predicate acts. <u>See</u> <u>City of New York v. Venkataram</u>, 396 F. App'x 722, 725 (2d Cir. 2010)(summary order).

Exhibit A to the complaint details "413 money laundering transactions… total[ing] more than $29 million." Dkt. No. 1 at ¶ 222; Dkt. No. 1-1. Many of these transactions allegedly furthered the scheme to hack Azima and weaponize the results of the hacking. <u>See e.g.</u> Dkt. No. 1-1, ¶ 25 ("Payment from Defendant Del Rosso's U.S. bank account (PNC Bank) to Coconspirator Jain's company Cyber Defense and Analytics for hacking…"); Dkt. No. 1-1, ¶ 175 ("$275,000 Payment from Defendants Forlit's and Insight's U.S. bank account…to Defendant Forlit's Israeli entity, used in part to compensate those involved in the hacking, sham litigation, coverup…"); Dkt. No. 1-1, ¶ 50 ("$40,744 Payment from Co-conspirator Emirate of Ras Al Khaimah to Defendant KARV Communications to promote unlawful Enterprise activities related to Azima and others.").

The alleged money laundering and fraudulent transactions span from 2014 to 2022. The key issue is whether any of these acts of money laundering furthered an ongoing scheme that caused a new and independent injury. The Court finds that they do not. Instead, the alleged acts of money laundering merely concealed an already completed scheme.

The payments related to the hacking cannot cause any new and independent harms separate from those caused by the original hacking in 2016. Azima had to have

been aware of such harms in 2016 given that he filed a lawsuit in 2016 seeking compensation for such harms. See Dkt. No. 157-10, Quinn Decl., Ex. 10 (Complaint, Azima v. RAK Inv. Auth., No. 1:16-cv-01948, Dkt. 1 (D.D.C. Sep 30, 2016)) ¶¶ 33, 39, 45, 51, 57;  see also Azima v. Del Rosso, 2021 WL 5861282, at *3 (finding that D.C. Proceeding complaint established that Azima had knowledge of hacking in 2016 for statute-of-limitations purposes).

Thus, even the post-October 2018 payments did not further any new scheme. Rather, similar to Democratic Nat'l Comm. v. Russian Fed'n, the alleged acts of concealment could not be considered predicate acts where "the harm suffered…had already taken place before the alleged acts of concealment." Democratic Nat'l Comm. v. Russian Fed'n, 392 F. Supp. 3d 410, 444 (S.D.N.Y. 2019); see e.g., Dkt. No. 1-1 ¶ 391 ("February 1, 2021, $148,500.00 Payment from Defendants Forlit's and Insight's U.S. bank account (Bank of America) to Defendant Forlit's Israeli entity, used in part to compensate those involved in the hacking, sham litigation, coverup, and related services to promote unlawful Enterprise activities.").

In the Second Circuit, "continuing efforts to conceal the initial fraud" do not result in "new and independent injuries." In re Merrill Lynch Ltd. Partnerships Litig., 154 F.3d 56, 59–60 (2d Cir. 1998).

The alleged acts of money laundering that furthered ongoing schemes, furthered a hacking scheme, the harms of which were known to Azima in 2016. More recent acts of money laundering were done simply to pay co-conspirators to cover-up that hacking scheme or to lie in litigation brought by Azima seeking compensation

for harms flowing from that hacking scheme. Thus, the alleged acts of money laundering do not result in any "new and independent injuries" within the four-year limit and as "mere acts of concealment" do not constitute RICO predicates. In re Merrill Lynch Ltd. Partnerships Litig., 154 F.3d at 59–60.

### vi. Mail & Wire Fraud Claims

Plaintiffs also plead predicate acts of wire fraud and mail fraud, alleging that multiple Defendants "used the U.S. financial system to send multiple wires overseas for the purpose of promoting unlawful criminal activity." Dkt. No. 1 at ¶¶ 32, 34. Ultimately, all these alleged frauds fail as they lack the intent to obtain Azima's "money or property" or lack the specificity required of Rule 9(b). Thus, the alleged wire and bank frauds here are not RICO predicates.

- **Elements of Mail & Wire Fraud**

"'The essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme.'" Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo, 346 F. Supp. 3d 432, 456 (S.D.N.Y. 2018) (quoting United States v. Shellef, 507 F.3d 82, 107 (2d Cir. 2007)); 18 U.S.C. § 1343; Kelly v. United States, 590 U.S. 391, 398 (2020). "A 'scheme to defraud' is 'a plan to deprive a person of something of value by trick, deceit, chicanery, or overreaching.'" Williams v. Affinion Grp., LLC, 889 F.3d 116, 124 (2d Cir. 2018).

- **Pleading Fraud**

"The elements of mail and wire fraud must be pled with particularity." Williams v. Affinion Grp., LLC, 889 F.3d 116, 124 (2d Cir. 2018) (cleaned up). A "RICO complaint must provide 'a detailed description of the underlying [fraudulent] scheme and the connection of the mail and/or wire communications to the scheme.'" De Sole v. Knoedler Gallery, LLC, 137 F. Supp. 3d 387, 402 (S.D.N.Y. 2015) (Gardephe, J.) (quoting In re Sumitomo Copper Litig., 995 F.Supp. 451, 456 (S.D.N.Y. 1998)). To plead a scheme to defraud, a plaintiff must "allege a material misrepresentation as part of the defendants' scheme" and include a "particularized allegation of an underlying 'scheme to defraud' animated by a material misrepresentation." Id. at 125.

"Allegations of [RICO] predicate mail and wire fraud acts 'should state the contents of the communications, who was involved…where and when they took place, and…why they were fraudulent.'" Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 185 (2d Cir. 2008) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993). To plead with sufficient particularity, Plaintiffs must describe the "precise effects" of the fraudulent acts. See Rakoff, Goldstein, & Queen, RICO: Civil and Criminal Law and Strategy (2022) at § 7.04(1)(citing Moore v. PaineWebber, Inc. 189 F.3d 165, 172–73 (2nd. Cir. 1999).

- **Fraud Claims Not Pled With Sufficient Particularity**

Here, Plaintiffs attach to the Complaint a chart that alleges 173 instances of wire and mail fraud. Dkt. No. 1-2. Approximately 85 of these actions are alleged to have taken place after October 13, 2018, and thus are within the four-year statute of

limitations applicable in the instant action. Id. The chart includes the sender and recipient of each alleged communication, as well as the format, the date, and a general description. Id.

However, the "purpose" of these communications is repeatedly described as "in furtherance of a scheme to defraud Azima." Id. at 2. The purpose column of the chart is conclusory at best and does not "[allege] what any particular Defendant did to advance the RICO scheme." Lundy v. Cath. Health Sys. of Long Island Inc., 711 F.3d 106, 119 (2d Cir. 2013). Because the purpose of the alleged acts of wire and mail fraud within the overall scheme is not sufficiently detailed, these acts are not adequately pled RICO predicates.

- **No Intent to Obtain "Money or Property"**

Even if the wire and mail fraud acts were pled with sufficient particularity, Plaintiffs would also need to show "that an object of" the fraud was "money or property." Kelly v. United States, 140 S. Ct. 1565, 1566 (2020). However, as Plaintiffs rightly note, "*Plaintiffs'* money or property need not be the object of the scheme to defraud." Dkt. No. 167 at 45 (emphasis in original). It is true that "the mail and wire fraud statutes" are "broad enough to include a wide variety of deceptions intended to deprive another of money or property," and the person deceived need not be "'the same person deprived of the money or property by the fraud.'" United States v. Greenberg, 835 F.3d 295, 306 (2d Cir. 2016) (quoting United States v. Christopher, 142 F.3d 46, 54 (1st Cir. 1998)). The wire fraud statute "does not require convergence between the parties intended to be deceived and those whose property is sought in a fraudulent

scheme." <u>United States v Martinez</u>, 22-CR-251 (LJL), 2023 WL 2118081, at *3 (S.D.N.Y. 2023); <u>United States v Weigand</u>, 20-CR-188 (JSR), 482 F. Supp. 3d 224 (S.D.N.Y. 2020).

For example, in <u>Greenberg</u>, a RICO defendant's conviction was upheld even though the deceived banks were "not the same person" as the bank customers who lost money as a result of the fraud. <u>Greenberg</u>, 835 F.3d at 306.

Here, on the other hand, Plaintiffs plead that the "affairs of the Enterprise were intended to, and have in fact resulted in, great financial gain for the RICO Defendants through millions in fees for their criminal services..." Dkt No. 1 at ¶ 207. Plaintiffs allege that "the Enterprise intentionally perpetrated a fraud and damaged Plaintiffs to curry favor with RAK and obtain more legal fees." Dkt. No. 167 at 45 (citing Dkt. No. 1 at ¶¶ 39, 207).

The mail and wire fraud statutes cannot be stretched so far as to include deceiving banks, to pay for the hacking of Azima, at the behest of Defendants' client, to obtain "money or property" from that very same client. In <u>Greenberg</u>, the deceived banks did not have interests aligned with the RICO defendant, rather, their interests were aligned with the customers deprived of property. <u>See</u> <u>Greenberg</u>, 835 F.3d at 306.

Here, it is the reverse, the alleged entity deprived of property is RAK, who allegedly directed the Defendants to undertake the very hacking campaign at the core

of this suit. Thus, RAK's interests were aligned with Defendants. The deprived party cannot also be the one to instigate the fraudulent scheme.[12]

The alignment of interests between RAK and the Defendants distinguishes this case from others like Greenberg. See Greenberg, 835 F.3d at 306. The Complaint alleges that RAK and the Defendants joined together in a scheme whose object was to harm Azima. Any fees that the Defendants obtained as a result of that scheme were not the object of the scheme. Rather, here, as in Kelly, the "loss" to RAK "is only an incidental byproduct of the scheme." Kelly v United States, 590 US 391, 402, (2020).

