**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FARHAD AZIMA, et al., | No. 22 Civ. 8728 (PGG) (JW) |
| Plaintiffs, | **PLAINTIFFS' OBJECTIONS TO REPORT & RECOMMENDATION** |
| - against - | **ORAL ARGUMENT REQUESTED** |
| DECHERT LLP, et al., | |
| Defendants. | |

Calvin Lee
Kirby D. Behre (admitted *pro hac vice*)
Timothy P. O'Toole (admitted *pro hac vice*)
Lauren E. Briggerman (admitted *pro hac vice*)
Ian A. Herbert (admitted *pro hac vice*)
Cody F. Marden (admitted *pro hac vice*)
Miller & Chevalier Chartered
900 Sixteenth St. NW
Black Lives Matter Plaza
Washington, DC 20006
Tel. (202) 626-5800
Fax. (202) 626-5801
Email: clee@milchev.com
Email: kbehre@milchev.com
Email: totoole@milchev.com
Email: lbriggerman@milchev.com
Email: iherbert@milchev.com
Email: cmarden@milchev.com


Harry H. Rimm
Womble Bond Dickinson (US) LLP
950 Third Avenue, Suite 2400
New York, NY 10022
Tel. (332) 258-8400
Fax. (332) 258-8949
Email: harry.rimm@wbd-us.com

November 1, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT .................................................................................................... 3

I.      THE R&R FAILS TO APPLY THE PROPER STANDARD OF REVIEW. ................... 3

II.     THE ALLEGATIONS OF OBSTRUCTION OF US LAW ENFORCEMENT ALONE ARE SUFFICIENT TO PLEAD UNLAWFUL RACKETEERING ACTIVITY ................................................................................................ 5

III.    THE R&R ERRONEOUSLY REJECTS HUNDREDS OF RICO PREDICATES. .............................................................................................. 6

      A.    The Complaint Properly Alleges Valid Obstruction Predicate Acts. .................... 6

      B.    The R&R Erroneously Rejects Obstruction-Related Acts as Inactionable "Litigation Activities." ............................................................. 7

            1.    The R&R Misapplies and Misconstrues *Kim v. Kimm.* ............................. 7

            2.    The R&R Inappropriately Expands *Kimm* to Read *Chevron* Out of Existence. ........................................................................................... 9

            3.    *Kimm's* Policy Concerns Do Not Exist Here. .......................................... 11

      C.    The R&R Mischaracterizes Predicates as Concealment. ...................................... 12

      D.    The R&R Erroneously Rejects Valid Witness Tampering Predicates. ................ 12

      E.    The R&R Erroneously Rejects Valid Money Laundering Predicate Acts. ........... 13

      F.    The R&R Erroneously Rejects Valid Wire and Mail Fraud Predicates. ............... 14

            1.    The R&R Incorrectly Concludes That Mail and Wire Fraud Is Not Pled with Particularity. .................................................................. 14

            2.    The R&R Incorrectly Concludes that the Object of the Scheme Was Not Money or Property. ................................................................ 15

IV.    THE R&R INCORRECTLY CONCLUDES THAT THE ALLEGED PREDICATE ACTS ARE NOT RELATED. ................................................... 16

V.    THE COMPLAINT ALLEGES COGNIZABLE HARM TO AZIMA AND
      HIS BUSINESSES.......................................................................................................... 17

VI.   PLAINTIFFS' CLAIMS ARE TIMELY......................................................................... 21

VII.  PLAINTIFFS ARE ENTITLED TO AMEND THE COMPLAINT................................ 23

CONCLUSION........................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Meeting IP, LLC v. Epic Games Inc.*,
No. 23-CV-8214, 2024 WL 4299686 (S.D.N.Y. Sept. 26, 2024).....................................23, 24

*Angermeier v. Cohen*,
14 F. Supp. 3d 134 (S.D.N.Y. 2014)................................................................................11, 21

*Arthur Andersen LLP v. United States*,
544 U.S. 696 (2005).................................................................................................................12

*Bankers Tr. Co. v. Rhoades*,
859 F.2d 1096 (2d Cir. 1998).........................................................................................11, 19, 22

*Bingham v. Zolt*,
66 F.3d 553 (2d Cir. 1995)..........................................................................................20, 22

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020)................................................................................................................11

*Bouveng v. NYG Cap. LLC*,
175 F. Supp. 3d 280 (S.D.N.Y. 2016)......................................................................................9

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)................................................................................................................18

*Carroll v. U.S. Equities Corp.*,
No. 18-CV-667, 2020 WL 11563716 (N.D.N.Y. Nov. 30, 2020) ......................................8, 10

*Chevron Corp. v. Donziger*,
871 F. Supp. 2d 229 (S.D.N.Y. 2012)...................................................5, 8, 9, 10, 13, 19, 20

*Chevron Corp. v. Donziger*,
974 F. Supp. 2d 362 (S.D.N.Y. 2014)......................................................................................9

*City of New York v. Gordon*,
155 F. Supp. 3d 411 (S.D.N.Y. 2015)....................................................................................19

*City of New York v. Venkataram*,
396 F. App'x 722 (2d Cir. 2010) ......................................................................................12, 13

*De Sole v. Knoedler Gallery, LLC*,
974 F. Supp. 2d 274 (S.D.N.Y. 2013)....................................................................................21

*De Sole v. Knoedler Gallery, LLC*,
    137 F. Supp. 3d 387 (S.D.N.Y. 2015).......................................................................18

*Erickson v. Pardus*,
    551 U.S. 89 (2007)........................................................................................................3

*Frydman v. Verschleiser*,
    172 F. Supp. 3d 653 (S.D.N.Y. 2016).................................................................16, 18

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016).........................................................................................3

*Guzman v. Hecht*,
    No. 18-cv-3947, 2019 WL 1315888 (S.D.N.Y. Mar. 22, 2019)................................16

*Kim v. Kimm*,
    884 F.3d 98 (2d Cir. 2018)...............................................5, 7, 8, 9, 10, 11, 12

*Lateral Recovery, LLC v. Capital Merchant Servs., LLC*,
    632 F. Supp. 3d 402 (S.D.N.Y. 2022)..........................................................................3

*Locus Techs. v. Honeywell Int'l Inc.*,
    632 F. Supp. 3d 341 (S.D.N.Y. 2022)..........................................................................3

*Michael Grecco Prods., Inc. v. RADesign, Inc.*,
    112 F.4th 144 (2d Cir. 2024) .....................................................................................21

*Reich v. Lopez*,
    38 F. Supp. 3d 436 (S.D.N.Y. 2014), *aff'd*, 858 F.3d 55 (2d Cir. 2017) ................18

*Rodonich v. House Wreckers Union, Loc. 95 of Laborers' Int'l Union of N. Am.*,
    627 F. Supp. 176 (S.D.N.Y. 1985) .............................................................................19

*Sensoria, LLC v. Kaweske*,
    548 F. Supp. 3d 1011 (D. Colo. 2021)........................................................................24

*Sikhs for Justice v. Nath*,
    893 F. Supp. 2d 598 (S.D.N.Y. 2012)..........................................................................3

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008).......................................................................................14

*Stochastic Decisions, Inc. v. DiDomenico*,
    995 F.2d 1158 (2d Cir. 1993); ............................................................................11, 19

*Sykes v. Mel Harris & Assocs., LLC*,
    757 F. Supp. 2d 413 (S.D.N.Y. 2010)....................................................................8, 10

*United States v. Daidone*,
    471 F.3d 371 (2d Cir. 2006) ........................................................................................16

*United States v. Greenberg*,
    835 F.3d 295 (2d Cir. 2016) ........................................................................................16