Thus, the alleged mail and wire frauds are not cognizable predicate acts because "money or property" was not "the object of the schemes." Shellef, 507 F.3d at 107; 18 U.S.C. § 1341, 1343, and 1344.

## D. PATTERN

The Supreme Court has explained that a RICO "pattern" requires "continuity plus relationship." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 at n. 14 (1985); see also Rakoff, Goldstein, & Queen, RICO: Civil and Criminal Law and Strategy (2022) at § 1.04(2). As will be discussed below, after removing the alleged acts that are 1) litigation activities falling under the Kimm bar, 2) alleged frauds that were not pled with specificity or did not seek to obtain money or property, and 3) acts that

---

[12] Plaintiffs do not allege that RAK instigated a deceptive scheme to obtain money or property from Plaintiffs and then to share those proceeds with Defendants. Dkt. No. 167 at 45 (citing Complaint ¶¶ 39, 207).

merely concealed completed schemes, there are then insufficient remaining predicate acts to satisfy either continuity or relationship. Thus, there is no RICO pattern.

### 1. Continuity

To satisfy "continuity", the alleged racketeering activities must "amount to or pose a threat of continued criminal activity." Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999) (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)). Thus, a "plaintiff in a RICO action must allege either (a) an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or (b) a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." Grace Int'l Assembly of God v. Festa, 797 F. App'x 603, 605 (2d Cir. 2019).

### a. Open-ended continuity

"There are two ways to show open-ended continuity – (1) where the acts of the defendant or the enterprise [are] inherently unlawful, such as murder or obstruction of justice, and [are] in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, or (2) where the enterprise primarily conducts a legitimate business but there is some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." Grace Int'l Assembly of God v. Festa, 797 F. App'x 603, 606 (2d Cir. 2019)(internal citations and quotation marks omitted).

71

Even assuming the truth of Plaintiffs' allegations, Dechert is a global law firm that does not "regularly operate" through the commission of RICO predicate acts. Grace Int'l, 797 F. App'x at 606. Moreover, the nature of the completed hacking campaign alleged does not necessarily "[imply] a threat of continued criminal activity". Grace Int'l Assembly of God v. Festa, 797 F. App'x 603, 606 (2d Cir. 2019)(quoting Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 243 (2d Cir. 1999). Thus, Plaintiffs have not sufficiently alleged open-ended continuity.

### b. Closed-ended Continuity

Closed-ended continuity is demonstrated by predicate acts that "amount to continued criminal activity" by a particular defendant. DeFalco v. Bernas, 244 F.3d 286, 321 (2d Cir. 2001). To satisfy closed-ended continuity, the plaintiff must prove "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months … do not satisfy this requirement." Id. The activities must be "neither isolated nor sporadic.'" GICC Capital Corp. v. Technology Finance Group, Inc., 67 F.3d 463, 467 (2d Cir.1995). The Second Circuit has held that "two years" meets the minimum requirement for a "substantial period of time." DeFalco v. Bernas, 244 F.3d 286, 321 (2d Cir. 2001).

Although the two-year requirement is not a "bright-line" rule, "it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where … the activities alleged involved only a handful of participants and do not involve a complex multi-faceted conspiracy." Highmore Fin. Co. I, LLC v. Greig Companies, Inc., No. 21-CV-11021 (AT), 2023 WL 4865722, at *5

(S.D.N.Y. July 31, 2023)(citing <u>Spool v. World Child Int'l Adoption Agency</u>, 520 F.3d 178, 183 (2d Cir. 2008).

Here, Defendants claim that Plaintiffs allege only a "single scheme" directed at a "single victim." Dkt. No. 158 at 11. Plaintiffs counter that it was a "multi-prong complex campaign" against multiple targets. Plaintiffs argue that they have alleged many acts occurring over a greater span than two years and that while Azima is the only individual Plaintiff, the enterprise "harmed others" as well, so it is not a "single-victim" case. Dkt. No. 167 at 35 (citing <u>SKS Constructors, Inc. v. Drinkwine</u>, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006); <u>see also</u> <u>First Interregional Advisors Corp. v. Wolff</u>, 956 F.Supp. 480, 486 (S.D.N.Y. 1997) (closed-ended continuity established where plaintiff alleged similar schemes to defraud non-named parties).

On the one hand, the Second Circuit has dismissed allegations of "one scheme with one clear victim" as failing to show a pattern. <u>Grace Int'l Assembly of God v. Festa</u>, 797 F. App'x 603, 606 (2d Cir. 2019). However, "the fact that there is only a single victim does not preclude the existence of a pattern of racketeering activities." <u>See</u> Rakoff, Goldstein, & Queen, at § 2.03(3); <u>see generally</u> <u>H.J. Inc. v. Nw. Bell Tel. Co.</u>, 492 U.S. 229 (1989); <u>see also</u> <u>State Wide Photocopy Corp. v. Tokai Fin. Servs., Inc.</u>, 909 F.Supp. 137, 140–41 (S.D.N.Y.1995); <u>Com-Tech Assocs. v. Computer Assocs. Int'l, Inc.</u>, 753 F. Supp. 1078, 1091 (E.D.N.Y. 1990), aff'd, 938 F.2d 1574 (2d Cir. 1991); <u>Polycast Technology Corp. v. Uniroyal, Inc.</u>, 728 F.Supp. 926, 952 n. 5 (S.D.N.Y., 1989). Moreover, the Supreme Court has held that a "single scheme" may also be

sufficient to show a pattern. See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 254 (1989)

Rather, in the Second Circuit, "closed-ended continuity is primarily a temporal concept," and when the racketeering acts span a "lengthy period of time" the "other factors" are "less critical." See Rakoff, Goldstein, & Queen, RICO: Civil and Criminal Law and Strategy (2022) at § 2.03(3)(citing Fresh Meadow Food Servs., LLC v. RB 175 Corp., 282 F. App'x 94, 99 (2d Cir. 2008); Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 242 (2nd. Cir. 1999). Along with length of time, "other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." Cofacredit, 187 F.3d at 242; One World, LLC v. Onoufriadis, 2021 WL 4452070, at *2 (2nd. Cir. 2021); see generally Crawford v. Franklin Credit Management Corp., 758 F.3d 473, 489 (2nd. Cir. 2014). Thus, determining continuity involves balancing all these factors.

Here, if the alleged predicate acts were deemed to be timely and cognizable RICO predicates, there would be sufficient closed-ended continuity. This is so for three reasons.

**First**, the alleged "Enterprise has operated continuously since 2014." Dkt. No. 1 at ¶ 208. That is an alleged period of eight years—longer than several other cases where the lengthy period of operation was sufficient to establish closed-ended continuity. See Fresh Meadow, 282 F. App'x at 99 (three and half years); State Wide Photocopy Corp. v. Tokai Fin. Servs., Inc., 909 F.Supp. 137, 140–41 (S.D.N.Y.

1995)(five years); <u>Columbus McKinnon Corp. v. HealthNow New York, Inc</u>., No. 03–CV–831S, 2006 WL 2827675, at *11 (W.D.N.Y. Sept. 29, 2006)(four years); <u>Marini v. Adamo</u>, 812 F.Supp.2d 243 (E.D.N.Y., 2011)(six years). Thus, the lengthy period of time over which the alleged acts occurred makes the other factors "less critical". <u>See</u> Rakoff, Goldstein, & Queen, at § 2.03(3)(citing <u>Fresh Meadow,</u> 282 F. App'x at 99.

Second,  the Complaint alleges hundreds of predicate acts, including "obstruction of justice, witness tampering, money laundering, wire and mail fraud, and bank fraud." Dkt. No. 167 at 35; Dkt. No. 1 at ¶¶ 15–24, 68–74. The number and variety of alleged predicate acts distinguishes this case from the "single scheme" in <u>Grace International</u>, which involved wire frauds committed during the course of a single construction project. <u>Grace International</u>, 797 Fed.Appx. at 605. "Millions of dollars" paid to undertake a hacking campaign is vastly different from lies told during the construction of a single church like in Grace International. Dkt. No. 1 at 55.

Third, there were other alleged victims. The Complaint alleges Defendants harmed the other Plaintiffs (Azima's businesses). And Azima only owns 50% of Plaintiff FFV Development LLC. Dkt. No. 1 at 14. The Complaint also alleges "the Enterprise conspired to and did inflict harm on numerous victims, including Massaad, Al Sadeq, and others referenced but not named in the Complaint." Dkt. No. 167 at 35 (citing Dkt. No. 1 ¶¶ 2–3, 59–61, 165–69, 175–78).

Moreover, Plaintiffs are correct that merely because these individuals are not plaintiffs in this action, "it does not necessarily follow that a plaintiff may not allege injury to others in support of allegations of an ongoing fraudulent scheme, or pattern

of racketeering activity." See SKS Constructors, Inc. v. Drinkwine, 458 F.Supp.2d 68, 80 (E.D.N.Y. 2006); see also First Interregional Advisors Corp. v. Wolff, 956 F.Supp. 480, 486 (S.D.N.Y. 1997). Logically, this must be the case, otherwise, "schemes could remain in force, provided the orchestrators changed targets prior to the actual accrual of a 'substantial' period of time." See Wells Fargo Century, Inc. v. Hanakis, 2005 WL 1523788 *5 (E.D.N.Y. 2005).