*United States v. Ng*,
    578 F. App'x 38 (2d Cir. 2014) ..............................................................................16, 17

*United States v. Scott*,
    681 F. App'x 89 (2d Cir. 2017) ...................................................................................16

*Velez v. Syracuse Univ. Hosp. Sci. Ctr.*,
    No. 10-CV-1570, 2012 WL 685891 (N.D.N.Y. Jan. 23, 2012) ...................................24

*World Wrestling Ent., Inc. v. Jakks Pac., Inc.*,
    328 F. App'x 695 (2d Cir. 2009) .................................................................................22

**Statutes**

18 U.S.C. § 1341 ...............................................................................................................6

18 U.S.C. § 1343 ...............................................................................................................6

18 U.S.C. § 1503 ...............................................................................................................6

18 U.S.C. § 1512 ...............................................................................................6, 12, 13

18 U.S.C. § 1961 ........................................................................................................10, 11

18 U.S.C. § 1962 .............................................................................................................25

28 U.S.C. § 636 .................................................................................................................3

**Other Authorities**

Fed. R. Civ. P. 15 ............................................................................................................23

Fed. R. Civ. P. 72 ..............................................................................................................3

## PRELIMINARY STATEMENT

Plaintiffs respectfully object to significant portions of the Magistrate's Report and Recommendation (ECF No. 201) ("R&R"). The R&R properly finds that the Complaint alleges a criminal Enterprise led by Dechert LLP ("Dechert") with a "common unlawful purpose" that operated for more than eight years. R&R at 34, 39. Nevertheless, by recasting the Complaint and drawing unwarranted inferences against Plaintiffs, the R&R incorrectly rejects hundreds of predicate acts, finds no damages and causation, dismisses Plaintiffs' claims as untimely, and denies Plaintiffs an opportunity to amend the Complaint. The R&R is erroneous and should be rejected by this Court. Plaintiffs have settled this case with Dechert, and the case should continue against the remaining Defendants, all of whom played a critical role in the criminal Enterprise.

The R&R concludes that the Complaint ("Compl.") alleges a "dastardly," "massive scheme" "to destroy [Azima's] reputation, to ruin his businesses, and to embroil him in expensive litigation." *Id.* at 1, 84, 99. However, the R&R then narrowly construes the allegations, improperly whittling them down to little more than a hacking scheme. This mischaracterization results in the erroneous conclusion that hundreds of obstruction, witness tampering, wire and mail fraud, and money laundering predicates do not qualify because they merely concealed the completed crime of hacking. The R&R ignores the Complaint's allegations that hacking was not just a one-time event but continued over a period of many years until as late as 2020. The Enterprise's plan started with hacking but did not achieve its goals until the Enterprise deployed hacked data through various lawyers, investigators, public relations advisors, intermediaries, and operatives. Multiple crimes furthered the Enterprise's goal of burying Azima in litigation and investigations and forcing him to spend millions of dollars defending himself, his reputation, and his businesses. All members of the Enterprise—from its masterminds to those implementing it—made millions of dollars in the process.

The misreading of the Complaint also infects the R&R's erroneous legal conclusion that the hundreds of alleged wire fraud acts did not deprive Azima of money or property, even though the Complaint clearly alleges they did. And the same misreading leads to the erroneous conclusion that this case is barred by statute of limitations, even though the Complaint clearly alleges damages to money and property in the United States that arose in the four years prior to this suit's filing, including 2019-2020 legal fees, the 2020 court judgment, and 2019 business losses. Those harms had not occurred in 2016 and could not have been recovered in 2016. Second Circuit governing law makes clear that such damages are within the statute of limitations, but the R&R ignores that case law entirely.

The R&R also improperly invalidates hundreds of predicate acts as inactionable "litigation activities," taking a limited ruling that applies only to a narrow set of circumstances and expanding it beyond recognition to essentially read obstruction and witness tampering out of the RICO statute. The R&R is based on policy concerns that are not relevant to these remarkable facts, which are supported by significant evidence.

Finally, the R&R refuses to allow amendment, even though Plaintiffs requested it and leave to amend should be freely granted. Since this Complaint was filed, Plaintiffs have uncovered substantial new evidence that reveals an Enterprise with a collective budget of well over $60 million and dozens of meetings with and reports given to U.S. law enforcement to initiate government investigations into Azima within the limitations period. Much of this new information establishes the pivotal role that ringleaders Dechert and Amir Handjani ("Handjani") played. The concerns that the R&R raises could be addressed through amendment, and Plaintiffs renew their request to do so.

2

**ARGUMENT**

A magistrate judge's report and recommendation is reviewed *de novo*. Fed. R. Civ. P. 72(b)(3). The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).[1]

## I.    THE R&R FAILS TO APPLY THE PROPER STANDARD OF REVIEW.

In ruling on a motion to dismiss, "the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Locus Techs. v. Honeywell Int'l Inc.*, 632 F. Supp. 3d 341, 366-67 (S.D.N.Y. 2022) (Gardephe, J.) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)). Courts "look [at the] 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken.'" *Lateral Recovery, LLC v. Capital Merchant Servs., LLC*, 632 F. Supp. 3d 402, 405 (S.D.N.Y. 2022) (quoting *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)). In evaluating a motion to dismiss, the court "construes the complaint liberally." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012).

The Complaint alleges an eight-year conspiracy to harm Azima and his businesses through (1) hacking, Compl. ¶¶ 45-54; (2) using the hacked materials to initiate fraudulent and obstructive U.S. law enforcement investigations and criminal litigation, *id.* ¶¶ 35, 37, 74, 76-79, 181-82; (3) using the hacked materials to force him into litigation to incur legal fees and to suffer a fraudulent judgment against him, *id.* ¶¶ 44, 89, 127-69, 175-79, 181, 183, 229, 244-46, 256-58; and (4) using the hacked materials to plant negative and false press stories, *id.* ¶¶ 24-25, 74, 80-82, 179. *See*

---

[1] The R&R rightly rejects Defendants' comity argument and all the arguments made in individual briefs. It correctly finds that the Complaint alleges an Enterprise with a criminal purpose and continuity and that Defendants all directed the affairs of the Enterprise. The Court should adopt those recommendations.

*also id.* ¶¶ 59-61 (describing the plan). The Enterprise's goal was to cause Azima ongoing harm and ruin him and his businesses financially and reputationally. *Id.* That scheme was ongoing through 2020. *See*, *e.g.*, Compl. ¶ 51.

The R&R discounts these allegations and instead recharacterizes them as efforts to conceal the hacking scheme.[2] *See, e.g.*, R&R at 77 (Enterprise's "unlawful purpose" was "hacking Azima"); *id.* at 56 (money laundering done to "compensate hackers"); *id.* at 60-61 (witness tampering related to "scheme to hack"); *id*. at 84 (legal fees spent on "scheme to hack"); *id.* at 93-94 ("core injury" related to hack). By ignoring the overarching scheme set forth in the Complaint and reducing the allegations to a single hack and an effort to escape detection, the R&R errs by fundamentally misconstruing the proper standard of review. Elsewhere, the R&R mischaracterizes the Complaint and explicitly draws inferences against Plaintiffs.[3] For example:

- The R&R creates a distinction between "offensive" and "defensive" litigation, R&R at 49 n.7, and appears to go outside the Complaint to find that the Section 1782 proceedings in aid of Azima's defense in the U.K. litigation are "better classified as offensive" litigation. *Id*. This conclusion conflicts with other statements in the R&R: "Plaintiffs characterize the allegation as intended to support the defense of the suit initiated by RAK." *Id*.; *see also infra* Section V.