Therefore, this Court finds even if many of the predicate acts allegedly targeted Azima, due to the lengthy period of operation, the number and variety of alleged predicate acts, and the other alleged victims, the allegations would be sufficient to satisfy close-ended continuity. But this is true *only if* the District Judge were to find that the alleged acts within this period could be RICO predicates. See Dkt. No. 1 at ¶¶ 15–24, 68–74. This Court ultimately finds that they are not RICO predicates, and therefore, there is no pattern.

### 2. Relationship

RICO predicate acts must be "related to each other (horizontal relatedness) and to the enterprise (vertical relatedness)." See Rakoff, Goldstein, & Queen, at § 1.04(2)(citing United States v. Daidone, 471 F.3d 371, 376 (2d Cir. 2006). Assuming arguendo that some of the alleged acts do amount to RICO predicates, and also finds that the Plaintiffs adequately alleged closed-ended continuity, the predicate acts must still be sufficiently related both horizontally and vertically.

Plaintiffs claim that this case is not "about old hacking activity that is the subject of ongoing litigation in a foreign court. Rather, as pleaded, it is about a years-

long effort to leverage the result of that illegal hacking in combination with other illegal behavior to inflict financial and reputational harm on the targets of the Enterprise" including efforts to "embroil Azima in costly litigation, obstruct litigation in the U.S., and destroy Plaintiffs' businesses." Dkt. No. 167 at ¶¶ 14, 57.

However, many of the predicate acts Plaintiffs allege could only further the purpose of concealing the original hacking. See, e.g., ¶¶32–34 (allegations of money laundering); ¶¶ 154–55 (witness intimidation in proceedings Azima initiated). Such acts are not "horizontally related" to the other acts done only for the purpose of "embroiling Azima in bogus litigation." See Dkt. No. 167 at 20–21 (citing Dkt. No. 1 at ¶¶ 86, 102–10, 238, 240–44). Moreover, the acts designed to embroil Azima in "bogus litigation" are not necessarily "vertically related" to the unlawful purpose of the enterprise: hacking Azima. Dkt. No. 177 at 8.

To be sure, Plaintiffs view all this as inherently related. As they explained at oral argument:

> You can hack someone. But the hacking doesn't necessarily do much damage. If someone hacks my computers and takes my documents and just keeps them for themselves or hands them to a friend, that doesn't do much damage. What does the damage was this force multiplier, where they agreed to go commit crimes by engaging in false public relation activity which we have alleged clearly in paragraph 182 is part of the force multiplier. See Dkt. No. 192 at 156 (March 11, 2024).

Nevertheless, many of the alleged predicate acts would not fit within Plaintiffs' "force multiplier" theory. For example, false statements in proceedings Azima initiated would not further a purpose of increased legal fees.

Similarly, Plaintiffs argue that fraudulent statements made to journalists acted as a "force multiplier" in damaging Azima's reputation. However, fraudulent statements made to banks for the purpose of concealing payments to hackers would not act as a force multiplier in the scheme to damage Azima's reputation.

Thus, even if some of the alleged litigation activities clear the <u>Kimm</u> bar, they are not sufficiently related to the common purpose of the enterprise as alleged in the Complaint.

## 2. PLAINTIFFS DO NOT PLEAD COGNIZABLE RICO INJURIES

### A. RICO Standing Requires Injury to Business or Property

"A RICO plaintiff 'only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.'" <u>First Nationwide Bank v. Gelt Funding Corp.</u>, 27 F.3d 763, 768 (2d Cir. 1994) (quoting <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985)). To state a civil RICO claim, a plaintiff must "plead facts sufficient to demonstrate that plaintiff suffered an injury and that the plaintiff's injury was caused by the defendant's racketeering activities." <u>De Sole v. Knoedler Gallery, LLC</u>, 137 F. Supp. 3d 387, 402 (S.D.N.Y. 2015) (Gardephe, J.) (citing <u>Ideal Steel Supply Corp. v. Anza</u>, 652 F.3d 310, 323 (2d Cir. 2011)).

### B. Injury Must Be Proximately Caused by Racketeering Activity

The Supreme Court has held that proximate cause is required to show a civil RICO injury under 18 USC §1964. <u>Holmes v. Sec. Inv. Prot. Corp.</u>, 503 U.S. 258, 268 (1992). "When a court evaluates a RICO claim for proximate causation, the central

question it must ask is whether the alleged violation led directly to the plaintiff's injuries." <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451, 461 (2006). "A predicate act does not proximately cause an injury if it merely furthers, facilitates, permits or conceals an injury that happened or could have happened independently of the act." <u>Vicon Fiber Optics Corp. v. Scrivo</u>, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2002) (quoting <u>Moeller v. Zaccaria</u>, 831 F.Supp. 1046, 1054 (S.D.N.Y. 1993)). A mere "but for" cause is "insufficient." <u>See</u> Rakoff, Goldstein, & Queen, at § 1.07(2)(citing <u>Doe v. Trump Corp.</u>, 385 F. Supp. 3d 265 (S.D.N.Y. 2019); <u>see also</u> <u>Empire Merchants, LLC v. Reliable Churchill LLP</u>, 902 F.3d 132, 140 (2d Cir. 2018). There is no proximate cause if the chain of causation is interrupted by the "independent actions of third and even fourth parties" <u>See</u> <u>Hemi Grp., LLC v. City of New York</u>, 559 U.S. 1, 15, (2010).

## C. Plaintiff Azima's Alleged Injuries

Defendants move to dismiss Plaintiffs' claims on the grounds that Plaintiffs have failed to plead injuries cognizable under RICO that were proximately caused by alleged racketeering activities. Dkt. No. 156 at 43–51. As alleged, the injuries to Plaintiff Azima and his related businesses include "depriving Azima of identifiable and quantifiable business opportunities and causing Azima's banks to close accounts, cancel credit cards and lines of credit, and cancel business financing and/or refuse to provide Azima with such financing," "defeating Azima's meritorious claims for the Enterprise's hacking and related injuries," and "forcing Azima to spend fees to pursue these claims." Dkt. No. 1 at ¶ 229.

Defendants claim that all the alleged injuries to Azima and his businesses are not cognizable under RICO. Each is addressed in turn.

### i. Reputational Harm

First, the complaint here repeatedly alleges that the Enterprise Defendants intended to cause and did cause "extensive damage to [Azima's] reputation." Dkt. No. 1 at ¶¶ 81, 245.

Courts appear split on whether to permit a plaintiff to recover for reputational harm. Some courts have found "RICO only protects injury to the plaintiff's business or property." Westchester County. Indep. Party v. Astorino, 137 F. Supp. 3d 586, 612 (S.D.N.Y. 2015). Injury to "character, business reputation, and/or the intentional infliction of emotional distress are not actionable under civil RICO." Tsipouras v. W&M Properties, Inc., 9 F. Supp. 2d 365, 368 (S.D.N.Y. 1998).

But other courts have permitted RICO plaintiffs to sue for damage to business reputation. See Rakoff, Goldstein, & Queen, at § 4.02(4)(b)(citing Philatelic Found. v. Kaplan, No. 85 CIV. 8571 (RWS), 1986 WL 5629 (S.D.N.Y. May 9, 1986), abrogated by Aramony v. United Way of Am., 969 F. Supp. 226 (S.D.N.Y. 1997).

One such example is Frydman v. Verschleiser. See 172 F. Supp. 3d 653 (S.D.N.Y. 2016). In Frydman, a plaintiff was permitted to bring a RICO suit for defamatory and fraudulent statements that "played a material and substantial part in inducing others not to deal" with him. Id. at 668. The Frydman Complaint "lists many investors by name" and many of the relevant paragraphs of that complaint listed the specific fraudulent communications that caused those specific investors to

80

redeem their REIT shares.  Id. at 668; see e.g., Frydman Consolidated Amended Complaint at ¶ 374 ("Ed Suzuki…reported that he lost approximately five client sales as a result of the email blast campaign of May and June 2015…Concord…dropped United Realty as a result of the False Claims Letter and the email blast campaign…").

Here, however, Plaintiffs do not allege that Defendants intentionally sought to disrupt a specific business deal or particular business contact. Plaintiffs only allege an intent to tarnish Azima's reputation generally. Plaintiffs do not tie any of the lost deals to specific fraudulent communications. Thus, while this case is similar to Frydman, on balance, the alleged reputational damage and resulting lost deals here are not actionable RICO injuries.

Second, Plaintiffs claim banks, "have closed Azima's accounts and denied him loans citing the negative publicity brought on by the Enterprise's litigation against Azima in the U.K. based on the hacked documents." Id. at ¶ 179. Even reading these pleadings in the light most favorable to Plaintiff, these injuries were caused by the independent decisions of non-party banks. See Hemi Grp., LLC v. City of New York, 559 U.S. 1, 15, (2010).  When "factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions." First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994). Plaintiffs have thus failed to establish the necessary direct connection between the alleged predicate acts and his injuries. The alleged harm to his reputation and the lost loans were not proximately caused by Defendants' actions.

### ii. Legal Fees

Plaintiffs also allege financial injury to Azima through "unnecessary legal fees and associated costs in connection with the litigation." Dkt. No. 1 at ¶ 160. Plaintiffs claim that the Enterprise Defendants caused Azima "to expend significant legal fees and expenses" and have "[driven] up Azima's legal costs." Id. at ¶¶ 181, 183. Indeed, Plaintiffs contend that "Defendants' instigation and obstruction of litigation was at the core of their Plan to destroy Azima financially." Dkt. No. 167 at 44.

It is true that "monetary losses in the form of legal fees…may constitute injuries to business or property under § 1964(c)…" See Angermeir v. Cohen, 14 F. Supp. 3d 134, 153 (S.D.N.Y. 2014) (quoting Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1167 (2d Cir. 1993)) (collecting cases).