- The R&R concludes that the bribery and perjury did not "infect the entire adversarial process." R&R at 50. This contradicts the Complaint, which alleges that the entire litigation was based on a fraudulent agreement, Compl. ¶¶ 62-64, and the U.K. court's conclusion that it was deceived and its process corrupted. The U.K. case was "an egregious case and it has had the somewhat extraordinary consequence that they obtained judgments by fraud." ECF No. 186-1 at 84:5-7. As a result of the corruption of the U.K. legal process, the U.K. ruling against Azima was reversed. *See infra* Section III.A.2.

---

[2] The R&R is inherently inconsistent, acknowledging the breadth of this scheme in the factual background. R&R at 1-3 (Defendants "develop[ed] a scheme to hack Plaintiff Farhad Azima, to use the fruits of that hack to destroy his reputation, to ruin his businesses, and to embroil him in expensive litigation").

[3] The R&R contains a summary chart grouping some, but not all, of the alleged predicate acts and explaining the grounds for recommending dismissal. *See* R&R at 40-43. Just like the body of the R&R, the chart minimizes, incorrectly characterizes, or even omits many of the predicate acts.

- The R&R dismisses "perjury school," where witnesses secretly gathered amongst themselves to coordinate and rehearse false testimony to obtain a judgment against Azima, Compl. ¶¶ 109-10, as "too close to standard attorney activity," R&R at 61, even though counsel was not involved.[4]

- The R&R strays way beyond the Complaint and incorrectly infers that Plaintiffs' injuries "were caused in material part by the pre-2018 hacking and the release of those hacked materials." R&R at 94. The R&R also improperly accepts as true Defendants' argument that "the Complaint does not allege that the negative publicity was generated after 2018." *Id*. But the Complaint clearly alleges that as late as 2019, "the Enterprise published Azima's stolen data on WeTransfer . . . , which triggered additional negative media coverage directly harming Azima and his businesses." Compl. ¶ 82.

- The R&R incorrectly views the Complaint as one of the "retaliatory RICO suits" discussed in *Kimm*. R&R at 45. But the Complaint alleges crimes far broader than those associated with a single piece of litigation. Defendants' stated and written goal was to affirmatively use litigation to harm Azima and that is just what they did. Compl. ¶¶ 59-61.

The R&R confuses the motion to dismiss stage with trial and attempts to find facts. When the proper standard is applied, there is no basis to dismiss the Complaint.

## II.    THE ALLEGATIONS OF OBSTRUCTION OF US LAW ENFORCEMENT ALONE ARE SUFFICIENT TO PLEAD UNLAWFUL RACKETEERING ACTIVITY.

The Complaint adequately alleges obstruction and the improper manipulation of numerous law enforcement investigations, which alone is sufficient to allege the racketeering activity needed to sustain a RICO claim. *Id*. ¶¶ 76-79; *see Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 236-37 (S.D.N.Y. 2012) (allegations include "inducing U.S. public officials to investigate Chevron on the basis of false claims").

The R&R acknowledges that the alleged manipulation of law enforcement is a valid predicate, but incorrectly concludes that this obstruction resulted in no injury. R&R at 40. The

---

[4] The R&R also erroneously minimizes some of the obstruction allegations merely "denials of tortious conduct by attorneys in one form or another," "witness preparation," and "failures to preserve evidence." R&R at 61. These characterizations contradict the Complaint allegations and result in a faulty basis to recommend dismissal of the case.

Complaint specifically alleges Azima "was forced to incur significant legal and professional fees responding to document requests and subpoenas."  Compl. ¶ 79.  Legal fees are cognizable damages as the R&R concedes.  R&R at 82-83 (discussing cases).  The harm was directly caused by Defendants' repeated initiation of government investigations against Azima.  *See* Compl. ¶¶ 76-79.[5]  The Complaint's allegation of a five-year campaign to instigate federal criminal law enforcement investigations of Azima and the resulting damages through the incursion of attorney's fees is enough, standing alone, to survive a motion to dismiss.  The R&R erred in concluding otherwise.  As discussed below, based upon new evidence obtained during the two-year pendency of this case, significant amendments can be made that address the issues raised in the R&R.

## III.    THE R&R ERRONEOUSLY REJECTS HUNDREDS OF RICO PREDICATES.

### A.    The Complaint Properly Alleges Valid Obstruction Predicate Acts.

The Complaint alleges hundreds of obstruction-related predicates acts that are expressly enumerated in the RICO statute, including: (1) obstruction of justice under 18 U.S.C. § 1503 (*e.g.,* fabrication of evidence, ¶¶ 151-52; bribe payments to witnesses, ¶¶ 172-74; intimidation and hacking of a potential witness, ¶¶ 153-55; coordination of perjury, ¶¶ 109-10; false statements to law enforcement to induce a government investigation, ¶¶ 76-79; hacking to interfere with court proceedings, ¶¶ 162-64; and widespread perjury and false statements across at least five U.S. legal proceedings, ¶¶ 83-126 (District of Columbia.), ¶¶ 127-43 (multiple Section 1782 proceedings), ¶¶ 156-60 (North Carolina)); (2) witness tampering under 18 U.S.C. § 1512 (*e.g.,* threats to a witness and fabrication of evidence, *id*. ¶¶ 145-55, 170-74); (3) mail and wire fraud under 18

---

[5] The R&R never specifically discusses these legal fees in its analysis on damages or proximate cause, so it is difficult to know why these allegations are infirm.  To the extent the R&R concludes that the FBI decision to investigate was an intervening cause, that is not what the Complaint alleges.  The Complaint alleges that the Enterprise manipulated and co-opted the law enforcement investigation.  Compl. ¶ 76.

U.S.C. § 1341 and § 1343 (*e.g.,* deprive Plaintiffs of money and property by embroiling Azima in expensive litigation, ¶¶ 63-64; fraudulently obtaining a multi-million-dollar judgment against him, ¶ 71; and starting fraudulent law enforcement investigations, ¶¶ 74, 76-79). The R&R erroneously determines that each of these hundreds of predicate acts fails as a matter of law, ignoring the crux of these allegations and misconstruing Second Circuit law related to "litigation activities."

### B. The R&R Erroneously Rejects Obstruction-Related Acts as Inactionable "Litigation Activities."

#### 1. The R&R Misapplies and Misconstrues *Kim v. Kimm.*

The R&R erroneously invalidates hundreds of predicate acts as "litigation activities," which the R&R exempts from liability under *Kim v. Kimm*, 884 F.3d 98 (2d Cir. 2018).[6] R&R at 44. But the R&R ignores *Kimm*'s facts, its holding, and its express limitation on its ruling. In *Kimm*, a disgruntled litigant attempted to manufacture a RICO case against a plaintiff who had sued him and lost. 884 F.3d at 101. The only allegations were that the plaintiff in the prior litigation had prepared and filed four fraudulent declarations. *Id.* at 103. The Second Circuit upheld dismissal, finding that allegations of "frivolous, fraudulent, or baseless litigation activities – *without more* – cannot constitute a RICO predicate act." *Id.* at 104 (emphasis added). Under *Kimm*, retaliatory RICO actions solely alleging false statements in a single piece of prior litigation without more may be inactionable. The R&R fails to quote, or even acknowledge, *Kimm*'s express limited reach:

> We conclude *only* that where, as here, a plaintiff alleges that a defendant engaged in a *single* frivolous, fraudulent, or baseless lawsuit, such litigation activity *alone* cannot constitute a viable RICO predicate act.

---

[6] The chart in the R&R lists more than a dozen predicate acts that it describes as concealment of hacking, R&R at 40-43, but the R&R analyzes only the fabrication and destruction of evidence in the D.C. Proceeding and the "perjury school" to coordinate false testimony before the U.K. trial. *See id.* at 55-56.