One key case permitting the recovery of legal fees in a RICO action is Bankers Trust Co. v. Rhoades, 859 F.2d 1096 (2d Cir. 1988). In Bankers Trust, the RICO defendants allegedly engaged in fraudulent conveyances to distort the apparent value of a company about to enter bankruptcy. Bankers Trust, 859 F.2d at 1096. The Bankers Trust plaintiffs, creditors of the defendants there, brought a RICO action asserting that they were injured by the defendants' bankruptcy fraud because they needed to expend legal fees to combat the Chapter 11 plan that was structured based on the reduced value of the company. Bankers Trust, 859 F.2d at 1096.

Another example of a RICO plaintiff recovering legal fees is Angermeir v. Cohen, 14 F. Supp. 3d 134 (S.D.N.Y. 2014). There, the Court held the plaintiffs alleged "a sufficient injury to business or property … in the form of legal fees they

had to pay in response to…allegedly fraudulent lawsuits" which "resulted in default judgments." See Angermeir, 14 F. Supp. 3d at 141, 156.

A third example is Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1166 (2d Cir. 1993). In Stochastic, a judgment creditor of a bankrupt company brought a RICO action claiming that the defendant-company fraudulently transferred assets to prevent the plaintiff from collecting on several judgments. Stochastic, 995 F.2d at 1167.

A final example is Sykes v. Mel Harris & Assocs., LLC, 757 F. Supp. 2d 413 (S.D.N.Y. 2010). Sykes involved "industrial scale state court litigations filed for the exclusive purpose of obtaining default judgments." See Rajaratnam, 449 F. Supp. 3d at 71; Sykes 757 F. Supp. 2d at 419 (104,341 fraudulent collection actions). Plaintiffs argue that the "enterprise in Sykes focused on injuring the plaintiffs through litigation, and yet the court found the stated RICO claim cognizable." Dkt. No. 167 at 40 (citing Sykes, 757 F. Supp. 2d at 418).

The allegations in this case can be distinguished from all four of Plaintiffs' cited cases.

What Bankers Trust, Angermeir, Stochastic, and Sykes all have in common is that there is a tight nexus between the RICO plaintiff's need to expend legal fees *defensively* and the RICO scheme. In Sykes and Angermeir, the plaintiffs were permitted to recover fees in pursuit of lifting default judgments that had been part of the underlying RICO schemes. The RICO claims in those cases could thus be

characterized as defensive litigation, making <u>Sykes</u> and <u>Angermeir</u> distinguishable from the offensive litigation Azima has initiated here.

<u>Bankers Trust</u> and <u>Stochastic</u> both involved legal fees spent resisting RICO schemes that combined out-of-court frauds with maneuvers that used the legal process as an instrument of the scheme. Fees spent resisting a fraudulent chapter 11 plan or pursuing a judgment debtor who is using the legal process to frustrate collection also strike this Court as defensive litigation.

On the other hand, here, Azima brought the DC suit, brought the North Carolina suit, and brought the § 1782 proceedings in New York, North Carolina, and Florida seeking discovery in support of counterclaims he brought in the U.K.  Dkt No. 1 at ¶¶ 83, 127–28, 129, 133, 144, 150, 171, 218.[13] Therefore, <u>Bankers Trust</u> and <u>Stochastic</u> are also not applicable to the offensive litigation here.

As dastardly as the alleged scheme is, to permit Plaintiffs to recover for legal fees spent resisting the scheme to hack him would grant RICO too long a reach.  It would transform any perceived deprivation of legal rights or any perceived tortious conduct involving predicate acts into a timely RICO claim. This is so for two reasons.

First, if plaintiffs could use the legal fees in actions *they* initiated as their damages, then the limitation in RICO to "business or property" damages would vanish because anything leading a RICO plaintiff to sue to protect their interests would necessarily result in damage to "business or property."

---

[13] Among other reasons, Azima cannot recover for any fees spent defending against the suit brought by RAK, because he has already settled the suit in the U.K and legal fees were included in the settlement. <u>See</u> Dkt No. 174-2 at ¶ 5.

Second, as discussed above, the Second Circuit has expressed a concern that if such litigation-related acts were RICO predicates, plaintiffs could use the attorney fees flowing from those litigation activities to "restart the limitations clock". Bingham v. Zolt, 66 F.3d 553, 560 (2d Cir. 1995); see also Bankers Tr. Co. v. Rhoades, 859 F.2d 1096, 1105 (2d Cir. 1988)(disfavoring interpretation where a plaintiff "could keep its claim open indefinitely simply by protracting the litigation"); see also Zahl v. Kosovsky, No. 08-CV-8308 LTS THK, 2011 WL 779784, at *13 (S.D.N.Y. Mar. 3, 2011), aff'd, 471 F. App'x 34 (2d Cir. 2012).

Other SDNY decisions that limited RICO's reach into litigation activities also endorsed the policy goals of providing "repose, elimination of stale claims, and certainty...." See Tech. Opportunity Grp., Ltd. v. BCN Telecom, Inc., No. 16-CV-9576 (KMK), 2019 WL 4688628, at *9–10 (S.D.N.Y. Sept. 25, 2019)(citing Rotella v. Wood, 528 U.S. 549, 554 (2000).

Under the circumstances here, where Plaintiffs' legal fees were incurred in *offensive* litigation, the legal fees are not RICO injuries.

### D. The Corporate Plaintiffs' Alleged Injuries

Defendants also argue that the Corporate Plaintiffs cannot establish that they were proximately harmed by Defendants' alleged actions or that the Corporate Plaintiffs were the target of Defendants' alleged scheme.

In Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006), the Supreme Court affirmed District Court's decision granting petitioners' motion to dismiss plaintiff's §1964(c) RICO claim because the plaintiff "[had] not satisfied the

proximate-cause requirement articulated in Holmes." The Court focused on the "discontinuity between the RICO violation and the asserted injury." Id. at 459. In particular, the Court contended that plaintiff's injury "could have resulted from factors other than petitioners' alleged acts of fraud," and it would be difficult to establish what portion of harm to plaintiff was attributable to petitioner's alleged wrongdoing. Id. The Court remarked, "[t]he cause of [Plaintiff's] asserted harms…[was] a set of actions…entirely distinct from the alleged RICO violation." Id. at 458. The Court further raised concerns about "the speculative nature of the proceedings that would follow if [Plaintiff] were permitted to maintain its claim" based on this "attenuated connection." Id. at 459. Similarly in Empire Merchants, LLC v. Reliable Churchill LLLP, the Second Circuit affirmed the dismissal of a civil RICO claim where "the asserted causal relationship between the alleged racketeering and [the injury]" was "intricate and uncertain." 902 F.3d 132, 142 (2d Cir. 2018).

Here, the Corporate Plaintiffs repeatedly allege "lost business opportunities" as a significant injury. Dkt. No. 1 at ¶ 230. Corporate Plaintiffs claim, "[t]he injuries to FFV Development LLC caused by reason of the violations of 18 U.S.C. § 1962(c) include but are not limited to damages stemming from the loss of financing that had been preliminarily approved for the housing projects, lost profits related to the projects, and damages to the company's reputation and goodwill." Id. at ¶ 249.

Most specifically, Corporate Plaintiffs claim that "Main 3260 LLC…was expecting to receive a loan of approximately $13.5 million," but "[t]he lender refused to provide financing due to the negative publicity instigated by the Enterprise that

the bank found when conducting its due diligence…As a result, Azima and his companies suffered approximately $15 millions of dollars in lost profits that they otherwise would have obtained from these two projects." Id. at ¶180.

The "negative publicity" presumably resulted from the release of the allegedly hacked documents "that the bank found when conducting its due diligence." Id. But the predicate acts of fraud, money laundering, and litigation misconduct are pled as relating to the concealment of this hacking.

As alleged, the harm to Corporate Plaintiffs was the result of the hacking, so "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud." Hemi Grp., LLC v. City of New York, N.Y., 559 U.S. 1, 11 (2010). This attenuated connection between the predicate acts and the alleged injury to the Corporate Plaintiffs is similar to the indirect causal relationships that the Supreme Court rejected in Anza and Hemi.

Because there is no "directness of the relationship between the purported enterprise's alleged criminal acts and the [Corporate Plaintiffs'] injuries," the proximate cause requirement has not been satisfied here. Picard v. Kohn, 907 F. Supp. 2d 392, 397 (S.D.N.Y. 2012) (citing McBrearty v. Vanguard Group, Inc., 353 Fed.Appx. 640, 641–42 & n. 1 (2d Cir. 2009); but see Frydman v. Verschleiser, 172 F. Supp. 3d 653, 671 (S.D.N.Y. 2016) (plaintiffs sufficiently alleged proximate cause by claiming that allegedly fraudulent statements played a "material and substantial" role in tanking a loan deal).

Additionally, Defendants contend that "the Corporate Plaintiffs fail to plead that any of them were 'targets' of the RICO predicate acts." Dkt. No. 156 at 47. To bring a civil RICO claim, "plaintiffs must show that they were "the intended targets of the RICO violations" and that any alleged RICO injury must have been the "preconceived purpose" of the RICO activities. G-I Holdings, Inc. v. Baron & Budd, 238 F. Supp. 2d 521, 549 (S.DN.Y. 2002) (quoting In re American Express Co. Shareholder Litig., 39 F.3d 395, 400 (2d Cir. 1994)). The Complaint does plead that Defendants intended "to cause economic damages to Azima and his businesses." Dkt. No. 1 at ¶59. In J.T. v. de Blasio, the court found that the plaintiff could not establish standing under RICO where the fraudulent scheme alleged targeted another victim. 500 F. Supp. 3d 137, 166 (S.D.N.Y. 2020), aff'd in part, appeal dismissed in part sub nom. K.M. v. Adams, No. 20-4128, 2022 WL 4352040 (2d Cir. Aug. 31, 2022). Similarly, here, the alleged scheme as pled targeted Azima, and the Corporate Plaintiffs appear to have merely sustained collateral damage. The conclusory assertion that Defendants also intended to harm the Corporate Plaintiffs is not concrete enough to establish that they were a target of the alleged scheme.