*Id.* at 105 (emphasis added). As subsequent case law clarifies, "*Kim[m]* leaves open the door for RICO claims premised on abusive litigation activities involving conduct beyond a single lawsuit." *Carroll v. U.S. Equities Corp.*, No. 18-CV-667, 2020 WL 11563716, at *9 (N.D.N.Y. Nov. 30, 2020). The R&R's failure to acknowledge *Kimm*'s express limitation on its own holding is fatal to its recommendation regarding so called "litigation activity."

The R&R selectively cites three cases and erroneously concludes that obstruction only counts as a RICO predicate when it involves: (1) a mass scheme, as in *Sykes v. Mel Harris & Associates, LLC,* 757 F. Supp. 2d 413 (S.D.N.Y. 2010), (2) the corruption of court decisionmakers, as in *Chevron*, 871 F. Supp. 2d 229 (but not corruption of parties or witnesses), or (3) the fraudulent securing of default judgments, as in *Carroll*. R&R at 47. The R&R's improper reading of *Kimm* invalidates hundreds of obstructive acts because they occurred while litigation was pending, ignoring the language of the RICO statute and numerous RICO cases involving obstruction.

The Complaint alleges criminal conduct far broader than a prior lawsuit. The Complaint alleges nearly eight years of witness tampering, obstruction, wire fraud, and money laundering to support a scheme to embroil Azima in continued litigation, spanning multiple countries, and targeting multiple victims. *See, e.g.*, Compl. ¶ 61 (describing the Plan), ¶¶ 69-72 (initiating litigation against Azima), ¶¶ 83-160 (widespread obstruction and witness tampering). The Complaint also includes actional criminal conduct outside of the courtroom, including manipulation of a law enforcement investigation, ¶¶ 76-79, continued hacking into 2020, ¶¶ 161-69, bribing of witnesses, ¶¶ 170-74, intimidation of witnesses, ¶¶ 153-55, fabrication of false documents, ¶¶ 151-52, and additional hacking, ¶¶ 163-64, 169. This case is not *Kimm*.[7]

---

[7] Even under the R&R's interpretation of *Kimm*, this Complaint survives. The Complaint here alleges (1) a "massive scheme" across many different cases, R&R at 54; (2) systemic corruption of the U.K. court proceedings, Compl. ¶ 89; and (3) fraudulent judgments, *id.* ¶ 90; *see also* ECF

2.      **The R&R Inappropriately Expands *Kimm* to Read *Chevron* Out of Existence.**

The R&R reads *Chevron* out of existence.  In *Chevron*, the court denied a motion to dismiss a RICO complaint that alleged obstruction, including "inducing U.S. public officials to investigate Chevron on the basis of false claims" and "making false statements to U.S. courts and intimidating and tampering with witnesses . . . to prevent Chevron from obtaining evidence of the fraud."  871 F. Supp. 2d at 236-37.  The *Chevron* complaint alleged "a multi-faceted, extortionate scheme that has included not only bringing . . . litigation, but also intimidating . . . judges, fabricating evidence, making false statements to U.S. courts, Congress, the SEC, and the media."  *Id*. at 249.  Similarly, the Complaint here alleges a "multi-prong" plan "to attack and damage Azima, including civil litigation, criminal investigations, and planting stories with media."  Compl. ¶ 59; *see also id.* ¶ 207*; supra* Section I.  As this Court has recognized elsewhere, litigation activities take on a different character when "'not pursued by lawful methods alone.'"  *See Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 320-24 (S.D.N.Y. 2016) (Gardephe, J.) (analyzing and quoting *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 577 (S.D.N.Y. 2014)).

The R&R attempts to distinguish *Chevron* by differentiating between "offensive" and "defensive" proceedings.  *See* R&R at 49 n.7.  The R&R cites no case law for this distinction and does not define or describe how to apply it.  *Id.*  Multiple RICO cases have allowed legal fees as compensable RICO damages for litigation that is at least in part "offensive."  *See infra* Section V.  Here, Defendants engaged in wire fraud when they brought suit against Azima in the U.K. to obtain a fraudulent judgment, Compl. ¶¶ 65-72, and obstructed Section 1782 cases brought to help Azima defend himself in that U.K. case, *id.* ¶ 127; *infra* Section V (discussing defensive nature of the

---

No. 186-1 at 84:5-7 (U.K. court concluding that this was "an egregious case and it has had the somewhat extraordinary consequence that they obtained judgments by fraud").

Section 1782 applications).  Moreover, Defendants' obstructive conduct in all the litigation (offensive or defensive) caused damage to Azima in the form of increased legal fees, precisely as the Enterprise intended.  Compl. ¶¶ 59-61.

The R&R also erroneously concludes that bribing witnesses does not "infect the entire adversarial process."  R&R at 50.  RICO expressly defines bribing witnesses as racketeering activity.  *See* 18 U.S.C. § 1961(1).  Here, the U.K. ruled that the Enterprise obtained a judgment against Azima by committing massive fraud on the U.K. court system, thus infecting the entire adversarial process.  ECF No. 186-1; *see also* Ex. 1 (attached hereto), ("RAKIA has behaved dishonestly and fraudulently, obtaining judgments from this court by fraud . . . .").  It would be welcome news to racketeering enterprises to know that they can engage in these sorts of egregious obstructive activities with complete immunity from RICO liability.  But that is not the law.

Finally, the R&R appears to assume the role of the circuit court, finding that "*Chevron* may no longer be good law," and concluding that, to the extent *Chevron* found a single false affidavit to be a RICO predicate, that issue would not survive *Kimm*.  R&R at 62-63.  That is not what *Chevron* decided.  There, like here, the allegations included a massive scheme to harm a plaintiff through litigation, government investigations, and a negative media campaign.  *See* 871 F. Supp. 2d at 236-37.  There is no basis to overturn, or decline to follow, *Chevron*.  It has not been overruled, is consistent with *Kimm*, and is directly on point here.

Other courts in this Circuit before and after *Kimm* have upheld RICO complaints based on schemes involving obstruction-related misconduct.  The allegations here are similar to *Sykes*, 757 F. Supp. 2d 413, where the defendants "used litigation to carry out their scheme, [but] also engaged in a variety of other out-of-court actions to further this activity."  *Kimm*, 884 F.3d at 105 (describing *Sykes*).  This case here is also consistent with *Carroll*, 2020 WL 11563716, at *9,

where the court refused to dismiss because the complaint alleged widespread corrupt conduct relating to litigation going well beyond a single debt collection case.  The R&R also fails to consider numerous other cases involving litigation activities that allowed RICO claims to proceed. R&R at 82-85 (citing *Angermeier v. Cohen*, 14 F. Supp. 3d 134 (S.D.N.Y. 2014); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158 (2d Cir. 1993); *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1096 (2d Cir. 1998).[8]

### 3. *Kimm's* Policy Concerns Do Not Exist Here.

Allowing this remarkable case to proceed would not open the floodgates to retaliatory RICO suits or erode res judicata principles.[9]  R&R at 44-45.  The Complaint alleges a massive eight-year scheme to defraud Plaintiffs inside and outside of the courtroom, which Defendants distilled in a detailed, written plan and then executed.  *See infra* Section I.  The allegations are backed by bank records, witness confessions from admitted hackers and perjurers, and a U.K. court ruling finding that Ras Al Khaimah ("RAK") and Dechert engaged in egregious fraud.  Compl. at 4 n.3.  It is not a retaliatory suit brought by a disgruntled litigant.[10]

---

[8] The R&R ignores these cases when analyzing the Complaint's predicate acts but considers them when determining whether Plaintiffs have sufficiently alleged legal fees as a cognizable injury.