### 3. CLAIMS ARE TIME-BARRED

RICO actions are subject to a four-year statute of limitations. Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987). When "a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury." Bankers Tr. Co. v. Rhoades, 859 F.2d 1096, 1102 (2d Cir.

1988). "It is the RICO *injury* that triggers the accrual, not the RICO *violation*." Angermeir v. Cohen, 14 F. Supp. 3d 134, 158 (S.D.N.Y. 2014)(emphasis in original).

Plaintiffs filed their Complaint in this action on October 13, 2022, so the relevant date for statute of limitations purposes is October 13, 2018. Dkt. No. 1.

### A. Discovery or Knowledge of Injury

"The first step in the statute of limitations analysis is to determine when a plaintiff sustained the alleged injuries for which it seeks redress…From there, the Court is to determine when a plaintiff discovered or should have discovered each injury, which establishes when the four-year statute of limitations period begins." World Wrestling Ent., Inc. v. Jakks Pac., Inc., 530 F. Supp. 2d 486, 524 (S.D.N.Y. 2007), aff'd, 328 F. App'x 695 (2d Cir. 2009).

"The RICO statute of limitations…runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were *'storm warnings'* that should have prompted an inquiry." World Wrestling Ent., Inc. v. Jakks Pac., Inc., 328 F. App'x 695, 697 (2d Cir. 2009)(citing Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 427 (2d Cir. 2008)).

In the Complaint, Plaintiffs contend, "Azima did not learn about the extent of the RICO Conspirators' false statements until years later, starting in 2020, when individuals involved in the hacking began confessing their involvement." Dkt. No. 1 at ¶112. Plaintiffs also point to De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 296 (S.D.N.Y. 2013) (Gardephe, J.) where the court said that "determining

whether a plaintiff had sufficient facts to place her on inquiry notice is often inappropriate for resolution on a motion to dismiss." Dkt. No. 167 at 55–56.

But the Court need not speculate as to when Azima learned of injuries flowing from the hacking. It is beyond dispute that Azima knew of the injuries when he sued seeking compensation for those injuries "in September 2016" when "Azima filed his own suit against RAKIA in the United States District Court for the District of Columbia, seeking compensation for the hacking of his accounts and theft of his emails, documents, and other information." Dkt. No. 1 at ¶ 83.

Thus, the Court finds that Plaintiffs were on notice as early as 2016. For any injuries that were not alleged in the 2016 suit, there were certainly sufficient "storm warnings" that such injuries would flow from the earlier hack, and thus (fair or unfair) the limitations clock begins to run.

In <u>Verschleiser v. Frydman</u>, the plaintiff similarly contended "that the alleged RICO scheme and the resulting ... damages were unknown to him until recently," but the court there still found the claims to be untimely as "it was clear on the face of the complaint that there were multiple storm warnings…." No. 22-CV-7909 (JGK), 2023 WL 5835031, at *6 (S.D.N.Y. Sept. 7, 2023).

Similarly, here, the Complaint alleges that the Defendants released Plaintiff Azima's private information and disparaged him in the press as early as 2016. Dkt. No. 1 at ¶¶ 67, 80. Once this allegedly hacked information was publicly available and reported in the press, it was certainly at least "probable that fraud had occurred," and

therefore there were "storm warnings" that started the RICO clock. <u>Koch v. Christie's Int'l PLC</u>, 699 F.3d 141, 151 (2d Cir. 2012).

Because the clock started at the time of the 2016 lawsuit and any associated storm warnings, the pre-2018 injuries are outside the statutory period, and claims after 2018 flowing from those injuries are time barred.

### B. New and Independent Injuries

Still, Plaintiffs contend that their RICO claims are not barred by the statute of limitations because *some* of the injuries alleged occurred after October 13, 2018.

The Second Circuit has recognized a "separate accrual" rule under which "the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury." <u>In re Merrill Lynch Ltd. Partnerships Litig.</u>, 154 F.3d 56, 59 (2d Cir. 1998). A plaintiff may base a civil RICO claim on "separate and independent injuries" flowing from underlying RICO violations "regardless of when those violations occurred," but "non-independent injuries will not cause a new limitations period to accrue." <u>Bingham v. Zolt</u>, 66 F.3d 553, 560 (2d Cir. 1995).

Courts in this circuit have noted, "'allegations of 'new and independent' injuries cannot depend on injuries that are derivative of the core injury sustained.'" <u>World Wrestling Ent., Inc. v. Jakks Pac., Inc.</u>, 530 F. Supp. 2d 486, 524 (S.D.N.Y. 2007), aff'd, 328 F. App'x 695 (2d Cir. 2009) (quoting <u>Eno Farms Coop. Assoc, Inc. v. Corp. for Indep. Living</u>, No. 3:06–CV–1983, 2007 WL 3308016, at *8 (D.Conn. Nov. 5, 2007)). As discussed above, the Second Circuit has also found that "continuing efforts

to conceal the initial fraud" do not "result in new and independent injuries." In re Merrill Lynch Ltd. Partnerships Litig., 154 F.3d 56, 59–60 (2d Cir. 1998).

Plaintiffs argue that their new injuries are "independent" because they arise from "a wide variety of criminal conduct" rather than "a continuum of the same misconduct." Dkt. No. 167 at 58. Plaintiffs rely on Bingham v. Zolt, 66 F.3d 553(2d Cir. 1995) where the "separate accrual" rule applied because a "continuing series of fraudulent actions" led to a series of "new and independent legally cognizable [injuries]." Id. at 561. In Bingham, the Defendants were accused of continuously funneling royalty checks away from Bob Marley's estate up until the date of the filing of the litigation. The Second Circuit held that each transfer of funds out of the estate restarted the limitations clock. See Bingham v. Zolt, 66 F.3d at 561.

Plaintiffs point to some specific injuries that occurred within the four-year limitations period, namely the substantial legal fees incurred after 2018 and a lost loan of approximately $13.5 million in January 2019. Dkt. No. 1 at ¶¶ 180–81. The Defendants respond that "[t]he 'new' injuries are…not independent as a matter of law." Dkt. No. 158 at 21.

On balance, this Court agrees with Defendants that the injuries alleged to have accrued after October 13, 2018, were not sufficiently independent to trigger Bingham's separate accrual rule. The Court will discuss each alleged post-2018 injury in turn.

92

### a. The Lost Loan

Plaintiffs point to the lost FFV loan as the first example of an independent injury that accrued after October 13, 2018. Dkt. No. 1 at ¶ 180. Defendants allege that the lost loan injury is not independent because it "is 'derivative of the core injury sustained,' Tech. Opportunity Grp., Ltd. v. BCN Telecom, Inc., 2019 WL 4688628, at *6 (S.D.N.Y. Sept. 25, 2019): harm to Azima's reputation from the 2016 release of his hacked materials."

In 421-A Tenants Ass'n, Inc. v. 125 Ct. St. LLC, 760 F. App'x 44, 50 (2d Cir. 2019), the plaintiffs alleged that a landlord who had defrauded tenants by lying about the rent-stabilized nature of the properties "compounded that fraud by using the illegally inflated initial rent amount to calculate rent increases each time a tenant renewed their lease." The Second Circuit found that new injuries caused by the subsequent renewal leases were "not independent of the alleged underlying RICO violation because they were caused in material part by the alleged fraud committed in connection with the first lease."

Similarly, in Tech. Opportunity Grp., Ltd. v. BCN Telecom, Inc., No. 16-CV-9576 (KMK), 2019 WL 4688628, at *7 (S.D.N.Y. Sept. 25, 2019), the court found that newly alleged injuries which "relate[d] back to, and reinforce[d] the initial threat… [did] not constitute independent injuries."

The Complaint itself connects the lost loan to the original hack: "Banks have closed Azima's accounts and denied him loans citing the negative publicity brought on by the Enterprise's litigation against Azima in the U.K. based on the hacked

documents." Dkt. No. 1 at ¶ 179. Defendants also point out that "the Complaint does not allege that the negative publicity was generated after 2018." Dkt. No. 156 at 33. Thus, on balance, it is reasonable to infer that the injuries were "caused in material part" by the pre-2018 hacking and the release of those hacked materials. 421-A Tenants Ass'n, Inc., 760 F. App'x at 50. Courts have "refused to extend the life span of a RICO plaintiff's injuries when they merely involve subsequent costs associated with the initial injury." World Wrestling Ent., Inc. v. Jakks Pac., Inc., 530 F. Supp. 2d 486, 527 (S.D.N.Y. 2007), aff'd, 328 F. App'x 695 (2d Cir. 2009).

Because the lost loan injury was inextricably intertwined with the initial hacking injury, Plaintiffs cannot establish that these injuries were sufficiently independent to trigger separate accrual.

### b. Post-2018 Legal Fees

Plaintiffs also contend that the legal fees they incurred after October 13, 2018 should separately accrue. In Bankers Tr. Co. v. Rhoades, 859 F.2d 1096, 1105 (2d Cir. 1988), the Second Circuit held that a RICO plaintiff could recover legal fees when it became obligated to pay those fees. Similarly, the court in Angermeir v. Cohen, 14 F. Supp. 3d 134, 159 (S.D.N.Y. 2014), found that claims for damages based on legal expenses incurred within the statute of limitations were not time barred under the separate accrual rule.