[9] The R&R prioritizes the policy arguments identified in *Kimm* over the text of RICO statute itself, which expressly permits the obstruction predicates pled in the Complaint.  *See* 18 U.S.C. § 1961(1).  "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law."  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 653 (2020).

[10] Plaintiffs cannot and never could avail themselves of sanctions in an individual litigation to redress their harm.  Here, most of the Defendants were not even parties in prior litigation involving Azima, and much of the alleged misconduct occurred outside the courtroom.

The R&R effectively writes obstruction, witness tampering, and mail and wire fraud out of the RICO statute, thereby giving immunity to anyone who involves a lawyer or uses litigation as part of their scheme.  The *Kimm* decision does not require or countenance such an extreme result.

### C.    The R&R Mischaracterizes Predicates as Concealment.

Acts of concealment committed *in furtherance* of the conspiracy constitute valid predicate acts.  *See City of New York v. Venkataram*, 396 F. App'x 722, 725 (2d Cir. 2010) (submission of false invoices were "essential to the overall scheme," not just concealing a previous fraud).  The R&R improperly rejects numerous obstruction crimes because of its misinterpretation of the Complaint.  The R&R buckets many of the obstructive acts as related only to the concealment of the initial hacking, ignoring the ongoing nature of the scheme and the harm that continued into 2020.  R&R at 55-56.  Defendants' written plan was executed over an eight-year period and included hacking, document destruction, a fraudulent settlement agreement, a negative media campaign, litigation, and law enforcement investigations.  *See, e.g.*, Compl. ¶¶ 24-25, 45-54, 59-64.  The scheme did not end with the first hacking; it began with it and included other crimes.  The crimes that the R&R dismisses as covering up the initial hack were much more than that.  *See, e.g.*, *id*. ¶¶ 86, 111.  Accordingly, they are actionable predicate acts under *Venktaram*.

### D.    The R&R Erroneously Rejects Valid Witness Tampering Predicates.

"[A]n official proceeding need not be pending or about to be instituted at the time of the [witness tampering] offense."  18 U.S.C. § 1512(f)(1).  The Supreme Court has held that a proceeding must only be foreseeable to sustain a witness tampering charge.  *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 707 (2005).  The R&R makes a mistake of law when concluding that payments to Grayson and Robinson are not witness tampering because there was

no U.S. litigation pending at that time.[11]  R&R at 58.  The Complaint alleges that Handjani through Del Rosso offered payments to Grayson to help make sure the litigation "stay[ed] over there" in the U.K. and out of the U.S.  Compl. ¶ 174; *see also id.* ¶ 172 ("Del Rosso's conduct was directed at obstructing . . . potential litigation in the US.").  Thus, litigation was foreseeable.

The R&R also dismisses allegations of Aditya Jain's witness tampering as mere concealment of the hack of Azima.[12]  Here too, the R&R's conclusion appears to be built upon its erroneously narrow view of the Complaint.  Like in *Chevron* and *Venkataram*, the Complaint alleges that Defendants threatened Jain to block his truthful testimony as part of the plan to harm Plaintiffs.  Compl. ¶ 151-55.  This was part of the ongoing scheme to harm Azima, not an effort to conceal a completed scheme to hack Azima.  *See supra* Section I.

### E.    The R&R Erroneously Rejects Valid Money Laundering Predicate Acts.

The R&R improperly rejects approximately 413 acts of money laundering, 181 of which occurred after October 15, 2018, based on its erroneous interpretation that they "merely concealed an already completed [hacking] scheme."  R&R at 64.  The Enterprise's scheme to harm Azima continued for years following the initial hack, and it caused new harm to Azima and his businesses at least through 2020.  Compl. ¶¶ 179-83; *see supra* Section I.  For example, payments for hacking reports were to "outline strategies for using the hacked data to attack him."  Compl. ¶ 51.  The Complaint alleges dozens of transfers from RAK to KARV Communications ("KARV"), including payments in December 2015, January 2016, and February 2020.  *See* ECF No. 1-1, at

---

[11] The R&R focuses only on intimidation of Robinson, but the Complaint also alleges that Del Rosso and Handjani agreed to pay Grayson for false testimony.  *See* Compl. ¶ 174.

[12] The Complaint alleges both fabricated evidence, specifically a false, backdated contract between Del Rosso and Jain, ¶¶ 151-52, and threats against Jain, ¶¶ 153-55.  The R&R focuses on the threats, but fabrication of evidence also constitutes witness tampering under 18 U.S.C. § 1512.

Lines 1-5, 7-14, 1-20, 22-24, 26-28, 340, 351, 367-69 (select examples).  The Complaint alleges

that in December 2015 and January 2016, KARV was involved in preparing the written plan to

attack Azima through civil litigation and criminal investigations.  Compl. ¶¶ 60-61. And the

Complaint alleges that, in February 2020, Handjani, who directed the fraudulent U.K. litigation

against Azima, instructed hackers to obtain information about how Azima was funding his

litigation to assist "the Enterprise's plan to inflict financial harm on [Azima and Al Sadeq] through

litigation." *Id.* ¶ 163.  The referenced payments were not related to the hack, and they caused new

and independent injuries to Azima because they allowed Defendants to continue the campaign

against Azima and force him to expend ever more legal fees in his defense.

**F.      The R&R Erroneously Rejects Valid Wire and Mail Fraud Predicates.**

**1.      The R&R Incorrectly Concludes That Mail and Wire Fraud Is Not
Pled with Particularity.**

The Complaint includes a chart of 173 wire and mail fraud allegations, identifying the

sender, recipient, date, format, and detailed purpose of each wire, including quotes from the wires.

ECF No. 1-2.  In addition, the Complaint's 413 money laundering transactions, which likewise

identify the sender, recipient, date, amount, and description of the payment, including the improper

purpose, also represent wires in furtherance of the scheme to defraud.  ECF No. 1-1.

Nevertheless, the R&R incorrectly concludes these wires are not pled with sufficient

particularity, R&R at 66, apparently ignoring the 82 pages of supporting detail in the Complaint

that describe what each Defendant did to advance the RICO scheme.  The information in the

Complaint's exhibits, coupled with the text of the Complaint, adequately detail """"the contents of

the communications, who was involved . . . where and when they took place, and . . . why they

were fraudulent.""""  R&R at 67 (quoting *Spool v. World Child Int'l Adoption Agency*, 520 F.3d

178, 185 (2d Cir. 2008) (citation omitted)).

As just one example, Exhibit B includes a wire from Amir Handjani to Patrick Grayson and Steve McIntyre confirming that Grayson's "fees will be fully paid." ECF No. 1-2, Line 155. That allegation must be read in conjunction with the Complaint allegations that Del Rosso and Handjani agreed to pay bribes to Grayson and Robinson in exchange for false testimony to obstruct potential suits in the U.S. that would thwart the Enterprise's efforts. Compl. ¶¶ 23, 170-74. The Complaint also clearly alleges that Handjani: coordinated the attack on Azima through civil and criminal allegations, ¶ 45; drafted the written plan describing the massive scheme, ¶¶ 59-60; deceived Azima to sign the 2016 Settlement Agreement that would serve as the basis for the fraudulent litigation, ¶¶ 23, 62; and instructed Page to hack information about litigation funding, ¶¶ 23, 163-69. Read in its totality, the role each Defendant played in the conspiracy is clear and the wire fraud allegations are pled with particularity.[13]

### 2. The R&R Incorrectly Concludes that the Object of the Scheme Was Not Money or Property.

The Enterprise's goal was to inflict substantial financial harm to Azima (and others) and to make a lot of money doing it. Compl. ¶ 207; *see also id.* ¶¶ 15, 69, 135, 159, 185. Each of these goals are financial objectives sufficient to support the wire and mail fraud allegations. The R&R ignores these twin goals and recasts the Complaint as alleging that the only purpose of Defendants' scheme was "to curry favor with RAK and obtain more legal fees." R&R at 69 (quoting motion to dismiss). Yet Defendants intended "to defraud Azima of money and property by harming his businesses and bankrupting him." Compl. ¶ 61; *see also* ¶¶ 9, 89 (intended harm to Azima included obtaining a U.K. judgment, legal expenses, and more). There is no requirement

---

[13] If the Court believes that additional detail about how each wire fits into the broader conspiracy, Plaintiffs can easily amend to include that information. But such amendment is not necessary here where the Complaint read as a whole includes that information.

that Defendants obtain Plaintiffs' money or property, *Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 668 (S.D.N.Y. 2016), though here the Enterprise fraudulently secured a multi-million dollar judgment against Azima in the U.K.  Ex. 1 (attached hereto).