Defendants object that "Plaintiffs' claims for legal fees here arise largely from lawsuits that Azima himself initiated," and Plaintiffs should not be able to "re-start their own injury by initiating a lawsuit about it." Dkt. No. 158 at 21; see also Dkt No.

94

1 at ¶¶ 83, 127–28, 129, 133, 144, 150, 171, 218 (Azima initiated D.C. suit, North Carolina suit, and § 1782 proceedings in NY, Florida, and North Carolina).

Defendants cite Zahl v. Kosovsky, No. 08 CIV. 8308 LTS THK, 2011 WL 779784, at *13 (S.D.N.Y. Mar. 3, 2011), aff'd, 471 F. App'x 34 (2d Cir. 2012) in which the court rejected separate accrual where the new injuries allegedly flowed from legal proceedings "many of which were the products of Plaintiff's own initiation." Defendants also rightly note that both Bankers Tr. Co. and Angermeir are distinguishable from the instant case because the legal fees in those actions were incurred as a result of litigation brought by the defendants. See Dkt. No. 158 at 21, 34.

On balance, the legal fees incurred by Plaintiffs here are more akin to those rejected by the court in Zahl because these fees were incurred in *offensive litigation* brought by Azima. See supra, Section C.ii, *Legal Fees*.

## V. RICO CONSPIRACY CLAIM SHOULD BE DISMISSED

The defects identified above are fatal to both Plaintiffs' substantive civil RICO claims and to the RICO conspiracy claim. See Festinger v. Snitow Kaminetsky Rosner & Snitow, LLP, No. 20-CIV-9784(PGG)(JW), 2022 WL 901660, at *21 (S.D.N.Y. Mar. 28, 2022), appeal dismissed (Sept. 21, 2022)(citing First Capital Asset Mgmt., 385 F.3d at 182. "Any claim under § 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient" Id.

## VI. PRINCIPLES OF COMITY & CLAIM SPLITTING DO NOT WARRANT DISMISSAL

### 1. International Comity

Defendants also argue Plaintiff's claims should be dismissed under the principles of international comity because this case is duplicative of the litigation in the U.K. Dkt. No. 156 at 25.

Out of respect for foreign nations, and to give effect to the principle of *international comity*, federal courts have articulated a test for determining when to abstain from exercising jurisdiction over parallel foreign proceedings. The test requires 1) that the foreign action be sufficiently *parallel* and 2) that there be *"exceptional circumstances"* warranting abstention. Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 95 (2d Cir. 2006).

Abstention from the exercise of federal jurisdiction "is the exception, not the rule." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976). Thus, courts should "examine the totality of the circumstances" and "determine whether exceptional circumstances exist that justify the surrender of that jurisdiction." Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d at 93–94 (internal citations omitted)(emphasis added). Whatever factors weigh in favor of abstention, "**only the clearest of justifications will warrant dismissal**." Royal & Sun 466 F.3d at 93. Circumstances that "routinely exist in connection with parallel litigation cannot reasonably be considered exceptional circumstances." Id.

The Second Circuit emphasized that the "totality of the circumstances" analysis also applies to whether "exceptional circumstances" exist. Id. The Second

Circuit detailed eight factors: 1) the similarity of the parties, 2) the similarity of the issues, 3) the order in which the actions were filed, 4) the adequacy of the alternate forum, 5) the potential prejudice to either party, 6) the convenience of the parties, 7) the connection between the litigation and the United States, and 8) the connection between the litigation and the foreign jurisdiction. Royal Sun, 466 F.3d at 94.

Defendants contend that the parties and issues in the U.K. Proceeding are "nearly identical." Dkt. No. 156 at 26. Defendants rely on Kingstown Cap. Mgmt., L.P. v. Vitek where the court dismissed claims on international comity grounds because the "lawsuits involve[d] the same core parties" and "the same overarching theory of wrongdoing." Id.; Kingstown Cap. Mgmt., L.P. v. Vitek, No. 19-CV-3170 (DLC), 2020 WL 5350492, at *5 (S.D.N.Y. Sept. 4, 2020), aff'd, No. 20-3406, 2022 WL 3970920 (2d Cir. Sept. 1, 2022). Defendants argue that here, Azima is alleging the same "cover up" that he has raised as a "set-aside counterclaim" in the U.K. proceeding. Dkt. No. 156 at 26. Defendants also note that Plaintiffs have remedies available to them in the U.K. Proceeding because they could seek contempt or sanctions in that forum for many of the wrongs alleged here. Id. at 27. Finally, Defendants reiterate that the U.K. Proceeding was filed three years prior to the instant case, and this court should thus defer to the first-filed suit. Id. at 28–29.

Plaintiffs respond that a consideration of the discretional international comity factors here does not weigh in favor of dismissal. Dkt. No. 167 at 59–65. First, Plaintiffs contend that the parties are not similar because "there are sixteen parties

named here,[14] only three of which are also parties to the U.K. Proceeding." Id. at 59–60. Second, Plaintiffs state that the issues in the two actions are not similar because "[t]he U.K. Proceeding counterclaims concern the 2015 hack of Azima," while the RICO claims here "cover substantially different misconduct," including alleged attempts to "unlawfully influence U.S. law enforcement" and "obstruct federal judicial proceedings." Id. at 61. Furthermore, Plaintiffs argue that the U.K. would not be an adequate forum for these claims because Azima cannot seek treble or punitive damages in the U.K. Id.

Finally, Plaintiffs note, "this litigation is much more connected to the U.S., as it relates to a fraud on the U.S. courts, about which the U.S. courts have a much stronger interest than U.K. courts." Id. at 63.

While Defendants have identified similarities between the parties, facts, and issues in this case and the U.K. Proceeding that could render the two proceedings sufficiently parallel, Dkt. No. 156 at 26–27, the "mere existence of an adequate parallel action, by itself, does not justify the dismissal of a case on grounds of international comity abstention. Rather, additional circumstances must be present." Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d at 95. In Klonis v. Nat'l Bank of Greece, S.A., the court denied defendant's motion to dismiss on international comity grounds because "[m]ost of the arguments advanced by

---

[14] On September 19, 2024, Plaintiffs voluntarily dismissed the claims against Defendants Dechert LLP, David Neil Gerrard, and David Graham Hughes with prejudice. Dkt. No. 197. Thus, now, there are thirteen named Parties remaining and none are parties to the UK litigation.

defendant relate to facts which will generally exist in parallel litigations," and were therefore "unexceptional." Klonis v. Nat'l Bank of Greece, S.A., 487 F. Supp. 2d 351, 356 (S.D.N.Y. 2006). The same is true here. Defendants' reference to some overlapping facts and a few issues in the U.K. proceeding is not alone enough to warrant abstention where no greater "exceptional circumstances" exist. See Kitaru Innovations Inc. v. Chandaria, 698 F. Supp. 2d 386, 391 (S.D.N.Y. 2010)(Gardephe, J.).

There are three reasons that this case does not present the "clearest of justifications" for deferring to the foreign jurisdiction. First, while "it is to be expected that cases filed in different jurisdictions plead different causes of action," Kingstown, 2020 WL 5350492, at *6, the fact that RICO's unique claims and remedies are unavailable under U.K. law is a valid reason for the Court to exercise its discretion to decline to surrender jurisdiction.  See e.g., Amimon Inc. v. Shenzhen Hollyland Tech Co. Ltd., No. 20-CV-9170 (ER), 2021 WL 5605258 (S.D.N.Y., 2021)(noting unique relief only available in the US action and declining to defer to foreign proceeding).

Second, Courts have a special responsibility to address alleged frauds on U.S. courts. See generally Alix v. McKinsey & Co., 23 F.4th 196 (2d Cir.), cert. denied, 143 S. Ct. 302, 214 L. Ed. 2d 132 (2022)(discussing that "Fraud on the Bankruptcy Court…calls into play our unique supervisory responsibilities….in light of these special considerations"). Plaintiffs allege a massive scheme to deceive several US courts. This too is a reason to not defer to the U.K. action.

Third, the U.K. case has since settled, and the settlement did not cover this lawsuit. Dkt. No. 174. The Court cannot defer to a U.K. proceeding that is no longer ongoing.

Because Defendants have not met their burden of showing additional circumstances beyond those "that routinely exist in connection with parallel litigation," Royal & Sun, 466 F.3d at 95, the Court finds no sufficient basis to dismiss this case on international comity grounds.

### 2. Claim Splitting

Defendants also argue that claim-splitting dictates dismissal of Plaintiffs' claims. Dkt. No. 156 at 29-31.

Under the rule against claim splitting or duplicative litigation,[15] "a plaintiff cannot avoid the effect of res judicata by splitting his claim into various suits, based on different legal theories." Santander Bank, N.A. v. Contreras, 414 F. Supp. 3d 650, 653 (S.D.N.Y. 2019)(Rakoff, J.)(citing Waldman v. Village of Kiryas Joel, 207 F. 3d 105, 110 (2d Cir. 2000). In line with this principle, "a district court may stay or dismiss a suit that is duplicative of another federal court suit." Curtis v. Citibank, N.A., 226 F.3d 133, 138 (2d Cir. 2000) (citing Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)).

---

[15] The Second Circuit has noted that "claim splitting" and "duplicative litigation" are sometimes used interchangeably. Sacerdote v. Cammack Larhette Advisors, LLC, 939 F.3d 498, 504 (2d Cir. 2019) ("the rule against duplicative litigation, sometimes termed the rule against claim-splitting").