The R&R also rejects the significant sums of money that the Enterprise obtained from RAK.  Compl. ¶¶ 39, 207.  The R&R incorrectly concludes that the fees RAK paid to the Enterprise to harm Azima are not cognizable because RAK's interests aligned with Defendants'.  R&R at 69-70.  The Second Circuit makes no such distinction about alignment and holds only that the person deceived need not be "the same person deprived of money or property by the fraud."  *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) (cleaned up); *see also Guzman v. Hecht*, No. 18-cv-3947, 2019 WL 1315888, at *5 (S.D.N.Y. Mar. 22, 2019); *United States v. Ng*, 578 F. App'x 38 (2d Cir. 2014).  The Complaint alleges that the Enterprise's campaign against Azima turned into a spectacular bonanza for all members of the Enterprise, from its masterminds (Dechert and Handjani) to multiple hackers, investigators, lawyers, PR advisors, intermediaries, and operators involved.  That is sufficient to adequately plead wire fraud.

## IV.    THE R&R INCORRECTLY CONCLUDES THAT THE ALLEGED PREDICATE ACTS ARE NOT RELATED.

To establish a pattern, Plaintiffs must show that the "predicate acts [are] related to each other and the enterprise."  *United States v. Daidone*, 471 F.3d 371, 376 (2d Cir. 2006) (cleaned up).  The standard is so low that only two predicate acts must be horizontally related to each other and the enterprise to sustain a RICO count.  *Id.* (relatedness is only "a bulwark against . . . 'isolated' or 'sporadic' criminal acts.").  The R&R acknowledges that at least some predicate acts are related to each other and the Enterprise when it says that "many" (not all) are unrelated.  R&R at 77-78.  To dismiss, the Court would have to find no two predicate acts are related.  *See United States v. Scott*, 681 F. App'x 89, 95 (2d Cir. 2017).  Given the sheer volume and magnitude of the

Enterprise's crimes, all stemming from the Enterprise's written, pre-determined plan to harm Plaintiffs, such a conclusion is unsupportable.

Though the R&R acknowledges the Enterprise had a common unlawful purpose, R&R at 32, 33, it incorrectly concludes that the money laundering and witness tampering acts are not related to that purpose. *Id.* at 76-78. The R&R's erroneous conclusion stems from a misreading of the unlawful purpose alleged. *Id.* at 77. As explained above, the initial hacking was not the Enterprise's purpose; it was a tool used to accomplish the Enterprise's broader goal, which was to harm Azima and other victims financially and reputationally. *See supra* Section I. The Complaint alleges that the money laundering and witness tampering crimes derived from the Enterprise's detailed, written scheme and therefore related to each other and the Enterprise's ultimate goal.

While unclear, the R&R also appears to conclude that false statements to courts and the press did not further the Enterprise's broader purpose of harming Plaintiffs. R&R at 77-78. But the Complaint alleges that the false statements furthered the unlawful purpose by increasing Azima's legal fees, and false statements to the press furthered the unlawful purpose by harming his business reputation, leading to lost contracts. *See, e.g.,* Compl. ¶ 80-82, 160, 179, 181, 256.[14]

## V.    THE COMPLAINT ALLEGES COGNIZABLE HARM TO AZIMA AND HIS BUSINESSES.

The R&R erroneously concludes that Plaintiffs have not properly alleged harm in the form of reputational damage, legal fees, or harm to the corporate Plaintiffs. R&R at 78-88. That conclusion misapplies the law and yet again misinterprets the Complaint's allegations.

---

[14] The R&R concludes that that RICO's pattern requirement was not met because there were insufficient RICO predicates but found that if the predicates were valid, the allegations would be sufficient to establish a pattern. R&R at 76-77. Because the predicates are valid, there is a pattern. The allegations are also sufficient to show  closed-ended continuity.

With respect to reputational harm, the R&R concedes that RICO plaintiffs may sue for damage to business reputation where they allege specific lost business opportunities. R&R at 80-81 (citing cases). It even admits that this case is similar to *Frydman*, 172 F. Supp. 3d 653 at 668, where the court permitted a RICO suit to proceed based on fraudulent statements "that played a material and substantial part in inducing others not to deal." *Id.* at 80 (cleaned up). However, it incorrectly concludes that Plaintiffs only allege an intent to tarnish Azima's reputation generally. *Id.* at 81. The R&R ignores the Complaint's clear allegations of concrete business losses, including two examples of lost business opportunities. *See* Compl. ¶ 180 (near-final real estate development fell through); *id.* ¶ 179 (banks have denied loans). These damages are specific, concrete examples of harm caused by the Enterprise, which is all that is needed at this stage. *See Reich v. Lopez*, 38 F. Supp. 3d 436, 450 (S.D.N.Y. 2014), *aff'd*, 858 F.3d 55 (2d Cir. 2017) ("[C]laims of actual economic losses stemming from a harmed reputation" are "sufficient"). There is no requirement to connect these concrete losses to specific fraudulent communications. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) (concluding that reliance on the defendant's alleged misrepresentation is not required for fraud-based RICO claims). It is enough that the Complaint alleges these losses were directly caused by the Enterprise's scheme to defraud Azima.

The R&R also incorrectly concludes that the Complaint fails to allege the requisite connection between harm to Azima's reputation and the denial of bank loans. "Proximate cause for RICO purposes requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 408 (S.D.N.Y. 2015) (Gardephe, J.). There is no requirement that a defendant's actions be the only contributing factor; rather, there just needs to be a direct relationship between Defendants' conduct and the damage inflicted. *See id.* That direct relationship is easier to allege where "[t]he scheme in which [the

defendant] was engaged was designed to cause the very injury [the plaintiff] suffered." *City of New York v. Gordon*, 155 F. Supp. 3d 411, 426 (S.D.N.Y. 2015). "It is not necessary for plaintiffs to allege that the predicate acts are directly responsible for the injury as long as the injury flows from the predicate acts." *Rodonich v. House Wreckers Union, Loc. 95 of Laborers' Int'l Union of N. Am.*, 627 F. Supp. 176, 180 (S.D.N.Y. 1985). Here, causation is obvious from the Complaint: Defendants drafted a plan to harm Azima and his businesses financially, they took hundreds of steps to implement that plan, and those steps had their intended effect: substantial damage to Azima's reputation and businesses along with significant legal fees. *See, e.g.,* Compl. ¶¶ 59-61, 207; *supra* Section I. The only reasonable inference is that the damage was directly caused by the Enterprise's conduct.