Defendants contend that the North Carolina Proceeding brought by Azima against Del Rosso and Vital was "based on the same alleged hacking and cover-up" raised here. Dkt. No. 156 at 30. Defendants also note that "the rule against duplicative litigation 'does not require that all aspects of the new and prior suits be identical'" where, "there are sufficient grounds to conclude that the two suits arise out of the same nucleus of operative fact." Dkt. No. 158 at 19 (citing <u>Davis v. Norwalk Econ. Opportunity Now, Inc.</u>, 534 F. App'x 47, 48 (2d Cir. 2013)).

Plaintiffs respond that the claims here are not duplicative because the predicate acts and larger scheme pleaded here "are unrelated to the publication of Azima's trade secrets at issue in [the North Carolina Proceeding]." Dkt. No. 167 at 66. Additionally, Plaintiffs argue, "[f]or a court to dismiss a suit under the claim splitting doctrine,... '[t]here must be the same parties, or, at least, such as represent the same interests; there must be the same rights asserted and the same relief prayed for; the relief must be founded upon the same facts, and the title, or essential basis, of the relief sought must be the same.'" <u>Id.</u> at 67 (quoting <u>Sacerdote v. Cammack Larhette Advisors</u>, LLC, 939 F.3d 498, 504 (2d Cir. 2019) and <u>The Haytian Republic</u>, 154 U.S. 118, 124 (1894)). Plaintiffs note that the "North Carolina Proceeding involve[s] different parties, arise[s] out of separate transactions, and seek[s] distinct forms of relief" from the instant case. <u>Id.</u>

Considering the equities at issue, the Court does not find this case duplicative of the North Carolina Proceeding to warrant dismissal based on claim splitting. First, the North Carolina Proceeding concerns claims against only Del Rosso and Vital,

whereas many additional Defendants are named in this case. Dkt. No. 1 ¶¶ 15–17, 20–25. While Defendants remark that some Defendants here "who are not parties to the North Carolina case—are facing broad non-party discovery requests from Plaintiffs on the same conduct at issue in this action," Dkt. No. 156 at 30, Defendants cite no authority for their apparent proposition that this makes the parties sufficiently similar. Courts in this district have declined to dismiss actions based on claim splitting where the two cases had "separate defendants." See Santander Bank, N.A. v. Contreras, 414 F. Supp. 3d 650, 653 (S.D.N.Y. 2019). This distinction between the instant case and the North Carolina Proceeding weighs against dismissing this case as duplicative.

Additionally, Plaintiffs here bring claims based on allegations that occurred after the North Carolina Proceeding was filed, see e.g. Dkt. No. 1 ¶¶ 144–155, and "a plaintiff cannot be precluded from litigating a claim on the basis of an earlier claim where, for factual or procedural reasons, he could not bring the later claim at the same time as the earlier claim." Murray v. UBS Sec., LLC, No. 14 CIV. 927 KPF, 2015 WL 769586, at *4 (S.D.N.Y. Feb. 24, 2015). Plaintiffs have convincingly argued that the operative facts at issue here are somewhat materially different from those litigated in the North Carolina Proceeding. Dkt. No. 167 at 66–69. Balancing all of these distinctions between the North Carolina Proceeding and the instant case, the Court finds that it would be inappropriate to dismiss this suit as purely duplicative at this early stage.

## VII. INDIVIDUAL MOTIONS TO DISMISS

Above, the Court discussed the arguments made in the Joint Memorandum of Law in Support of the Motion to Dismiss, the Joint Opposition, and the Joint Reply. Below, the Court will analyze each[16] individual Defendant's independent Motion to Dismiss.

### 1. Dismissal for Lack of Personal Jurisdiction

Defendant Forlit also argues that Plaintiffs failed to plead a cognizable basis for this Court to exercise personal jurisdiction over them. See Dkt. Nos. 140 at 9–18, 143 at 12–18, 145-1 at 5–11.

On a motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant…[but] the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." JCorps Int'l, Inc. v. Charles & Lynn Schusterman Fam. Found., 828 F. App'x 740, 742 (2d Cir. 2020) (internal quotation and citation omitted). In making this assessment, the court must resolve all doubts in the plaintiff's favor. Id.

Plaintiffs allege that jurisdiction over Defendant Forlit is proper pursuant to 18 U.S.C. § 1965(b). Dkt. No. 1 ¶¶ 35–37. 18 U.S.C. § 1965(b) "governs the exercise of personal jurisdiction under RICO." PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 70 (2d Cir. 1998). In any civil RICO action, parties can be "served in any

---

[16] The Court will not address arguments raised only in individual Motions to Dismiss brought by Gerard, Hughes, or Dechert as those Defendants have been dismissed from the case.

judicial district of the United States." 18 U.S.C. § 1965(b). But district courts may not exert this "jurisdictional pull" over foreign defendants. <u>Elsevier, Inc. v. Grossman</u>, 77 F. Supp. 3d 331, 343 (S.D.N.Y. 2015).

Defendant Forlit is a resident of Israel and was served in Israel. Dkt. Nos. 1 ¶ 20, 105. Plaintiffs here are "asserting RICO claims against foreign defendants," and therefore, "must rely on the long-arm statute of the state in which they filed suit." <u>Elsevier, Inc. v. Grossman</u>, 77 F. Supp. 3d at 343 (collecting cases).

Under New York's long-arm statute, "a court may exercise personal jurisdiction over any non-domiciliary…who in person or through an agent: (1) transacts any business within the state…(2) commits a tortious act within the state…(3) commits a tortious act without the state causing injury to person or property within the state… if he (i) regularly does or solicits business…in the state, or (ii) expects or should reasonably expect the act to have consequences in the state." N.Y. C.P.L.R. § 302. Plaintiffs note that they "relied on §§ 302(a)(1) and (a)(2) in their pre-motion letter." Dkt. No. 162 at 8 (citing Dkt. No. 100).

### i. Forlit

Forlit contends that the complaint is devoid of allegations connecting him to the state of New York. Dkt. No. 145-1 at 8. He claims that his contact with New York "[consists] of a single trip to New York in 2018 to meet with Jamie Buchanan." <u>Id.</u> He further notes that Plaintiffs did not identify any "funds transfer" to or from Forlit, Insight, or SDC-Gadot that was connected to "a person or entity located or operating within the State of New York." <u>Id.</u> at 7.

Plaintiffs respond that Forlit purposely availed himself to this jurisdiction because Forlit maintained a business relationship with New York by "creat[ing] a New York company, us[ing] a New York address, [and] mov[ing] money through New York." Dkt. No. 164 at 9. As Plaintiffs note, the Complaint alleges that Forlit attended meetings with other Defendants and opened bank accounts in New York. Id. (citing Dkt. No. 1 ¶¶ 26(e), 37, 232, 235).

Construing "the pleadings…in the light most favorable to" Plaintiffs at this early stage in the litigation, DiStefano v. Carozzi N. Am., Inc., 286 F.3d at 84, the Court finds that the allegations connecting Forlit to New York through his business conduct are sufficient to satisfy N.Y. C.P.L.R. § 302. See also Warren v. eBay, Inc., No. 22-CV-3524PGGGWG, 2023 WL 6559855, at *6 (S.D.N.Y. Oct. 10, 2023), report and recommendation adopted, No. 22-CV-3524 (PGG) (GWG), 2024 WL 662594 (S.D.N.Y. Jan. 8, 2024) (Gardephe, J.).

In sum, this Court finds that the claim against Defendant Forlit should not be dismissed for lack of personal jurisdiction.

### 2.  Operation or Management of the Enterprise

Defendants Handjani, Frank, and KARV (the "KARV Defendants"), as well as Del Rosso, and Vital also contend that the RICO claims should be dismissed as to them because these Defendants did not participate in the "operation or management" of the alleged enterprise. Dkt. Nos. 138 at 17, 140 at 21, 148 at 19.

The Supreme Court has held that one cannot be liable under § 1962(c) "unless one has participated in the operation or management of the enterprise itself." Reves

v. Ernst & Young, 507 U.S. 170, 183 (1993). Whether a defendant participated in the operation or management of the enterprise is essentially a question of fact. United States v. Allen, 155 F.3d 35, 42 (2d Cir. 1998) (denying summary judgment). "While the 'operation or management' test presents a 'relatively low hurdle for plaintiffs to clear, ... especially at the pleading stage,' RICO plaintiffs must plausibly allege that each defendant played 'some part in directing the enterprise's affairs" if the RICO claim is to survive a motion to dismiss.'" D'Addario v. D'Addario, 901 F.3d 80, 103 (2d Cir. 2018)(citing First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 176 (2d Cir. 2004)).

### i. KARV Defendants

The KARV Defendants contend that they were "mere participants" who did not play a role in directing the affairs of the enterprise. Dkt. No. 148 at 19-20. They cite to Azrielli v. Cohen L. Offs., 21 F.3d 512, 521 (2d Cir. 1994) where the Second Circuit affirmed dismissal of RICO claims against a defendant lawyer who "had no role in the conception, creation, or execution" of the underlying scheme.

However, the Complaint actually alleges that the KARV Defendants played a significant role in drafting the Action Plan to harm Azima. Dkt. No. 1 ¶¶ 59–61. Plaintiffs specifically allege that Frank and KARV were "key architects" of the plan and "repeatedly met with other members of the Enterprise in New York to plan and coordinate its affairs." Id. ¶¶ 24–25. Plaintiffs further contend that Handjani directed others to produce hacking reports and destroy evidence. Id. ¶¶ 169, 219. These pleadings adequately identify the KARV Defendants' role in directing the enterprise's

affairs. Thus, the Court finds that Plaintiffs have satisfied the "operation and management test" as to the KARV Defendants at this early stage.