Regarding legal fees, the R&R acknowledges that legal fees may constitute recoverable RICO damages. R&R at 82-85. However, the R&R creates a false dichotomy between "offensive" and "defensive" litigation to reject Azima's legal fees as purportedly inactionable offensive damages. *Id.* at 84. Case law does not make this distinction, and the cases the R&R cites were not purely defensive as it suggests. *See Bankers*, 859 F.2d at 1105-06 (legal fees a plaintiff incurred to bring a motion to revoke a fraudulent bankruptcy were cognizable); *Stochastic*, 995 F.2d at 1165-66 (costs a plaintiff incurred to collect judgments were cognizable); *Chevron*, 871 F. Supp. 2d at 253 (legal fees incurred to bring a Section 1782 proceedings were cognizable).[15]

Furthermore, the legal fees Azima incurred defending against the Enterprise's attack on him, including millions incurred defending against the fraudulent litigation in the U.K. and

---

[15] As discussed below, the R&R's concern that legal fees could "restart the limitations clock" is based on an incorrect reading of the caselaw. *See infra* Section VI, note 18. Moreover, the policy concerns raised by the R&R do not apply where the Enterprise created a written plan to use litigation to harm Azima.

millions more responding to the U.S. law enforcement investigations Defendants initiated.  Compl. ¶ 79, 181.  Oddly, neither of these types of legal fees is addressed in the R&R, but both are clearly cognizable.[16]  The R&R also dismisses the legal fees Azima incurred in connection with Section 1782 proceedings as "offensive" because they were brought by Azima, R&R at 84, but just like in *Chevron*, Azima sought foreign evidence under Section 1782 to defend himself in the U.K.  Even the D.C. and North Carolina proceedings were "defensive" because Azima brought them to counter the Enterprise's attacks.  Like the fees spent resisting a fraudulent bankruptcy proceeding in *Bankers' Trust*, all the legal fees Azima incurred were spent resisting the Enterprise's scheme to defraud Azima through litigation.[17]

Finally, the R&R erroneously concludes that the corporate Plaintiffs have not adequately alleged harm, once again based on a misreading of the Complaint.  The R&R incorrectly finds that the Complaint alleges that denial of business loans was caused by the hacking rather than the larger scheme to defraud Azima.  R&R at 87.  That is not true.  The Complaint alleges that banks rejected the corporate Plaintiffs' financing in 2019 based on negative publicity instigated by the Enterprise.

---

[16] The Complaint alleges that the Section 1782 applications from Azima and Al Sadeq "sought the aid of U.S. federal courts to obtain evidence for use in their respective UK cases."  Compl. ¶ 128.  The R&R infers that the applications were only to aid Azima's counterclaims, R&R at 49 n.7, but that is not correct and is not based in the Complaint.

In a footnote, the R&R incorrectly says that these fees were included in the settlement of the U.K. case.  R&R at 84 n.13.  Under the U.K. process, a small portion of the legal fees incurred are included in a U.K. judgment, but Azima incurred millions more defending against the Enterprise's fraudulent litigation in the U.K.

[17] The R&R's policy concerns that litigation-related acts could "restart the limitations clock" has no basis in the law.  The R&R incorrectly cites (at 6, 46, 85) *Bingham* for this proposition, but in *Bingham*, the Second Circuit explicitly rejected that same argument and held that "each illegal diversion [of royalty checks] constituted a new and independent legally cognizable injury . . . with each diversion a new civil RICO cause of action accrued."  *See Bingham v. Zolt*, 66 F.3d 553, 561 (2d Cir. 1995).

Compl. ¶ 180.[18]   The R&R also incorrectly concludes that the Complaint fails to allege the corporate Plaintiffs were the intended targets of the RICO violations, R&R at 88, contrary to the Complaint's allegation that "[o]ne of the objectives of the Enterprise's scheme to defraud was to cause economic damages to Azima *and his businesses*."  Compl. ¶ 59 (emphasis added).  The R&R dismisses this allegation as conclusory, R&R at 88, but the Complaint elsewhere alleges that the Enterprise targeted Azima's businesses directly.  Compl. ¶ 61 (intent to harm Azima's businesses); *id.* ¶ 67 (stolen data included "important business records"); *id.* ¶ 74 (attack meant to "bankrupt Azima and his businesses"),*id.* ¶ 82 (media campaign "directly harmed Azima and his businesses.").  The Complaint alleges that the Enterprise's attacks "successfully damaged Azima and the other Plaintiffs, not only by causing extensive damage to Azima's reputation but also by *destroying his business ventures*."  *Id.* ¶ 179 (emphasis added).  The R&R ignores these allegations to improperly infer that the corporate Plaintiffs were "merely . . . collateral damage."  R&R at 88.  Azima's businesses were an explicit target, and their damages are cognizable.

## VI.    PLAINTIFFS' CLAIMS ARE TIMELY.

"[D]etermining whether a plaintiff had sufficient facts to [be] on [] notice is often inappropriate for resolution on a motion to dismiss."  *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 296 (S.D.N.Y. 2013) (Gardephe, J.); *see also Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 149-50 (2d Cir. 2024).  In the Second Circuit, "[i]t is the RICO *injury* that triggers the accrual, not the RICO *violation*."  *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 158 (S.D.N.Y. 2014).  A plaintiff "may sue for any injury he discovers . . . within four years of the

---

[18] To the extent the R&R's conclusion is based on the mistaken belief that Azima's stolen data was publicly available in 2016, that is not what the Complaint alleges.  *See infra* note 20.

commencement of his suit, regardless when the RICO violation causing such injury occurred." *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988)).

The R&R misinterprets the Complaint as a narrow, one-crime conspiracy and erroneously concludes that Plaintiffs' claims are not timely.  It also fails to apply the relevant Second Circuit law regarding the application of the statute of limitations.

*Bankers Trust* and *Bingham* hold that:  "As long as separate and independent injuries continue to flow from the underlying RICO violations—regardless of when those violations occurred—plaintiff may wait indefinitely to sue, but may then win compensation only for injuries discovered or discoverable within the four year 'window' before the suit was filed."  *Bingham v. Zolt*, 66 F.3d at 560; *Bankers Tr. Co.*, 859 F.2d at 1103 ("[C]ongress tied the right to sue . . . not to the time of the defendant's RICO violation, but to the time when plaintiff suffers injury to 'his business or property.'").[19]  Thus, Plaintiffs may sue for those damages for four years from when the harm occurred.

The R&R nevertheless erroneously recommends dismissal because it concludes that every one of Plaintiffs' injuries derived from "harm to Azima's reputation from the 2016 release of his hacked materials."  R&R at 93.  That is not what the Complaint alleges.  First, the hacking continued from 2015 and caused harm until at least into 2020.  *See* Compl. ¶¶ 51,164-69.  Moreover, the Complaint alleges that Plaintiffs suffered injuries after 2018 caused by fraudulent litigation in the U.K., obstruction of U.S. lawsuits, a law enforcement investigation, and lost

---

[19]  The cases that the R&R relies upon do not address statute of limitations under the proper framework.  The R&R relies upon *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 328 F. App'x 695, 697 (2d Cir. 2009) to conclude that RICO claims are barred where the full extent of the scheme is not discovered until a later date if there are "storm warnings" that should have prompted an inquiry.  That case is about equitable tolling where the defendants engaged in fraudulent concealment. It does not address the situation, like here, where Defendants' acts caused harm to Plaintiffs within the statute of limitations period.  Here, *Bingham* governs.

business opportunities, not hacking.  *Id.* ¶¶ 18, 88-89, 180-81, 218.  The R&R makes improper "infer[ences] that the injuries were caused in material part by the pre-2018 hacking and the release of those hacked materials."  R&R at 94.  But there is no basis for that conclusion in the Complaint, and to infer otherwise is improper at this stage.[20]