### ii. Del Rosso and Vital

Del Rosso and Vital also contend that they did not participate in the operation or management of the enterprise because they merely acted on instructions from others and were paid to provide services for Dechert. Dkt. No. 138 at 19. They cite Feirstein v. Nanbar Realty Corp. for the proposition that providing "professional services…is insufficient to satisfy the participation element of RICO." Id. (citing Feirstein v. Nanbar Realty Corp., 963 F. Supp. 254, 258 (S.D.N.Y. 1997)).

Plaintiffs respond that, as detailed in the Complaint, Del Rosso directed others to hack Azima and obstruct U.S. proceedings. Dkt. No. 161 at 10 (citing Dkt. No. 1 ¶¶ 26, 121–22, 148–51, 165–66). Plaintiffs also allege that Vital engaged in bank fraud and money laundering while paying millions to hackers. Dkt. No. 1 ¶¶ 157–58, 236, 241. Plaintiffs cite Baisch v. Gallina where the court noted that a defendant who exercised "discretionary authority" in recruiting financing and concealing falsified payment information had some part in directing the enterprise's affairs. Dkt. No. 161 at 9 (citing Baisch v. Gallina, 346 F.3d 366, 376 (2d Cir. 2003)). Similarly, here, Plaintiffs allege that Del Rosso and Vital exercised discretion while directing others to execute key elements of the enterprise's scheme. Id. at 9–10.

While a finder of fact may later conclude that Del Rosso and Vital did not manage or direct the enterprise, this Court finds the allegations in the Complaint

sufficient to satisfy the "low hurdle" that these Defendants played "some part" in directing the enterprise's affairs. D'Addario v. D'Addario, 901 F.3d at 103.

### 3. Res Judicata and Collateral Estoppel

Defendants Del Rosso and Vital also contend that the instant claims are barred under the doctrines of res judicata and collateral estoppel because this suit is duplicative of the claims Azima brought against Del Rosso and Vital in North Carolina. Dkt. No. 138-3 at 5.

"The doctrine of collateral estoppel—also known as issue preclusion—bars successive litigation of an issue of fact or law actually litigated and resolved in a prior judgment, even if the issue recurs in the context of a different claim." Ben-Zvi v. Bo Hi Pak, No. 10 CV 9588 VB, 2011 WL 7095422, at *2 (S.D.N.Y. Dec. 16, 2011), aff'd, 510 F. App'x 2 (2d Cir. 2013) (citing Taylor v. Sturgell, 553 U.S. 880, 892 (2008)). Collateral estoppel prevents a party from relitigating an issue if "'(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.'" Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting Interoceanica Corp. v. Sound Pilots, Inc., 107 F.3d 86, 91 (2d Cir.1997))(cleaned up).

The doctrine of res judicata, or claim preclusion, "precludes the parties or their privies from relitigating issues that were or could have been raised in [an earlier] action" where there was a final judgment on the merits. Simmons v. Trans Express

Inc., 16 F.4th 357, 360 (2d Cir. 2021) (citing St. Pierre v. Dyer, 208 F.3d 394, 399 (2d Cir. 2000))(cleaned up). "The timeframe for assessing claims that could have been raised during the prior litigation ends when the complaint in that action is filed." Horti Americas, LLC v. Jacob's Vill. Farm Corp., No. 21-915-CV, 2022 WL 38719, at *2 (2d Cir. Jan. 5, 2022).

Additionally, res judicata may not properly apply "where the facts underlying the later claim were not present in the prior action...were fraudulently concealed, or could not have been discovered through the exercise of due diligence." Bin Saud v. Bank of New York, 734 F. Supp. 628, 634 (S.D.N.Y. 1990), aff'd sub nom. Saud v. Bank of New York, 929 F.2d 916 (2d Cir. 1991).

Del Rosso and Vital contend that Plaintiffs cannot repackage their earlier allegations into a RICO lawsuit. Dkt. No. 138 at 16. Del Rosso and Vital rely on Bin Saud v. Bank of New York where the court found that the plaintiff could not "avoid res judicata by reformulating the facts he submitted to the court in [an earlier action] into the mold of a RICO claim." Id.; Bin Saud v. Bank of New York, 734 F. Supp. at 635. Defendants argue that "the operative facts here are identical" to those raised and litigated in the North Carolina proceeding. Dkt. No. 138 at 15–16, see also Dkt. No. 192 at 137–39.

They argue that the "ultimate issue" governing the accrual date for the statute of limitations was already decided in the North Carolina proceeding where the court found that Azima had knowledge of the hacking in 2016 and therefore "had sufficient

109

knowledge of the injuries to trigger the statute." Dkt. No. 138 at 13–14 (citing <u>Azima</u>, 2021 WL 5961282, at *3).

Plaintiffs respond that the North Carolina Proceeding "could not, and did not" decide the instant case which "is about different claims, different conduct and different injuries." Dkt. No. 161 at 13. Additionally, Plaintiffs allege that Del Rosso and Vital engaged in some of the predicate acts in connection with the North Carolina proceeding. <u>Id.</u>; Dkt. No. 1 ¶¶ 154–60, 219.

Plaintiffs argue that this RICO case relies on different evidence and seeks to prove different facts that those adjudicated in the North Carolina proceeding. Dkt. No. 161 at 17. Plaintiffs further note that the operative facts here cannot be identical to those addressed in the North Carolina proceeding because many of the predicate acts alleged here "occurred *after* the 2020 North Carolina Proceeding was filed." <u>Id.</u> at 15-16 (emphasis in original). Plaintiffs cite <u>Storey v. Cello Holdings, L.L.C.</u> where the Second Circuit remarked, "[c]laims arising subsequent to a prior action need not, and often perhaps could not, have been brought in that prior action; accordingly, they are not barred by *res judicata* regardless of whether they are premised on facts representing a continuance of the same 'course of conduct.'" <u>Id.</u>; <u>Storey v. Cello Holdings, L.L.C.</u>, 347 F.3d 370, 383 (2d Cir. 2003)(citing <u>Lawlor v. Nat'l Screen Serv. Corp.</u>, 349 U.S. 322, 327–28 (1955)).

"The party asserting [collateral estoppel] bears the burden of showing that the identical issue was previously decided." <u>Abdelal v. Kelly</u>, 726 F. App'x 8, 11 (2d Cir. 2018)(citing <u>Colon v. Coughlin</u>, 58 F.3d 865, 870 n.3 (2d Cir. 1995)). "[I]t is the

110

defendants' burden to prove that res judicata bars the second action, not the plaintiffs' to prove that they are not barred." <u>Brown Media Corp. v. K&L Gates, LLP</u>, 854 F.3d 150, 161 (2d Cir. 2017) (citing <u>Comput. Assocs. Int'l v. Altai, Inc.</u>, 126 F.3d 365, 369 (2d Cir. 1997)). Defendants Del Rosso and Vital have not met that burden here.

As Plaintiffs and Defendants both note, Dkt. Nos. 138 at 14, 161 at 12, the claims in the North Carolina proceeding were subject to a different limitations period. Moreover, as discussed in Section III, <u>infra</u>, the statute of limitations for RICO claims are subject to a number of unique features, including separate accrual. Because the statute of limitations issue here is not sufficiently identical to the issue analyzed by the North Carolina court, the doctrine of collateral estoppel does not bar Plaintiffs' claims against these Defendants.

Here, Del Rosso and Vital claim that "the operative facts here are identical" to those litigated in prior proceedings, but they fail to address how the alleged predicate acts which were fraudulently concealed or occurred after 2020 could have been raised in those earlier cases. Dkt. No. 138 at 16.

Therefore, the Court finds that Defendants have not met their burden of showing that res judicata should bar Plaintiffs' claims.

## VIII. LEAVE TO AMEND

District courts "ha[ve] broad discretion in determining whether to grant leave to amend." <u>Gurary v. Winehouse</u>, 235 F.3d 792, 801 (2d Cir. 2000); <u>Vora v. New York City Department of Education</u>, 2024 WL 1116312, at *14 (S.D.N.Y. 2024). Under Rule 15 of the Federal Rules of Civil Procedure, leave to amend should be "freely give[n] ...

when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "leave to amend need not be granted when amendment would be futile." See Terry v. Inc. Vill. of Patchogue, 826 F.3d 631, 633 (2d Cir. 2016)

Here, "the problems with" Plaintiff's claims "are substantive," not technical, so amendment would be futile. See JRLDDS, LLC v. Hartford Fin. Servs. Grp. Inc., No. 21-CV-9487 (JMF), 2022 WL 3018152, at *3 (S.D.N.Y. July 29, 2022). Moreover, this Court has reviewed hundreds of pages in briefs from multiple defendants, held multiple oral arguments, and has a firm understanding of the case. A second round is not needed.

Therefore, the Court recommends that leave to amend be DENIED.

## IX. CONCLUSION

For all the above reasons, this Court recommends that the joint Motion to Dismiss be GRANTED and the Complaint dismissed with prejudice.

## X. FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. See also Fed. R. Civ. P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court. Any requests for an extension of time for filing objections must be directed to Judge Gardephe. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. Thomas v. Arn, 474 U.S. 140, 155 21 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-

CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57–59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237–38 (2d Cir. 1983) (per curiam).

**The Clerk of the Court is respectfully requested to close Dkt. Nos. 138, 142, 145, 147, 179–80, 182–83, and 190.**

SO ORDERED.

DATED: New York, New York
September 26, 2024

_Jennifer E. Willis_

JENNIFER E. WILLIS
United States Magistrate Judge