The R&R also incorrectly concludes that the legal fees incurred after 2018 do not fall under the Second Circuit's separate accrual rule because the fees were incurred in cases brought by Azima.  R&R at 94-95.  As explained above, *Bankers Trust* and its progeny do not make any distinction between "offensive" and "defensive" litigation; rather, all legal fees incurred as the result of Defendants' RICO predicates are cognizable.  And regardless, most if not all of the legal fees were incurred to defend against the Enterprise's attacks.  *See supra* Section V.[21]

## VII.    PLAINTIFFS ARE ENTITLED TO AMEND THE COMPLAINT.

Under Federal Rule of Civil Procedure 15, leave to amend should be "freely give[n]."  Fed. R. Civ. P. 15(a)(2).  "It is the usual practice upon granting a motion to dismiss to allow leave to replead."  *AK Meeting IP, LLC v. Epic Games Inc.*, No. 23-CV-8214, 2024 WL 4299686, at *9 (S.D.N.Y. Sept. 26, 2024).  If new facts can be added that would insulate the Complaint,

---

[20] The R&R bases its conclusion on a Complaint allegation that business losses were "brought on by the Enterprise's litigation against Azima in the U.K. based on the hacked documents."  R&R at 93-94 (quoting Compl. ¶ 179).  That allegation connects the business losses to the U.K. litigation, not to the hack.  Moreover, the hacked data was not available until the Enterprise published Azima's data on WeTransfer as recently as 2019, well within the statute period.  Compl. ¶ 71.

The R&R also cites and improperly accepts as true Defendants' argument that "the Complaint does not allege that the negative publicity was generated after 2018."  R&R at 94 (quoting ECF No. 156).  That argument ignores that, as late as 2019, "the Enterprise published Azima's stolen data on WeTransfer links on the internet, *which triggered additional negative media coverage directly harming Azima and his businesses*."  Compl. ¶ 82 (emphasis added).

[21] *Zahl* is inapposite.  In that case, the injuries during the litigation period were enforcement of and compliance with court orders that were made outside of the statute of limitations period.  The court in *Zahl* merely concluded that the harm arose out of the prior court orders.

amendment should be allowed.  *See Velez v. Syracuse Univ. Hosp. Sci. Ctr.*, No. 10-CV-1570, 2012 WL 685891, at *4 (N.D.N.Y. Jan. 23, 2012); *see also AK Meeting IP*, 2024 WL 4299686, at *9 (quotation omitted); *Sensoria, LLC v. Kaweske*, 548 F. Supp. 3d 1011, 1033 (D. Colo. 2021).

Plaintiffs have not yet amended their Complaint, and amendment here would not be futile. Since filing, Plaintiffs have obtained substantial additional evidence.  The R&R's concerns can be cured with amendment, including to make the following new allegations:[22]

- New, independent wire fraud and money laundering acts continued until at least 2020 related to ongoing hacking.  CyberRoot officers have admitted to far more hacking than is alleged in the Complaint, continuing into 2020.  Del Rosso instructed CyberRoot to hack Azima multiple times up through trial, and Gerrard said he was specifically interested privileged correspondence between Azima and his lawyers leading up to trial.  *See* Ex. 2 (attached hereto).

- The obstruction of law enforcement investigations was far more pervasive and lasted much longer than initially believed.  Dechert, Del Rosso, and others made repeated criminal complaints about Azima for more than five years to initiate criminal litigation in multiple federal jurisdictions.  Defendants provided detailed reports and met with nearly a dozen different federal government offices through at least 2020. An integral part of Dechert's efforts was to co-opt FBI agent Paul Zukas, who worked at the direction of Dechert and spent years traveling the globe to please Dechert and the Enterprise.  These efforts continued into May 2020, when conspirator Christopher Swecker, working at Dechert's and Del Rosso's direction, sought to convince a U.S. Attorney's Office to launch a criminal case.

- Handjani's role in the conspiracy was far greater than alleged in the initial Complaint. Handjani oversaw the U.K. litigation and not only choreographed the litigation but also organized the perjury school and later lied about it during a deposition in this jurisdiction. Handjani instructed Gerrard to attend the perjury planning meeting and told him to keep it secret from RAK's general counsel.

- The Enterprise explicitly discussed laundering the stolen data so that it could be used against Azima in litigation.  Buchanan asked in writing whether Azima's stolen emails were "suitable as evidence."  The response from a conspirator was "[w]e would like to suggest a plan to launder the evidence utilizing a US PR firm we are familiar with, and

---

[22] This is not a complete list of new allegations Plaintiffs could make.  If the Court is inclined to deny leave to amend, Plaintiffs request additional briefing on the topic to lay out this and other new and additional evidence.

knows how to handle this kind of material and make it admissible," a reference to Handjani and KARV.

- The Enterprise stood to profit from the multi-million-dollar U.K. judgment, which would result in payment of Dechert's fees.

- Dechert negotiated a settlement agreement with Azima while reading his privileged correspondence with his lawyer about the settlement agreement Dechert drafted.  In one email, Azima's lawyer warns that the settlement was a trap set by Dechert, and within days, that attorney client communication was distributed to the Enterprise in a hacking report.

- Dozens of anti-Azima websites were created up until at least 2020, including a large increase in those disparaging websites immediately before the U.K. trial in order to aid the effort to obtain the fraudulent judgment against Azima.

- Bank records show more than $60 million in transfers, including millions of dollars spent on manipulation of law enforcement and other out-of-court misconduct such as payments through Del Rosso's lawyers of the contractor who mailed hacked documents to the D.C. court, payments to witnesses made through Del Rosso's lawyers, and payments to hackers as late as 2020.  Del Rosso alone earned more than $35 million.

## CONCLUSION

For the reasons discussed in these objections and Plaintiffs' oppositions to the motions to dismiss, the Court should reject the Report and Recommendation, and the motions to dismiss should be denied in their entirety.[23]

---

[23] The R&R also recommends dismissal of Plaintiffs' conspiracy claim under 18 U.S.C. § 1962(d) because it recommends dismissing Plaintiffs' substantive RICO claim.  The Court should not dismiss the substantive RICO claims, and Plaintiffs have adequately pled that Defendants knew about and agreed to the underlying scheme to harm Azima and others through a campaign of fraud and obstruction, as set forth in the Enterprise's written plan.  Compl. ¶¶ 61, 252-56.

November 1, 2024
Washington, DC

Respectfully submitted,

___*/s/ Calvin Lee*_____
Calvin Lee
Kirby D. Behre (admitted *pro hac vice*)
Timothy P. O'Toole (admitted *pro hac vice*)
Lauren E. Briggerman (admitted *pro hac vice*)
Ian A. Herbert (admitted *pro hac vice*)
Cody F. Marden (admitted *pro hac vice*)
Miller & Chevalier Chartered
900 Sixteenth St. NW
Black Lives Matter Plaza
Washington, DC 20006
Tel. (202) 626-5800
Fax. (202) 626-5801
Email: clee@milchev.com
Email: kbehre@milchev.com
Email: totoole@milchev.com
Email: lbriggerman@milchev.com
Email: iherbert@milchev.com
Email: cmarden@milchev.com

Harry H. Rimm
Womble Bond Dickinson (US) LLP
950 Third Avenue, Suite 2400
New York, NY 10022
Tel. (332) 258-8400
Fax. (332) 258-8949
Email: harry.rimm@wbd-us.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 1, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.  All attorneys in this case are registered CM/ECF users and will, therefore, be directly notified of the filing.


_/s/ Calvin Lee_____
Calvin Lee